Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-31641-mvl-7 |
| GOODMAN NETWORKS, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE; | § | |
| GNET ATC, LLC; MULTIBAND | § | |
| FIELD SERVICES, INC., | § | ADVERSARY PROCEEDING |
| | § | NO:  23-03036 |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES FRINZI; MULTIBAND GLOBAL | § | |
| RESOURCES, LLC; and FEDERAL | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT[1]

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel, Trustee (the "Trustee"), the trustee of Goodman Networks,

Inc. (the "Debtor"), the debtor in the above styled and numbered chapter 7 bankruptcy case (the

"Bankruptcy Case"), and, together with GNET ATC, LLC ("GNET ATC") and Multiband Field

---

[1] This amended complaint deletes one defendant who has been dismissed (Frinzi Family Trust) and adds one
new defendant (Federal Insurance Company).

EXHIBIT "A"

Services, Inc. ("Multiband," with the Trustee and GNET ATC, collectively the "Plaintiffs"), file

this *Second Amended Complaint* (the "Complaint"), complaining of James Frinzi ("Frinzi"),

Multiband Global Resources, LLC ("MGR"), and Federal Insurance Company ("Federal," with

(Frinzi and MGR, the "Defendants"), and, for cause and action, would respectfully show as

follows:

## I.    PROCEDURAL BACKGROUND

1.    On September 6, 2022 (the "Petition Date"), various petitioning creditors filed an

involuntary petition against the Debtor, thereby initiating the Bankruptcy Case and creating the

Debtor's bankruptcy estate (the "Estate").

2.    The Court entered an order for relief against the Debtor on December 12, 2022.

3.    The Trustee is the duly appointed trustee of the Debtor and the Estate.

4.    The Court has jurisdiction over this Complaint under 28 U.S.C. § 1334.  Such

jurisdiction is core under 28 U.S.C. § 157(b)(2).  To the extent that any matter in this Adversary

Proceeding is not core, the Plaintiffs consent to this Court's entry of a final judgment over any and

all such matters.

5.    Venue of this Adversary Proceeding before this Court is proper under 28 U.S.C. §§

1408 and 1409.

## II.    PARTIES

6.    The Trustee is the Chapter 7 trustee of the Debtor and the Estate and files this

Complaint in such capacity only.

7.    GNET ATC is a Texas limited liability company, the sole member and owner of

which is the Debtor.  In that the Trustee controls the Debtor, and the Debtor is the sole member of

GNET ATC, the Trustee has all necessary authority to cause GNET ATC to file this Complaint

and to direct its actions in this matter as the sole member and manager.

8.      Multiband is a Texas corporation, the sole shareholder and owner of which is the

Debtor.  In that the Trustee controls the Debtor, and the Debtor is the sole shareholder of

Multiband, the Trustee has all necessary authority to cause Multiband to file this Complaint and

to direct its actions in this matter as the sole shareholder.

9.      Frinzi is an individual and a resident of Texas who has appeared in this Adversary

Proceeding.

10.     MGR is a limited liability company organized and existing under the laws of the

State of Delaware, which has appeared in this Adversary Proceeding.

11.     Federal is an insurance company authorized to write and issue insurance in the State

of Texas.  Pursuant to Bankruptcy Rule 7004, it may be served with process in this Adversary

Proceeding by and through its registered agent as follows: Federal Insurance Company, c/o C T

Corporation System, Registered Agent, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

### III.    FACTS

**A.    FRINZI**

12.     In December, 2021 and at all times relevant hereto, Frinzi was the Chief Executive

Officer of the Debtor.  As such, he owed fiduciary duties to the Debtor, including the duty of

loyalty and the duty of care.

13.     In December, 2021 and at all times relevant hereto, Frinzi was the Chief Executive

Officer of GNET ATC.  As such, he owed fiduciary duties to GNET ATC, including the duty of

loyalty and the duty of care.

14.     In December, 2021 and at all times relevant hereto, Frinzi was the Chief Executive

Officer of Multiband.  As such, he owed fiduciary duties to Multiband, including the duty of

loyalty and the duty of care.

15.     In December, 2021, and at all times material to this Complaint, Frinzi was the sole member and the sole manager of MGR.  As such, Frinzi wholly owned and solely managed MGR, and received any benefit inuring to the equity owners of MGR.

## B.    THE STOCK PURCHASE

16.     In or by December, 2021, Frinzi discovered an opportunity to purchase a publicly traded shell that otherwise had no assets, and had value only as a shell, and an opportunity to purchase an existing business and merge it into the publicly traded shell.

17.     The publicly traded shell was American Metals Recover and Recycling, Inc. n/k/a MBG Holdings, Inc. ("AMRR").

18.     The existing business was AMR Resources, LLC and/or OnePath Systems, LLC, operating an existing business platform under the name OnePath ("OnePath").

19.     Both the purchase of AMRR and that of OnePath would require money.  Frinzi did not have this money.  Instead, at that time, the Debtor, GNET ATC, and Multiband had large amounts of cash on hand, and Frinzi decided to use these funds to acquire AMRR for his benefit, knowing and intending that AMRR would soon own OnePath.

20.     As of December 1, 2021, Repository Services, LLC ("Repository") owned 71.31% of the common stock of AMRR and 100% of the preferred stock of AMRR (together, the "Stock").

21.     On December 3, 2021, MGR entered into a Share Purchases Agreement by which Repository would sell the Stock to MGR.  The purchase price was $500,000.00.  This transaction closed on December 23, 2021 and, on and after that date, MGR owned the Stock and with it control of AMRR.

22.     MGR did not have the funds to make the purchase price.  Rather, Frinzi caused the Debtor and/or GNET ATC to pay the purchase price to Repository.

23.     Namely, on December 13, 2021, GNET ATC wired from its bank account at East West Bank (account ending in 0690) $500,000.00 to Stauber Law Office ("Stauber").

24.     Stauber was acting as the escrow agent for the purchase by MGR of the Stock from Repository or was representing Repository or the escrow agent David Hill on behalf of Hill Innovative Law, LLC.

25.     The $500,000.00 purchase price under said agreement was the aforementioned $500,000.00 transfer from the Debtor and/or GNET ATC.

26.     Thus, as of December 23, 2021, MGR owned all of the Stock with the funds that Frinzi caused to be transferred to Repository from the Debtor and/or GNET ATC (the "Stock Purchase").

27.     Frinzi was not authorized by the Debtor and/or GNET ATC to transfer the $500,000.00 or to use the money for the purpose which he did.  His use of the $500,000.00 was without the knowledge and the approval of the directors and/or managers of any of the Plaintiffs.

28.     The Debtor and/or GNET ATC received no reasonably equivalent value and no return value or consideration at all as a result of the Stock Purchase.

29.     After MGR, solely owned and controlled by Frinzi, purchased the Stock and controlled AMRR, Frinzi had AMRR purchase OnePath for at least $38,000,000.00.  This purchase closed on February 1, 2022.  At that time, therefore, Frinzi, who owned MGR, which owned AMRR, now owned OnePath without any consideration of his own, all such consideration coming from the Debtor or its subsidiaries.[2]

---

[2] The Trustee has claims and causes of action against Frinzi, AMRR, and others, related to at least $44,000,000.00 transferred to AMRR in order to, among other things, purchase OnePath.  The Trustee reserves all of those claims and causes of action and intends to bring them pursuant to separate complaint, the same not being necessary to this Complaint.  No preclusive doctrine shall apply to the same.

C.     T<small>HE</small> $4.4 M<small>ILLION</small> T<small>RANSFER</small>

30.     Separately, on January 4, 2022, Multiband wired $4,400,000.00 to MGR from Multiband's bank account at East West Bank (account ending in 8462) (the "$4.4 Million Transfer").

31.     The funds used by Multiband originated with the Debtor.  Namely, as of December 1, 2021, Multiband had $739.48 in its East West Bank account ending in 8462.  On December 10, 2021, the Debtor transferred $500,000.00 of its funds into said account, and on December 21, 2021, the Debtor transferred $4,000,000.00 of its funds into said account.  Thus, all except potentially the trivial amount of $739.48 of the funds used to make the $4.4 Million Transfer was of the Debtor's funds.

32.     Upon information and belief, Frinzi caused the foregoing funds to be transferred by the Debtor to Multiband with the intention and for the express purpose of then causing Multiband to transfer said funds to MGR.  As such, Multiband was a mere conduit and the funds always remained the property of the Debtor.

33.     The $4.4 Million Transfer was recorded by the Debtor on its books and records as a loan from the Debtor to MGR.  Upon information and belief, this alleged loan was never reduced to a writing or a promissory note nor was this ever in fact a loan.  Rather, Frinzi had it recorded as such to hide his transactions and embezzlement.

34.     MGR has not repaid the Debtor any portion of this alleged loan.

35.     Frinzi was not authorized by the Debtor and/or Multiband to transfer the $4,400,000.00 or to use them for the purpose which he did.  His use of the $4,400,000.00 was without the knowledge and the approval of the directors and/or managers of any of the Plaintiffs.

36.     Nor did the Debtor or Multiband ever authorize or approve any such alleged loan, which approval would have had to come from the director(s) of the Debtor, especially because the

Debtor was not in the business of making any loans.  Frinzi lacked corporate authority to make

any such loan, and any apparent authority he may have claimed was not possible for MGR since

MGR would be charged with Frinzi's knowledge and intent, which was imputed to it.

37.    Among other things, Frinzi discussed the potential of acquiring AMRR and

OnePath with James Goodman towards the end of 2021 and early 2022, as a transaction that James

Goodman may authorize for the Debtor.  At that time, James Goodman was the sole director of

the Debtor.  James Goodman expressly rejected Frinzi's proposal and instructed Frinzi to not

proceed with AMRR and OnePath.  Upon information and belief, it was at that time that Frinzi

decided to simply take the opportunity for himself, but using the Debtor's money, and without the

Debtor's knowledge or approval.

38.    The Debtor and/or Multiband received no reasonably equivalent value for the $4.4

Million Transfer.

39.    Upon information and belief, Frinzi had no expectation that MGR would repay any

of this alleged loan.  Among other things, MGR did not pay any of it back, used the funds to make

purchases ultimately for the benefit of Frinzi, had no operations or financial wherewithal to repay

the funds, and failed to enter into any writing for any repayment.

40.    The purpose and intent of the $4.4 Million Transfer was solely to benefit Frinzi,

though his sole ownership and control of MGR.

41.    The illegitimate nature of the $4.4 Million Transfer is further evidenced by Frinzi's

subsequent attempts to hide it.  As part of a purported "settlement" between the Debtor and 18920

NW 11th LLC ("18920"), Frinzi attempted to grant 18920 a security interest in, or an assignment

of, the purported "loan" from the Debtor to MGR regarding the $4.4 Million Transfer.  To this

end, Frinzi signed for the Debtor an *Amended Secured Promissory Note* dated December 20, 2021

(which date was false, the document instead being signed on or about March 9, 2022), purporting

to create a note payable by Multiband to MGR (even though Multiband or the Debtor allegedly loaned the funds to MGR) for $4.5 million, and a *Security Agreement* purporting to grant 18920 a security interest in said amended and false promissory note.  Upon belief, Frinzi orchestrated the creation of this sham transaction and the execution of these sham documents in order to make it appear that, instead of the Debtor or Multiband having rights against MGR, it was in fact the Debtor or Multiband who owed money to MGR and which rights 18920 held a security interest against.

42.      The illegitimate nature of the transaction and that it was never intended to be a loan and was not a loan is further evidenced by what MGR did with the proceeds, which were used solely to benefit Frinzi through the Frinzi Family Trust ("FFT"), of which Frinzi was a co-trustee and settlor at all times material hereto.

43.      On or about January 24, 2022, MGR purchased, by warranty deed, certain real property and improvements located at 521 N. Horseshow Bay Blvd., Horseshoe Bay, Texas (the "Lakehouse").  Upon information and belief, all or some of the purchase price MGR used to purchase the Lakehouse was from the $4.4 Million Transfer or the $962k Transfer (defined below).  On or about May 13, 2022, MGR transferred the Lakehouse, by warranty deed, to FFT, for no return consideration.

44.      On or about April 7, 2022, MGR purchased, by warranty deed, certain undeveloped real property in Llano County, Texas, consisting of approximately .7 acres, and identified as Lot 44 at the La Serena Loop, Horseshoe Bay, Texas 78657 (the "Lot").  Upon information and belief, all or some of the purchase price MGR used to purchase the Lot was from the $4.4 Million Transfer or the $962k Transfer.  On or about May 13, 2022, MGR transferred the Lot, by special warranty deed, to FFT, for no return consideration.

45.     Effective August 21, 2022, AMRR entered into an asset purchase agreement with MGR, whereby AMRR purchased substantially all assets of MGR, including $1,000,000.00 in cash, certain contracts, and certain other property, in exchange for AMRR issuing to MGR 1,000,000 shares of Series A Convertible Preferred Stock (the "Preferred Stock").  AMRR was insolvent and the Preferred Stock had zero value.  Upon information and belief, some or all of said $1 million was from the $4.4 Million Transfer or the $962k Transfer.  Thus, MGR received no return consideration for this transfer.

46.     The Trustee has reached a settlement with the FFT which, to the extent the Trustee recovers under the same, represents the mitigation by the Trustee of the Plaintiffs' and the Debtor's damages.  Nevertheless, he recounts the above facts as further evidence that Frinzi embezzled the $4.4 million and other transfers for his personal benefit which funds ended up in real property and were otherwise transferred out of MGR by him to benefit himself, as opposed to any legitimate business purpose of MGR, and much less any legitimate business purpose of the Debtor.

47.     In no event would the Plaintiffs, through their director(s), have approved any of the foregoing transfers and transactions, and in no event did they.

48.     Furthermore, in no event was Frinzi authorized to unilaterally approve or make the foregoing transfers and transactions, since the Debtor was not in the business of lending funds or transferring out funds for Frinzi to use for his personal benefits, and the same served no legitimate interest of the Debtor.

**D.     THE $962K TRANSFER**

49.     On or about December 31, 2021, Frinzi caused GNET ATC to enter into that certain *Subcontract Services Agreements* with MGR, pursuant to which GNET ATC allegedly subcontracted various services to MGR related to Citizens Telecom Services Company, LLC d/b/a Frontier Communications.  Said agreement provided for a payment by GNET ATC to MGR of

$962,000.00, on a non-refundable basis, purportedly for services that MGR would provide to GNET ATC.

50.    On December 30, 2021, Frinzi caused GNET ATC to transfer $962,000.00 of its funds held at East West Bank (account ending in 0690) to MGR (the "$962k Transfer").

51.    This was an insider transaction for which GNET ATC received no reasonably equivalent value.  Among other things, there was no reason for GNET ATC to pay MGR for any subcontracting services to Frontier Communications related to recycling decommissioned telecommunications equipment, as the underlying contract to be serviced thereby was profitable, albeit marginally, and there was no reason for any set-up fees for work.  The underlying contract was serviced by fairly low-paid employees, who would have simply been moved over to MGR. The only legitimate reason for a subcontract was that the subcontractor would have been able to perform the services for a lower price, but in that instance it would not be GNET ATC paying MGR for anything.  Nor was the underlying contract a large one.  Furthermore, upon information and belief, Frinzi subsequently caused the underlying contract to be assigned to MGR.

E.    <u>FEDERAL INSURANCE</u>

52.    The Debtor, for itself and its subsidiaries, including GNET and Multiband, purchased from Federal insurance policy number 8262-4874 (the "Policy").

53.    A true and correct copy of the Policy is attached hereto as Exhibit "A."

54.    The coverage policy period under the Policy is from October 30, 2021 through October 30, 2022 (the "Policy Period").

55.    All of the actions of Frinzi complained of above, including his embezzlement, occurred during the Policy Period.

56.    The Policy includes the Crime Coverage Part (the "Crime Policy").

57.    The limit of coverage under the Crime Policy is $5,000,000.00.  This limit is not reduced by other coverages under the Policy, including for breach of director's and officer's fiduciary duty claims.

58.    The insuring clause A under the Crime Policy provides that "[t]he Company shall pay the **Parent Organization** for direct loss of **Money**, **Securities** or **Property** sustained by an **Insured** resulting from **Theft** or **Forgery** committed by an **Employee** acting alone or in collusion with others."

59.    The Debtor is both the "Parent Organization" and an "Insured" under the Crime Policy, while the remaining Plaintiffs are likewise "Insureds" under the Crime Policy.

60.    "Employee" is defined as including "**Executive** while performing acts within the scope of the usual duties of an **Employee**."

61.    "Executive" is defined as a natural person including an "officer," which would have included Frinzi.

62.    "Employee" is defined as "natural person in the regular service of an Organization in the ordinary course of such Organization's business, whom such Organization governs and directs in the performance of such service."

63.    As the CEO, Frinzi was in the regular service of the Plaintiffs and was governed and directed by the Plaintiffs in the performance of such service.

64.    It was not the Debtor's business to transfer funds to MGR or for the benefit of MGR or Frinzi, as discussed above.  However, Frinzi created MGR with the name "Multiband Global Resources" intentionally to be very close to the name of the Debtor's subsidiary "Multiband Field Services, Inc." in order to be able to mislead the Debtor's employees.

65.    Namely, in making the $4.4 Million Transfer, Frinzi instructed Debtor employees to make the transfer simply to "Multiband," and provided the wiring information.  It was in the

ordinary course of the Debtor's business to transfer funds as between the Debtor and its subsidiaries and as between its subsidiaries. These employees did not know that they were actually transferring funds to Frinzi's "Multiband" instead of the Debtor's "Multiband." In fact, and upon information and belief, this is why Frinzi caused the funds to be first transferred from the Debtor to Multiband: so that to the other employees, it would look like Multiband was just transferring money from one of its accounts to another, which would have been within the ordinary course of its business and of Frinzi's role to command. Thus, Frinzi's transfers were an ordinary action in the course of the Debtor's business, even though surreptitiously intended to facilitate the embezzlement of funds from Debtor to MGR.

66. "Money" is defined as including "currency," which would have included the bank funds on account for the Plaintiffs, and belonging to the Debtor, which Frinzi caused to have transferred out as discussed above. Alternatively, "Property" is defined as "tangible property other than Money or Securities." Said bank account funds would have been such "Property" under the Crime Policy.

67. "Theft" is defined as "the unlawful taking of Money, Securities or Property to the deprivation of [] an Insured, solely for the purposes of Insuring Clause (A), Employee Theft Coverage."

68. The actions of Frinzi complained of above constitute embezzlement, which is an unlawful taking of money to the deprivation of the Plaintiffs.

69. Separately, Crime Policy insuring clause F provides that "[t]he Company shall pay the Parent Organization for direct loss of Money or Securities sustained by an Insured resulting from Funds Transfer Fraud committed by a Third Party."

70.     "Third Party" is defined as a natural person other than an Employee.  Thus, if Frinzi was not an "employee" and Part A of the Crime Policy would not apply, he would be a "Third Party" for purposes of Part F.

71.     "Funds Transfer Fraud" is defined as "fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions (other than Forgery), purportedly issued by an Organization, and issued to a financial institution directing such institution to transfer, pay or deliver Money or Securities from any account maintained by such Organization at such institution, without such Organization's knowledge or consent."

72.     In this respect, the Plaintiffs did not know that Frinzi orchestrated the $4.4 Million Transfer and they did not consent to the same, as his felonious knowledge could not be imputed to the Plaintiffs and the Plaintiffs did not otherwise know or consent to the same.

73.     Frinzi caused one or more Debtor employees, including Stephanie Elmore, to make the $4.4 Million Transfer, with her believing that the transfer was simply to the Debtor's subsidiary, Multiband  Field Services, Inc.  As such, this was a written or electronic instruction purportedly issued by the Plaintiffs to their banks.

74.     The Debtor and the Plaintiffs first learned of Frinzi's transfers and thefts as detailed above in approximately September, 2022, when Frinzi was no longer there and a new officer and new financial advisor were retained by the Debtor.

75.     The Plaintiffs first made a claim under the Policy, including the Crime Policy, on October 28, 2022, through its financial advisor / chief restructuring officer at the time, Howard Konicov.

76.     On April 27, 2023, the Trustee transmitted his claim to Federal in writing, which claim included the transfers referenced above.

77.     Federal did not respond to said claim with respect to the Crime Policy.

78.    On September 29, 2023, the Trustee notified Federal in writing of its obligation to its policyholders under Texas law, including with respect to the Crime Policy and with respect to promptly reviewing and adjudicating claims.

79.    Federal did not respond to said notice.

80.    As of this filing, Federal has still not responded, replied, or communicated with the Debtor, the Plaintiffs, or the Trustee at all with respect to the Crime Policy and the transfers complained of above.

81.    The Plaintiffs have otherwise complied with any condition precedent in the Crime Policy to a recovery.

### IV.    CAUSES OF ACTION

**COUNT 1:    BREACH OF FIDUCIARY DUTY—STOCK PURCHASE & 962K TRANSFER**

82.    The Plaintiffs incorporate their allegations above.

83.    Frinzi, while an officer and a fiduciary of the Debtor and/or GNET ATC, caused the Debtor and/or GNET ATC to transfer the $500,000.00 purchase price for the Stock Purchase in an insider transaction in that the beneficiary of the transfer was MGR and Frinzi.  Neither the Debtor nor GNET ATC received any value for this transfer.

84.    Frinzi, while an officer and a fiduciary of the Debtor and/or GNET ATC, caused the Debtor and/or GNET ATC to make the $962K Transfer to MGR in an insider transaction in that the beneficiary of the transfer was MGR and Frinzi.  Neither the Debtor nor GNET ATC received any value for this transfer.

85.    The Debtor was insolvent at the time of these transfers, as was GNET ATC.

86.    At the time of said transfers, Frinzi owed a duty of care to the Debtor and/or GNET ATC, including to safeguard their assets and to not waste their assets.

87.    At the time of said transfers, Frinzi owed a duty of loyalty to the Debtor and/or

GNET ATC, including not to self-deal and not to transact in a manner harmful to the Debtor and/or

GNET ATC and beneficial to himself, and to make any insider transaction fair, which these

transactions were not.

88.    Frinzi caused the Debtor and/or GNET ATC to make the foregoing transfers solely

for his benefit, in order that he could purchase the Stock and own and control AMRR, and in order

to transfer cash to MGR for his use and benefit, with the subsequent intention of vesting AMRR

with OnePath, again for his benefit, all to the exclusion of any benefit to the Debtor and/or GNET

ATC.    Under any alternative scenario, it would have been the Debtor and/or GNET ATC that

would have purchased the Stock.

89.    With respect to the duty of care, Frinzi was grossly negligent in not causing the

Debtor and/or GNET ATC to acquire the stock, in that its/their money was used to pay the same,

and was grossly negligent in making the $962K Transfer because that amount greatly overstated

the value of any services that MGR would or could provide to GNET ATC under the subcontract

agreement.

90.    In the process, Frinzi breached his fiduciary duties to the Debtor and/or GNET

ATC.

91.    Accordingly, the Trustee and GNET ATC hereby seek a judgment that Frinzi

breached his fiduciary duties to one, either, or both of them by causing one or both of them to

transfer $500,000.00 in order that he could solely benefit by MGR purchasing the stock and in

causing the $962K Transfer.

## COUNT 2:    UNJUST ENRICHMENT (FRINZI AND MGR)

92.    The Plaintiffs incorporate their allegations above.

93.    In causing the Debtor and/or GNET ATC to transfer $500,000.00 for MGR in order that MGR could purchase the Stock, MGR was unjustly enriched at the expense of the Debtor and/or GNET ATC.  Likewise, Frinzi, as the sole owner of MGR, was unjustly enriched by the same.

94.    In causing the Debtor and/or GNET ATC to make the $962K Transfer, MGR was unjustly enriched at the expense of the Debtor and/or GNET ATC.  Likewise, Frinzi, as the sole owner of MGR, was unjustly enriched by the same.

95.    Accordingly, the Trustee and/or GNET ATC seek a judgment against MGR and Frinzi for the unjust enrichment of $500,000.00 and $962,000.00.

**COUNT 3:**    **IMPOSITION/DECLARATION OF CONSTRUCTIVE TRUST—STOCK**

96.    The Plaintiffs incorporate their allegations above.

97.    Texas law permits the imposition of a constructive trust when a fiduciary breaches his fiduciary duties, as Frinzi did with respect to the Debtor and GNET ATC, over the fruits and proceeds of the breach of fiduciary duty regarding the Stock and Stock Purchase.

98.    Texas law permits the imposition of a constructive trust when one has been unjustly enriched, over the fruits and proceeds of the unjust enrichment.

99.    The Stock, meaning the ownership of AMRR, is readily identifiable and traceable to the $500,000.00 transferred by the Debtor and/or GNET ATC that was used directly to purchase the Stock as a result of Frinzi's breach of fiduciary duty and the unjust enrichment, as plead in Counts 1 and 2 above.

100.    Accordingly, the Trustee and GNET ATC seek the immediate imposition, for their mutual benefit pending an adjudication as between them of which owns the right, of a constructive trust over the Stock and over all of MGR's stock, ownership, and rights of AMRR, and a finding

that MGR has owned the Stock since its purchased it in trust for the benefit of the Debtor and/or GNET ATC.

**COUNT 4:**   **IMPOSITION/DECLARATION OF RESULTING TRUST—STOCK**

101.   The Plaintiffs incorporate their allegations above.

102.   A resulting trust arises by operation of Texas law when title is conveyed to one person but the purchase price or a portion thereof is paid by another.  The parties are presumed to have intended that the grantee hold title to the use of him who paid the purchase price and whom equity deems to be the true owner.

103.   Here, the Debtor and/or GNET ATC paid the purchase price of the Stock; *i.e.* the funds that were used such that MGR could purchase the Stock.  As such, the Debtor and/or GNET have at all times been the true owners of the Stock and of AMRR.

104.   Accordingly, the Trustee and GNET ATC seek the immediate imposition or declaration, for their mutual benefit pending an adjudication as between them of which owns the right, of a resulting trust over the Stock and over all of MGR's stock, ownership, and rights of AMRR, and a finding that the Debtor and/or GNET have owned the Stock and all of the foregoing since its purchase by MGR.

**COUNT 5:**   **BREACH OF FIDUCIARY DUTY—$4.4 MILLION TRANSFER**

105.   The Plaintiffs incorporate their allegations above.

106.   Frinzi, while an officer and a fiduciary of the Debtor and/or Multiband, caused the Debtor and/or Multiband to transfer the $4.4 Million to MGR in an insider transaction in that the beneficiary of the $4.4 Million Transfer was MGR and Frinzi.  Neither the Debtor nor Multiband received any value for this transfer.

107.   The Debtor was insolvent at the time of this transfer.

108.    At the time of the $4.4 Million Transfer, Frinzi owed a duty of care to the Debtor and/or Multiband, including to safeguard their assets and to not waste their assets.

109.    At the time of the $4.4 Million Transfer, Frinzi owed a duty of loyalty to the Debtor and/or Multiband, including not to self-deal and not to transact in a manner harmful to the Debtor and/or Multiband and beneficial to himself, and to make any insider transaction fair, which this transaction was not.

110.    Frinzi caused the Debtor and/or Multiband to make the $4.4 Million Transfer solely for his benefit, in order that he could use the funds for his personal benefit through MGR.

111.    In the process, Frinzi breached his fiduciary duties to the Debtor and/or Multiband, including his duty of loyalty.

112.    To the extent the $4.4 Million Transfer was intended to be a loan, the same constituted gross negligence by Frinzi in that MGR had no ability to repay the loan, did not attempt to repay the loan, entered into no written agreement for the same, and provided no security for the same.  As such, Frinzi breached his duty of care to the Debtor and/or Multiband by causing the $4.4 Million Transfer.

113.    Accordingly, the Trustee and Multiband hereby seek a judgment that Frinzi breached his fiduciary duties to one, either, or both of them by causing one or both of them make the $4.4 Million Transfer in order that he could solely benefit from it.

## COUNT 6:    UNJUST ENRICHMENT (FRINZI AND MGR)

114.    The Plaintiffs incorporate their allegations above.

115.    In causing the Debtor and/or Multiband to make the $4.4 Million Transfer, MGR was unjustly enriched at the expense of the Debtor and/or Multiband.  Likewise, Frinzi, as the sole owner of MGR, was unjustly enriched by the same.

116.     Accordingly, the Trustee and/or Multiband seek a judgment against MGR and Frinzi for the unjust enrichment of $4.4 million.

**COUNT 7:**     **FRAUDULENT TRANSFER—$4.4 MILLION TRANSFER**

117.     The Plaintiffs incorporate their allegations above.

118.     The funds used to make the $4.4 Million Transfer were the Debtor's funds, earmarked to make the transfer with Multiband being used as a mere conduit.

119.     The Debtor was insolvent at the time of the $4.4 Million Transfer.

120.     The Debtor did not receive reasonably equivalent value for the $4.4 Million Transfer.

121.     Accordingly, the Trustee seeks the avoidance, under section 548(a)(1)(B) of the Bankruptcy Code.

**COUNT 8:**     **RECOVERY OF FRAUDULENT TRANSFER—$4.4 MILLION TRANSFER**

122.     The Plaintiffs incorporate their allegations above.

123.     The Trustee requests the recovery of the avoided $4.4 Million Transfer under section 550(a)(1) of the Bankruptcy Code by way of money judgment against MGR and turnover of the Preferred Stock as identifiable proceeds of the $4.4 Million Transfer.

124.     The Trustee requests the recovery of the avoided $4.4 Million Transfer under section 550(a)(2) of the Bankruptcy Code from FFT by way of turnover of the Lakehouse and the Lot, as identifiable proceeds of the $4.4 Million Transfer.

125.     The Trustee requests the recovery of the Preferred Stock by way of turnover as additional identifiable proceeds of the $4.4 Million Transfer.

**COUNT 9:**     **CONVERSION (FRINZI)**

126. The Plaintiffs incorporate their allegations above.

127.    The $500,000.00 and the $4,400,000.00 in funds used to make the transfers above were property of the Plaintiffs prior to Frinzi causing the same to be transferred.  Frinzi had access to said funds as an officer of the Plaintiffs.

128.    At no time did the Plaintiffs authorize Frinzi to use any of the foregoing funds for his personal benefit, or to make the $500,000.00 transfer or the $4.4 Million Transfer.  At no time did the Plaintiffs, through their respective ultimate directors and managers, authorize or approve of either transfer, which transfers Frinzi hid from said directors and managers.

129.    In transferring those funds into entities that Frinzi owned and controlled, Frinzi exercised dominion and control of the Plaintiffs' property, without their effective consent, and with the intent of depriving the Plaintiffs of their property for Frinzi's personal benefit, with Frinzi illegally assuming ownership of the funds as though they were his, for his personal benefit, and to the exclusion of any benefit to the Plaintiffs.

130.    Accordingly, the Plaintiffs seek a money judgment against Frinzi for conversion of the $500,000.00 and the $4,400,000.00, allocated as between them with respect to the extent of their rights in and to said funds.

**COUNT 10:**  **EMBEZZLEMENT (FRINZI)**

131.    The Plaintiffs incorporate their allegations above.

132.    The $500,000.00 and the $4,400,000.00 in funds used to make the transfers above were property of the Plaintiffs prior to Frinzi causing the same to be transferred.  Frinzi had access to said funds as an officer of the Plaintiffs.  As an officer of the Plaintiffs, the funds were entrusted to Frinzi's care to be used for proper and lawful corporate purposes, including for business operations and to pay corporate debt; not to be used by Frinzi for personal investments or to be transferred to him or to entities he owned and controlled.

133.    At no time did the Plaintiffs authorize Frinzi to use any of the foregoing funds for his personal benefit, or to make the $500,000.00 transfer or the $4.4 Million Transfer.  At no time did the Plaintiffs, through their respective ultimate directors and managers, authorize or approve of either transfer, which transfers Frinzi hid from said directors and managers.

134.    In transferring those funds into entities that Frinzi owned and controlled, Frinzi exercised dominion and control of the Plaintiffs' property, without their effective consent, and with the intent of depriving the Plaintiffs of their property for Frinzi's personal benefit, with Frinzi illegally assuming ownership of the funds as though they were his, for his personal benefit, and to the exclusion of any benefit to the Plaintiffs.

135.    Furthermore, upon information and belief, Frinzi intentionally and deceptively created MGR with the name "Multiband" in order to be able to hide the fact of the transfers from employees of the Debtors, who assumed that the transfers were to the Debtor's subsidiary and not to a Frinzi-owned entity.

136.    Accordingly, the Plaintiffs seek a money judgment against Frinzi for embezzlement of the $500,000.00 and the $4,400,000.00, allocated as between them with respect to the extent of their rights in and to said funds.

## COUNT 11:  TEXAS THEFT LIABILITY ACT (FRINZI)

137.    The Plaintiffs incorporate their allegations above.

138.    The $500,000.00 and the $4,400,000.00 in funds used to make the transfers above were property of the Plaintiffs prior to Frinzi causing the same to be transferred.  Frinzi had access to said funds as an officer of the Plaintiffs.  As an officer of the Plaintiffs, the funds were entrusted to Frinzi's care to be used for proper and lawful corporate purposes, including for business operations and to pay corporate debt; not to be used by Frinzi for personal investments or to be transferred to him or to entities he owned and controlled.

139.    At no time did the Plaintiffs authorize Frinzi to use any of the foregoing funds for his personal benefit, or to make the $500,000.00 transfer or the $4.4 Million Transfer.  At no time did the Plaintiffs, through their respective ultimate directors and managers, authorize or approve of either transfer, which transfers Frinzi hid from said directors and managers.

140.    In transferring those funds into entities that Frinzi owned and controlled, Frinzi exercised dominion and control of the Plaintiffs' property, without their effective consent, and with the intent of depriving the Plaintiffs of their property for Frinzi's personal benefit, with Frinzi illegally assuming ownership of the funds as though they were his, for his personal benefit, and to the exclusion of any benefit to the Plaintiffs.

141.    Furthermore, upon information and belief, Frinzi intentionally and deceptively created MGR with the name "Multiband" in order to be able to hide the fact of the transfers from employees of the Debtors, who assumed that the transfers were to the Debtor's subsidiary and not to a Frinzi-owned entity.

142.    Accordingly, the Plaintiffs seek a money judgment against Frinzi under section 134.003 and 134.005(a) of the Texas Civil Practice and Remedies Code for the $500,000.00 and the $4,400,000.00 wrongfully taken by him, allocated as between them with respect to the extent of their rights in and to said funds.

143.    The Plaintiffs further seek their reasonable and necessary attorney's fees and expenses incurred herein under section 134.005(b) of the Texas Civil Practice and Remedies Code.

## COUNT 12:  BREACH OF CONTRACT (FEDERAL)

144.    The Plaintiffs incorporate their allegations above.

145.    The Plaintiffs and Federal were parties to a written contract whereby Federal, through Part A and Part F of the Crime Policy, agreed to pay the Plaintiffs their losses for Frinzi's thefts, including the $500,000.00 and $4,400,000.00 wrongly taken by him.

146.     The $500,000.00 was property of GNET, an insured under the Policy.

147.     The $4,400,000.00 was property of the Debtor, despite being temporarily in an account held by Multiband.

148.     The Plaintiffs have performed all necessary contractual obligations and all conditions precedent to any recovery. Alternatively, Federal by its silence has waived or is estopped to assert any failure to perform or satisfy any contractual obligation or condition precedent to any recovery.  Moreover, if there had been any such failure, which Plaintiffs deny, it was not prejudicial to Federal's rights under the Policy.

149.     Federal, despite timely demands and claims for payment under the Crime Policy, has not done so.  In fact, it has utterly ignored the Trustee with respect to the Crime Policy.

150.     In so doing, Federal has breached the Crime Policy.

151.     The Plaintiffs have been damaged by the foregoing at least in the amount of $5 million, of which $500,000.00 was incurred by GNET and $4,400,000.00 by the Debtor.

152.     Furthermore, the Trustee has been forced to retain legal counsel to file this Complaint to enforce the Plaintiffs' rights.  The Policy and Texas law, including section 38.001 of the Texas Civil Practice and Remedies Code, entitle the Trustee to recover his reasonable attorney's fees and expenses incurred herein.

153.     Accordingly, the Trustee requests a money judgment against Federal for the $5,000,000.00 policy limits of the Crime Policy, less the self-retention amount, and an additional award under Texas law for his reasonable attorney's fees and expenses incurred herein.

## COUNT 12:  TEXAS INSURANCE CODE (FEDERAL)

154.     The Plaintiffs incorporate their allegations above.

155.     Federal's conduct constitutes multiple violations of the Texas Insurance Code. Unfair methods of competition, unfair or deceptive act or practice in the business of insurance, or

unlawful deceptive trade practices relied upon to a person's detriment are actionable under Section 541.151 of the Texas Insurance Code. *See* TEX. INS. CODE § 541.151. The Plaintiffs and the Trustee are each a "person" as defined by Section 541.002(2) of the Texas Insurance Code.[3] Likewise, Federal is a "person" as defined by Section 541.002(2) of the Texas Insurance Code.[4]

156.    Violations of the type described in the preceding paragraph subject an insurer under Texas Insurance Code Section 542.060 to liability for the amount of the claim, interest on the amount of the claim at the rate of 18 percent a year as damages, and reasonable and necessary attorney's fees. *See* TEX. INS. CODE § 542.060.

157.    Federal engaged in the violations described in paragraph 156 by any one or more of the following:

a.    failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which Federal's liability has become reasonably clear, in violation of TEX. INS. CODE § 541.060(a)(2);

b.    failing to promptly provide the Trustee a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for Federal's failure to accept liability for the claim in violation of TEX. INS. CODE § 541.060(a)(3);

c.    failing within a reasonable time to affirm or deny coverage of a claim to the Trustee in violation of TEX. INS. CODE § 541.060(a)(4);

d.    refusing to pay the claim without conducting a reasonable investigation with respect to the claim in violation of TEX. INS. CODE § 541.060(a)(7);

e.    failing to provide a timely notice of acceptance or rejection in violation of TEX. INS. CODE § 542.056; and

f.    failing to timely pay the claim after receiving all items, statements, and forms reasonably requested in violation of TEX. INS. CODE § 542.055-059.

---

[3] *See* TEX. INS. CODE § 541.002(2); *see Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 383 (Tex. 2000); *see also Farmers Group, Inc. v. Lubin*, 222 S.W.3d 417, 422 (Tex. 2007) ("[A]ny person may file suit for damages.").

[4] *See* TEX. INS. CODE § 541.002(2); *see also Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482 (Tex. 1998).

158.    Federal's wrongful acts and omissions in violation of the Texas Insurance Code were the producing cause of the Trustee's damages, including actual damages (direct, indirect and/or consequential), costs, and attorneys' fees.

159.    Federal's wrongful acts and omissions in violation of the Texas Insurance Code were done knowingly; that is, with actual awareness of the falsity, unfairness, or deceptiveness of the act or practice. Such knowing conduct entitles the Trustee to three times actual damages.[5]  This is not only because the Plaintiffs and the Trustee made timely and proper demand, but also because the Trustee separately wrote to Federal to remind it of its duties under Texas law, which reminder Federal wholly ignored.

160.    Accordingly, the Trustee requests a money judgment against Federal for three times his actual damages, interest on the amount of actual damages at the rate of 18% per year, costs, and reasonable and necessary attorney's fees incurred herein.

## V.    RESERVATION OF RIGHTS

161.    The Trustee and the Estate, and GNET ATC and Multiband, hold other claims and causes of action against Frinzi related to transactions and transfers, including breaches of fiduciary duty, other than and in addition to the MGR transfers and transactions complained of herein. Nothing in this Complaint is intended to or shall prejudice any such separate and additional claims, including under principles of *res judicata*, and the Trustee expressly preserves and retains all such separate and additional claims.

## VI.    PRAYER

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs request that the Defendants be cited to appear and to answer this Complaint and that they have judgment as follows:

---

[5] *See* TEX. INS. CODE § 541.152(b).

(i)      money judgment against Frinzi for his breaches of fiduciary duty, conversion, embezzlement, and under the Texas Theft Liability Act;

(ii)     money judgment for unjust enrichment and restitution against MGR as requested above;

(iii)    a constructive trust and/or resulting trust over the Stock and over all of MGR's stock, ownership, and rights of AMRR;

(iv)    avoidance and recovery of the $4.4 Million Transfer;

(v)     a money judgment against Federal for breach of contract;

(vi)    a money judgment against Federal for its violations of the Texas Insurance Code;

(vii)   reasonable attorney's fees to the extent provided for by applicable law;

(viii)  prejudgment and postjudgment interest to the extent provided by applicable law; and

(ix)    such other and further relief as may be appropriate.

RESPECTFULLY SUBMITTED this _____ day of _____, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
       Davor Rukavina, Esq.
       Texas Bar No. 24030781
       Thomas D. Berghman, Esq.
       Texas Bar No. 24082683
       3800 Ross Tower
       500 N. Akard Street
       Dallas, Texas  75201-6659
       Telephone: (214) 855-7500
       Facsimile: (214) 855-7584
       Email: drukavina@munsch.com

**COUNSEL FOR SCOTT SEIDEL, CHAPTER 7 TRUSTEE**