IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE:                          §    CASE NO. 22-31641-mvl-7
                                §
GOODMAN NETWORKS, INC.,         §    (Chapter 7)
                                §
     Debtor.                    §
_____

                                **Related Adversary
                                Proceedings Listed
                                   on Pages 2-3

     -----------------------------------------------

          ORAL AND VIDEOTAPED DEPOSITION OF

                   JAMES FRINZI

                  MARCH 19, 2025

                 (VOLUME 1 OF 3)

          **CONFIDENTIAL TRANSCRIPT**

     -----------------------------------------------


     ORAL AND VIDEOTAPED DEPOSITION of JAMES FRINZI,
produced as a witness at the instance of the Plaintiff(s)
and duly sworn, was taken in the above-styled and
numbered cause on March 19, 2025, from 9:05 a.m. to 5:55
p.m., before Molly Carter, Certified Shorthand Reporter
in and for the State of Texas, reported by machine
shorthand, at the offices of Munsch Hardt Kopf & Harr,
P.C., 1717 West 6th Street, Suite 250, Austin, Texas,
pursuant to the Federal Rules of Civil Procedure.

RELATED ADVERSARY PROCEEDINGS:

SCOTT M. SEIDEL, TRUSTEE;          §
GNET ATC, LLC; and MULTIBAND       §
FIELD SERVICES, INC.,              §
        Plaintiffs,                §
                                   §
VS.                                §          Adv. No. 23-03036-mvl
                                   §
MULTIBAND GLOBAL RESOURCES,        §
LLC and FEDERAL INSURANCE          §
COMPANY,                           §
        Defendants.                §

_____

SCOTT M. SEIDEL, TRUSTEE;          §
and GNET ATC, LLC,                 §
        Plaintiffs,                §
                                   §
VS.                                §          Adv. No. 23-03072-mvl
                                   §
18920 NW 11TH, LLC; JAMES          §
GOODMAN; STEVEN ZAKHARYAYEV;       §
EVELINA PINKHASOVA; PEOPLE NQ      §
INC.; JJC & PEOPLE LLC; GDMN       §
FAMILY INVESTMENTS 2, LLC,         §
        Defendants.                §

_____

SCOTT M. SEIDEL, TRUSTEE,          §
        Plaintiff,                 §
                                   §
VS.                                §          Adv. No. 24-03037-mvl
                                   §
MSOUTH EQUITY PARTNERS III,        §
L.P.; 1PATH MANAGED SERVICES,      §
LLC; ONEPATH ITDS HOLDINGS,        §
LLC; ONEPATH ITDS BUYER,           §
INC.; ONEPATH HOLDINGS, LLC;       §
ONEPATH HOLDING CORPORATION;       §
and ONEPATH SYSTEMS OF NC,         §
LLC,                               §
        Defendants.                §

```
SCOTT M. SEIDEL, TRUSTEE,        §
        Plaintiff,               §
                                 §
VS.                              §        Adv. No. 24-03039-mvl
                                 §
JAMES GOODMAN; JASON GOODMAN;    §
and JOSEPH GOODMAN,              §
        Defendants.              §
_____

SCOTT M. SEIDEL, TRUSTEE,        §
        Plaintiff,               §
                                 §
VS.                              §        Adv. No. 23-03090-mvl
                                 §
HUDSON CLEAN ENERGY              §
ENTERPRISES, LLC; ALLIANCE       §
TEXAS HOLDINGS, LLC; NEIL Z.     §
AUERBACH; JUDITH AUERBACH;       §
AUERBACH PARTNERS, L.P.;         §
JAMES GOODMAN; GOODMAN           §
INVESTMENT HOLDINGS, LLC;        §
GENESIS NETWORKS, INC.;          §
GENESIS NETWORKS GLOBAL          §
SERVICES, LLC; AUERBACH          §
CHILDRENS DYNASTY TRUST U/A/D    §
OCTOBER 9, 2012; AUERBACH        §
FAMILY DYNASTY TRUST U/A/D       §
OCTOBER 9, 2012; AND             §
SHALOM AUERBACH                  §
        Defendants.              §
```

A P P E A R A N C E S


FOR THE PLAINTIFF(S):
     Davor Rukavina
     Conor P. White
     Anne-Alise "Ali" Hinckley
     Julian Preston Vasek (via Zoom)
     Jacob J. King (via Zoom)
     MUNSCH HARDT KOPF & HARR, P.C.
     500 North Akard Street, Suite 4000
     Dallas, Texas 75201-6659
     (214) 855-7500
     drukavina@munsch.com
     cwhite@munsch.com
     ahinckley@munsch.com
     jvasek@munsch.com
     jking@munsch.com

     Scott M. Seidel (via Zoom)
     SEIDEL LAW FIRM
     6505 West Park Boulevard, Suite 306
     Plano, Texas 75093
     (214) 234-2500
     scott@scottseidel.com


FOR JAMES FRINZI:
     Paul T. Elkins
     WICK PHILLIPS GOULD & MARTIN,LLP
     100 Throckmorton Street, Suite 1500
     Fort Worth, Texas 76102
     (817) 984-7422
     paul.elkins@wickphillips.com

     Jason M. Rudd
     WICK PHILLIPS GOULD & MARTIN,LLP
     3131 McKinney Avenue, Suite 500
     Dallas, Texas 75204
     (214) 692-6200
     jason.rudd@wickphillips.com

FOR DEFENDANT(S) FEDERAL INSURANCE COMPANY:
      Scott Louis Schmookler
      Iga Wiktoria Todd (via Zoom)
      GORDON REES SCULLY MANSUKHANI, LLP
      One North Wacker, Suite 1600
      Chicago, Illinois 60606
      (312) 565-1400
      sschmookler@grsm.com
      itodd@grsm.com


FOR DEFENDANT(S) JAMES GOODMAN; GOODMAN INVESTMENT
HOLDINGS, LLC; GENESIS NETWORKS, INC.; GENESIS NETWORKS
GLOBAL SERVICES, LLC; PEOPLE NQ INC. and JJC & PEOPLE
LLC:
      Randall A. Pulman
      Matthieu Belanger-Coast
      Kerry Alleyne (via Zoom)
      PULMAN, CAPPUCCIO & PULLEN, LLP
      2161 Northwest Military Highway, Suite 400
      San Antonio, Texas 78213
      (210) 222-9494
      rpulman@pulmanlaw.com
      matthieu@pulmanlaw.com
      kalleyne@pulmanlaw.com


FOR DEFENDANT(S) MSOUTH EQUITY PARTNERS III, L.P.; 1PATH
MANAGED SERVICES, LLC; ONEPATH ITDS HOLDINGS, LLC;
ONEPATH ITDS BUYER, INC.; ONEPATH HOLDINGS, LLC; ONEPATH
HOLDING CORPORATION and ONEPATH SYSTEMS OF NC, LLC:
      Sima G. Fried (via Zoom)
      DLA PIPER LLP (US)
      650 Exeter Street, Suite 1100
      Baltimore, Maryland 21202
      (410) 580-3000
      sima.fried@us.dlapiper.com

FOR DEFENDANT(S) 18920 NW 11th, LLC; STEVEN ZAKHARYAYEV; EVELINA PINKHASOVA; HUDSON CLEAN ENERGY ENTERPRISES, LLC; ALLIANCE TEXAS HOLDINGS, LLC; NEIL Z. AUERBACH; JUDITH AUERBACH; AUERBACH PARTNERS, L.P.; AUERBACH CHILDRENS DYNASTY TRUST U/A/D 10/9/2012 and AUERBACH FAMILY DYNASTY TRUST U/A/D 10/9/2012;
        Brittainie J. Zinsmeyer
        Caroline Carter
        JORDAN, LYNCH & CANCIENNE PLLC
        1980 Post Oak, Suite 2300
        Houston, Texas 77056
        713-955-4793
        bzinsmeyer@jlcfirm.com
        ccarter@jlcfirm.com


FOR THE DEFENDANT(S) JASON GOODMAN AND JOSEPH GOODMAN:
        Robert A. Simon (via Zoom)
        David A. Skeels (via Zoom)
        WHITAKER CHALK SWINDLE & SCHWARTZ, PLLC
        301 Commerce Street, Suite 3500
        Fort Worth, Texas 76102
        (817) 878-0500
        rsimon@whitakerchalk.com
        dskeels@whitakerchalk.com


ALSO PRESENT:
        Mr. Stephen Pinkston, Videographer

I N D E X

Appearances ........................................  4


JAMES FRINZI
        Examination by Mr. Rukavina ...................  12
        Examination by Ms. Hinckley ................... 156
        Re-Examination by Mr. Rukavina ............... 220
        Examination by Ms. Zinsmeyer ................. 249
        Examination by Mr. Pulman .................... 294


Signature and Changes ............................. 329

Reporter's Certificate ............................ 330

EXHIBITS

NUMBER      DESCRIPTION                                    PAGE

Exhibit 1   ........................................ 103
            12/31/21 Statement from East West Bank
            for GNET ATC LLC

Exhibit 2   ........................................ 111
            1/31/22 Statement from East West Bank
            for Multiband Field Services, Inc.

Exhibit 3   ........................................ 114
            12/31/21 Statement from East West Bank
            for Multiband Field Services, Inc.

Exhibit 4   ........................................ 115
            12/31/21 Statement from Prosperity Bank
            for Goodman Networks, Inc. Cash
            Concentration Account

Case 23-03036-mvl   Doc 183-14   Filed 03/18/26   Entered 03/18/26 15:12:06   Desc N
James Frinzi, Volume 1 - Confidential
Page 8 of 37

Page 8

Exhibit 5     ........................................ 124
              3/31/22 Statement from Prosperity Bank
              for Goodman Networks, Inc.

Exhibit 6     ........................................ 124
              3/31/22 Statement from East West Bank
              for GNET ATC LLC

Exhibit 7     ........................................ 133
              2/28/22 Statement from Prosperity Bank
              for Goodman Networks, Inc. Controlled
              Disbursement Account

Exhibit 8     ........................................ 141
              2/3/22 Bond Purchase Agreement between
              Goodman Investment Holdings, Genesis
              Networks Inc. and Alliance Texas
              Holdings, LLC

Exhibit 9     ........................................ 143
              2/3/22 Bond Purchase Agreement between
              Alliance Texas Holdings, LLC and Goodman
              Networks Incorporated

Exhibit 10    ........................................ 151
              11/18/2021 Emails Re: Confidential- Bonds

Exhibit 11    ........................................ 155
              11/18/2021 Emails Re: Confidential- Bonds

Exhibit 12    ........................................ 159
              Signal Text Messages

Exhibit 13    ........................................ 167
              12/8/21 Emails Re: Note UFS GS

Exhibit 14    ........................................ 177
              11/1/21 Emails Re: UFS-GS Transition Item

Exhibit 15    ........................................ 179
              10/22/21 Emails Re: Note UFS GS

Exhibit 16    ........................................ 182
              8/3/22 Goodman Networks et al. Financial
              Presentation

Exhibit 17    ........................................ 186
              8/8/22 Emails Re: Confidential Goodman
              Brothers meeting

Exhibit 18   ................................................ 191
             11/19/21 Goodman Networks Incorporated
             Current Report

Exhibit 19   ................................................ 200
             1/31/22 Statement from Prosperity Bank
             for Goodman Networks, Inc. Controlled
             Disbursement Account

Exhibit 20   ................................................ 202
             1/21/22 AMRR Secured Promissory Note

Exhibit 21   ................................................ 204
             7/18/22 AMRR Letter to James Goodman,
             GNET ATC, Inc.

Exhibit 22   ................................................ 208
             12/15/21 Emails Re: Payroll Has Been
             Finalized

Exhibit 23   ................................................ 216
             1/24/22 Letter from Forshey to Goodman
             Re: Goodman Networks Incorporated

Exhibit 24   ................................................ 238
             11/30/21 Emails Re: OIS - Second Round
             Process Letter

Exhibit 25   ................................................ 239
             2/1/22 Unit Purchase Agreement by and
             among American Metals Recovery and
             Recycling, Inc., OnePath Systems, LLC, and
             AMR Resources, LLC (Execution Version)

Exhibit 26   ................................................ 245
             12/4/21 Emails Re: LOI

Exhibit 27   ................................................ 245
             12/1/21 Email Re: LOI

Exhibit 28   ................................................ 245
             12/31/21 Emails Re: Confidential -
             Acquisition Status

Exhibit 29   ................................................ 247
             7/18/22 Email Re: AMRR Demand Letter to
             OnePath Systems, LLC.

Exhibit 30   ......................................... 278
             2/3/22 Emails Re: GNI-Alliance BPA and
             Sig Page

Exhibit 31   ......................................... 284
             4/18/22 Emails Re: Goodman Clean-up from
             Friday

THE VIDEOGRAPHER:  Today's date is March 19th, 2025.  The time is 9:05 a.m. Central.  We are on the record.  This is the deposition of James Frinzi.  You may swear in the witness.

(Witness duly sworn.)

MR. RUKAVINA:  Good morning.  My name is Davor Rukavina.  My law partner Ali Hinckley and I will be taking these depositions.  I'd like to thank all Counsel for cooperating on logistics.  This is not going to be easy.  We'll get through it.

To confirm for the record, the Trustee has waived the Debtor's and the Estate's pre-petition privileges that will include the Baker man, Winstead and Bobby Forshey.

What I will try to do to accommodate the Federal lawyers is I will start this deposition on general topics.  I will then move into the Federal lawsuit, and I will say that I have stopped the Federal lawsuit.  And then we will proceed with other matters.  And then, of course, all Counsel will have the opportunity to cross-examine Mr. Frinzi.  Anything else we should discuss before we start?

MR. PULMAN:  Do we want to put on the record which cases we're taking these depositions in?

MR. RUKAVINA:  The problem is I don't have the

style right now.  I, you know, I call them by their nicknames.

MR. PULMAN:  I think that's okay.  Just put it on the record.

MR. RUKAVINA:  There is one adversary proceeding that currently is Seidel versus Federal Insurance Company.

There is a second adversary proceeding, Seidel versus 18920 Northwest 11th LLC et al.

There's another adversary proceeding, Seidel versus Hudson Clean Energy Enterprises, LLC, et al.

There's another adversary proceeding, Seidel -- which is also an arbitration -- Seidel versus James Goodman, Joseph Goodman and Jason Goodman.

And there's another adversary proceeding, Seidel versus MSouth something, et al.  I believe that's it.

MR. PULMAN:  Okay.

MR. RUKAVINA:  Are you prepared, Mr. Frinzi?

THE WITNESS:  Yes.

JAMES FRINZI,

having been first duly sworn, testified as follows:

E X A M I N A T I O N

BY MR. RUKAVINA:

Q    Thank you for joining us today.

A    Yes, sir.

Q    I know this is an inconvenience.

A    Yes, sir.

Q    What's your full name, for the record?

A    James Nicholas Frinzi, Jr.

Q    Date of birth?

A    7/22/73.

Q    Where do you live?

A    I live in Dubai, United Arab Emirates.

Q    And is that -- how long are you fixing to be living there, or do you have any plans to come back?

A    I'm actually getting my permanent residency next week.

Q    So you flew down here for these depositions?

A    Only for these depositions, yes.

Q    Thank you.  And when are you flying back?

A    April 1st.

Q    Okay.  You and I met with your lawyers and Mr. Seidel about two years ago; is that correct?

A    Yes.

Q    In my offices?

A    Yes, yes.  Yes.

Q    And at that point in time you gave me a stack of Signal communications that we'll go through later, correct?

Q    So let's go back to James.  So we talked about a couple of instances where you formed an opinion that perhaps he wasn't honest.  Any more?

A    I'm sure, but I can't consider anything at this moment.  Well, I can consider it, but nothing's coming to my, my direct --

Q    That's okay.  It's my job to ask discrete questions.  And if I don't do a good job, that's my fault.

A    Okay.

Q    What about business, business ethics, have you ever known personally for him to have acted unethically in business, James Goodman?

A    Sure.  Yes.

Q    Can you give me an example, please?

A    Well, so really, the whole -- I feel that the whole -- the reseller MBE business, in and of itself, is an unethical scam, because the intention of these MBE programs is to create jobs for minorities.  But instead, it was set up as a shop to turn through high volumes of equipment through a minority company to allow big companies like FedEx and Arris to claim that they're spending millions and millions of dollars on minorities, but there was -- I never understood if a single person got a job out of it, to be honest with you.

Q     (By Mr. Rukavina) Mr. Frinzi, we're going to focus now on how you came to work for the Debtor.

A     Okay.

Q     At some point you became the CEO of the Debtor, right?

A     That's right.

Q     Do you remember approximately when?  We'll have documents later, but --

A     Sure.

THE REPORTER:  I'm sorry, did you say CEO?

MR. RUKAVINA:  CEO, I apologize.

THE REPORTER:  Thank you.

Q     (By Mr. Rukavina) Do you remember approximately?

A     It would have been maybe September or August '20 or '21, I forgot.

Q     I think '21 maybe.

A     Okay, could be.

Q     Whenever it is, did you also simultaneously become the CEO of GNET?

A     Yes.

Q     Whenever it was, did you also simultaneously become the CEO of Multiband Fiber --

A     Field Services.

Q     Field Services.  Thank you.

A     Yes.

Q     Okay.  Was that -- whenever that was, your role as CEO, was that the first time you were ever formally employed or engaged by the Debtor and/or its subsidiaries?

A     No.

Q     When was the first time and what was it?

A     I was in-house government relations for maybe two years, and it was during the Obama administration.

Q     Did you have a title?

A     Yeah.  I think it was Senior Vice President Government Relations.

Q     Do you happen to know whether you were formally an officer at that time in the Obama administration?

A     No.  I mean I remember, and my answer is no.

Q     But your role, your title was Senior Vice President?

A     That's right.

Q     Back then who did you work for?

A     Technically, I'm reporting -- I reported to Scott Pickett, but I really reported to John.

Q     Was John in charge of the Debtor back then?

A     Yes.

Q     So let's fast forward to when you became the CEO.  Whose idea was it that you become the CEO, to your

A    I do.

Q    Do you remember that transfer?

A    I respectfully decline to answer this question and exercise my rights under the Fifth Amendment of the U.S. Constitution.

Q    I have no choice but to ask you a series of questions.

A    Okay.

Q    And -- I just have to.

A    I understand.

MR. RUKAVINA:  Paul, do you want him to say that thing every time or just can he say "Fifth Amendment"?  I don't care.  It's up to you.

MR. ELKINS:  For each question he can cite "Fifth Amendment" if that's fine with you.

MR. RUKAVINA:  That's fine with me.

MR. ELKINS:  It's got to be to each question, though.

MR. RUKAVINA:  I understand.

Q    (By Mr. Rukavina) Who authorized the making of this wire?

A    Fifth Amendment.

Q    What did MGR do with this money?

A    Fifth Amendment.

Q    MGR bought a lake house with this money, didn't

it?

A    Fifth Amendment.

Q    Then it transferred that lake house to your family trust, didn't it?

A    Fifth Amendment.

Q    MGR bought vacant land on Horseshoe Bay with that money, didn't it?

A    Fifth Amendment.

Q    Then that was transferred to your family trust, wasn't it?

A    Fifth Amendment.

MR. PULMAN:  Objection.

Q    (By Mr. Rukavina) MGR purchased some boats and Sea-Doos with that money, didn't they?

MR. PULMAN:  Objection.

A    Fifth Amendment.

Q    (By Mr. Rukavina) Did the Debtor or Multiband or GNET benefit from the making of this $4.4 million transfer?

MR. PULMAN:  Objection, compound.

A    Fifth Amendment.

Q    (By Mr. Rukavina) If a wire of this size needed two people to approve, who was the second person?

A    Fifth Amendment.

Q    Did you have the authority as the CEO to make

this wire?

A     Fifth Amendment.

MR. SCHMOOKLER:  Objection.

Q     (By Mr. Rukavina) Did James Goodman instruct you to make this wire?

A     Fifth Amendment.

Q     Did any director authorize you to make this wire?

A     Fifth Amendment.

Q     Did you discuss with James Goodman or the directors or anyone beforehand that you were going to make this wire?

A     Fifth Amendment.

MR. RUKAVINA:  Exhibit 3, please.

(Exhibit 3 marked for identification.)

Q     (By Mr. Rukavina) Mr. Frinzi, you now have Exhibit 3.  I'm going to ask you about -- so if you look at Exhibit 2 --

A     Uh-huh.

Q     -- the $4.4 million transfer was out of Multiband.  I know you asserted your Fifth Amendment rights.  That is your absolute right.  Now I'm going to ask about how the money came into Multiband.

A     Okay.

Q     Just a second.  Is this a duplicate?  Or wire

in.  I apologize.

Exhibit 3 shows two transfers from Goodman Networks, Inc., to the Multiband account.  Do you know anything about those transfers?

A     Fifth Amendment.

Q     Was the purpose of making those transfers to then enable the $4.4 million transfer to Multiband?

A     Fifth Amendment.

MR. SCHMOOKLER:  Objection, form.

Q     (By Mr. Rukavina) What was the purpose of the 4 million and the $500,000 transfers?

A     Fifth Amendment.

Q     Were you authorized to make those transfers?

A     Fifth Amendment.

Q     Did anyone at Goodman or GNET or Multiband authorize you to make those transfers?

MR. SCHMOOKLER:  Objection, form.

A     Fifth Amendment.

MR. RUKAVINA:  Exhibit 4.

(Exhibit 4 marked for identification.)

Q     (By Mr. Rukavina) Mr. Frinzi, you've been given Exhibit 4.  I'm going to ask you to look at the transfers out, which I believe are called other debits.

A     Okay.

Q     And you may or may not answer my questions.  Do

you see, sir, on Page 3, $4 million transfer on December 21, 2021 -- well, I don't want -- I don't want to ask you do you see it.  Why don't you look at it.

A    I'm looking for it.

Q    It's on Page 3 of 4, $4 million.

A    Oh, okay.

Q    Are you ready for my questions?

A    I see it now.  I'm ready.

Q    Do you know anything about this transfer?

MR. SCHMOOKLER:  Objection, form.

A    Fifth Amendment.

Q    (By Mr. Rukavina) Is it -- isn't it true that the money transferred out by Multiband to MGR originated with Goodman Networks, Inc.?

MR. SCHMOOKLER:  Object to form.

A    Fifth Amendment.

Q    (By Mr. Rukavina) Were you the one that made this $4 million transfer from the Debtor to Multiband?

MR. SCHMOOKLER:  Object to form.

A    Fifth Amendment.

Q    (By Mr. Rukavina) Did anyone authorize you to make that transfer?

A    Fifth Amendment.

MR. SCHMOOKLER:  Object to form.

Q    (By Mr. Rukavina) Did anyone instruct you to

make that transfer?

MR. SCHMOOKLER:  Object to form.

A    Fifth Amendment.

Q    (By Mr. Rukavina) Did the Debtor receive any return benefit from making that transfer?

MR. SCHMOOKLER:  Object to form.

A    Fifth Amendment.

Q    (By Mr. Rukavina) Did the Debtor receive any benefit from the $4.4 million that ultimately were transferred to MGR?

A    Fifth Amendment.

MR. SCHMOOKLER:  Object to form.

Q    (By Mr. Rukavina) Did the Debtor receive any benefit from the $500,000 transferred to Stauber law firm?

MR. SCHMOOKLER:  Object to form.

A    Fifth Amendment.

MR. SCHMOOKLER:  Can I just have a clarification, Counsel, on the Fifth Amendment objection that's being made?  Earlier he did talk about Stauber. What's the -- can you explain to me what the line is that's being drawn?

MR. ELKINS:  No.  You can redirect him on it.

MR. SCHMOOKLER:  Okay.

Q    (By Mr. Rukavina) Okay.  Let me just compose my

Q    Are you aware that Goodman Networks executed an amended and restated shareholders agreement and amended and restated Certificate of Formation and amended and restated bylaws when it emerged from bankruptcy?

A    I'm not aware.

Q    Have you ever seen the shareholders agreement, the Certificate of Formation and the bylaws that were executed and adopted back in 2017?

A    I was not.

Q    Are you familiar with any requirements contained in the 2017 shareholders agreement or bylaws with respect to the number of directors that were required to serve on Goodman Net- -- on Goodman Networks' board?

A    I have no knowledge of that document or requirements pertaining to it.

Q    Are you aware of the individuals that were serving on Goodman Networks' board in 2017?

A    I'm not.

Q    Are you aware -- from the time period when the Debtor emerged from bankruptcy in 2017 until you became CEO of the company in 2021, are you aware of any individuals who served on the board of directors?

A    No.

Q    And it's your understanding that when you

became CEO of the company, that James Goodman was the chairman of the board and the sole director of that company?

A    That's my understanding.

Q    Are you aware of -- so with respect to the corporate documents that I just referenced being executed and adopted back in 2017, are you aware of those documents ever being amended?

A    I have no idea.

Q    Have you ever seen -- scratch that.

Are you aware who was, who became CEO of the company when it emerged from bankruptcy back in 2017?

A    No.

Q    Are you aware of James Goodman ever serving as the CEO of the company?

A    No.

MS. HINCKLEY:  Let's mark this as Exhibit 12, please.

(Exhibit 12 marked for identification.)

Q    (By Ms. Hinckley) I just want to cover -- I just have a few other questions.  I'm going to try not to repeat what Mr. Rukavina already covered with you, Mr. Frinzi.  But with respect to the bond deal between Shalom Auerbach and James Goodman, and specifically I would like to take a look at -- it's going to be the page

A    I don't recall.

Q    Did Goodman Networks or GNET ATC ever enter into any subsequent agreements with AMRR with respect to the note?

A    I don't recall.

Q    Suffice to say you don't recall making -- you don't recall AMRR making a payment of $10 million to GNET, do you?

A    I do not remember that.

Q    Did Shalom Auerbach have any involvement in the AMRR entity?

A    He was a board member for a period of time.

Q    For what period of time?

A    I don't -- I don't know.  I'm sure it's public record actually.

Q    Was Mr. Auerbach on the board of AMRR at the time that it entered into this promissory note in January of 2022?

A    I don't recall.

Q    Did you have any discussions with Mr. Auerbach with respect to this transaction between AMRR and GNET ATC?

A    I don't recall.

Q    At the time that this note was executed in January of 2022, is it your understanding that



PAPP0563

Mr. Goodman was the sole member of -- on the Debtor's board of directors?

A    Yes.

Q    Mr. Frinzi, do you have any documentary evidence that would establish that Mr. Goodman had approved of the $44 million -- $44 million in transfers to AMRR?

A    I don't --

MR. ELKINS:  Legal conclusion.  And asked and answered.

A    There are maybe messages in your Exhibit 12 perhaps.  But showing up today, I don't have documentary evidence of anything.  I'm relying on you guys to hand it over to me as it comes.

Q    (By Ms. Hinckley) Do you have any documents that would establish that Mr. Goodman had approved of the transfer of $44 million out of the company?

A    I came with no documents.

Q    Have you provided any documents to your Counsel that would suggest that?

A    Over the past two years I've provided substantial amounts of documents.  And again, I wasn't prepared to cite or present documents at this deposition.

Q    Are you aware of any documents or communications between yourself and James Goodman with

MR. SCHMOOKLER:  It's asked and answered. Objection, asked and answered and leading.

MR. RUKAVINA:  Okay.

Q    (By Ms. Hinckley) Are you aware of any actions by Goodman Networks' board of directors to vet this $4.4 million transfer to MGR?

MR. SCHMOOKLER:  Objection -- hold on. Mr. Frinzi, you have to let me get my objections in because he is back to letting me --

THE WITNESS:  I apologize.

MR. SCHMOOKLER:  I'm back in the -- apparently I'm back in the game.

MR. ELKINS:  Back in the game, Scott.

MR. SCHMOOKLER:  All right.  So objection to the phrase -- because you want the evidentiary objections as to how you're defining the board of directors, I object, form, on the grounds that it assumes facts not in evidence, and -- go ahead.

MR. RUKAVINA:  Go ahead, Mr. Frinzi.

Q    (By Ms. Hinckley) Who was --

MR. RUKAVINA:  Hold on, let him answer your question after the objection.

MS. HINCKLEY:  Oh.

A    Oh.  Fifth Amendment.

Q    (By Ms. Hinckley) Who was on Goodman Networks'

board of directors in January of 2022?

MR. ELKINS:  Asked and answered.

A      Yeah, I mean, James Goodman.

Q      (By Ms. Hinckley) And same question for December 2021.

MR. ELKINS:  Same.

A      James Goodman.

MR. RUKAVINA:  So that will end our side --

MR. SCHMOOKLER:  Okay.  I'm pretty sure you asked that one earlier today anyway.  I don't think -- I think that horse is dead.

MS. HINCKLEY:  That was, that was a while ago.

MR. ELKINS:  If not, it's beaten.

MR. SCHMOOKLER:  Don't worry.  We can come back to it tomorrow.

MS. HINCKLEY:  What exhibit am I on?

MR. RUKAVINA:  23.

MS. HINCKLEY:  This will be Exhibit 23.

(Exhibit 23 marked for identification.)

Q      (By Ms. Hinckley) Mr. Frinzi, have you seen this letter before?

MR. PULMAN:  What's the exhibit number?

MS. HINCKLEY:  23.

MR. SIMON:  Is this a new exhibit?  All right.

Q      (By Ms. Hinckley) Do you know why -- well, this

company, and the deal was very well documented.  And so
to -- it certainly wasn't hidden from anybody, because
it's, it's public.

MS. ZINSMEYER:  Objection, speculation.

Q    (By Mr. Rukavina) Why should the jury believe
you and not James Goodman?

A    Again, I mean, it was a -- it was a
publicly-traded company, so there was sufficient notice
to understand that it was, the transaction happened.  And
so then to say that you didn't know it happened after a
publicly-traded company is bought and reversed merger
into a company that was referred to me by James, I
don't -- I mean, I didn't know OnePath, and he bought
another OnePath entity.  Then it came into a public
entity, so it was widely, you know, shared.  And you saw
the email I sent to multiple people, one of which is a
niece to James Goodman.  So it seems highly unlikely
that -- how would, how would you not know.

Q    When did you leave your position as CEO of the
Debtor?

A    Maybe June 2022.

Q    Did you subsequently write a letter of
resignation going back to that date?

A    I don't recall.

Q    I don't know if we have it.  During that time,

don't remember if you got paid during these first nine months of 2021?

A    I'm sorry, I've been deposed for almost eight hours and --

Q    I understand.

A    -- I'm nine hours ahead with my -- I just flew in from Dubai yesterday, so I'm sorry, I don't know.  I can't answer that.

Q    Okay.  Let me try it this way, and then I'll go to another topic.

From January of 2021 to October of 2021, were you doing any work for business with Goodman Networks, Inc., or James Goodman?

A    I don't recall.

Q    How would we know the answer to that?

A    I don't know.  And I'm not being hostile.  I'm saying I just --

Q    I didn't think you were.

A    Okay.  I just can't recall, because you know, again, it's been a long deposition.

Q    That's fair.

A    Mentally, I can't --

Q    Okay.

A    -- come up with -- if I had -- I don't know, maybe if I was more fresh or had some calendars or some

other benefit, but right now this is the best I can offer.

MR. RUKAVINA:  It is 6:00 p.m., Randy, if you want to reserve your questions.

MR. PULMAN:  Oh.

MS. ZINSMEYER:  Five till.

MR. RUKAVINA:  Five till, but the witness is drained.

MR. PULMAN:  Yeah, if you want to stop, we can stop.  I'd prefer you got a good night's sleep and were fresh in the morning.

THE WITNESS:  Yeah, I can't have -- sorry, man.

MR. PULMAN:  That's okay.  We'll go off the record.  We'll take this back up tomorrow morning.

THE VIDEOGRAPHER:  All right.  Just before we go off the record, Mr. Rukavina, would you like your video synced with the transcript?

MR. RUKAVINA:  Ask me tomorrow.

THE VIDEOGRAPHER:  Okay.  And would any of the attorneys present like to order a copy of the video or the transcript?

MR. RUKAVINA:  Will we have you here tomorrow?

THE VIDEOGRAPHER:  Yeah, but just for my paperwork, I've got to finish this out.

MR. RUKAVINA:  Conor, what's our answer?

MR. WHITE:  We'll --

THE VIDEOGRAPHER:  I can follow up.

MR. WHITE:  We'll want a copy of the video, if this is going to be his trial testimony.

MR. RUKAVINA:  Do we want it synchronized?

MR. WHITE:  Yes, you do.

MR. RUKAVINA:  Okay.

MS. HINCKLEY:  I think you probably need -- yeah.

MR. RUKAVINA:  Then the answer is yes.

THE VIDEOGRAPHER:  The time is 5:55 p.m. Central.  We are off the record.

    (Deposition recessed at 5:55 p.m.)

CHANGES AND SIGNATURE OF WITNESS

WITNESS NAME:  JAMES FRINZI

DATE OF DEPOSITION:  MARCH 19, 2025

PAGE/LINE   CHANGE                        REASON FOR CHANGE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

     I, JAMES FRINZI, have read the foregoing deposition

and hereby affix my signature that same is true and

correct, except as noted above.

                                    _____

                                    JAMES FRINZI

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


IN RE:                              §   CASE NO. 22-31641-mvl-7
                                    §
GOODMAN NETWORKS, INC.,             §    (Chapter 7)
                                    §
      Debtor.                       §
_____

AND RELATED ADVERSARY PROCEEDINGS:

SCOTT M. SEIDEL, TRUSTEE;           §
GNET ATC, LLC; and MULTIBAND        §
FIELD SERVICES, INC.,               §
          Plaintiffs,               §
                                    §
VS.                                 §   Adv. No. 23-03036-mvl
                                    §
MULTIBAND GLOBAL RESOURCES,         §
LLC and FEDERAL INSURANCE           §
COMPANY,                            §
      Defendants.                   §


_____

SCOTT M. SEIDEL, TRUSTEE;           §
and GNET ATC, LLC,                  §
          Plaintiffs,               §
                                    §
VS.                                 §   Adv. No. 23-03072-mvl
                                    §
18920 NW 11TH, LLC; JAMES           §
GOODMAN; STEVEN ZAKHARYAYEV;        §
EVELINA PINKHASOVA; PEOPLE NQ       §
INC.; JJC & PEOPLE LLC; GDMN        §
FAMILY INVESTMENTS 2, LLC,          §
      Defendants.                   §


_____

SCOTT M. SEIDEL, TRUSTEE,          §
        Plaintiff,                 §
                                   §
VS.                                §     Adv. No. 24-03037-mvl
                                   §
MSOUTH EQUITY PARTNERS III,        §
L.P.; 1PATH MANAGED SERVICES,      §
LLC; ONEPATH ITDS HOLDINGS,        §
LLC; ONEPATH ITDS BUYER,           §
INC.; ONEPATH HOLDINGS, LLC;       §
ONEPATH HOLDING CORPORATION;       §
and ONEPATH SYSTEMS OF NC,         §
LLC,                               §
        Defendants.                §
_____

SCOTT M. SEIDEL, TRUSTEE,          §
        Plaintiff,                 §
                                   §
VS.                                §     Adv. No. 24-03039-mvl
                                   §
JAMES GOODMAN; JASON GOODMAN;      §
and JOSEPH GOODMAN,                §
        Defendants.                §
_____

SCOTT M. SEIDEL, TRUSTEE,          §
        Plaintiff,                 §
                                   §
VS.                                §     Adv. No. 23-03090-mvl
                                   §
HUDSON CLEAN ENERGY                §
ENTERPRISES, LLC; ALLIANCE         §
TEXAS HOLDINGS, LLC; NEIL Z.       §
AUERBACH; JUDITH AUERBACH;         §
AUERBACH PARTNERS, L.P.;           §
JAMES GOODMAN; GOODMAN             §
INVESTMENT HOLDINGS, LLC;          §
GENESIS NETWORKS, INC.;            §
GENESIS NETWORKS GLOBAL            §
SERVICES, LLC; AUERBACH            §
CHILDRENS DYNASTY TRUST U/A/D      §
OCTOBER 9, 2012; AUERBACH          §
FAMILY DYNASTY TRUST U/A/D         §
OCTOBER 9, 2012; AND               §
SHALOM AUERBACH                    §
        Defendants.                §

- - - - - -

REPORTER'S CERTIFICATION

ORAL DEPOSITION OF JAMES FRINZI

(VOLUME 1 OF 3)

MARCH 19, 2025

- - - - - -

I, MOLLY CARTER, Certified Shorthand Reporter in and for The State of Texas, hereby certify to the following:

That the witness, JAMES FRINZI, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(e)(1), that the signature of the deponent:

_XX_ was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken. Further, I am not a relative or employee of any attorney

of record in this cause, nor do I have a financial

interest in the action.

Certified to by me on this 31st day of March 2025.

_____
MOLLY CARTER, CSR NO. 2613
Expires 04/30/2026

Lexitas - Dallas
Firm No. 459, Expires: 12/31/2026
325 North St. Paul, Suite 1900
Dallas, Texas 75206
(214) 373-4977