IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re:

GOODMAN NETWORKS, INC.,           )
                                  )Case No. 22-31641-mvl-7
          Debtor.                 )(Chapter 7)

SCOTT M. SEIDEL, TRUSTEE,         )
                                  )
              Plaintiff,          )
                                  ) ADVERSARY PROCEEDING
VS.                               )
                                  ) NO.: 23-3036-mvl
MULTIBAND GLOBAL                  )
RESOURCES, LLC, ET AL,            )
                                  )
              Defendants.         )

      -------------------------------------

        ORAL AND VIDEOTAPED DEPOSITION OF

                 JAMES E. GOODMAN

                 NOVEMBER 13, 2025

      -------------------------------------

     ORAL AND VIDEOTAPED DEPOSITION OF JAMES E. GOODMAN,

produced as a witness at the instance of the PLAINTIFF,

and duly sworn, was taken in the above-styled and

numbered cause on November 13, 2025 from

1:07 o'clock p.m. to 3:24 o'clock p.m., before

DEBBIE S. LONGORIA, CSR in and for the State of Texas,

reported by machine shorthand, at the law offices of

MUNSCH, HARDT, KOPF & HARR, P.C., 1717 West 6th Street,

Suite 250, Austin, Travis County, Texas, pursuant to the

Federal Rules of Civil Procedure.

A P P E A R A N C E S


FOR THE PLAINTIFF:

     CONOR WHITE
     MUNSCH, HARDT, KOPF & HARR, P.C.
     500 N. AKARD STREET, STUIE 4000
     DALLAS, TEXAS 75201
     (214) 855-7500
     cwhite@munsch.com

FOR THE DEFENDANT FEDERAL INSURANCE COMPANY:

     SCOTT L. SCHMOOKLER (Via Zoom)
     GORDON, REES, SCULLY MANSUKHANI
     ONE NORTH WACKER, SUITE 1600
     CHICAGO, ILLINOIS 60606
     (312) 980-6779
     sschmookler@grsm.com


ALSO PRESENT:

     NANCY MARTIN, Videographer

INDEX

PAGE

Appearances...................................... 2

JAMES E. GOODMAN
       Examination by Mr. White........................ 5
       Examination by Mr. Schmookler................... 55
       Examination by Mr. White........................ 89
       Examination by Mr. Schmookler................... 92

Signature and Changes............................. 96
Reporter's Certificate............................ 97

EXHIBITS

NO.       DESCRIPTION                                     PAGE

Ex. 1     Subpoena................................... 5
Ex. 2     Prosperity Bank statement................. 13
Ex. 3     East West Bank statement.................. 15
Ex. 4     East West Bank statement.................. 15
Ex. 5     E-mail w/GNET member consent attached..... 23
Ex. 6     E-mails................................... 26
Ex. 7     E-mails................................... 46
Ex. 8     Prosperity Bank statement................. 64
Ex. 9     E-mail.................................... 67
Ex. 10    Resignation letter........................ 78
Ex. 11    Insurance application..................... 81

(REPORTER'S NOTE:  Deposition Exhibit Nos. 8-11 were not
provided prior to the completion of the transcript.
They may be provided by counsel at a later date.)

VIDEOGRAPHER:  We are on the record to begin the video recorded deposition of James E. Goodman in the matter of Scott M. Seidel, Trustee, et al versus Multiband Global Resources, LLC, et al.  Today's date is November 3rd -- November 13th, 2025 and we are on the record at approximately 1:07 p.m.

This case is filed in the U.S. Bankruptcy Court Northern District of Texas, Case 23-31641, adversarial procedural No. 23-3036.  The deposition is being requested by Munsch, Hardt, Kopf & Harr.  We are located in their offices located at 1717 West 6th Street, Suite 250, Austin, Texas 78703.  The court reporter is Deborah Longoria and is with the firm of Lexitas, Texas.  My name is Nancy Martin, I am with the firm of Lexitas, Texas.  If all counsel present could please identify themselves for the record and whom they represent.

MR. WHITE:  Conor White on behalf of Scott Seidel, Chapter 7 Trustee of Goodman Networks, Inc.

MR. SCHMOOKLER:  Scott Schmookler on behalf of Federal Insurance Company.

JAMES E. GOODMAN, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. WHITE:

Q. Thank you. Can you please state your name for the record?

A. James Goodman.

Q. And your home address?

A. Is 103 Tomahawk Trail, San Antonio, Texas 78232.

(Exhibit No. 1 marked.)

Q. I'm going to hand you what we're going to mark as Exhibit 1, Scott, for your -- one moment for the court reporter to mark this with an exhibit number. Actually, I'll do it. I'm sorry, I don't know why I said that.

MR. WHITE: Scott, for your reference, we are handing him the subpoena to appear and testify in this deposition.

MS. SCHMOOKLER: Okay. Thank you.

Q. (By Mr. White) Please take your time to look at that document and let me know when you have done so.

A. Okay.

Q. Do you recognize that document?

A. I do.

Q. Is that a true and correct copy of the subpoena that you were served with?

A.   Yes.

Q.   And that is the subpoena pursuant to which you are appearing for this deposition today, correct?

A.   Yes.

Q.   The style of this case name is there at the top.  Do you recall the details of this lawsuit?

A.   I do not.

Q.   I'll represent to you that the remaining issues in this lawsuit, as the trustee sees them, and Mr. Schmookler will -- may disagree with some of the details, are the transfers of certain amounts of money out of Goodman Networks, Inc., the debtor in this case, to Multiband Global Resources and some other unrelated entities, but what is remaining is the trustee's claim against Federal Insurance for crime coverage policy that Federal Insurance issued to the debtor.

I know you've done this several times, so I'd like to streamline this, but I will have to ask some redundant questions, so please bear with me.  When I refer to Goodman Networks or the debtor, can we agree that that is Goodman Networks, Inc.?

A.   Yes.

Q.   And for the benefit of everybody here and the reporter, please speak all of your answers, no "uh-huhs," no "huh-uhs," yes, nos, verbal answers.  And

moving forward, if you have any questions or if my questions are unclear to you, please feel free to ask me what that means and I will do my best to clarify.

A.   Understood.

Q.   Let's start briefly with what Goodman Networks is.  Are you familiar with that company?

A.   I am.

Q.   How so?

A.   I'm a shareholder and was an original founder, along with my brothers, in the company.

Q.   When you say "shareholder," how are you a shareholder in the -- in Goodman Networks?

A.   In just common shares with my brothers and some preferred shares as an investor.

Q.   Did you hold those shares personally?

A.   For the common shares, yes.  And any other shares, they would have been held by Goodman Investment Holdings a/k/a Symbiont.

Q.   And maybe -- was there an entity named Goodman MBE Group?

A.   There was, yeah, they could have held preferred shares, also, yes.

Q.   In any event, would it be safe to have referred to you -- would it be safe to refer to you as the majority shareholder of Goodman Networks?

A.   Yes.

MR. SCHMOOKLER:  Object to -- sir, I have to be able to interpose my objections.  If you could give me heartbeat to do that, I would appreciate it.  Object to form.

Q.   (By Mr. White) Let me re-ask the question.  Approximately, how many shares of Goodman Networks did you own by percentage?

A.   I don't recall.

Q.   Would it have been over 50 percent?

A.   Not me as an individual, no.

Q.   Either directly to you or indirectly through some of your corporate holdings?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  I would just need to verify that.  You know, the total number of shares that myself or entities that I was associated with, how many shares, you know, that they owned, as well, just to verify what that number is.

Q.   (By Mr. White) Okay.  Is it your understanding that you would have been considered or would you have considered your -- let me restart, Scott.

Would you have considered yourself, at January 30th of 2022, to be the majority shareholder of Goodman Networks?

A.   Yes.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) At any point, were you a director of Goodman Networks?

A.   I was, yes.

Q.   How long?

A.   Four years.

Q.   From when to when?

A.   I don't recall the exact dates.

Q.   Would that have included January of 2022?

A.   I think by paper, yes.  You know, I did do a verbal, you know, earlier than that, but officially by documents, yes.

Q.   When you say "verbal," what do you mean by that?

A.   I sent an e-mail and notification to the company, you know, that -- of my resignation in December, but the official signed document between the parties ended up being like January or February 2022.

Q.   Does February 1st, 2022 sound right for the executed resignation?

A.   It does.

MR. SCHMOOKLER:  Object to form.  Object to form.  Sir, you do have to give me a chance.  I apologize for being on video today due to travel, but if

you could just bear with me a moment to let me get my objections in, it will make the court reporter's job easier.

Q.   (By Mr. White) For the period of time that you've remained a director, from December of 2021 through whenever that executed document was, would you have been the only director of Goodman Networks?

A.   I'd have to go back and look.  I can't recall.

Q.   Who else might have been a director at that point in time?

A.   James Frinzi.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) And when you get an objection from Mr. Schmookler, please state your answer again, and then if we have to address the objection, we will, so please, your answer.

A.   James Frinzi.

Q.   Was there ever any document, to your recollection, formally appoints Mr. Frinzi as a director of Goodman Networks?

A.   I don't recall.  I would need to go back and look.

Q.   Your directorship of Goodman Networks, would that have applied -- well, let me take a step back.  Did Goodman Networks have any wholly owned subsidiaries?

A.    It did.

Q.    What would those entities have been?

A.    The GNET Company and Multiband and Multiband, I can't remember if it was holdings or -- but Multiband and GNE -- or GNET would have been two companies that would have been wholly owned subsidiaries of Goodman.

Q.    And would that have been GNET ATC and Multiband Field Services?

A.    Yes, yes.

Q.    At the point in time you were a director, were there any officer -- well, that's too broad.  Let's focus our conversation right now on December of 2021 and January of 2022.  Are you with me?

A.    Yes.

Q.    During that period of two months, did Goodman Networks have any officers?

A.    Yes.

Q.    Who would that have been?

A.    It would have been James Frinzi and myself, James Goodman.

Q.    What officer position did you hold?

A.    Board position only.

Q.    Okay.  So, no -- you weren't a Chief Finance Officer or something like that?

A.    I was not.

Q.   So, as far as a C-suite officer goes, that would have only been Mr. Frinzi?

A.   To my recollection, yes.  I would just need to confirm that.

Q.   And what position did Mr. Frinzi have?

A.   The CEO position.

Q.   Do you recall what time -- around what time Mr. Frinzi was made the CEO of Goodman Networks?

A.   In -- I want to say around the October 2021 timeframe.

Q.   At the time that Mr. Frinzi was named CEO, would he have had to go to you for certain business decisions?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  Structurally, you know, he would have had to look at the bylaws of the company and see what needed board decisions, so -- so, yes, Jim would have -- you know, Jim would have needed to, you know, follow whatever bylaws the -- the company had in place.

Q.   (By Mr. White) With respect to that, would -- again, purely by recollection, would that have included perhaps making transfers above a certain size?

A.   I'm not sure.  I would need to look at the bylaws.



Q.   I'm going to ask you a couple of questions and we're going to focus today realistically on the transfer of around $4.4 million that left Goodman Networks, the debtor, in December of 2021 and were transferred to a separate entity in January of 2022, and I'm going to hand you a couple of documents now.

MR. WHITE:  Scott, we're starting with the Prosperity Bank statement for Goodman Networks on December of 2021.  I'll give you the Bates whenever you're ready.

MR. SCHMOOKLER:  Yeah, I got the statement here.

MR. WHITE:  Okay.

MR. SCHMOOKLER:  Just give me the last four account numbers to make sure I have the right number.

MR. WHITE:  It's 1838.

MR. SCHMOOKLER:  Yep.

(Exhibit No. 2 marked.)

Q.   (By Mr. White) I'm handing you what we're going to mark as Exhibit 2.  Do you recognize that document?

A.   I do not.

MR. SCHMOOKLER:  I'm just going to move on -- sir, I just want to move to strike the colloquy

comment.  Obviously, you're interposing facts we may not agree with, but up until you introduced the exhibit, that's fine; after that.

Q.   (By Mr. White) Okay.  Please give yourself a moment and take a look at that document and let me know when you've had a chance to review that.

A.   Okay.

Q.   Do you recognize this document?

A.   I do not.

Q.   Are you aware of Goodman Networks holding certain bank accounts at Prosperity Bank?

A.   Yes.

Q.   Would one of those accounts have been a cash concentration account ending in 13 -- 1838?

A.   I can't recall, you know, account numbers, but I do know that Prosperity did hold an account for Goodman Networks.

Q.   Okay.  If you look at this document, if you review this document, do you have any reason to dispute that this is a true and correct copy of the bank statement for December of 2021?

A.   I do not.

Q.   I'd like to flip you to the second page here, and around halfway down, starting on December 10th of 2021, do you see a line item that says "CM Wire Domestic

WIRE OUT Multiband Field Services, Inc."?

A.   CM Domestic Wire and Multiband Field Services?

Q.   Yes.

A.   Yes, I see that.

Q.   Do you see that it is for $500,000?

A.   I do.

Q.   Do you recall what that transfer was for?

A.   No.

          MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) I'm going to move you to the next page, and I'll move you to the transfers on December 21st of 2021.  The line item will be "CM Wire Domestic WIRE OUT Multiband Field Services, Inc."  Do you see that?

A.   I do.

Q.   Do you see on the right that it was a transfer out of $4 million?

A.   Yes.

Q.   Do you recall what that transfer was for?

A.   I do not.

          (Exhibit Nos. 3 & 4 marked.)

Q.   I'm going to hand you a second -- or a second bank account now.  Actually, I'll hand you two to speed this along a little bit.  And these are going to be marked as Exhibits 3 and 4.

MR. WHITE:  Scott, these are the East West Bank account statements for January and December.

MR. SCHMOOKLER:  Okay.  Is it -- you're talking from MSF or --

MR. WHITE:  Yes, for Multiband Field Services.

Q.   (By Mr. White) So, I'm handing you Exhibit 3.

MR. SCHMOOKLER:  What month is that, Conor?

MR. WHITE:  Should be December.

THE WITNESS:  It is, December.

MR. WHITE:  And then Exhibit 4 will be January.

Q.   (By Mr. White) Have you had a chance to review those documents?

A.   Yes.

Q.   Do you -- let's start with Exhibit 3.  Do you recognize Exhibit 3?

A.   I do not.

Q.   Are you aware generally of Multiband Field Services having an East West Bank account?

A.   I don't -- I don't recall.

Q.   Would you have any reason to dispute that Multiband Field Services did have -- well, let me -- let me start over.

Do you see there in the bottom right corner, there are a couple of names and then numbers. One says "Goodman" and the other says "Trustee GRSM." Do you see that?

A.   Yes.

Q.   You've produced many documents to the trustee through the course of this bankruptcy case and the several adversary proceedings, correct?

A.   Yes.

Q.   Are you aware that your productions were generally marked with the Bates prefix of Goodman?

A.   No.

Q.   Do you have any reason to dispute that you provided a copy of this bank statement to the trustees?

A.   No.

Q.   Do you have any reason to dispute that this is not a -- don't want to get that double-negative.

Do you have any reason to dispute that this is a true and correct copy of the bank statement for Multiband Field Services for December of 2021?

A.   No.

Q.   I'm going to ask you the same questions of Exhibit 4 now.  Do you recognize this document?

A.   I do not.

Q.   Do you see in the bottom right corner that

this is marked as a Bates prefix of Goodman underscore?

A.   Yes.

Q.   Do you have any reason to dispute that you've provided this document to the trustee through the course of this bankruptcy case?

A.   Me personally?

Q.   Your counsel.

A.   No.

Q.   Do you have any reason to dispute that this is a true and correct copy of Multiband Field Services bank statement for January of 2022?

A.   No.

Q.   I'm going to start you on Exhibit 3 just for a moment here.  Do you see that the same dates that we looked at on Exhibit 2 are identified here in the credits for Exhibit 3?

A.   Could you repeat that question?

Q.   Sure.  Let me -- let me smooth that up a little bit.  We looked at two different transfers on Exhibit 2, correct?

A.   Yes.

Q.   One being a $500,000 transfer on December 10th and a $4 million transfer on 2021?

A.   Yes.

Q.   Sorry, excuse me, December 21st.

A.   Yes, yes.

Q.   And do you see on Exhibit 3 that there are two corresponding transfers in of December 10th for $500,000?

A.   Yes.

Q.   And then a second transfer in of December 21st for $4 million?

A.   Yes.

Q.   And then up at the top, you see that it has an ending balance of 4.4 million and $50,000?

A.   Yes.

Q.   If you turn to Exhibit 3, you will see that this is the same bank account number, correct?  Sorry, it will be -- it will be up in the top right corner where it says "account statement."  The part is redacted for the initial bank's numbers.

A.   Yes, I see it.

Q.   And these two statements, Exhibit 3 and Exhibit 4, these are the same bank account, correct?

A.   Yes.

Q.   And these are -- Exhibit 4 is the month following Exhibit 3 that we just looked at, correct?

A.   Yes.

Q.   Do you see that there is an outgoing wire on January 4th to Multiband Global Resources?

A.   Yes.

Q.   And that is for $4.4 million, correct?

A.   Yes.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) Let's focus on that $4.4 million at a high level for a moment, okay.  Do you recall, as of January of 2022, knowing that there would be a transfer of $4.4 million to a company named Multiband Global Resources?

A.   No.

Q.   Did you know, as of January of 2022, what Multiband Global Resources was?

A.   No.

Q.   Did you know, at any point in December, when the money was transferred to Multiband Field Services, Inc. that money would be used to fund a third-party?

A.   No.

MR. SCHMOOKLER:  Object to the form. Hold on.  Sorry, sir, I was just listening to the question.

Q.   (By Mr. White) And I'll rephrase that question.

MR. SCHMOOKLER:  I don't know what you mean by "third-party."

MR. WHITE:  That's fair.

Q.   (By Mr. White) Let's take a step back.  Do you know now what Multiband Global Resources is?

A.   Yes.

Q.   What is your understanding of what Multiband Global -- Multiband Global Resources is?

MR. SCHMOOKLER:  I'm going to object to the extent that it was learned through counsel and just to note that it -- I don't know to what extent you're waiving privilege, Conor, and to what extent he's waiving privilege.

MR. WHITE:  I don't think we have.

MR. SCHMOOKLER:  You may want to lay a foundation for how he learned this.  Is it he learned it through counsel?

MR. WHITE:  Okay.

MR. SCHMOOKLER:  I just want to be clear about this.

MR. WHITE:  That's fair.

Q.   (By Mr. White) Let me take a step back.  You just -- well, let me -- I'll just restart entirely.

You have an understanding as of today of what Multiband Global Resources is, correct?

A.   Yes.

Q.   Is any part of your understanding through anything other than conversations with your attorneys?

A.   I don't understand your question.

Q.   Then let me -- let me rephrase it this way: Without going into conversations that you had with your attorneys or what your attorneys have told you, what is your understanding of what Multiband Global Resources is?

A.   That it's a company -- you know, through all the discovery over the last, you know, two years, my understanding is that it's a company that James Frinzi created.

Q.   During your tenure as a director of Goodman Networks, were you ever asked to approve the transfer of $4.4 million to Multiband Global Resources?

A.   No.

Q.   Were any of your entities that were shareholders of Goodman Networks asked to approve a 4.4 million transfer to Multiband Global Resources?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  No.

Q.   (By Mr. White) Did you have any conversations with anybody -- anybody prior to January 4th of 2022 regarding a $4.4 million transfer to Multiband Global Resources?

A.   No.

Q.   Was it your understanding, as of January of

2022, that James Frinzi would have needed to get approval from the board to make a transfer of that size?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  Ask the question again.

Q.   (By Mr. White) Sure.  Would your understanding -- was your understanding of January of 2022 that Mr. Frinzi would have needed to seek approval to transfer $4.4 million to Multiband Global Resources?

A.   I would have to check the company bylaws to see what the approval requirement was.

Q.   Would you have expected him to seek board approval for a transfer of that size?

A.   Yes.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) To the best of your knowledge, was Mr. Frinzi authorized to make a transfer of that size?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  I would need to look at the company bylaws and the, you know, the company internal structure to see what the approval levels were for the different officers of the company.

(Exhibit No. 5 marked.)

Q.   (By Mr. White) Sure.  I'm going to hand you a document that we'll mark as Exhibit 5 for a moment here.

MR. WHITE:  Scott, this is going to be Trustee_GRSM_0553248.

MR. SCHMOOKLER:  0553248?

MR. WHITE:  Yes.

Q.   (By Mr. White) Now, I'm going to hand you this document.  Please take a moment to look at that.

A.   Okay.

MR. WHITE:  And Scott, I will let you know, this does have the attached exhibit starting at 3249, so the attachment to the e-mail, as well.

MR. SCHMOOKLER:  Okay.

Q.   (By Mr. White) Do you recognize this document?

A.   I do not.

Q.   Do you recognize the written consent of the sole member that is the second page of this document?

A.   Ask your question again, please.

Q.   Do you recognize this document that starts on page two, this written consent of the sole member?

A.   I do not.

Q.   Okay.  Looking at the first page of this document, do you see there where there are a couple of people in the CC line?

A.   I do.

Q.   Do you see that james.goodman@genesisnet.com is one of the recipients?

A.   I do.

Q.   Is that your e-mail?

A.   It is.

Q.   And then, you also see that there is a separate James Goodman recipient right below that, correct?

A.   No.

Q.   So, if you look at the line where it says james.goodman@genesisnet.com --

A.   Yes.

Q.   -- do you see right below that?

A.   Oh, yes, yes, yes, yes, yes, okay.

Q.   Do you know if that was just a separate e-mail you might have had that auto-filled to your name?

A.   It could have been, yes.

Q.   Do you have any reason to dispute that on December 1st of 2021 you received this e-mail?

A.   No.

Q.   And that the "from" line, it says james.frinzi@gnetatc.com, do you see that?

A.   I do.

Q.   And would that be James Frinzi, the CEO of Goodman Networks?

A.   Yes.

Q.   Let's start by looking at this e-mail.  You

see where it says "Hi.  Attached is a resolution for the banking procedures.  The net-net is at up to 100,000. James and I can each execute transactions independently. Above 100,000, we need a dual authorization."  Do you see that?

A.   I do.

Q.   Was that -- to your knowledge, was that true with respect to how the banking procedures worked as of December of 2021?

A.   I don't --

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  I don't recall.  I would need to see -- because Goodman Networks, you know, governed GNET ATC, so GNET ATC had no rights, no authority, you know, to -- so, I would just need to go back and go look at the Goodman Networks shareholder's agreement or authorization, you know, documents.

(Exhibit No. 6 marked.)

Q.   (By Mr. White) I'm going to hand you a separate document.  We'll mark this as Exhibit 6.

MR. WHITE:  Scott, this is going to be Trustee_GRSM_0841342 and the attachment.  Well, sorry, no attachment.

Q.   (By Mr. White) Please take a look at that document and let me know when you've had a chance to

review it.

A.   Okay.

Q.   Now, I recognize you're not on this document, but that's not the reason I'm going to ask you to look at this.  If you look at the second page, do you see that there is an e-mail from Stephanie Elmore dated December 1st, 2021 at 10:30?

A.   Yes.

Q.   And that's the same day as Exhibit 5 that we just looked at, correct?

A.   Yes.

Q.   Do you see where Stephanie Elmore -- well, let me ask this first, who is Stephanie Elmore?

A.   I think she was the -- the controller for Goodman Networks.

Q.   By controller, what do you mean?

A.   That -- that she remained at the company to help support the company and was managing the AP/AR and -- and finances, so -- but it just says she was accounts payable, so she wasn't the controller.

Q.   Okay.  But, it was your understanding that she was, for lack of a better term --

A.   She was helping with the AR and AP, you know, to be paid at -- at Goodman.

Q.   Okay.  Do you see where she writes, on

December 1st at 10:26 a.m., "Jim, is the agreement for Goodman Solutions, too, or just for GNET ATC"?

A.   I do.

Q.   Is Goodman Solutions another name for Goodman Networks?

A.   It is.

Q.   And is James Frinzi commonly referred to by Jim?

A.   He is.

Q.   And then do you see the e-mail immediately above, it's a little cutoff, but it's from James Frinzi at GNET ATC one minute later, December 1st, 2021 at 10:27.  Do you see that?

A.   I do.

Q.   And then do you see where Mr. Frinzi responds "both"?

A.   Yes.

Q.   Do you have any reason to dispute that the agreement -- well, before I get there, back on that second page, do you see the e-mail from James Frinzi where he discusses with Stephanie Elmore that -- the second page, do you see James Frinzi e-mailed Stephanie Elmore, "It's under my $100,000, which is in my authorization limit"?

A.   Yes, I see that.

Q.    And the response to that e-mail is Ms. Elmore asking if the agreement was for Goodman Solutions, too, or just GNET, correct?

A.    Yes.

Q.    Do you have any reason to dispute that the resolution that we looked at as Exhibit 5 was an authorization limit for both Goodman Networks and GNET?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  Yes, I don't think GNET ATC had, you know, any rights, or you know, executive ability as a corporation to govern, you know, Goodman Networks because it was just a wholly owned subsidiary.

Q.    (By Mr. White) And I'm -- I'm not asking about that.  What I'm asking is, would you have any reason to dispute that James Frinzi, as an individual, as the CEO of Goodman Networks, was restricted to unilateral authority of transfers of up to $100,000?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  That he was restricted?

Q.    (By Mr. White) Correct, that that was his sole discretion limit.

A.    Could you ask me that question again, please?

Q.    Sure.  Do you have any reason to dispute that for transfers over $100,000, James Frinzi was supposed to seek authorization from you, as well?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  I would just, again, need to -- you know, I would have to revert back and see what the approval or what the board, you know, allowed and, you know, any type of agreements at Goodman, what the board allowed an officer, you know, to make on his own.

Q.  (By Mr. White) Sure.  Let's take a step back. What was Goodman Networks business?

A.  Goodman Networks business was professional services and VAR services.

Q.  When you say "VAR," what do you mean?

A.  It's a -- would be a reseller.  They buy equipment from original equipment manufacturers and then sell it to -- back to AT&T or other providers, telecom providers, so that's what an OEM -- a VAR is, a value added reseller.

Q.  That was going to be my next question, does it stand for value added reseller?  Thank you.  What was Multiband Field Services business?

A.  Professional services.

Q.  Was Multiband Field Services the place where Goodman Networks employees were officially employed?

A.  Not that I recall.

Q.  When you say "professional services" then, what do you mean by professional services?

A.   Field services, so the installing a dish or a DirecTV antenna satellite on a home, providing those professional services.

Q.   Understood.  So, at any point, was the business of Goodman Networks to be a lender?

A.   No.

Q.   Was Multiband Field Services business to be a lender?

A.   No.

Q.   Did you run any businesses under the Goodman Networks umbrella whose sole purpose was to provide loans?

A.   Not that I recall, no.

Q.   As of December of 2021, what ongoing operations did Goodman Networks have?

A.   To my recollection, it would have been Frontier Communications, it would have been like the -- the LSU DAS, you know, business.  There were still -- there were still some accounts, you know, at Goodman -- at Goodman Networks after December 2021.

Q.   But, nothing that would have involved strictly the business of lending money to another party with the expectation it would be repaid?

A.   That's correct.

Q.   What -- as of December of 2021, what were

Multiband Field Services ongoing operations?

A.   Nothing as far as I recall.

Q.   Now, we spoke briefly earlier about when -- or whether or not you knew about what Multiband Global Resources was as of December 21 -- December of 2021 or January of 2022.  When was the first time that you learned of Multiband Global Resources?

A.   I don't recall.

Q.   Do you have any recollection as to who first told you about it?

A.   James Frinzi.

Q.   Do you recall, roughly, what timeframe that would have been?

A.   I do not.

Q.   Would it have been after the bankruptcy petition?

A.   I don't recall.  I would just need to go back and see if there was any communication between James Frinzi and myself, you know, prior to that.  Otherwise, you know, what -- it would have been after the bankruptcy that I started to learn what was -- who Multiband Global was.

Q.   Okay.  When you said that's when you began to learn who or what Multiband Global Resources was, what do you mean by that?



MR. SCHMOOKLER:  Object to form.  And sir, I just caution you, if you're disclosing something you learned from your lawyer, if you could just make that clear so I know to what extent you're waiving privilege, that would be helpful to me.

THE WITNESS:  Could you ask the question again?

Q.   (By Mr. White) Sure.  You just testified that to the extent you learned who or what Multiband Global Resources was would have been after the bankruptcy petition, correct?

A.   That I recall, yes.

Q.   And what I -- what I'm asking you is, to the extent you have this knowledge beyond conversations with your attorneys, what about Multiband Global Resources did you learn following the bankruptcy case?

A.   That James Frinzi used, you know, that company, you know, for his own gain, his own -- his own service.

Q.   And when you say "for his own gain," what do you mean by that?

A.   That it was used outside of Goodman Networks. Goodman Networks didn't get any benefit from Multiband Global Services.

Q.   Did Multiband Field Services get any benefit

from Multiband Global Resources?

A.   Not that --

MR. SCHMOOKLER:  Object to form.  Hold on, sir.  Object to form.  And I'm objecting to this line of questioning as lacking foundation.  Thank you, sir.

Q.   (By Mr. White) Please answer.  What was your answer?

A.   What was the question again?

Q.   Sure.  Did Multiband Field Services get any benefit from Multiband Global Resources?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  So, I'm not sure.  I don't recall who the loan agreement, you know, was, if it was between Multiband Field Services or if it was between Goodman Networks, but you know, I don't recall them getting any benefit.

Q.   (By Mr. White) And you mentioned a loan agreement.  What loan agreement are you referring to?

A.   I thought there was a loan agreement, you know, between -- you know, between the companies, other -- Multiband Global or AMRR, you know, back to the company, but that's -- that's what I'm recalling.

Q.   Understood.  For purposes of today, we're going to stay away from AMRR, from the $44 million.

A.   Okay.

Q.   When you refer to a loan agreement, are you aware if you were told of or learned of a $4.4 million loan agreement?

A.   No.

MR. SCHMOOKLER:   Object to form.

Q.   (By Mr. White) Do you -- let me restart.   At any point, did Goodman Networks have any ownership interest in Multiband Global Resources?

A.   Not that I recall, no.

Q.   Would you have been told as the majority shareholder of Goodman Networks?

MR. SCHMOOKLER:   Object to form.

THE WITNESS:   The company should have been told if they -- they would have had to, you know, approve it, look at the documents, have an attorney look at it.   There would have been some formality that they would have needed to go through.

Q.   (By Mr. White) But you were never involved in any of that?

A.   I was not.

Q.   Did you have any agreement, oral, written, otherwise, in secret or not, with Mr. Frinzi to -- well, this may be a little bit premature.   Is it your understanding today that Multiband Global Resources is

owned entirely by James Frinzi individually?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  Ask me the question again.

Q.    Sure.   What is your understanding of who owns Multiband Global Resources?

A.    James Frinzi.

MR. SCHMOOKLER:  Object to form.

Q.    (By Mr. White) In its entirety?

A.    Yes.

MR. SCHMOOKLER:  Object to form.

Q.    (By Mr. White) Did you have any agreement, oral or written, secret or not, any kind of handshake deal or not, with Mr. Frinzi to share any profits or benefits or value of Multiband Global Resources?

A.    Not that I recall.

Q.    Would you remember an agreement like that?

A.    If I signed something like that, yes, or it would have been discovered, you know, in the e-mails coming from the attorneys.

Q.    But, to the extent that those documents don't exist, or if we don't have them, you don't have any recollection that there was such an agreement?

A.    No.

Q.    Do you recall when you first learned of this $4.4 million transfer?

888-893-3767
www.lexitaslegal.com

LEXITAS

PAPP0659

A.   No.

Q.   And are you aware -- I will represent this to you -- as part of this adversary proceeding, that this $4.4 million was used to purchase a lake house property in Horseshoe Bay, boats and jet skis.  Are you aware that the money was used -- this $4.4 million was used for that purpose?

A.   Yes.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) When did you become aware of that?

A.   Late into the bankruptcy through discovery.

Q.   Through discovery?

A.   Yes.

Q.   So, do you recall who -- and if this was your attorneys, I don't want to know.  Do you recall who told you that?  Would that have been John Goodman?

A.   Well, John didn't know -- John told me that James Frinzi bought a lake house in Horseshoe Bay, and so that's whenever I was, you know, first aware of, you know, that -- that -- or my suspicions of what Jim was doing or what he might have did.  But when I confronted Jim about it, he told me he made the money from -- you know, from a COVID company where he was collecting money from a COVID company that he owned.

Q.   Now, are you aware that there was initially a defendant in this adversary proceeding by the name of Frinzi Family Trust?

A.   Yes.

Q.   Do you know what Frinzi Family Trust is?

A.   I do not.

Q.   Are you aware whether or not this lake house was and the lot was ever transferred to Frinzi Family Trust?

A.   I do not.

Q.   Did you ever receive any benefit personally or through a company you own for this lake house, the lot, the boats or the jet skis?

A.   No.

Q.   Can you think of any legitimate reason that this $4.4 million was transferred to Multiband Field Services and then to Multiband Global Resources?

A.   None.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) If you had been made aware of this $4.4 million going to Multiband Global Resources, would you have approved that transfer?

A.   No.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) Was Frinzi ever authorized, in

his role as CEO of Goodman Networks, to use Goodman Networks' funds for his personal benefit?

A.   No.

Q.   Would you --

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) Would you have ever authorized him to use Goodman Networks' money for his own personal benefit?

A.   No.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) Before I continue, I want to talk briefly about the structure of Goodman Networks. Was Goodman Networks owned or run at any point by anybody other than yourself?

A.   Yes.

Q.   Who would those people have been?

A.    It would have been Mark Keifer was the -- the CEO of the company, and then my brother John was the CEO prior to him.

Q.   And with respect to how the board was organized, did you have, at any point prior to December of 2021, any other board members with you?

A.   Prior to 2021?

Q.   Prior to December of 2021.

A.   Well, yes.

Q.   I'll be more specific.  Up until around October of 2021, you were also joined on the board by two of your brothers, correct?

A.   I believe so.

Q.   And you mentioned that your other brother John was a -- the CEO of the company prior to Mark Keifer, correct?

A.   Yes.

Q.   Are you aware that John was later brought on in late of 2022 to help consult the company with the bankruptcy filing?

A.   Yes.

Q.   To your knowledge, were either of your -- any of your brothers, John, Jason, Joseph, any other brothers you may have, involved in Goodman Networks, made aware of the $4.4 million transfer?

A.   No.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) Did you have any discussions with John about the $4.4 million transfer?

A.   No.

Q.   Did you have any discussions with Jason about the $4.4 million transfer?

A.   No.

Q.   Jason?

A.   No.

Q.   And again, I want to ask this question without getting into any conversations you might have had with your attorneys.  When did you first learn that this $4.4 million that went to Multiband Global Resources was transferred for the benefit of Frinzi individually?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  Through -- through the Chapter 7 discovery.

Q.   (By Mr. White) And through that process, you discovered documents that Frinzi had shielded from you?

A.   Yes.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) That there was information you were never told about respect -- with respect to this $4.4 million?

A.   Yes.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) That Mr. Frinzi hid this transfer from you?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  Yes.

Q.   (By Mr. White) I believe I asked this question already, but I want to ask it again to make sure I remember your testimony.  Do you recall having any

conversation with Mr. Frinzi about this $4.4 million?

A.   No.

Q.   And so, he never came to you after the bankruptcy filing and admitted that he did this?

A.   He did not.

Q.   But, he also never told you that this was something he was going to be doing, correct?

A.   Correct.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) When did you first form the opinion that this money was actually transferred for Mr. Frinzi's sole benefit?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  I would need to go back and look when we received, you know, the discovery, you know, documents, but it would have been late 2023 or 2024.

Q.   (By Mr. White) 2023 or 2022?  The bankruptcy was started in September of 2022.

A.   So, I would say it would have been -- wait, when was the bankruptcy started?

Q.   The petition -- the involuntary petition was filed, I believe, on September 6th of 2022.

A.   I would have learned whenever we got -- when my attorney received the discovery documents from James

LEXITAS

Frinzi and from Goodman Networks.

Q.   Okay.  Is it possible that you knew about this transfer before the bankruptcy, but you just didn't think it was made for Frinzi's personal benefit?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  I don't think so.  I mean, if I did, then I would just need to see an e-mail or need to see something that, you know, that shows that.

Q.   (By Mr. White) What I'm asking realistically is, if you were told about this transfer at some point, is it possible that Frinzi hid the true nature of it from you?

A.   Absolutely.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) Is it your opinion -- what is your opinion of Mr. Frinzi?

A.   That --

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  That he stole all the money from Goodman Networks, worked, colluded with the group out of Florida, looted the company, self-served himself, signed my name to a loan document that I never signed and did not disclose to me, you know, where the money was coming from from the individuals who bought my bonds and bought my A1 preferred.

Q.   (By Mr. White) Would it be safe to say that your opinion of Mr. Frinzi is that he's dishonest?

A.   Yes.

MR. SCHMOOKLER:   Object to form.

Q.   (By Mr. White) At any point before the bankruptcy, after the bankruptcy, did you have any discussions with any other employees or officers or directors of Goodman Networks about this $4.4 million?

A.   No.

Q.   So, as you sit here today, you have no recollection of any conversations with anybody else who might have been aware of this 4.4?

A.   Not that I can recall.

Q.   It's been about an hour.  Why don't we take a quick break.

MR. WHITE:   Scott, does five to ten minutes sound good?

MR. SCHMOOKLER:   However long you'd like.

MR. WHITE:   All right.  Let's take a quick five, ten minute break and then we'll take this back up in a minute.

THE WITNESS:   Okay.

VIDEOGRAPHER:   Off the record at approximately 2:01 p.m.

(Recess from 2:01 to 2:08.)

VIDEOGRAPHER:  This is the beginning of media two, we're on the record at approximately 2:08 p.m.

THE WITNESS:  Can I clarify something?

Q.   (By Mr. White) Sure.

A.   So, I think there was some prior communication on Multiband Global Services.

Q.   Just before we get to it, do you mean Multiband Global Resources or Multiband Field Services?

A.   Multiband -- wait.

Q.   It's hard to keep the names together, I understand.

A.   I thought it was Multiband Global.

Q.   Yes, Multiband Global Resources is the company that received the $4.4 million.

A.   Okay.  All right.  Just for the record, I think there was some prior communication with that entity because I thought it bought AMRR.  I thought Multiband Global borrowed money from Goodman Networks to buy AMRR.  And if there was, there might have been some, you know, prior conversation, you know, on it, but there would have been an e-mail or e-mail exchange.  I just wanted to clarify that.

Q.   Understood.  It is the same entity, I'll represent to you.

A.   Okay.

Q.   But, at the time, was it also your understanding that Goodman Networks would own some portion of MGR?

A.   Well, it would have been --

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  It would have been all for Goodman Networks' benefit and its creditors.

Q.   (By Mr. White) The purpose of the entity, to your understanding, was that it would ultimately be used to benefit the stakeholders of Goodman Networks?

A.   I can't recall all the conversation from all the way back then, but it was certainly not for, you know, the benefit of James Frinzi.

(Exhibit No. 7 marked.)

Q.   Understood.  I'm going to hand you what we'll mark as Exhibit 7.

MR. WHITE:  And Scott, this is Trustee_GRSM_0013380.

Q.   (By Mr. White) Take a moment and familiarize yourself with that document.

A.   Okay.

Q.   Now, you're not on this document, but do you recognize this?

A.   I do not, no.

Q.   See at the bottom of the first page, there is an e-mail from Robert DiRico to specialtyclaims@chubb.com.  Do you see that?

A.   I do.

Q.   That's dated October 28th of 2022?

A.   Yes.

Q.   Do you see that the subject line of the e-mail says that it is regarding Goodman Networks - potential claims under D&O policy, James Frinzi?

A.   Yes.

Q.   Do you also see below that there is a separate regarding line that says "Goodman Networks, Inc. management liability package including crime."  Do you see that?

A.   Yes.

Q.   Are you aware of what this is?

A.   No.

Q.   Were you involved, at any point, with the, for lack of a better term, issuance of a notice to Chubb of a potential crime claim regarding this $4.4 million?

A.   No.

          MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) Do you have any knowledge of who was involved with making this claim to Chubb?

          MR. SCHMOOKLER:  Object to form.

THE WITNESS:  The trustee, the Goodman Networks trustee.  I don't know.  I don't know who did the claim or --

Q.   (By Mr. White) All that to say that to the extent that there was a claim made or that this e-mail was a claim, you were not involved in the discussions?

A.   I was not.

Q.   Do you have any idea who did approve this claim?  And I will represent to you that the trustee is not on this e-mail conversation.  It's my understanding that this was not done with -- well, actually, I'll -- I won't go that far.  But, do you see that it is generally an e-mail chain from Robert DiRico and David Parham, Joseph Baum, Andrea Hartley?  Do you see that?

A.   Yes.

Q.   Let's start generally with do you know who Howard Konicov is?

A.   Yes.

Q.   Who is he?

A.   He works for or a partner in CFGI.

Q.   Okay.  And what is your understanding of what CFGI is?

A.   So, CFGI was hired by James Frinzi early -- was hired by James Frinzi to -- to represent Goodman Networks and workout an agreement with the creditors and

LEXITAS
PAPP0671

the bondholders.

Q. Understood. Do you know who Robert DiRico is?

A. I do not, no.

Q. Do you know what ARC Excess & Surplus is?

A. I do not.

Q. And then, are you aware of who David Parham is?

A. I know the name, but I've -- yes, I know who David Parham is.

Q. Who is he?

A. He works for or is a partner at Akerman in New York.

Q. And was Akerman initially retained to be bankruptcy counsel for Goodman Networks?

A. I can't recall.

Q. Do you recall why Akerman was ever retained?

A. No.

Q. Okay. I do have one question. If you look at the page ending in 81, there is a recipient in the CC line that is just a jg@goodmannetworks.net. Do you know who that is?

A. No.

Q. But that J.G. is not you J.G.?

A. It is not.

Q. I wanted to ask briefly about -- there's some

narrative here in this e-mail from Howard Konicov about the $4.4 million.  Do you see that?  It starts at the very bottom of that page.

A.   Yes.

Q.   Do you see that it refers to the $4.4 million as a loan?

A.   Yes.

Q.   Do you know why it might have been referred to as a loan or do you have an --

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) Do you have any understanding as to why it might have been viewed as a loan?

A.   No.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) And you mentioned, or we discussed earlier, rather, that if there was a loan document for the $4.4 million, you've never seen it?

A.   Correct.

Q.   You've never signed one?

A.   No, I have not.

Q.   We've touched briefly on the bottom of that first page where it says "Management liability package, including crime."  Do you have any idea -- and, again, strictly your personal knowledge or your personal understanding, as to why anything would be transmitted

to Chubb for a potential crime?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  Could you ask the question again, please?

Q.   (By Mr. White) Sure.  And I'll go one step further.  What is your understanding of Chubb's role in relation to Goodman Networks?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  That it's -- it's -- was its insurance company and D&O insurance provider.

Q.   (By Mr. White) Now, looking actually what I asked you about earlier, do you have any independent understanding as to why anything was -- or this e-mail in particular was transmitted to Chubb about a potential management liability package, including crime?

A.   No.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) With respect to this $4.4 million, have you, at any point after the fact, ratified that transfer?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  Ratified, what do you mean?

Q.   (By Mr. White) Have you ever had a discussion with Mr. Frinzi or somebody acting on Goodman Networks' behalf where you, after the transfer was made, approved

that transfer?

A.   No.

Q.   You -- have you ever had a discussion where you learned of the transfer being for Mr. Frinzi's benefit and failed to take action to recover that money?

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) In other words, if you had known that that money was going to Mr. Frinzi's entity for no legitimate business purpose, would you have done something to prevent that money going to MGR?

A.   Yes.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) To your knowledge, did any other shareholders ever approve this transfer?

A.   No.

MR. SCHMOOKLER:  Object to form.

Q.   (By Mr. White) Have you ever had a conversation with any other shareholders of Goodman Networks regarding this transfer?

A.   No.

Q.   This transfer being --

MR. SCHMOOKLER:  Object to form.

Q.   -- the $4.4 million.

A.   No.

MR. WHITE:  I know we just came back, but

I'm going to make one quick phone call, Scott, and then

I think we might be able to wrap up on -- on our end

here.  Does that work for you?

MR. SCHMOOKLER:  Yeah, yeah.  Is there a

computer so I can show the witness documents virtually?

MR. WHITE:  There is.  There's one right

in front of Mr. Goodman.

MR. SCHMOOKLER:  Great.  Just making

sure.  You want to take five minutes, ten minutes?  How

long do you want to take?

MR. WHITE:  Yeah, let's take -- let's

take a quick ten minute break one more time and then

we'll be back as soon as we can.

MR. SCHMOOKLER:  Okay.  Sounds great.

VIDEOGRAPHER:  Off the record at

approximately 2:19 p.m.

(Recess from 2:19 to 2:27.)

VIDEOGRAPHER:  On the record at

approximately 2:27 p.m.

Q.   (By Mr. White) Just one or two questions left

for you, Mr. Goodman, to clean-up.  Understanding that

there may or may not have been an informal conversation

with your resignation in December, until the document

was signed, you would have been the only board member of

Goodman Networks, correct?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  I would just need to check to see if James Frinzi was a board member, also.

Q.   (By Mr. White) If Mr. Frinzi was not, then you would have been the only -- only board member?

A.   Yes.

Q.   And absent the structure of the board of Goodman Networks, it's your understanding that Multiband Field Services had no authority to act other than to the extent that Goodman Networks directed it to, correct?

A.   Yes.

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  Could I clarify something, also?

Q.   (By Mr. White) Sure.

A.   You asked earlier if anyone else would have known about the $4.4 loan, or even that $44 million loan, and CFGI would have known about that.  Jason Bond would have known.  They managed all of the financials for Goodman Networks.  They worked with Jim Frinzi on a daily basis.  They would have looked at the bank statements, talked to Stephanie, talked to Samantha, they would have been aware of what Jim was doing.

Q.   Do you have any understanding as to whether or not they knew why Mr. Frinzi was doing what he was

doing?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  I don't know.  I don't know.

MR. WHITE:  Mr. Goodman, that, I think, will be everything that I have for you.  I thank you again for your time today and I will pass the witness.

EXAMINATION

BY MR. SCHMOOKLER:

Q.   Mr. Goodman, how are you today?

A.   Better when this is over.

Q.   Yeah, I get it.  I understand you've been deposed a number of times; is that correct?

A.   Yes.

Q.   Okay.  My name is Scott Schmookler.  You and I have never met before today, correct?

A.   Correct.

Q.   And -- and I represent Federal Insurance Company, which is a writing company under the Chubb umbrella, and I'm here to ask you some follow-up questions, okay?

A.   Okay.

Q.   I'd like to take a step back, if you will. During counsel's questions, there was broad references to Goodman Networks.  As I understand it, in the

2021-2022 timeframe, there was an entity called Goodman Networks, Inc.  Are you familiar with Goodman Networks, Inc.?

A.   Yes.

Q.   And can you and I agree that when I use the phrase "Goodman Networks" today, we'll be both referring to the entity Goodman Networks, Inc.?

A.   Yes.

Q.   Okay.  Did Goodman Networks, Inc., in the 2021-2022 timeframe, have companies that it owned, subsidiaries?

A.   Yes, yes.

Q.   Was one of the companies owned by Goodman Networks an entity called GNET ATC?

A.   Yes.

Q.   Are you familiar with GNET ATC?

A.   Yes.

Q.   Okay.  In 2021 and 2022, was GNET ATC a subsidiary owned by Goodman Networks?

A.   Yes.

Q.   Okay.  Are you familiar with an entity called Multiband Field Services?

A.   Yes.

Q.   In 2021 and 2022, was Multiband Field Services also a subsidiary owned by Goodman Networks, Inc.?

A.   Yes.

Q.   Okay.  And as someone who was one of the original founders of Goodman Networks, are you familiar generally with the client base for Goodman Networks, GNET and Multiband Field Services?

A.   Yes.

Q.   Have you ever heard of an entity called Federal Express otherwise known as FedEx?

A.   Yes.

Q.   And are you aware that there was an entity or have you ever heard of an entity called FedEx Supply Chain Logistics & Electronics, Inc.?

A.   Yes.

Q.   Okay.  Do you mind if I call that entity FedEx Supply Chain so I don't have to say all the rest of the words and get confused?

A.   Yes.

Q.   Do you understand -- strike that.

Do you understand that FedEx Supply Chain had a -- had an arrangement -- strike that.

I think you said -- what was the -- strike that.

What was the business of Goodman Networks?  I forget what the acronym you used.

A.   VAR, value added reseller, and professional

services.

Q.   Okay.  Are you familiar with a value added --
a VAR agreement with FedEx Supply Chain?

A.   Yes.

Q.   And are you -- do you agree that FedEx Supply
Chain had a value added agreement with an entity called
Genesis Networks Telecom Services, LLC?

A.   It was an expired contract, but yes, they had
a contract at one time with Genesis Networks Telecom
Services, yes.

Q.   Are you familiar with the entity Genesis
Networks Telecom Services, LLC?

A.   Yes.

Q.   And did you have some ownership interest in
Genesis Networks Telecom Services, LLC?

A.   Yes.

Q.   What was your ownership interest in that
entity?

A.   It would have been a majority ownership.

Q.   Do you agree that Genesis Networks Telecom
Services, LLC was not a subsidiary of Goodman Networks?

A.   Yes.

Q.   Okay.  At no time did Goodman Networks, in
whole or in part, own Genesis Networks Telecom Services,
LLC, correct?

A.   Correct, yes, correct.

Q.   And at no time did FedEx Supply Chain have a written VAR agreement with Goodman Networks or any of its subsidiaries, did it?

A.   No.

Q.   And is it true that the VAR agreement that -- that FedEx Supply Chain was operating under was an agreement with Genesis Networks Telecom Services, LLC?

A.   Yes.  An expired one because the contract expired in, I want to say, 2018.

Q.   Let me take a step back.  So, as I understand it, FedEx Supply Chain had a written agreement with Genesis Networks Telecom Services, LLC, correct?

A.   Well, technically, no.  Genco had a contract -- ATC -- if you'll bear with me here.  ATC had a contract with Genesis Networks Telecom Services.  They got purchased by Genco in -- out of Pittsburgh and then FedEx Supply Chain purchased Genco.  So, they were operating off that old agreement between Genco and Genesis Networks Telecom Services.

Q.   Okay.  Well, let's just clean this up.  I think you and I are on the same page, but we might as well have a clean record.

A.   Okay.

Q.   The original entity that Genesis Networks



contracted with was called ATC Logistics & Electronics, Inc., correct?

A.   Yes.

Q.   And then Genco acquired ATC Logistics & Electronics, Inc., correct?

A.   Yes.

Q.   And then FedEx Supply Chain acquired Genco, correct?

A.   Yes.

Q.   Okay.  And so, through its acquisition of Genco, FedEx Supply Chain became -- had a business relationship with Genesis Networks Telecom Services, LLC, correct?

A.   Yes.

Q.   Okay.  And as I understand it, there was, at one point, a contract between Genco and Genesis Networks Telecom Services; is that correct?

A.   Yes.

Q.   And after FedEx acquired Genco, FedEx Supply Chain continued to operate under the contract with Genesis Networks Telecom Services, LLC, correct?

A.   Yes.

Q.   And at that point, sometime in 2018 or so, the contract between FedEx Supply Chain and Genesis Networks Telecom expires; is that correct?



A.   To my knowledge, yes.

Q.   And although the contract expired, the parties, meaning Genesis Networks Telecom Services and FedEx Supply Chain, continued to operate under that contract, correct?

A.   Yes.

Q.   And so, Genesis Networks Telecom Services continued to provide services and FedEx Supply Chain continued to provide -- to pay for those services; is that correct?

A.   Yes.

Q.   Now, and I don't mean to demean your role, but it sounds like, as a founder of the company and a member of the board, it doesn't sound like you were involved in the day-to-day of the accounting department at Goodman, were you?

A.   I was not.

Q.   And you were not the person responsible for determining where payment should be deposited and whatnot, correct?

A.   Correct.

Q.   And were you ever aware that there was a period where payments from FedEx Supply Chain to Genesis Networks Telecom Services, LLC were being deposited into a GNET bank account?

A.   Could you ask that question again?

Q.   Sure.  Did you ever learn, prior to the bankruptcy, that payments from FedEx Supply Chain to Genesis Networks Telecom Services were being deposited into an account in the name of GNET?

A.   I don't -- I'm sorry, I don't understand the question.

Q.   Do you -- do you know if Genesis Networks Telecom Services, LLC had its own bank accounts?

A.   It did.

Q.   And do you know if the payments from FedEx Supply Chain were being deposited into a Genesis Networks Telecom Services account?

A.   They were.

Q.   Okay.  And did Genesis Networks Telecom Services have its own employees or was -- or was it using Goodman employees?

A.   They were using both.  We had --

Q.   From a -- I didn't mean to interrupt you.  I apologize, sir.

A.   There was a shared services agreement between -- between Goodman Networks and Genesis Networks Telecom Services to support any transactions that FedEx continued whenever they continued to send money to Goodman Net -- or Genesis Networks Telecom Services

and/or the customer, AT&T, then Genesis Networks Telecom would work on behalf of Goodman Networks to transfer that money or reconcile the account, and so it did provide support services.

Q.   And you -- I think you mentioned that you knew Ms. Elmore; is that correct?

A.   I'm sorry, say the -- what was the question?

Q.   Did you know Ms. Elmore?

A.   Only by name.  I never met her.

Q.   Do you know if the accounting personnel for Goodman Networks were performing accounting functions for Genesis Networks Telecom Services?

A.   They were not.

Q.   And do you know who had control over -- signatory control over accounts in the name of Genesis Networks Telecom?

A.    It would have been myself, I would have been on the account, Kathy Kensey, she was the CFO at the time.  She would have had account control.  And I'm sure --

Q.   To the best of --

A.   Go ahead.

Q.   No, go ahead.  Sorry.

A.    I was just going to say, there might have been somebody else, you know, also.  We typically had, you

know, three people on the account.

Q.   Just bear with me a moment while I find the exhibits I need.  I am going to show you -- bear with me a minute, sir.

MR. SCHMOOKLER:  What number are we on, Conor?

MR. WHITE:  You're going to be on Exhibit 8.

(Exhibit No. 8 marked.)

Q.   (By Mr. Schmookler) Let me show you what has been marked as Exhibit 8.

MR. SCHMOOKLER:  Conor, you have it up on the screen, right, you have a computer available?

MR. WHITE:  Yeah, I pulled the Zoom up, too.

MR. SCHMOOKLER:  Did you previously show him the 4352 statement for December?

MR. WHITE:  The East West Multiband, yes.

MR. SCHMOOKLER:  No, Prosperity.  I'll show him.

Q.   (By Mr. Schmookler) I'm going to show you, sir, what has been marked as Exhibit 8.  Let me know if you can see this exhibit.

A.   Yes.

Q.   Okay.  I'm showing you a bank statement from

December 31st, 2021, and you'll see -- you're familiar with how to read bank statements, I assume, from your personal life?

A.   Yes.

Q.   Okay.  Do you see in the upper left-hand corner an address and a name associated with this statement?

A.   Yes.

Q.   And do you see that it says Goodman Networks, Inc.?

A.   Yes.

Q.   Okay.  Now, look down at the deposits, and you'll see there are five deposits reflected on this statement in December of 2021.  Do you see that?

A.   I do, sir.

Q.   And during this period, you were still on the board for Goodman Networks; is that correct?

A.   Yes.

Q.   And during this period, you were equally aware of the business of Genesis Networks Telecom Services, LLC, correct?

A.   Yes.

Q.   And you were aware, in December of 2021, that the business with FedEx Supply Chain was business associated with Genesis Networks Telecom Services, LLC,

correct?

A.   Yes.

Q.   Do you see the deposits reflected on this statement all refer to FedEx Supply?

A.   Yes.

Q.   And do you see that there are deposits totalling more than $23 million from FedEx in December?

A.   Yes.

Q.   And in December of 2021, the payments that FedEx Supply Chain were making were statement payments that were due and owing to Genesis Networks Telecom Services; is that correct?

MR. WHITE:  Objection, foundation.

THE WITNESS:  Well, the business -- the services would have been, you know, being performed by, you know, Goodman Networks via, you know, Genesis ATC, the subsidiary of Goodman Networks.

Q.   (By Mr. Schmookler) Well, let me ask it this way:  Did FedEx Supply Chain ever have a direct contract with Goodman Networks or any of its subsidiaries?

A.   Not that I'm aware of, no.

Q.   The only contract you're aware of is a contract between FedEx Supply Chain and -- well, the only contract you're aware of is a -- an expired contract between FedEx Supply Chain and Genesis Networks

Telecom Services; is that correct?

A.   Yes.

Q.   Were you aware, at any time, that anyone, on behalf of Genesis Networks Telecom Services, LLC directed FedEx to deposit payments into a Goodman Networks account?

A.   Can you ask me that question again, please?

Q.   Sure.  Were you ever told that anyone, on behalf of Genesis Networks Telecom Services, directed FedEx Supply Chain to make payments to a Goodman Networks?

A.   No.

Q.   Now, were you aware, in December of 2021, that -- of any discussions with FedEx Supply Chain about moving the business to a Goodman Networks Company?

A.   Yes.

(Exhibit No. 9 marked.)

Q.   Now, I will show you what I'm marking as Exhibit 9.  And I'm going to -- this is a long e-mail string, sir, and I'm happy to show you as much of it as you'd like to see, or quite frankly, as little of it you'd like to see, but this is an e-mail dated June -- the top e-mail is the one I'd like you to orient to if you could.  If you could read that to yourself and let me know when you're done.  It's dated June 29th,

2020, 9:36 a.m. Central time.

A.    Okay.

Q.    Do you know who Joella is?

A.    I do, sir.

Q.    Okay.  Who is Joella?

A.    She was an employee of Genesis Networks Telecom Services until Goodman Networks purchased the business, and then she transferred over and became an employee of Goodman Networks, but she managed -- she helped manage the VAR business and helped manage the -- the FedEx Supply Chain VAR business.

Q.    And she says to Mr. Bullard in her e-mail, very first sentence, "It was a pleasure talking to you this morning.  Please find our new company name agreement assignment below, GNET ATC, LLC."  Do you see that?

A.    Yes.

Q.    And you are familiar with GNET ATC, LLC, correct?

A.    Yes.

Q.    That is the GNET entity that I earlier referred to as a subsidiary of Goodman Networks, correct?

A.    Yes.

Q.    Now, following Ms. Joella's e-mail, June 29th,

2020, is it correct that GNET ATC was the entity that was performing the VAR services for FedEx Supply Chain?

A.   Yes.

Q.   And is it correct that following Joella's June 29th, 2020 e-mail, the payments from FedEx were due and owing to GNET ATC, LLC?

A.   Yes.

Q.   And so, the deposits we previously looked at in Exhibit 8 would have been deposits due and owing to GNET ATC, LLC as opposed to Goodman Networks, Inc., correct?

A.   Yes.

Q.   Now, although you weren't asked about it, I have a few questions about AMRR.

A.   Yes.

Q.   Have you ever heard of an entity called or referred to by the acronym AMRR?

A.   Yes.

Q.   And that's American Metals -- otherwise known as American Metals, correct?

A.   Yes.

Q.   And you -- are you aware -- strike that.

Were you ever aware of a loan to AMRR?

A.   From?

Q.   From Goodman Networks or any of the Goodman

James E. Goodman

Networks companies.

A.   After the bankruptcy, yes.

Q.   Is it true, sir, that in late 2021, meaning November or December of 2021, you had a discussion with Mr. Frinzi about a potential loan to AMRR?

A.   Yes.

Q.   And that conversation did occur in either late November or early December of 2021, correct?

A.   Yes.

Q.   And at the time you spoke to Mr. Frinzi about the proposed loan to AMRR, you were still a member of the Board of Directors for Goodman Networks, correct?

A.   Yes.

Q.   And based on your discussion with Mr. Frinzi in November/December 2021, it was your understanding that monies paid by FedEx Supply Chain were proposed to be lent to AMRR, correct?

A.   No.   Can you ask that question again?

Q.   Sure.   In November/December of 2021, did you -- you had a conversation with Mr. Frinzi about a potential loan to AMRR, correct?

A.   Yes.

Q.   Okay.   What was your understanding of the proposed transaction, as detailed by Mr. Frinzi in this conversation in November or December 2021?



A.   I don't recall.

Q.   Do you recall being upset about the proposed transaction?

A.   I just recall the, you know, discussion that it couldn't be, you know, self-serving, it couldn't be -- the company Goodman Networks could not get -- you know, had to get benefit from it.

Q.   Okay.  And did you tell Mr. Frinzi, in November and December of 2021, that you thought this loan to AMRR was inappropriate?

A.   Yes.

Q.   And isn't it true that in November 2021, you told Mr. Frinzi that you didn't agree that AMRR could borrow payments that came in from FedEx Supply Chain?

A.   Could you say that again, please?

Q.   Sure.  Isn't it true that you told Mr. Frinzi that you thought his plan to loan money to AMRR was inappropriate in November/December 2021?

A.   Yes.

Q.   And isn't it true you told him you didn't agree with his plan to loan money to AMRR in November/December 2021?

A.   Yes.

Q.   And isn't it true, sir, that that conversation about the inappropriate transfer of money to AMRR

predated the $4.4 million transfer that Mr. White has

spoken to you about today?

A.   Yes.

Q.   And so, isn't it true that while you were on

the board and prior to the $4.4 million transfer

Mr. White spoke of earlier, you were aware that

Mr. Frinzi was proposing transactions you thought were

inappropriate?

A.   Yes.

Q.   And even though Mr. Frinzi did propose a

transaction you thought inappropriate, he was not

removed from his position as CEO, correct?

A.   Can you ask me that question again, please?

Q.   Sure.  Although you have a discussion with

Mr. Frinzi in November/December 2021 where you tell him

you thought his plan was inappropriate, he was not

immediately removed as CEO, correct?

A.   Correct.

Q.   And in fact, immediately following this

discussion where you tell Mr. Frinzi his plan to loan

money to AMRR is inappropriate, you -- you resign from

the board of Goodman Networks, correct?

A.   If -- if the dates are the -- or after the

February 2022, then yes.

Q.   Okay.  And sir, what -- what about the loan to

AMRR did you think was inappropriate?

A.   That the Goodman Networks would need to get, you know, benefit from that loan.  They would have had to have been the beneficiary of, you know, any money that left the company.

Q.   And you understood that Mr. Frinzi was proposing a transaction where Goodman Networks -- a Goodman Networks company, in this case GNET, would send out money, but not receive a direct benefit, correct?

A.   No, I don't remember us having that conversation.

Q.   Following this discussion with Mr. Frinzi in late '21 about AMRR, were you monitoring, on either a daily or a weekly basis, all of the outgoing transfers from Goodman Network bank accounts?

A.   No.

Q.   Were you routinely asked on a daily, weekly or monthly basis to approve any outgoing transfers from the Goodman Networks bank accounts?

A.   No.

Q.   Did you, at any time following this November or December discussion, ever receive funds from any Goodman Network bank account or account held by a Goodman Network company?

A.   Yes.

Q.   Okay.  What was -- what was the approximate size of those transfers?

A.   What -- what months are you asking about?

Q.   At any time late '21, early '22.

A.   They would have been, you know, payments for, you know, salary for myself that -- that I was asking -- was asking or received money from Goodman Networks.

Q.   Did you ever receive a transfer in excess of $100,000 in late '21 or early '22 from -- from Goodman Networks or any of its affiliates?

A.   I would need to check the bank statements, you know, to be sure because I know there was 100,000, it could have been over that or under that, but I would just need to check the bank statements.

Q.   But, you do recall receiving some -- some funds?

A.   Yes.

Q.   And prior to you receiving those funds, did you -- were you contacted for your consent to the transfer?

A.   No.

Q.   So, was it your understanding that there were times when Goodman Networks, in the normal course of business, was paying out money without you necessarily signing off on a wire transfer?

A.   Yes.

Q.   And was it your understanding that just given the nature of the day-to-day business, those transfers, meaning transfers in excess of 100,000, were being conducted without you blessing each and every one of them?

A.   Could you ask that question again, please?

Q.   Sure.  Was it your understanding, in the late '21, early '22 timeframe, that there were transactions in excess of 100,000 that were being conducted without you approving each and every transaction?  I can give you an example if it would help.

A.   No, I think I understand your question. You're asking me, just to be sure, that was I aware or understood that there would have -- you know, there was transactions taking place at Goodman that would have been over $100,000 transactions, without my approval?

Q.   Yes.

A.   Yes, I would have assumed that, yes.

Q.   Okay.  So, for example, you were shown a bank statement by counsel, I believe it is Exhibit 2, which is a bank statement for account ending 1838, December of 2021.  Do you see that, sir?

A.   Yes.

Q.   If you could flip to page three of that

James E. Goodman

statement, you'll see three transfers dated

December 27th, 2021.  Do you see that?

A.    Yes.

Q.    And they're all to the -- to the federal

government, the IRS.  Do you see the three transfers to

the IRS?

A.    In December 21st, 2021?

Q.    December 27, 2021.

A.    Oh, 27.  Yes.

Q.    Okay.  Do you see that on December 27th, as

reflected on the bank statement, this account sent, give

or take, $1.5 million to the federal government,

presumably for taxes?

A.    Yes.

Q.    You would not have expected to -- for somebody

to ask you to approve transactions of this nature,

correct?

A.    Correct.

Q.    Okay.  So, in this timeframe, meaning in the

December timeframe, you were aware that transfers in

excess of $100,000 were occurring without you approving

each and every one, correct?

A.    Yes.

Q.    And it would not have been your expectation to

approve every transfer in excess of 100,000 in this

James E. Goodman

timeframe, correct?

A.   Yes.

Q.   Great.   Thank you.   You can put that down.
Now, I will -- I'm going to ask you some specific
questions.   You were asked by counsel, and I think the
way the question was asked if you have an opinion as to
whether or not Mr. Frinzi was dishonest.   Do you
remember questions of that nature?   And I think you used
the word "looted."

A.   Yes.

Q.   Okay.   Now, I understand that you have been
involved in this litigation a long time, no offense; is
that correct?

A.   Yes.

Q.   And I understand that over the course of
many -- many years, you have learned things through the
litigation; is that correct?

A.   Yes.

Q.   And due to things that you've learned through
the course of the litigation, you've reached certain
opinions about Mr. Frinzi, as reflected in the questions
asked by counsel; is that correct?

A.   Yes.

Q.   Okay.   I want to be more specific about
timeframe, sir.   On or before October 30th of 2022, were

you ever aware of any facts which would cause you to

believe that Mr. Frinzi had engaged in a theft?

A.   No.

Q.   On or before October 30th of 2022, were you

aware of any facts that would lead you to believe that

Mr. Frinzi had looted the company?

A.   No.

Q.   On or before December 30th, 2022, were you

aware of any facts which would cause you to believe that

Mr. Frinzi had acted dishonestly?

A.   No.

Q.   As I understand it, you resigned officially

from the board of Goodman Networks on February 1st of

2022, correct?

A.   Yes.

Q.   And Mr. Frinzi resigned -- I'm just getting

you the exact date -- from Goodman Networks on

September 4th, 2022.  Are you aware of that?

A.   I believe so.  I think that's correct.

(Exhibit No. 10 marked.)

Q.   Okay.  Well, let me show you a document,

Exhibit 10.  I'm put up on the screen Exhibit, 10.  Sir

do you see a resignation letter from Mr. Frinzi?

A.   Yes.

Q.   Were you aware -- did you ever receive this

before today?

A.   I -- I've seen it in discovery.

Q.   Were you aware that on September 4th of 2022, Mr. Frinzi had resigned?

A.   I don't recall.

Q.   And I know you have a number of brothers; is that correct?

A.   Yes.

Q.   One of your brothers is John Goodman; is that correct?

A.   Yes.

Q.   And John Goodman, your brother, became interim CEO when Mr. Frinzi resigned; is that correct?

A.   That sounds correct.

Q.   Do you have any reason to doubt that Mr. John Goodman was CEO after Mr. Frinzi's resignation September 4th, 2022?

A.   I would just need to see a document that made him CEO of the company.  I don't know if he came in on a consulting basis, but I would just need to verify what his official role was.

Q.   Do you know of -- strike that.

Other than sources from your attorney, things that your attorneys have given you or things they've said, do you know if John Goodman, during the

period in which he was CEO, was aware of any facts that caused him to believe that Mr. Frinzi acted dishonestly or committed a theft?

MR. WHITE:  I'm going to object to foundation and legal conclusion.

THE WITNESS:  What year are we talking about?

Q.   (By Mr. Schmookler) Sure.  Did your brother, John Goodman, ever tell you that he became aware of anything that led him to believe that Mr. Frinzi had acted dishonestly?

A.   When?  Like any time or --

Q.   At any time, yes, at any time.

A.   Yes.

Q.   Was that before or after the bankruptcy itself?

A.   I believe it was after the -- well, I don't know.  I would need to be sure about that.

Q.   That's fine.  Are you familiar with somebody named Sandra Sondrup?

A.   Yes.

Q.   Okay.  Who is she?

A.   She was the -- she was an employee at Goodman, and I believe she was the either COO or Chief of Staff for Jim at Goodman Networks, for myself and for James

Frinzi.

MR. WHITE:  And Scott, real quick, just to clarify, do you mean Samantha Sondrup?

MR. SCHMOOKLER:  Samantha.  Did I say -- yes.  Sorry.  I always screw that up for some reason.

MR. WHITE:  No worries.  Just wanted to make sure that we were clear.

MR. SCHMOOKLER:  Yeah, okay.

Q.   (By Mr. Schmookler) Do you know whether Ms. Sondrup had any role in the placement of insurance for Goodman Networks?

A.   I do not know.

Q.   And do you know whether or not she, at any time, was designated to represent Goodman Networks for the purposes of effecting and maintaining insurance?

A.   I do not recall.

Q.   I will show you what I'm now marking --

MR. SCHMOOKLER:  I think I'm on 11; is that correct.

THE REPORTER:  Yes.

MR. SCHMOOKLER:  Thank you, ma'am.

(Exhibit No. 11 marked.)

Q.   (By Mr. Schmookler) Sir, this is an insurance application that was provided to my client, I will represent that to you.  It was previously marked as

Exhibit 49 at the deposition of James Frinzi, you'll see the sticker at the bottom.  I want to call your attention to Section 1 of this application, question one -- Roman numeral one, paragraph three.  Do you see 3A, primary insurance contact?

A.    Yes.

Q.    And do you see that the name Samantha Sondrup is typed?

A.    Yes.

Q.    Were you involved at all in the application for insurance to my client Chubb?

A.    No.

Q.    Okay.  I want to flip to the bottom, just bear with me while I do that, and you will see that this document was DocuSigned or digitally executed effective November 10th of 2021.  Do you see that?

A.    Yes.

Q.    And it was electronically or digitally executed by Ms. Sondrup.  Do you see that?

A.    Yes.

Q.    Do you know whether or not Ms. Sondrup was authorized to apply for insurance from Chubb?

A.    Could you ask me that again, please?

Q.    Sure.  Did Goodman Networks authorize Ms. Sondrup to apply for insurance with Chubb?

MR. WHITE:  I'm going to object to the extent it calls for a legal conclusion.

THE WITNESS:  I would yes, she had authorization or --

Q.  (By Mr. Schmookler) And was Ms. Sondrup the person that Goodman Networks relied upon to apply for insurance, internally at least?

MR. WHITE:  I'm going to object to the extent he's -- he's testifying in his individual capacity, not as a representative of the debtor.

MR. SCHMOOKLER:  Agreed.

Q.  (By Mr. Schmookler) Well, I'll rephrase.  Sir, you were on the Board of Directors for Goodman Networks in November of '21, correct?

A.  Yes.

Q.  And in your capacity on the Board of Directors for Goodman Networks in 2021, you understood that somebody at Goodman Networks was applying for insurance, correct?

A.  I'm -- I mean, somebody could have, you know, mentioned it to me.  I don't recall it, but I would just have to go back and look at the records or e-mails to see if I was consulted or not.

Q.  Okay.  Did Mr. Frinzi, as CEO, was he the person who was -- would have been responsible for

overseeing the applications for insurance?

A.   Yes.

Q.   Okay.  And would he, Mr. Frinzi, as CEO been the person who would have picked someone to be Goodman Networks' representative with the insurance company?

A.   Yes.

Q.   And so, to the extent that somebody had to be chosen to apply for -- strike that.

To the extent that somebody had to be chosen to represent Goodman Networks for the purposes of effecting and maintaining insurance, Mr. Frinzi, as CEO, would be the person to choose that representative, correct?

A.   Yes.

Q.   Thank you, sir.  That's helpful.  Do you recall any documents showing when your brother, John Goodman, took over as CEO?

MR. WHITE:  Objection to foundation and --

THE WITNESS:  Again, I would just -- you know, I don't recall the day, you know, and if he went back in as CEO or as a consultant.  I would just need to verify, you know, what role and capacity -- you know, what role and capacity he served whenever he went back into the company.



Q.   (By Mr. Schmookler) Did you ever receive e-mails from your brother, John Goodman, which he signed as CEO of Goodman Networks?

A.   I'd have to go back and check.

Q.   Do you know if your brother, John Goodman, ever held himself out to be the CEO of Goodman Networks?

A.   I would need to go check.

MR. WHITE:   During which time period, Scott?

Q.   (By Mr. Schmookler) At any period.

A.   Well, any period, yes, I mean, he was the CEO before Mark Keifer came into the company and John resigned, you know, and left the company.

Q.   Okay.   Bear with me a minute.   Sir, just a few more things.   I understand you used to communicate with Mr. Frinzi via electronic messages; is that correct?

A.   Yes.

Q.   And I think you used Signal, is that what you used?

A.   Yes, Signal, WhatsApp, I can't remember what it was, but yes, that's correct.

Q.   And I know you said you've been deposed in this matter in other cases.   I will not ask you the same questions that other lawyers have asked you, but if I were -- did you -- have you had a chance to go back and

look at your prior deposition testimony?

A.   I have not.

Q.   And your opinions about Mr. Frinzi are educated in part about information you learned in litigation; is that correct?

A.   Yes.

Q.   And that included litigation against you and your family members; is that correct?

A.   Yes.

Q.   And some of that litigation against you and your family members derived from the alleged actions of Mr. Frinzi; is that correct?

A.   Yes.

Q.   And so, it was in the context of litigation against you involving allegations of conduct by Mr. Frinzi that you reached conclusions about his -- him and his conduct, correct?

A.   Yes.

Q.   Other than that, meaning something prior to the bankruptcy, did you always believe that Mr. Frinzi was honest?

A.   Yes.

Q.   And you had a long-term relationship with him, correct?

A.   Yes.

Q.   And you and he had lots of discussions about what -- about how to wind down Goodman Networks, correct?

A.   Both, you know, how to take the 25 million, you know, or the 40 million total that I invested in the company and reinvent the company, and then -- and then the transition and wind down, so both conversations, yes.

Q.   And during those conversations, isn't it true that you discussed the prospect that there would be some litigation as you tried to wind down the company?

A.   Yes.

Q.   And so, everybody knew that there was a strong likelihood that litigation would ensue, correct?

A.   Yes.

Q.   And you knew that because you knew that in the effort to wind down the company some people were going to be unhappy because they were going to be unpaid; is that correct?

A.   Yes.

Q.   And you knew that that was inevitable, correct?

A.   Yes.

Q.   And one of the reasons you brought Mr. Frinzi in is to run the company with -- with that in mind; is

that correct?

A.   No.

Q.   You didn't bring him in to run the company?

A.   No.   I brought Jim in to help me find investors as we transitioned, you know, the company -- so that, you know, so that way I could grow the company. That's why I invested over $30 million of my -- my money into the company.   I brought Jim in to help me find private equity and other companies so that, you know, so that I could save Goodman Networks.

Q.   When you invested 30 million, was it an investment of 30 million in cash?

A.   It was over 30 million in cash, yes.

Q.   When was your investment?

A.   There were two separate investments, or two different transactions, one was a $25 million investment, I want to say in 2021, I'd have to go back and go look, and then -- or 2020 -- and another -- or 2021 -- and another -- I can't remember.

One was a cash investment, equity investment, to -- to help the company reduce debt based off a conversation that I had with AT&T.   And then the second investment was to reduce Goodman's debt via the -- the bonds, so there were two separate investments into Goodman Networks.



Q.   And one of those -- the second investment was you purchasing bonds from third-parties?

A.   Yes.

Q.   Did you purchase them at a discount?

A.   Yes, I did.

Q.   And the first investment was prior to -- was based on business with AT&T; is that correct?  Strike that.  Never mind.  It's okay.

MR. SCHMOOKLER:  You know what, sir, I have no further questions today subject to my right to ask more if Mr. White asks any questions.

MR. WHITE:  I'm going to have just a couple, but I'll keep it very brief.  So, are you passing for now, Scott?

MR. SCHMOOKLER:  Yes.  Yes, sir.

EXAMINATION

BY MR. WHITE:

Q.   Mr. Goodman, I'm not your attorney, correct?

A.   Yes, correct.

Q.   And I've never represented you?

A.   Correct.

Q.   We've met once or twice prior in the context of this litigation; is that correct?

A.   Yes.

Q.   We did not have any discussions with respect

to your testimony today, correct?

A.   Correct.

Q.   Have you discussed your testimony today with anybody other than your attorneys?

A.   No.

Q.   If you were to be called at trial in this case, would you be available to testify?

A.   Yes.

Q.   You mentioned that you lived in San Antonio, correct?

A.   Yes.

Q.   Would it cause you undue financial hardship to come to Dallas for trial?

A.   Yes.  No.

Q.   Okay.  And so, you would not incur any undue hardship if you were to be called to testify in Dallas?

A.   No.

Q.   There is one line of questioning I want to follow-up on briefly that Mr. Schmookler asked you about.  He asked you about a series of conversations that you had with Mr. Frinzi in November and December of 2021 regarding the potential loan to AMRR; is that correct?

A.   Yes.

Q.   That was with respect to one of the things

that we touched on, which was you may or may not have had conversations, you had conversations with Mr. Frinzi about using a company, Multiband Global Resources, to acquire AMRR; is that correct?

A. Yes.

Q. But you were having those discussions with Mr. Frinzi because the acquisition of a new company would have been outside of Goodman Networks' ordinary course of business, right?

A. Yes.

Q. So, the idea that money would have to go to a newly formed, as of yet unaffiliated company, whether that be AMRR or MGR, Multiband Global Resources, would have been something that Mr. Frinzi would have run by you, correct?

A. Yes.

Q. Because in his authority as CEO, although he may have been running the day-to-day, that would not be considered something that was Goodman Networks' day-to-day business, correct?

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  Correct.

Q. (By Mr. White) That also would have fallen outside of Multiband Field Services day-to-day business, correct?

A.   Yes.

Q.   So, as it relates to money going out to a corporate entity that was not fully owned by Goodman Networks or had ongoing business with Goodman Networks, that would have been something that would have needed to have been vetted by you as a board member, correct?

A.   Well, not all --

MR. SCHMOOKLER:  Object to form.

THE WITNESS:  Yes.  And it would have needed to be vetted by the Goodman Networks', you know, lawyers, the law firm, CFGI, Jim worked with them.  I mean, there would have been multiple organizations and people that would have -- would have needed to be involved in that discussion and decision-making.

Q.   (By Mr. White) And to the best of your knowledge, none of that was done with respect to the $4.4 million that went to MGR?

A.   It was not.

MR. SCHMOOKLER:  Object to form.

MR. WHITE:  I've got no further questions, Mr. Goodman.  Thank you.

EXAMINATION

BY MR. SCHMOOKLER:

Q.   Let me just ask a couple, sir.  Sorry.  This is like our tennis version of the questioning at this

point, back and forth.  Sir, do you know -- as I understood your testimony, in December of '21 you verbally resigned from the Board of Directors; is that correct?

A.   Yes.

Q.   And the paperwork that confirms that resignation is ultimately affected -- is ultimately put pen to paper February 1st; is that correct?

A.   Yes.

Q.   And between the time you verbally resigned and the time the paperwork came through in February 2022, were you involved in the day-to-day operations of Goodman Networks at all?

A.   No.

Q.   Were you -- prior -- between the time you verbally resigned in December and the paperwork comes through in February of '22, did you have any involvement at all with Goodman Networks' business?

A.   No, not to my knowledge, or not that I can recall.

Q.   Fair enough.

MR. SCHMOOKLER:  No further questions. Thank you, sir.

MR. WHITE:  I think that's it for us today.

MR. SCHMOOKLER:  Okay.  Sir, do you want to -- do you want to explain to him reserving signature, Conor?

MR. WHITE:  Mr. Goodman, you will get an opportunity that's called a read and sign.  I think you have some familiarity with this --

THE WITNESS:  Yes.

MR. WHITE:  -- is that correct?  Would you like to have an opportunity to read and sign a copy of your deposition?

THE WITNESS:  Yes.

MR. WHITE:  Then subject to that, the reporters will get you a copy, just leave your information with them so that they can provide you a copy, and we will be on the lookout for any errata that you wish to clarify once you have an opportunity to read your transcript.

THE WITNESS:  Okay.

MR. WHITE:  With that, no further questions for the trustee today.

MR. SCHMOOKLER:  Thank you.  No further questions.  And Debbie, I would like a copy, but I don't need it as a rush.

VIDEOGRAPHER:  Mr. Schmookler, did you want a copy of the video also?

James E. Goodman

MR. SCHMOOKLER:  No thank you.

VIDEOGRAPHER:  All right.  Thank you.

Off the record at approximately 3:25 p.m.

CHANGES AND SIGNATURE

WITNESS NAME: JAMES E. GOODMAN   DATE: NOVEMBER 13, 2025

PAGE LINE       CHANGE                REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

        JAMES E. GOODMAN                    DATE

    _____        _____



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re:

GOODMAN NETWORKS, INC.,          )
                                 )Case No. 22-31641-mvl-7
          Debtor.                )(Chapter 7)
                                 )
SCOTT M. SEIDEL, TRUSTEE,        )
                                 )
          Plaintiff,             )
                                 )
VS.                              ) ADVERSARY PROCEEDING
                                 )
                                 ) NO.: 23-3036-mvl
MULTIBAND GLOBAL                 )
RESOURCES, LLC, ET AL,           )
                                 )
          Defendants.            )


REPORTER'S CERTIFICATION

DEPOSITION OF JAMES E. GOODMAN

NOVEMBER 13, 2025


     I, Debbie S. Longoria, Certified Shorthand Reporter
in and for the State of Texas, hereby certify to the
following:

     That the witness, JAMES E. GOODMAN, was duly sworn
by the officer and that the transcript of the oral
deposition is a true record of the testimony given by
the witness;

     I further certify that pursuant to FRCP Rule 30(f)
(1) that the signature of the deponent:

_X__was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

____was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Subscribed and sworn to on this the 20th day of November, 2025.

Debbie S. Longoria, Texas CSR #5232
Expiration Date:  10/31/27
Lexitas - Firm Registration No. 539
100 N.E. Loop 410, Suite 955
San Antonio, Texas 78216
(210) 481-7575

## Exhibits

**1003850_James_E_Goodman_111325_Ex 001** 3:11 5:9,11

**1003850_James_E_Goodman_111325_Ex 002** 3:12 13:19,21 18:15,20 75:21

**1003850_James_E_Goodman_111325_Ex 003** 3:12 16:7,17,18 18:13,16 19:2,12,18,22

**1003850_James_E_Goodman_111325_Ex 004** 3:13 16:12 17:23 19:19,21

**1003850_James_E_Goodman_111325_Ex 005** 3:13 23:23,25 27:9 29:6

**1003850_James_E_Goodman_111325_Ex 006** 3:14 26:18,20

**1003850_James_E_Goodman_111325_Ex 007** 3:14 46:15,17

## $

**$1.5** 76:12

**$100,000** 28:23 29:17,24 74:9 75:17 76:21

**$23** 66:7

**$25** 88:16

**$30** 88:7

**$4** 15:17 18:23 19:7

**$4.4** 13:3 20:2,6,8 22:13,22 23:8 35:3 36:25 37:4,6 38:16,21 40:16,20,23 41:5,16 42:1 44:8 45:15 47:20 50:2,5,17 51:19 52:23 54:17 72:1,5 92:17

**$44** 34:25 54:17

**$50,000** 19:10

**$500,000** 15:5 18:22 19:4

## 0

**0553248** 24:3

## 1

**1** 5:9,11 82:3

**10** 78:20,22

**100,000** 26:2,4 74:12 75:4,10 76:25

**103** 5:7

**10:26** 28:1

**10:27** 28:13

**10:30** 27:7

**10th** 14:24 18:22 19:3 82:16

**11** 81:18,22

**13** 14:14

**13th** 4:5

**1717** 4:11

**1838** 13:17 14:14 75:22

**1:07** 4:6

**1st** 9:20 25:17 27:7 28:1,12 78:13 93:8

## 2

**2** 13:19,21 18:15,20 75:21

**2018** 59:10 60:23

**2020** 68:1 69:1,5 88:18

**2021** 10:5 11:12 12:9 13:4,9 14:21,25 15:12 17:20 18:23 25:17 26:9 27:7 28:12 31:14,20,25 32:5 39:22,23,24 40:2 56:18,24 65:1,14,23 66:9 67:13 70:3,4,8,15,19,25 71:9,12,18,22 72:15 75:23 76:2,7,8 82:16 83:17 88:17,19 90:22

**2021-2022** 56:1,10

**2022** 8:24 9:10,19,20 11:13 13:5 18:11 20:7,11 22:21 23:1,7 32:6 40:10 42:18,19,23 47:5 56:18,24 72:24 77:25 78:4,8,14,18 79:3,17 93:11

**2023** 42:16,18

**2024** 42:17

**2025** 4:5

**21** 32:5 73:13 74:4,9 75:9 83:14 93:2

**21st** 15:12 18:25 19:6 76:7

**22** 74:4,9 75:9 93:17

**23-3036** 4:9

**23-31641** 4:8

**25** 87:4

**250** 4:12

**27** 76:8,9

**27th** 76:2,10

**28th** 47:5

**29th** 67:25 68:25 69:5

**2:01** 44:24,25

**2:08** 44:25 45:3

**2:19** 53:16,17

**2:27** 53:17,19

## 3

**3** 15:21,25 16:7,17,18 18:13,16 19:2,12,18,22

**30** 88:11,12,13

**30th** 8:24 77:25 78:4,8

**31st** 65:1

**3249** 24:10

**3:25** 95:3

**3A** 82:5

**3rd** 4:5

## 4

**4** 15:21,25 16:12 17:23 19:19,21

**4.4** 19:10 22:17 44:12

**40** 87:5

**4352** 64:17

888-893-3767
www.lexitaslegal.com

**49** 82:1

**4th** 19:25 22:21 78:18 79:3,17

**5**

**5** 23:23,25 27:9 29:6

**50** 8:10

**6**

**6** 26:18,20

**6th** 4:11 42:23

**7**

**7** 4:19 41:9 46:15,17

**78232** 5:8

**78703** 4:12

**8**

**8** 64:8,9,11,22 69:9

**81** 49:19

**9**

**9** 67:17,19

**9:36** 68:1

**A**

**a.m.** 28:1 68:1

**a/k/a** 7:18

**A1** 43:25

**ability** 29:11

**absent** 54:7

**Absolutely** 43:13

**account** 13:15 14:14, 15,16 15:23 16:2,21 19:13,15,19 61:25 62:5,13 63:3,18,19 64:1 67:6 73:23 75:22 76:11

**accounting** 61:15 63:10, 11

**accounts** 14:11,13 27:20 31:19 62:9 63:15 73:15,19

**acquire** 91:4

**acquired** 60:4,7,19

**acquisition** 60:10 91:7

**acronym** 57:24 69:17

**act** 54:9

**acted** 78:10 80:2,11

**acting** 51:24

**action** 52:5

**actions** 86:11

**added** 30:16, 18 57:25 58:2,6

**address** 5:6 10:15 65:6

**admitted** 42:4

**adversarial** 4:9

**adversary** 17:8 37:3 38:2

**affected** 93:7

**affiliates** 74:10

**agree** 6:20 14:2 56:5 58:5,20 71:13,21

**Agreed** 83:11

**agreement** 26:17 28:1,19 29:2 34:14, 19,20 35:2,4, 22 36:11,16, 22 48:25 58:3,6 59:3,6, 8,12,19 62:21 68:15

**agreements** 30:5

**ahead** 63:22, 23

**Akerman** 49:11,13,16

**allegations** 86:15

**alleged** 86:11

**allowed** 30:4, 6

**American** 69:19,20

**amounts** 6:11

**AMRR** 34:22, 25 45:18,20 69:14,17,23 70:5,11,17,21 71:10,13,17,

**21,25** 72:21 73:1,13 90:22 91:4,13

**and/or** 63:1

**Andrea** 48:14

**answers** 6:24, 25

**antenna** 31:2

**Antonio** 5:7 90:9

**AP** 27:23

**AP/AR** 27:18

**apologize** 9:25 62:20

**appearing** 6:3

**application** 81:24 82:3,10

**applications** 84:1

**applied** 10:24

**apply** 82:22, 25 83:6 84:8

**applying** 83:18

**appoints** 10:19

**approval** 23:2,7,10,12, 21 30:4 75:17

**approve** 22:12,16 35:16 48:8 52:14 73:18 76:16,25

**approved** 38:22 51:25

**approving** 75:11 76:21

**approximate** 74:1

**approximately** 4:6 8:7 44:24 45:2 53:16,19 95:3

**AR** 27:23

**ARC** 49:4

**arrangement** 57:20

**asks** 89:11

**assignment** 68:15

**assume** 65:2

**assumed** 75:19

**AT&T** 30:14 63:1 88:22 89:7

**ATC** 11:7 26:14 28:2,12 29:9 56:14, 16,18 59:15 60:1,4 66:16 68:15,18 69:1,6,10

**attached** 24:9 26:1

**attachment** 24:10 26:22, 23

**attention** 82:3

**attorney** 35:16 42:25 79:23 89:18

**attorneys** 21:25 22:4 33:15 36:19 37:16 41:4 79:24 90:4

 PAPP0723

**Austin** 4:12

**authority**
26:15 29:17
54:9 91:17

**authorization**
26:4,17 28:24
29:7,25 83:4

**authorize**
82:24

**authorized**
23:16 38:25
39:6 82:22

**auto-filled**
25:14

**aware** 14:10
16:20 17:10
35:3 37:2,5,
10,20 38:1,7,
20 40:9,16
44:12 47:16
49:6 54:23
57:10 61:22
65:19,23
66:21,22,24
67:3,13
69:22,23 72:6
75:14 76:20
78:1,5,9,18,
25 79:3 80:1,
9

**B**

**back** 10:8,21,
24 21:1,19
26:16 28:19
30:3,7,14
32:17 34:22
42:14 44:21
46:13 52:25
53:13 55:23
59:11 83:22
84:22,24
85:4,25 88:17

93:1

**balance** 19:10

**bank** 13:8
14:11,20
15:23 16:2,21
17:14,19
18:10 19:13,
19 54:21
61:25 62:9
64:25 65:2
73:15,19,23
74:11,14
75:20,22
76:11

**bank's** 19:16

**banking** 26:2,
8

**bankruptcy**
4:7 17:7 18:5
32:15,21
33:10,16
37:12 40:11
42:4,18,21
43:3 44:6
49:14 62:3
70:2 80:15
86:20

**base** 57:4

**based** 70:14
88:21 89:7

**basis** 54:21
73:14,18
79:20

**Bates** 13:9
17:11 18:1

**Baum** 48:14

**Bay** 37:5,19

**bear** 6:19 10:1
59:15 64:2,3
82:13 85:14

**began** 32:23

**begin** 4:2

**beginning**
45:1

**behalf** 4:18,22
51:25 63:2
67:4,9

**beneficiary**
73:4

**benefit** 6:23
33:23,25
34:11,17
38:11 39:2,8
41:6 42:12
43:4 46:8,11,
14 52:5 71:7
73:3,9

**benefits**
36:14

**bit** 15:24
18:19 35:24

**blessing** 75:5

**board** 11:22
12:17 23:2,11
30:4,6 39:20,
22 40:2 53:24
54:3,5,7
61:14 65:17
70:12 72:5,22
78:13 83:13,
16 92:6 93:3

**boats** 37:5
38:13

**Bond** 54:18

**bondholders**
49:1

**bonds** 43:24
88:24 89:2

**borrow** 71:14

**borrowed**
45:19

**bottom** 17:1,
25 47:1 50:3,
21 82:2,13

**bought** 37:19
43:24,25
45:18

**break** 44:15,
20 53:12

**briefly** 7:5
32:3 39:12
49:25 50:21
90:19

**bring** 88:3

**broad** 11:11
55:24

**brother** 39:18
40:5 79:12
80:8 84:16
85:2,5

**brothers** 7:10,
13 40:3,14,15
79:6,9

**brought** 40:9
87:24 88:4,8

**Bullard** 68:12

**business**
12:12 30:8,9,
19 31:5,7,18,
22 52:9 57:23
60:11 65:20,
24 66:14
67:15 68:8,
10,11 74:24
75:3 89:7
91:9,20,24
92:4 93:18

**businesses**
31:10

**buy** 30:12
45:20

**bylaws** 12:16,
19,25 23:9,20

**C**

**C-SUITE** 12:1

**call** 53:1
57:14 82:2

**called** 56:1,
14,21 57:7,11
58:6 60:1
69:16 90:6,16
94:5

**calls** 83:2

**capacity**
83:10,16
84:23,24

**case** 4:7,8
6:5,12 17:7
18:5 33:16
73:8 90:7

**cases** 85:23

**cash** 14:13
88:12,13,20

**caused** 80:2

**caution** 33:2

**Central** 68:1

**CEO** 12:6,8,
11 25:22
29:15 39:1,18
40:6 72:12,17
79:13,16,19
80:1 83:24
84:3,11,17,22
85:3,6,11
91:17

**CFGI** 48:20,
22,23 54:18
92:11

**CFO** 63:18

**chain** 48:13
57:12,15,19
58:3,6 59:2,7,



12,18 60:7,
11,20,24
61:4,8,23
62:3,12 65:24
66:10,19,23,
25 67:10,14
68:11 69:2
70:16 71:14

**chance** 9:24
14:6 16:14
26:25 85:25

**Chapter** 4:19
41:9

**check** 23:9
54:2 74:11,14
85:4,7

**Chief** 11:23
80:24

**choose** 84:12

**chosen** 84:8,
10

**Chubb** 47:19,
24 51:1,14
55:19 82:11,
22,25

**Chubb's** 51:6

**claim** 6:14
47:20,24
48:3,5,6,9

**claims** 47:9

**clarify** 7:3
45:4,23 54:13
81:3 94:16

**clean** 59:21,
23

**clean-up**
53:21

**clear** 21:16
33:4 81:7

**client** 57:4
81:24 82:11

**CM** 14:25
15:2,12

**collecting**
37:24

**colloquy**
13:25

**colluded**
43:20

**comment**
14:1

**committed**
80:3

**common**
7:13,16

**commonly**
28:7

**communicate**
85:15

**communicatio
n** 32:18 45:6,
17

**Communicati
ons** 31:17

**companies**
11:5 34:21
56:10,13 70:1
88:9

**company**
4:22 7:6,10
9:17 11:3
12:16,19 20:8
22:7,9 23:9,
20,22 27:17,
18 33:18
34:23 35:14
37:24,25
38:12 39:18
40:6,10 43:21
45:14 51:10
55:19 61:13
67:15 68:14
71:6 73:5,8,

24 78:6 79:19
84:5,25
85:12,13
87:6,11,17,25
88:3,5,6,8,21
91:3,7,12

**computer**
53:5 64:13

**concentration**
14:14

**conclusion**
80:5 83:2

**conclusions**
86:16

**conduct**
86:15,17

**conducted**
75:5,10

**confirm** 12:4

**confirms** 93:6

**confronted**
37:22

**confused**
57:16

**Conor** 4:18
16:9 21:9
64:6,12 94:3

**consent**
24:14,18
74:19

**considered**
8:21,22,23
91:19

**consult** 40:10

**consultant**
84:22

**consulted**
83:23

**consulting**
79:20

**contact** 82:5

**contacted**
74:19

**context** 86:14
89:22

**continue**
39:11

**continued**
60:20 61:4,8,
9 62:24

**contract** 58:8,
9 59:9,15,16
60:16,20,24
61:2,5 66:19,
22,23,24,25

**contracted**
60:1

**control** 63:14,
15,19

**controller**
27:14,16,20

**conversation**
11:12 42:1
45:21 46:12
48:10 52:18
53:22 70:7,
20,25 71:24
73:11 88:22

**conversations**
21:25 22:3,20
33:14 41:3
44:11 87:7,9
90:20 91:2

**COO** 80:24

**copy** 5:24
14:20 17:14,
19 18:10
94:9,13,15,
22,25

**corner** 17:2,
25 19:14 65:6

**corporate**
8:13 92:3

**corporation**
29:11

**correct** 5:24
6:3 14:20
17:8,19
18:10,20
19:13,19,22
20:2 21:22
25:6 27:10
29:3,20 31:24
33:11 40:3,7
42:7,8 50:18
53:25 54:10
55:13,16,17
58:25 59:1,13
60:2,5,8,13,
17,21,25
61:5,10,20,21
63:6 65:17,21
66:1,12 67:1
68:19,23
69:1,4,11,20
70:8,12,17,21
72:12,17,18,
22 73:9
76:17,18,22
77:1,13,17,22
78:14,19
79:7,10,13,14
81:19 83:14,
19 84:13
85:16,21
86:5,8,12,17,
24 87:3,14,
19,22 88:1
89:7,18,19,
21,23 90:1,2,
10,23 91:4,
15,20,22,25
92:6 93:4,8
94:8

**counsel** 4:15
18:7 21:7,14
49:14 75:21



77:5,22

**counsel's** 55:24

**couple** 13:1,6 17:2 24:21 89:13 92:24

**court** 4:8,12 5:12 10:2

**coverage** 6:15

**COVID** 37:24, 25

**created** 22:10

**creditors** 46:8 48:25

**credits** 18:16

**crime** 6:15 47:13,20 50:23 51:1,15

**customer** 63:1

**cutoff** 28:11

---

**D**

**D&o** 47:9 51:10

**daily** 54:21 73:14,17

**Dallas** 90:13, 16

**DAS** 31:18

**date** 4:4 78:17

**dated** 27:6 47:5 67:22,25 76:1

**dates** 9:9 18:14 72:23

**David** 48:13

49:6,9

**day** 27:9 84:21

**day-to-day** 61:15 75:3 91:18,20,24 93:12

**deal** 36:13

**Debbie** 94:22

**Deborah** 4:13

**debt** 88:21,23

**debtor** 6:12, 16,20 13:4 83:10

**December** 9:18 10:5 11:12 13:4,9 14:21,24 15:12 16:2, 10,11 17:20 18:22,25 19:3,6 20:14 25:17 26:9 27:7 28:1,12 31:14,20,25 32:5 39:21,24 53:23 64:17 65:1,14,23 66:7,9 67:13 70:4,8,25 71:9 73:22 75:22 76:2,7, 8,10,20 78:8 90:21 93:2,16

**decision-making** 92:14

**decisions** 12:13,17

**defendant** 38:2

**demean** 61:12

**department** 61:15

**deposed** 55:13 85:22

**deposit** 67:5

**deposited** 61:19,24 62:4,12

**deposition** 4:2,9 5:17 6:3 82:1 86:1 94:10

**deposits** 65:12,13 66:3,6 69:8,9

**derived** 86:11

**designated** 81:14

**detailed** 70:24

**details** 6:6,11

**determining** 61:19

**digitally** 82:15,18

**direct** 66:19 73:9

**directed** 54:10 67:5,9

**directly** 8:12

**director** 9:4 10:5,7,9,19 11:10 22:11

**directors** 44:8 70:12 83:13, 16 93:3

**directorship** 10:23

**Directv** 31:2

**Dirico** 47:2

48:13 49:2

**disagree** 6:10

**disclose** 43:23

**disclosing** 33:2

**discount** 89:4

**discovered** 36:18 41:11

**discovery** 22:8 37:12,13 41:9 42:15,25 79:2

**discretion** 29:21

**discussed** 50:16 87:10 90:3

**discusses** 28:21

**discussion** 51:23 52:3 70:4,14 71:4 72:14,20 73:12,22 92:14

**discussions** 40:19,22 44:7 48:6 67:14 87:1 89:25 91:6

**dish** 31:1

**dishonest** 44:2 77:7

**dishonestly** 78:10 80:2,11

**dispute** 14:19 16:23 17:13, 16,18 18:3,9 25:16 28:18 29:5,15,23

**District** 4:8

**document** 5:20,22 9:18 10:6,18 13:22 14:5,8,18,19 17:23 18:4 23:25 24:6, 12,15,17,21 26:20,25 27:3 43:22 46:21, 23 50:17 53:23 78:21 79:18 82:15

**documents** 9:13 13:6 16:15 17:6 26:17 35:16 36:20 41:11 42:16,25 53:5 84:16

**Docusigned** 82:15

**Domestic** 14:25 15:2,13

**double-negative** 17:17

**doubt** 79:15

**dual** 26:4

**due** 9:25 66:11 69:5,9 77:19

**duly** 4:24

---

**E**

**e-mail** 9:16 24:10 25:2, 13,17,25 27:6 28:10,20 29:1 43:7 45:22 47:2,7 48:5, 10,13 50:1



PAPP0726

51:13 67:19, 22,23 68:12, 25 69:5

**e-mailed** 28:22

**e-mails** 36:18 83:22 85:2

**earlier** 9:12 32:3 50:16 51:12 54:16 68:21 72:6

**early** 48:23 70:8 74:4,9 75:9

**easier** 10:3

**East** 16:1,21 64:18

**educated** 86:4

**effecting** 81:15 84:11

**effective** 82:15

**effort** 87:17

**electronic** 85:16

**electronically** 82:18

**Electronics** 57:12 60:1,5

**Elmore** 27:6, 12,13 28:21, 23 29:1 63:6, 8

**employed** 30:22

**employee** 68:6,9 80:23

**employees** 30:22 44:7

62:16,17

**end** 53:2

**ended** 9:19

**ending** 14:14 19:10 49:19 75:22

**engaged** 78:2

**ensue** 87:14

**entirety** 36:8

**entities** 6:14 8:17 11:2 22:15

**entity** 7:19 13:5 45:18,24 46:9 52:8 56:1,7,14,21 57:7,10,11,14 58:6,11,18 59:25 68:21 69:1,16 92:3

**equally** 65:19

**equipment** 30:13

**equity** 88:9,20

**errata** 94:15

**et al** 4:3,4

**event** 7:23

**exact** 9:9 78:17

**EXAMINATION** 5:1 55:8 89:16 92:22

**excess** 49:4 74:8 75:4,10 76:21,25

**exchange** 45:22

**excuse** 18:25

**execute** 26:3

**executed** 9:21 10:6 82:15,19

**executive** 29:10

**exhibit** 5:9,11, 12 13:19,21 14:2 15:21 16:7,12,17,18 17:23 18:13, 15,16,20 19:2,12,18, 19,21,22 23:23,25 24:9 26:18,20 27:9 29:6 46:15,17 64:8,9,11,22, 23 67:17,19 69:9 75:21 78:20,22 81:22 82:1

**exhibits** 15:25 64:3

**exist** 36:21

**expectation** 31:23 76:24

**expected** 23:11 76:15

**expired** 58:8 59:9,10 61:2 66:24

**expires** 60:25

**explain** 94:2

**Express** 57:8

**extent** 21:7,8, 9 33:4,9,14 36:20 48:5 54:10 83:2,9 84:7,9

— F —

**fact** 51:19 72:19

**facts** 14:1 78:1,5,9 80:1

**failed** 52:5

**fair** 20:25 21:18 93:21

**fallen** 91:23

**familiar** 7:6 56:2,16,21 57:3 58:2,11 65:1 68:18 80:19

**familiarity** 94:6

**familiarize** 46:20

**family** 38:3,5, 8 86:8,11

**February** 9:19,20 72:24 78:13 93:8, 11,17

**federal** 4:22 6:15,16 55:18 57:8 76:4,12

**Fedex** 57:8, 11,14,19 58:3,5 59:2,7, 12,18 60:7, 11,19,24 61:4,8,23 62:3,11,23 65:24 66:4,7, 10,19,23,25 67:5,10,14 68:11 69:2,5 70:16 71:14

**feel** 7:2

**Field** 11:8 15:1,2,13 16:5,20,24 17:20 18:10 20:15 30:19, 21 31:1,7 32:1 33:25 34:10,15 38:16 45:9 54:9 56:22,24 57:5 91:24

**filed** 4:7 42:23

**filing** 40:11 42:4

**Finance** 11:23

**finances** 27:19

**financial** 90:12

**financials** 54:19

**find** 64:2 68:14 88:4,8

**fine** 14:3 80:19

**firm** 4:13,15 92:11

**flip** 14:23 75:25 82:13

**Florida** 43:21

**focus** 11:12 13:2 20:5

**follow** 12:19

**follow-up** 55:20 90:19

**forget** 57:24

**form** 8:5,14 9:2,23,24 10:12 12:14 15:9 20:4,18



PAPP0727

22:18 23:3, 14,18 26:11 29:8,18 30:1 33:1 34:3,4, 12 35:6,13 36:2,7,10 37:9 38:19,24 39:5,10 40:18 41:7,13,18,21 42:9,10,13 43:5,14,18 44:4 46:6 47:22,25 50:10,14 51:2,8,17,21 52:6,12,16,22 54:1,12 55:2 91:21 92:8,19

**formality** 35:17

**formally** 10:19

**formed** 91:12

**forward** 7:1

**foundation** 21:13 34:5 66:13 80:5 84:18

**founder** 7:9 61:13

**founders** 57:3

**frankly** 67:21

**free** 7:2

**Frinzi** 10:11, 17,19 11:19 12:2,5,8,11 22:9 23:1,7, 16 25:22 28:7,11,15, 20,22 29:15, 24 32:11,19 33:17 35:23 36:1,6,13

37:19 38:3,5, 8,25 41:6,11, 19 42:1 43:1, 11,16 44:2 46:14 47:9 48:23,24 51:24 54:3,4, 20,25 70:5, 10,14,20,24 71:8,13,16 72:7,10,15,20 73:6,12 77:7, 21 78:2,6,10, 16,23 79:4,13 80:2,10 81:1 82:1 83:24 84:3,11 85:16 86:3,12,16,20 87:24 90:21 91:2,7,14

**Frinzi's** 42:12 43:4 52:4,8 79:16

**front** 53:7

**Frontier** 31:17

**fully** 92:3

**functions** 63:11

**fund** 20:16

**funds** 39:2 73:22 74:16, 18

---

**G**

---

**gain** 33:18,20

**Genco** 59:14, 17,18,19 60:4,7,11,16, 19

**generally** 16:20 17:11 48:12,16 57:4

**Genesis** 58:7, 9,11,15,20,24 59:8,13,16, 20,25 60:12, 16,21,24 61:3,7,23 62:4,8,12,15, 22,25 63:1, 12,15 65:20, 25 66:11,16, 25 67:4,9 68:6

**give** 8:4 9:24 13:9,14 14:4 75:11 76:11

**Global** 4:4 6:13 19:25 20:9,12 21:2, 5,22 22:5,13, 17,22 23:8 32:4,7,22,24 33:9,15,24 34:1,11,22 35:9,25 36:5, 14 38:17,21 41:5 45:7,9, 13,14,19 91:3,13

**GNE** 11:5

**GNET** 11:3,5, 7 26:14 28:2, 12 29:3,7,9 56:14,16,18 57:5 61:25 62:5 68:15, 18,21 69:1,6, 10 73:8

**good** 44:17

**Goodman** 4:2,19,23 5:5 6:12,20,21 7:5,12,17,19, 25 8:7,25 9:4 10:7,20,23,25

11:6,15,20 12:8 13:3,8 14:10,17 17:3,11 18:1 22:11,16 25:5,23 26:13,16 27:15,24 28:2,4 29:2,7, 11,16 30:5,8, 9,22 31:5,10, 15,19,20 33:22,23 34:16 35:8,12 37:17 39:1,7, 12,13 40:15 43:1,20 44:8 45:19 46:3,8, 11 47:8,12 48:1,24 49:14 51:7,24 52:18 53:7,21,25 54:8,10,20 55:5,10,25 56:1,2,6,7,9, 13,19,25 57:3,4,23 58:21,23 59:3 61:15 62:17, 22,25 63:2,11 65:9,17 66:16,17,20 67:5,10,15 68:7,9,22 69:10,25 70:12 71:6 72:22 73:2,7, 8,15,19,23,24 74:7,9,23 75:16 78:13, 17 79:9,12, 16,25 80:9, 23,25 81:11, 14 82:24 83:6,13,17,18 84:4,10,17 85:2,3,5,6

87:2 88:10,25 89:18 91:8,19 92:3,4,10,21 93:13,18 94:4

**Goodman's** 88:23

**govern** 29:11

**governed** 26:14

**government** 76:5,12

**great** 53:8,14 77:3

**group** 7:20 43:20

**grow** 88:6

**GRSM** 17:3

---

**H**

---

**halfway** 14:24

**hand** 5:10 13:6 15:22,23 23:24 24:5 26:19 46:16

**handing** 5:16 13:20 16:7

**handshake** 36:12

**happy** 67:20

**hard** 45:11

**hardship** 90:12,16

**Hardt** 4:10

**Harr** 4:10

**Hartley** 48:14

**heard** 57:7,11 69:16

**heartbeat** 8:4

**held** 7:17,21 73:23 85:6

**helped** 68:10

**helpful** 33:5 84:15

**helping** 27:23

**hid** 41:19 43:11

**high** 20:6

**hired** 48:23, 24

**hold** 7:15 11:21 14:16 20:19 34:3

**holding** 14:10

**holdings** 7:18 8:13 11:4

**home** 5:6 31:2

**honest** 86:21

**Horseshoe** 37:5,19

**hour** 44:14

**house** 37:4,19 38:7,12

**Howard** 48:17 50:1

**huh-uhs** 6:25

---

**I**

**idea** 48:8 50:23 91:11

**identified** 18:15

**identify** 4:16

**immediately** 28:10 72:17,

19

**inappropriate** 71:10,18,25 72:8,11,16,21 73:1

**included** 9:10 12:22 86:7

**including** 47:13 50:23 51:15

**incur** 90:15

**independent** 51:12

**independently** 26:3

**indirectly** 8:12

**individual** 8:11 29:15 83:9

**individually** 36:1 41:6

**individuals** 43:24

**inevitable** 87:21

**informal** 53:22

**information** 41:14 86:4 94:14

**initial** 19:16

**initially** 38:1 49:13

**installing** 31:1

**insurance** 4:22 6:15,16 51:10 55:18 81:10,15,23

82:5,11,22,25 83:7,18 84:1, 5,11

**interest** 35:9 58:14,17

**interim** 79:12

**internal** 23:20

**internally** 83:7

**interpose** 8:3

**interposing** 14:1

**interrupt** 62:19

**introduced** 14:2

**invested** 87:5 88:7,11

**investment** 7:17 88:12, 14,17,20,21, 23 89:1,6

**investments** 88:15,24

**investor** 7:14

**investors** 88:5

**involuntary** 42:22

**involved** 31:21 35:19 40:15 47:18, 24 48:6 61:14 77:12 82:10 92:14 93:12

**involvement** 93:17

**involving** 86:15

**IRS** 76:5,6

**issuance** 47:19

**issued** 6:16

**issues** 6:9

**item** 14:25 15:12

---

**J**

**J.G.** 49:23

**James** 4:2,23 5:5 10:11,17 11:19,20 22:9 23:1 25:5,22 26:3 28:7,11, 20,22 29:15, 24 32:11,18 33:17 36:1,6 37:19 42:25 46:14 47:9 48:23,24 54:3 80:25 82:1

**james.frinzi@ gnetatc.com** 25:20

**james. goodman@ genesisnet. com** 24:24 25:9

**January** 8:24 9:10,19 11:13 13:5 16:2,13 18:11 19:25 20:7,11 22:21,25 23:6 32:6

**Jason** 40:14, 22,25 54:18

**jet** 37:5 38:13

**jg@ goodmannetw orks.net.** 49:20

**Jim** 12:17,18 28:1,8 37:21, 23 54:20,23 80:25 88:4,8 92:11

**job** 10:2

**Joella** 68:3,5

**Joella's** 68:25 69:4

**John** 37:17,18 39:18 40:5,9, 14,20 79:9, 12,15,25 80:9 84:16 85:2,5, 12

**joined** 40:2

**Joseph** 40:14 48:14

**June** 67:23,25 68:25 69:5

---

**K**

**Kathy** 63:18

**Keifer** 39:17 40:6 85:12

**Kensey** 63:18

**kind** 36:12

**knew** 32:4 43:2 54:25 63:5 87:13, 16,21

**knowing** 20:7

**knowledge** 23:15 26:7 33:14 40:13 47:23 50:24

52:13 61:1 92:16 93:19

**Konicov** 48:17 50:1

**Kopf** 4:10

---

**L**

**lack** 27:22 47:19

**lacking** 34:5

**lake** 37:4,19 38:7,12

**late** 37:12 40:10 42:16 70:3,7 73:13 74:4,9 75:8

**law** 92:11

**lawsuit** 6:6,9

**lawyer** 33:3

**lawyers** 85:24 92:11

**lay** 21:12

**lead** 78:5

**learn** 32:21,24 33:16 41:4 62:2

**learned** 21:7, 13 32:7 33:3, 9 35:3 36:24 42:24 52:4 77:16,19 86:4

**leave** 94:13

**led** 80:10

**left** 13:3 53:20 73:5 85:13

**left-hand** 65:5

**legal** 80:5 83:2

**legitimate** 38:15 52:9

**lender** 31:5,8

**lending** 31:22

**lent** 70:17

**letter** 78:23

**level** 20:6

**levels** 23:21

**Lexitas** 4:14, 15

**liability** 47:13 50:22 51:15

**life** 65:3

**likelihood** 87:14

**limit** 28:24 29:7,21

**listening** 20:19

**litigation** 77:12,17,20 86:5,7,10,14 87:11,14 89:23

**lived** 90:9

**LLC** 4:4 58:7, 12,15,21,25 59:8,13 60:13,21 61:24 62:9 65:21,25 67:4 68:15,18 69:6,10

**loan** 34:14,18, 19,20 35:2,4 43:22 50:6,9, 12,16 54:17, 18 69:23 70:5,11,21 71:10,17,21

**loans** 31:12

**located** 4:11

**Logistics** 57:12 60:1,4

**long** 9:6 44:18 53:10 67:19 77:12

**long-term** 86:23

**Longoria** 4:13

**looked** 18:15, 19 19:22 27:10 29:6 54:21 69:8

**lookout** 94:15

**looted** 43:21 77:9 78:6

**lot** 38:8,12

**lots** 87:1

**LSU** 31:18

---

**M**

**made** 12:8 37:23 38:20 40:16 43:4 48:5 51:25 79:18

**maintaining** 81:15 84:11

**majority** 7:25 8:24 35:11 58:19

**make** 10:2 13:15 23:2,16 30:6 33:3 41:24 53:1 67:10 81:7

**making** 12:23 47:24 53:8 66:10

**manage** 68:10

**managed** 54:19 68:9

**management** 47:13 50:22 51:15

**managing** 27:18

**manufacturers** 30:13

**mark** 5:10,12 13:21 23:25 26:20 39:17 40:6 46:17 85:12

**marked** 5:9 13:19 15:21, 25 17:11 18:1 23:23 26:18 46:15 64:9, 11,22 67:17 78:20 81:22, 25

**marking** 67:18 81:17

**Martin** 4:14

**matter** 4:3 85:23

**MBE** 7:20

**meaning** 61:3 70:3 75:4 76:19 86:19

**means** 7:3

**media** 45:2

**member** 24:15,18 53:24 54:3,5 61:13 70:11

92:6

**members** 39:22 86:8,11

**mentioned** 34:18 40:5 50:15 63:5 83:21 90:9

**messages** 85:16

**met** 55:16 63:9 89:22

**Metals** 69:19, 20

**MGR** 46:4 52:10 91:13 92:17

**million** 13:3 15:17 18:23 19:7,10 20:2, 6,8 22:13,17, 22 23:8 34:25 35:3 36:25 37:4,6 38:16, 21 40:16,20, 23 41:5,16 42:1 44:8 45:15 47:20 50:2,5,17 51:19 52:23 54:17 66:7 72:1,5 76:12 87:4,5 88:7, 11,12,13,16 92:17

**mind** 57:14 87:25 89:8

**minute** 28:12 44:20,21 53:12 64:4 85:14

**minutes** 44:17 53:9

**moment** 5:11 10:1 14:5 18:14 20:6 23:25 24:6 46:20 64:2

**money** 6:11 20:15,16 31:22 37:6, 23,24 39:7 42:11 43:19, 23 45:19 52:5,8,10 62:24 63:3 71:17,21,25 72:21 73:4,9 74:7,24 88:7 91:11 92:2

**monies** 70:16

**monitoring** 73:13

**month** 16:8 19:21

**monthly** 73:18

**months** 11:15 74:3

**morning** 68:14

**move** 13:24, 25 15:10,11

**moving** 7:1 67:15

**MSF** 16:4

**Multiband** 4:4 6:13 11:3,4,8 15:1,2,13 16:5,20,24 17:20 18:10 19:25 20:9, 12,15 21:2,4, 5,22 22:5,13, 17,22 23:8

30:19,21 31:7 32:1,4,7,22, 24 33:9,15, 23,25 34:1, 10,11,15,22 35:9,25 36:5, 14 38:16,17, 21 41:5 45:7, 9,10,13,14,19 54:8 56:22,24 57:5 64:18 91:3,13,24

**multiple** 92:12

**Munsch** 4:10

---

**N**

---

**named** 7:19 12:11 20:8 80:20

**names** 17:2 45:11

**Nancy** 4:14

**narrative** 50:1

**nature** 43:11 75:3 76:16 77:8

**necessarily** 74:24

**needed** 12:17, 18 23:1,7 35:18 92:5, 10,13

**Net** 62:25

**net-net** 26:2

**Network** 73:15,23,24

**Networks** 4:19 6:12,20, 21 7:5,12,25 8:7,25 9:4

10:7,20,23,25 11:16 12:8 13:3,8 14:10, 17 22:12,16 25:23 26:13, 16 27:15 28:5 29:7,12,16 30:8,9,22 31:5,11,15,20 33:22,23 34:16 35:8,12 39:1,12,13 40:15 43:1,20 44:8 45:19 46:3,11 47:8, 12 48:2,25 49:14 51:7 52:19 53:25 54:8,10,20 55:25 56:2,6, 7,9,14,19,25 57:3,4,24 58:7,9,12,15, 20,21,23,24 59:3,8,13,16, 20,25 60:12, 16,21,24 61:3,7,24 62:4,8,13,15, 22,25 63:1,2, 11,12,16 65:9,17,20,25 66:11,16,17, 20,25 67:4,6, 9,11,15 68:6, 7,9,22 69:10, 25 70:1,12 71:6 72:22 73:2,7,8,19 74:7,10,23 78:13,17 80:25 81:11, 14 82:24 83:6,13,17,18 84:10 85:3,6 87:2 88:10,25 92:4 93:13

**Networks'** 39:2,7 46:8 51:24 84:5 91:8,19 92:10 93:18

**newly** 91:12

**normal** 74:23

**Northern** 4:8

**nos** 6:25 15:21

**note** 21:8

**notice** 47:19

**notification** 9:16

**November** 4:5 70:4,8,25 71:9,12 73:21 82:16 83:14 90:21

**November/ december** 70:15,19 71:18,22 72:15

**number** 5:12 8:16,19 13:16 19:13 55:13 64:5 79:6

**numbers** 13:15 14:15 17:2 19:16

**numeral** 82:4

---

**O**

---

**object** 8:2,5, 14 9:2,23 10:12 12:14 15:9 20:4,18 21:6 22:18 23:3,14,18 26:11 29:8,18

30:1 33:1 34:3,4,12 35:6,13 36:2, 7,10 37:9 38:19,24 39:5,10 40:18 41:7,13,18,21 42:9,13 43:5, 14,18 44:4 46:6 47:22,25 50:10,14 51:2,8,17,21 52:6,12,16,22 54:1,12 55:2 80:4 83:1,8 91:21 92:8,19

**objecting** 34:4

**objection** 10:13,15 66:13 84:18

**objections** 8:3 10:2

**occur** 70:7

**occurring** 76:21

**October** 12:9 40:2 47:5 77:25 78:4

**OEM** 30:15

**offense** 77:12

**officer** 11:11, 21,24 12:1 30:6

**officers** 11:16 23:22 44:7

**offices** 4:11

**official** 9:18 79:21

**officially** 9:12 30:22 78:12



**ongoing**
31:14 32:1
92:4

**operate** 60:20
61:4

**operating**
59:7,19

**operations**
31:15 32:1
93:12

**opinion** 42:11
43:15,16 44:2
77:6

**opinions**
77:21 86:3

**opportunity**
94:5,9,16

**opposed**
69:10

**oral** 35:22
36:12

**ordinary** 91:8

**organizations**
92:12

**organized**
39:21

**orient** 67:23

**original** 7:9
30:13 57:3
59:25

**outgoing**
19:24 73:14,
18

**overseeing**
84:1

**owing** 66:11
69:6,9

**owned** 8:18
10:25 11:6
29:12 36:1

37:25 39:13
56:10,13,19,
25 92:3

**ownership**
35:8 58:14,
17,19

**owns** 36:4

— P —

**p.m.** 4:6 44:24
45:3 53:16,19
95:3

**package**
47:13 50:22
51:15

**paid** 27:24
70:16

**paper** 9:11
93:8

**paperwork**
93:6,11,16

**paragraph**
82:4

**Parham** 48:13
49:6,9

**part** 19:15
21:24 37:3
58:24 86:4

**parties** 9:19
61:3

**partner** 48:20
49:11

**party** 31:22

**pass** 55:7

**passing** 89:14

**pay** 61:9

**payable** 27:20

**paying** 74:24

**payment**
61:19

**payments**
61:23 62:3,11
66:9,10 67:5,
10 69:5 71:14
74:5

**pen** 93:8

**people** 24:22
39:16 64:1
87:17 92:13

**percent** 8:10

**percentage**
8:8

**performed**
66:15

**performing**
63:11 69:2

**period** 10:4
11:15 61:23
65:16,19 80:1
85:8,10,11

**person** 61:18
83:6,25 84:4,
12

**personal**
39:2,7 43:4
50:24 65:3

**personally**
7:15 18:6
38:11

**personnel**
63:10

**petition** 32:16
33:11 42:22

**phone** 53:1

**phrase** 56:6

**picked** 84:4

**Pittsburgh**
59:17

**place** 12:20
30:21 75:16

**placement**
81:10

**plan** 71:17,21
72:16,20

**pleasure**
68:13

**point** 9:3
10:10 11:10
20:14 31:4
35:8 39:13,21
43:10 44:5
47:18 51:19
60:16,23 93:1

**policy** 6:15
47:9

**portion** 46:4

**position**
11:21,22
12:5,6 72:12

**potential**
47:8,20 51:1,
14 70:5,21
90:22

**predated** 72:1

**preferred**
7:14,22 43:25

**prefix** 17:11
18:1

**premature**
35:24

**present** 4:15

**prevent** 52:10

**previously**
64:16 69:8
81:25

**primary** 82:5

**prior** 22:21
32:19 39:19,

21,23,24 40:6
45:6,17,21
62:2 72:5
74:18 86:1,19
89:6,22 93:15

**private** 88:9

**privilege**
21:9,10 33:5

**procedural**
4:9

**procedures**
26:2,8

**proceeding**
37:3 38:2

**proceedings**
17:8

**process**
41:10

**produced**
17:6

**productions**
17:10

**professional**
30:9,20,24,25
31:3 57:25

**profits** 36:13

**property** 37:4

**propose**
72:10

**proposed**
70:11,16,24
71:2

**proposing**
72:7 73:7

**prospect**
87:10

**Prosperity**
13:8 14:11,16
64:19

 LEXITAS

PAPP0732

**provide** 31:11 61:8,9 63:4 94:14

**provided** 17:14 18:4 81:24

**provider** 51:10

**providers** 30:14,15

**providing** 31:2

**pulled** 64:14

**purchase** 37:4 89:4

**purchased** 59:17,18 68:7

**purchasing** 89:2

**purely** 12:22

**purpose** 31:11 37:7 46:9 52:9

**purposes** 34:24 81:15 84:10

**pursuant** 6:2

**put** 77:3 78:22 93:7

---

**Q**

**question** 8:6 18:17 20:20, 22 22:1 23:4 24:16 29:22 30:17 33:6 34:9 36:3 41:2,23 49:18 51:3 62:1,7 63:7 67:7

70:18 72:13 75:7,13 77:6 82:3

**questioning** 34:5 90:18 92:25

**questions** 6:19 7:1,2 13:1 17:22 53:20 55:21, 24 69:14 77:5,8,21 85:24 89:10, 11 92:21 93:22 94:20, 22

**quick** 44:15, 20 53:1,12 81:2

---

**R**

**ratified** 51:20, 22

**re-ask** 8:6

**reached** 77:20 86:16

**read** 65:2 67:24 94:5,9, 16

**ready** 13:10

**real** 81:2

**realistically** 13:2 43:9

**reason** 14:19 16:23 17:13, 16,18 18:3,9 25:16 27:4 28:18 29:5, 14,23 38:15 79:15 81:5

**reasons**

87:24

**recall** 6:6 8:9 9:9 10:8,21 12:7 14:15 15:7,19 16:22 20:7 26:12 30:23 31:13 32:2,8,12,17 33:12 34:14, 16 35:10 36:15,24 37:15,16 41:25 44:13 46:12 49:15, 16 71:1,2,4 74:15 79:5 81:16 83:21 84:16,21 93:20

**recalling** 34:23

**receive** 38:11 73:9,22 74:8 78:25 85:1

**received** 25:17 42:15, 25 45:15 74:7

**receiving** 74:15,18

**recess** 44:25 53:17

**recipient** 25:5 49:19

**recipients** 24:25

**recognize** 5:22 13:21 14:8 16:18 17:23 24:12, 14,17 27:3 46:24

**recollection** 10:19 12:3,22

31:16 32:9 36:22 44:11

**reconcile** 63:3

**record** 4:1,6, 16 5:4 44:23 45:2,16 53:15,18 59:23 95:3

**recorded** 4:2

**records** 83:22

**recover** 52:5

**redacted** 19:15

**reduce** 88:21, 23

**redundant** 6:19

**refer** 6:20 7:24 35:2 66:4

**reference** 5:15

**references** 55:24

**referred** 7:24 28:7 50:8 68:22 69:17

**referring** 34:19 56:6

**refers** 50:5

**reflected** 65:13 66:3 76:11 77:21

**reinvent** 87:6

**relates** 92:2

**relation** 51:7

**relationship** 60:12 86:23

**relied** 83:6

**remained** 10:5 27:17

**remaining** 6:8,14

**remember** 11:4 36:16 41:25 73:10 77:8 85:20 88:19

**removed** 72:12,17

**repaid** 31:23

**repeat** 18:17

**rephrase** 20:21 22:2 83:12

**reporter** 4:13 5:12 6:24 81:20

**reporter's** 10:2

**reporters** 94:13

**represent** 4:17 6:8 37:2 45:25 48:9,24 55:18 81:14, 25 84:10

**representative** 83:10 84:5,12

**represented** 89:20

**requested** 4:10

**requirement** 23:10

**reseller** 30:12,16,18 57:25



**reserving** 94:2

**resign** 72:21

**resignation** 9:17,21 53:23 78:23 79:16 93:7

**resigned** 78:12,16 79:4,13 85:13 93:3,10,16

**resolution** 26:1 29:6

**Resources** 4:4 6:13 19:25 20:9,12 21:2,5,22 22:5,13,17,23 23:8 32:5,7, 24 33:10,15 34:1,11 35:9, 25 36:5,14 38:17,21 41:5 45:9,14 91:3, 13

**respect** 12:21 26:8 39:20 41:15 51:18 89:25 90:25 92:16

**responds** 28:15

**response** 29:1

**responsible** 61:18 83:25

**rest** 57:15

**restart** 8:22 21:20 35:7

**restricted** 29:16,19

**retained** 49:13,16

**revert** 30:3

**review** 14:6, 19 16:14 27:1

**rights** 26:14 29:10

**Robert** 47:2 48:13 49:2

**role** 39:1 51:6 61:12 79:21 81:10 84:23, 24

**Roman** 82:4

**roughly** 32:12

**routinely** 73:17

**run** 31:10 39:13 87:25 88:3 91:14

**running** 91:18

**rush** 94:23

---

**S**

---

**safe** 7:23,24 44:1

**salary** 74:6

**Samantha** 54:22 81:3,4 82:7

**San** 5:7 90:9

**Sandra** 80:20

**satellite** 31:2

**save** 88:10

**Schmookler** 4:21 5:18 6:10 8:2,14 9:2,23 10:12,

14 12:14 13:11,14,18, 24 15:9 16:3, 8 20:4,18,23 21:6,12,16 22:18 23:3, 14,18 24:3,11 26:11 29:8,18 30:1 33:1 34:3,12 35:6, 13 36:2,7,10 37:9 38:19,24 39:5,10 40:18 41:7,13,18,21 42:9,13 43:5, 14,18 44:4,18 46:6 47:22,25 50:10,14 51:2,8,17,21 52:6,12,16,22 53:4,8,14 54:1,12 55:2, 9,15 64:5,10, 12,16,19,21 66:18 80:8 81:4,8,9,18, 21,23 83:5, 11,12 85:1,10 89:9,15 90:19 91:21 92:8, 19,23 93:22 94:1,21,24 95:1

**Scott** 4:3,19, 21 5:11,15 8:22 13:7 16:1 24:1,8 26:21 44:16 46:18 53:1 55:15 81:2 85:9 89:14

**screen** 64:13 78:22

**screw** 81:5

**secret** 35:23

36:12

**Section** 82:3

**seek** 23:7,11 29:25

**sees** 6:9

**Seidel** 4:3,19

**self-served** 43:21

**self-serving** 71:5

**sell** 30:14

**send** 62:24 73:8

**sentence** 68:13

**separate** 13:5 25:5,13 26:20 47:11 88:15, 24

**September** 42:19,23 78:18 79:3,17

**series** 90:20

**served** 5:25 84:24

**service** 33:19

**services** 11:8 15:1,2,13 16:6,21,24 17:20 18:10 20:15 30:10, 19,20,21,24, 25 31:1,3,7 32:1 33:24,25 34:10,15 38:17 45:7,9 54:9 56:22,24 57:5 58:1,7, 10,12,15,21, 24 59:8,13, 16,20 60:12,

17,21 61:3,7, 8,9,24 62:4,9, 13,16,21,23, 25 63:4,12 65:20,25 66:12,15 67:1,4,9 68:7 69:2 91:24

**share** 36:13

**shared** 62:21

**shareholder** 7:9,11,12,25 8:24 35:12

**shareholder's** 26:16

**shareholders** 22:16 52:14, 18

**shares** 7:13, 14,15,16,17, 22 8:7,16,17

**shielded** 41:11

**show** 53:5 64:3,10,16, 20,21 67:18, 20 78:21 81:17

**showing** 64:25 84:16

**shown** 75:20

**shows** 43:8

**sign** 94:5,9

**Signal** 85:18, 20

**signatory** 63:15

**signature** 94:2

**signed** 9:18



36:17 43:22 50:19 53:24 85:2

**signing** 74:25

**sir** 8:2 9:24 13:25 20:19 33:2 34:4,6 62:20 64:4,22 65:15 67:20 68:4 70:3 71:24 72:25 75:23 77:25 78:22 81:23 83:12 84:15 85:14 89:9,15 92:24 93:1,23 94:1

**sit** 44:10

**size** 12:23 23:2,12,17 74:2

**skis** 37:5 38:13

**smooth** 18:18

**sole** 24:15,18 29:20 31:11 42:12

**Solutions** 28:2,4 29:2

**Sondrup** 80:20 81:3,10 82:7,19,21,25 83:5

**sound** 9:20 44:17 61:14

**sounds** 53:14 61:13 79:14

**sources** 79:23

**speak** 6:24

**specialtyclaim s@chubb. com.** 47:3

**specific** 40:1 77:4,24

**speed** 15:23

**spoke** 32:3 70:10 72:6

**spoken** 72:2

**Staff** 80:24

**stakeholders** 46:11

**stand** 30:18

**start** 7:5 16:17,25 18:13 25:25 48:16

**started** 32:21 42:19,21

**starting** 13:7 14:24 24:9

**starts** 24:17 50:2

**state** 5:3 10:14

**statement** 13:8,12 14:21 17:14,19 18:11 19:15 64:17,25 65:7,14 66:4, 10 75:21,22 76:1,11

**statements** 16:2 19:18 54:22 65:2 74:11,14

**stay** 34:25

**step** 10:24 21:1,19 30:7

51:5 55:23 59:11

**Stephanie** 27:6,12,13 28:21,22 54:22

**sticker** 82:2

**stole** 43:19

**streamline** 6:18

**Street** 4:12

**strictly** 31:21 50:24

**strike** 13:25 57:18,20,22 69:22 79:22 84:8 89:7

**string** 67:20

**strong** 87:13

**Structurally** 12:15

**structure** 23:21 39:12 54:7

**style** 6:5

**subject** 47:7 89:10 94:12

**subpoena** 5:16,25 6:2

**subsidiaries** 10:25 11:6 56:11 59:4 66:20

**subsidiary** 29:12 56:19, 25 58:21 66:17 68:22

**Suite** 4:12

**Supply** 57:11, 15,19 58:3,5

59:2,7,12,18 60:7,11,19,24 61:4,8,23 62:3,12 65:24 66:4,10,19, 23,25 67:10, 14 68:11 69:2 70:16 71:14

**support** 27:18 62:23 63:4

**supposed** 29:24

**Surplus** 49:4

**suspicions** 37:21

**sworn** 4:24

**Symbiont** 7:18

---

**T**

---

**taking** 75:16

**talk** 39:12

**talked** 54:22

**talking** 16:4 68:13 80:6

**taxes** 76:13

**technically** 59:14

**telecom** 30:14 58:7,9,12,15, 20,24 59:8, 13,16,20 60:12,17,21, 25 61:3,7,24 62:4,9,13,15, 23,25 63:1, 12,16 65:20, 25 66:11 67:1,4,9 68:7

**ten** 44:17,20

53:9,12

**tennis** 92:25

**tenure** 22:11

**term** 27:22 47:19

**testified** 4:24 33:8

**testify** 5:16 90:7,16

**testifying** 83:9

**testimony** 41:25 86:1 90:1,3 93:2

**Texas** 4:8,12, 14,15 5:7

**theft** 78:2 80:3

**things** 77:16, 19 79:24 85:15 90:25

**third-parties** 89:2

**third-party** 20:16,24

**thought** 34:20 45:13,18 71:9,17 72:7, 11,16

**time** 5:19 10:4,10 11:10 12:7,11 32:6 46:2 53:12 55:7 58:9,23 59:2 63:19 67:3 68:1 70:10 73:21 74:4 77:12 80:12,13 81:14 85:8 93:10,11,15

888-893-3767
www.lexitaslegal.com



**timeframe** 12:10 32:12 56:1,10 75:9 76:19,20 77:1,25

**times** 6:17 55:13 74:23

**today** 6:3 9:25 13:2 21:21 34:24 35:25 44:10 55:7, 10,16 56:6 72:2 79:1 89:10 90:1,3 93:25 94:20

**Today's** 4:4

**told** 22:4 32:10 35:3, 11,15 37:16, 18,23 41:15 42:6 43:10 67:8 71:13, 16,20

**Tomahawk** 5:7

**top** 6:6 19:9, 14 67:23

**total** 8:16 87:5

**totalling** 66:7

**touched** 50:21 91:1

**Trail** 5:7

**transaction** 70:24 71:3 72:11 73:7 75:11

**transactions** 26:3 62:23 72:7 75:9,16, 17 76:16 88:16

**transcript** 94:17

**transfer** 13:2 15:7,16,19 18:22,23 19:6 20:8 22:12, 17,22 23:2,8, 12,16 36:25 38:22 40:16, 20,23 41:20 43:3,10 51:20,25 52:1,4,14,19, 21 63:2 71:25 72:1,5 74:8, 20,25 76:25

**transferred** 13:4 20:15 38:8,16 41:6 42:11 68:8

**transfers** 6:11 12:23 15:11 18:19 19:3 29:17,24 73:14,18 74:2 75:3,4 76:1,5, 20

**transition** 87:7

**transitioned** 88:5

**transmitted** 50:25 51:14

**travel** 9:25

**trial** 90:6,13

**true** 5:24 14:20 17:19 18:10 26:7 43:11 59:6 70:3 71:12, 16,20,24 72:4 87:9

**Trust** 38:3,5,9

**trustee** 4:3,19 6:9 17:3,6 18:4 48:1,2,9 94:20

**trustee's** 6:14

**Trustee_ grsm_ 0013380** 46:19

**Trustee_ grsm_ 0553248** 24:2

**Trustee_ grsm_ 0841342** 26:22

**trustees** 17:14

**turn** 19:12

**type** 30:5

**typed** 82:8

**typically** 63:25

---

**U**

**U.S.** 4:7

**uh-huhs** 6:25

**ultimately** 46:10 93:7

**umbrella** 31:11 55:20

**unaffiliated** 91:12

**unclear** 7:2

**underscore** 18:1

**understand** 22:1 45:12

55:12,25 57:18,19 59:11 60:15 62:6 75:13 77:11,15 78:12 85:15

**understandin g** 8:20 21:4, 21,24 22:5,9, 25 23:6 27:21 35:25 36:4 46:3,10 48:10,21 50:11,25 51:6,13 53:21 54:8,24 70:15,23 74:22 75:2,8

**understood** 7:4 31:4 34:24 45:24 46:16 49:2 73:6 75:15 83:17 93:2

**undue** 90:12, 15

**unhappy** 87:18

**unilateral** 29:16

**unpaid** 87:18

**unrelated** 6:13

**upper** 65:5

**upset** 71:2

---

**V**

**VAR** 30:10,11, 15 57:25 58:3 59:3,6 68:10, 11 69:2

**verbal** 6:25 9:12,14

**verbally** 93:3, 10,16

**verify** 8:15,18 79:20 84:23

**version** 92:25

**versus** 4:3

**vetted** 92:6,10

**video** 4:2 9:25 94:25

**viewed** 50:12

**virtually** 53:5

---

**W**

**wait** 42:20 45:10

**waiving** 21:9, 10 33:4

**wanted** 45:23 49:25 81:6

**weekly** 73:14, 17

**West** 4:11 16:2,21 64:18

**whatnot** 61:20

**Whatsapp** 85:20

**White** 4:18 5:2,15,19 8:6, 20 9:3 10:4, 13 12:21 13:7,13,17,20 14:4 15:10 16:1,5,7,10, 12,14 20:5, 21,25 21:1, 11,15,18,19

PAPP0736



22:20 23:5, 15,24 24:1,4, 5,8,12 26:19, 21,24 29:13, 20 30:7 33:8 34:7,18 35:7, 19 36:8,11 37:10 38:20, 25 39:6,11 40:19 41:10, 14,19,23 42:10,18 43:9,15 44:1, 5,16,19 45:5 46:9,18,20 47:23 48:4 50:11,15 51:5,11,18,23 52:7,13,17,25 53:6,11,20 54:4,15 55:5 64:7,14,18 66:13 72:1,6 80:4 81:2,6 83:1,8 84:18 85:8 89:11, 12,17 91:23 92:15,20 93:24 94:4,8, 12,19

**wholly** 10:25 11:6 29:12

**wind** 87:2,7, 11,17

**wire** 14:25 15:1,2,12,13 19:24 74:25

**word** 77:9

**words** 52:7 57:16

**work** 53:3 63:2

**worked** 26:8 43:20 54:20

92:11

**workout** 48:25

**works** 48:20 49:11

**worries** 81:6

**wrap** 53:2

**writes** 27:25

**writing** 55:19

**written** 24:14, 18 35:22 36:12 59:3,12

---

### Y

---

**year** 80:6

**years** 9:7 22:8 77:16

**York** 49:12

---

### Z

---

**Zoom** 64:14

888-893-3767
www.lexitaslegal.com



PAPP0737