Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re:                          )
                                )  Case No. 22-31641-mvl-7
GOODMAN NETWORKS, INC.,         )
                                )  (Chapter 7)
        Debtor                  )
_____   )  _____
                                )
SCOTT M. SEIDEL, TRUSTEE;       )
GNET ATC, LLC; Multiband        )
Field Services, INC.,           )  ADVERSARY PROCEEDING
                                )  NO.:  23-03036
        Plaintiffs,             )
                                )
v.                              )
                                )
JAMES FRINZI; MULTIBAND         )
GLOBAL RESOURCES, LLC; and      )
FEDERAL INSURANCE COMPANY,      )
                                )
        Defendants.             )

-------------------------------------
ORAL DEPOSITION OF
JOHN GOODMAN
JANUARY 9, 2026
(REPORTED REMOTELY)
-------------------------------------

     ORAL DEPOSITION OF JOHN GOODMAN, produced as a
witness at the instance of the DEFENDANT FEDERAL
INSURANCE COMPANY, and duly sworn, was taken in the
above-styled and numbered cause on January 9, 2026, from
10:38 a.m. to 1:30 p.m., via Zoom, before Amber Garcia,
Notary Public in and for the State of Texas, reported by
machine shorthand, pursuant to the Federal Rules of
Civil Procedure.
 Job No. CS7834181

PAPP0875

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF SCOTT SEIDEL, TRUSTEE:

    MR. CONOR P. WHITE

    Munsch Hardt Kopf & Harr, P.C.

    500 N. Akard Street

    Suite 4000

    Dallas, Texas 75201

    Phone: (214) 880-1085

    Cwhite@munsch.com


FOR THE DEFENDANT FEDERAL INSURANCE COMPANY:


    MR. SCOTT L. SCHMOOKLER

    Gordon Rees Scully Mansukhani, LLP

    One N. Wacker Street

    Suite 1600

    Chicago, Illinois 60606

    Phone:(312) 980-6779

    Fax:(312) 565-6511

    Sschmookler@grsm.com

PAPP0876

Page 3

INDEX

                                                        PAGE

Appearances.......................................2

JOHN GOODMAN
     Examination by Mr. Schmookler..................5
     Examination by Mr. White......................60
     Further Examination by Mr. Schmookler.........89

Signature and Changes............................102

Reporter's Certificate...........................104

                    EXHIBITS
NO.            DESCRIPTION                       PAGE
Exhibit 1      CT Corporation Service of Process   24
               Notification

Exhibit 2      9/19/2022 E-mail from Howard        31
               Konicov - TRUSTEE_GRSM_0575501 to
               TRUSTEE_GRSM_0575514

Exhibit 3      9/11/2022 E-mail from Joseph Baum - 33
               Trustee_23_03090_001141 to
               Trustee_23_03090_001142

Exhibit 4      12/31/2021 Prosperity Bank Statement 49

Exhibit 5      Consent of a Majority of the        52
               Managers of the General Partner of
               Goodman MBE Group LP -
               Trustee_23-03072_000663 to
               Trustee_23-03072_000670

Exhibit 6      Consulting Agreement -              54
               SEIDELFRINZI_013231 to
               SEIDELFRINZI_013236

Exhibit 7      9/16/2022 E-mail from John Goodman  65

Exhibit 8      East West Bank Multiband Field      67
               Services Commercial Analysis
               Checking

PAPP0877

Page 4

EXHIBITS (CONTINUED)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | 10/29/2022 E-mail from John Goodman | 73 |
| Exhibit 10 | 10/29/2022 E-mail from John Goodman - TRUSTEE_GRSM_0013266 to TRUSTEE_GRSM_0013267 | 75 |
| Exhibit 11 | 10/29/2022 E-mail from John Goodman - TRUSTEE_GRSM_0083806 to TRUSTEE_GRSM_0083822 | 77 |
| Exhibit 12 | 10/28/2022 E-mail from Howard Konicov - TRUSTEE_GRSM_0040503 to TRUSTEE_GRSM_0040504 | 78 |
| Exhibit 13 | 9/23/2022 E-mail from John Goodman - TRUSTEE_GRSM_0038567 to TRUSTEE_GRSM_0038575 | 85 |
| Exhibit 14 | 10/31/2022 E-mail from Howard Konicov - TRUSTEE_GRSM_0013380 to TRUSTEE_GRSM_0013382 | |

REPORTER'S NOTE: Exhibit 14 was provided, but was not marked during the deposition.

PAPP0878

Page 5

                    P R O C E E D I N G S

                    THE REPORTER:  We are on the record.  Today is January 9th, 2026.  The time is approximately 10:38 a.m.  We are taking the deposition on Zoom.  The witness is located in Fredericksburg, Texas.  This is the deposition of John Goodman in re Goodman Networks, Inc., Case Number 22-31641-mvl-7, in the matter of Scott M. Seidel, Trustee, et al, versus James Frinzi, et al, in the United States District Court for the Northern District of Texas, Dallas Division, Adversary Proceeding Number 23-03036.

                    My name is Amber Garcia, representing Veritext.  Will all Counsel present please state their appearances and whom they represent, and then I will swear in the witness.

                    MR. SCHMOOKLER:  Scott Schmookler on behalf of Federal Insurance Company.

                    MR. WHITE:  Conor White on behalf of Scott Seidel, Chapter 7 Trustee of Goodman Networks, Inc.

                    (Whereupon the witness was sworn.)

                    THE REPORTER:  Okay.  Thank you.

                    And you can proceed.

                    EXAMINATION

BY MR. SCHMOOKLER:

     Q.  Good morning, Mr. Goodman.  My name is Scott

PAPP0879

Page 6

Schmookler.  I represent Federal Insurance Company in litigation pending in Texas.  We're here to take your deposition today.  Have you had your deposition taken before today?

A.  Yes.

Q.  Approximately, how many times?

A.  I don't know.  Five to eight times.

Q.  Okay.  Before we start, I'd like to go over a few ground rules just so you and I have a mutual understanding.  I'm going to ask you a series of questions today.  To the extent that you do not understand any of my questions, please let me know, and I will, to the best of my ability, rephrase it.  But to the extent that you answer my question, I will assume you have understood the question as it was asked; is that fair?

A.  Yes.

Q.  I am going to show you documents today on a screen share.  To the extent that you want to go up, down, in, or out, and cannot see the documents, please let me know.  I want you to be able to see those documents to the extent you need them or want to see them before you answer my questions.  Okay?

A.  Okay.

Q.  We are here on Zoom.  To the extent that you do

PAPP0880

Page 7

not hear my questions for any reason, technical difficulties on my internet or your internet or the computer, please let me know.  I do not want you to answer any question unless you've heard it and understood it.  Is that understood?

A.  Yes.

Q.  There will be a time when Conor may want to object on behalf of the plaintiffs.  To the extent that he interposes an objection, and he can do so for the record, but to the extent, unless you're told not to answer a question for some reason, even though there's an objection, you can answer.  Okay?

A.  Okay.

Q.  And then, finally, we have a court reporter here today.  She's going to take down everything we say word for word.  It is best if we do not talk over each other.  It will make her job infinitely harder.  So if you can just let me finish my question, wait for an objection, and then answer, and then I will extend you that same courtesy.  We can go in an orderly fashion, and hopefully Amber will be able to take down the record accurately and quickly.  Okay?

A.  Sure.  Yes.

Q.  Can you give me a brief description of your educational background?

PAPP0881

Page 8

A.   Sure.  I grad- -- I graduated from high school from Highlands, Texas, graduated from college from Texas Tech University.  I started my master's at UTA, didn't finish it, and that's a brief summary.

Q.   Okay.  What is your college degree in?

A.   It's a business degree.

Q.   Okay.  Are you currently employed?

A.   I work as a consultant.  I am not employed by an independent company.

Q.   Okay.  What type of consulting services do you offer today?

A.   A variety to different companies that need help potentially raising capital or just improving their operations in their business.  Sometimes I'll help from an HR perspective.  It's a variety of business management consulting type of jobs.

Q.   Do you have any current clients that you are servicing?

A.   Not today, no.

Q.   Okay.  When is the last time you offered any consulting services to any clients or that you actually performed those services?

A.   I'm trying to think.  I believe this past -- this past summer.  Now, are you a- -- let me -- let me -- let me make sure I clarify that.  Are you asking

PAPP0882

Page 9

me if I'm performing it directly through them or if I'm performing it through a company that -- that I had?

Q. Either way.

A. It'd be in the past couple of months.

Q. Okay. Do you have a company that you operate under?

A. Yes, I do.

Q. What is that company's name?

A. It's called CSL.

Q. CS, and what was the last letter?

A. L, as in Larry.

Q. Okay. Who was your employer -- who was your last employer prior to providing these consulting services through CSL?

A. Well, I've been working as a consultant for the last couple of years, so it would probably be -- it would have been GTH. No, well, let me think. It was the last company I received a W-2 from. It would have primarily been GTH. I don't remember if -- if the other few companies, if they paid me as a W-2 or as a consultant, but I'd -- I'd have to pull up my tax return and look.

Q. Okay. What -- what is GTH?

A. It was Goodman Telecom Holdings.

Q. What was the business at Goodman Telecom

Page 10

Holdings?

A.   Sorry.  My cat's jumping up on the table.

We provided telecom services for a variety of companies.

Q.   Was Goodman Telecom Holdings related to Goodman Networks, Inc.?

A.   It was at a point, but not after it was purchased.

Q.   Can you explain that a little bit more?

A.   Sure.  The company, in 2019, the company, Goodman Networks, decided to divest the asset, and we were in a process that was overlooked by an independent board of directors.  And when COVID came through, the -- a lot of the bidders elected to back out, and we divested the company to myself and some of the other management team who raised capital through a third party, and we bought the small telecom division.

Q.   So at some point was Goodman Telecom Holdings owned by Goodman Networks, Inc.?

A.   Yes.  A division of it, yes.  Not the independent company, but it was a division of Goodman Networks.

Q.   Okay.  So let me try again.  So Goodman Telecom Holdings was a division of Goodman Networks, Inc., correct?

PAPP0884

Page 11

A.  It was not an independent division.  I should say -- to clarify, I should say it was a department.

Q.  Okay.  Did Goodman Networks, Inc., operate Goodman Telecom Holdings?

A.  Yes.

Q.  Okay.  And did Goodman Networks, Inc., divest Goodman Telecom Holdings --

A.  No, they --

(Speaking simultaneously.)

Q.  (BY MR. SCHMOOKLER) -- whatever -- that was --

A.  They divested the department, yes.

Q.  After that divestiture, was Goodman Telecom Holdings created as a separate company?

A.  Yes, it was.

Q.  Okay.  And who owned Goodman Telecom Holdings at that time?

A.  Myself, Scott Pickett, our investors.  We had some independent investors, as well as a financial -- an independent financial group, and Goodman Networks retained an ownership in it as well.

Q.  What happened to Goodman Telecom Holdings?

A.  I filed for a Chapter 7.

Q.  When was that?

A.  That would have been, I believe, in early 2024 or wh- -- yeah, 2024.  Spring of 2024.  I'd need to

PAPP0885

Page 12

check the date exactly, but I believe that's the time that we filed it.

Q. Okay. Were you ever an employee of Goodman Networks, Inc.?

A. Yes.

Q. When were you an employee of Goodman Networks, Inc.?

A. From 2000 until 2014, and then 2017 to 2020 -- early 2020.

Q. Were you ever an officer of Goodman Networks, Inc.?

A. Yes.

Q. Were you an officer during the period you just identified?

A. Yes, from 2000 to 2014, and then 2017 to early 2020, because -- I need to look back at the documents, but I either -- I think I had to resign or recuse myself on the board during the divestiture. So I don't remember if I resigned from the board first or if I resigned from my management position first, but they were within a couple of months of each other.

Q. Okay. From 2000 to 2014, what positions did you hold at Goodman Networks, Inc.?

A. CEO. From 2000 to 2014, should have been CEO and board member.

PAPP0886

Page 13

Q.  Were you the chairman of the board from 2000 to 2014 or did someone else serve in that role?

A.  I don't remember when I became chairman of the board, but it would have been a few years after the company was started, maybe, three or four years.  I'd have to look back, but for the most of the time, yes.

Q.  Did you hold any position at Goodman Networks, Inc., between 2014 and 2017?

A.  No.  Well, part of 2014, yes.  I don't remember when I left in 2014, and I don't remember exactly -- I'd need to look at my employment agreement dates.  But part of the year in 2017, and part of the year in 2014, I believe.

Q.  Okay.  Let me try it a different way.  From 2015 through 2016, did you hold any position at Goodman Networks?

THE WITNESS:  Sorry, guys.  My cat's on the table.  Get off.

A.  No, I did not.

Q.  (BY MR. SCHMOOKLER)  What did you do during that window of time?

A.  During that window of time, I was primarily running a medical company.

Q.  Were you involved in the founding of Goodman Networks?

PAPP0887

Page 14

A.   Yes.

Q.   Okay.  How would you --

A.   You know what, Scott, let me think about 2015 to 2016.  I need to look back.  I -- I believe I resigned from the board.  I don't remember if I was still on the board during that time, so I'm going to have to change my answer to that question.  I've got to look back and see if I was still a board member.  I wasn't an employee, but I would need to double-check.

Q.   That's fine.  It's not critical to what I'm doing, but thank you.

So did you resign both as an officer and a board member in 2020?

A.   Yes, I did.

Q.   Today, I want to ask you about events that happened in 2022.  Did you hold any position of any variety with Goodman Networks in 2021?

A.   No, not in 2021.  No.

Q.   Okay.  In the first half, so from January through July 1st of 2022, did you hold any positions with Goodman Networks?

A.   Did you say January -- can you clar- -- can you say the dates again?

Q.   Sure.  January 1st to July 1st, just the first half of the year.

PAPP0888

Page 15

A.  Of 2022?

Q.  Yeah.  Did you hold any positions?

A.  No, not -- not to my knowledge.  Not that I recall, no.

Q.  Okay.  Were you, at any time in 2022, an officer of Goodman Networks?

A.  No.

Q.  Are -- do you know who James Frinzi is?

A.  Yes, I do.

Q.  Okay.  Are you aware that Mr. Frinzi was at one point the CEO of Goodman Networks and a company called GNET ATC?

A.  Yes, I am now.

Q.  Okay.  Were you aware in 2022 of whether Mr. Frinzi held those positions with Goodman Networks?

A.  I would have learned that at some point in 2022, but I don't remember exactly which date.

Q.  Okay.  Did you learn at any time in 2022 that Mr. Frinzi had resigned his role at Goodman Networks, Inc.?

A.  Yes.

Q.  Okay.  After Mr. Frinzi resigned, did you take on the role of CEO of Goodman Networks, Inc.?

A.  No.

Q.  Okay.  After Mr. Frinzi resigned, did you ever

Page 16

hold yourself out as the CEO of Goodman Networks, Inc.?

A.   Please clarify "holding myself out" --

Q.   Sure.

A.   -- "as CEO."

Q.   After Mr. Frinzi resigned, did you ever send correspondence in which you identified yourself as the CEO of Goodman Networks, Inc.?

A.   Not that I recall, because I was working as a consultant.

Q.   Okay.  What was your role as a consultant for Goodman Networks, Inc., in 2022?

A.   I was asked by the family to come in and help because Jim Frinzi had resigned, and there was not anyone at the company to help operate and execute it. To the best of my knowledge, that's what I recall.

Q.   When you say you were "asked by the family," who -- who do you -- who are you referring to as "the family"?

A.   The primary family members, which were the majority shareholders and the -- which would have been Jody, Jonathan, and Jason primarily.

Q.   Does that include James Goodman?

A.   Yes.  Did I not say James?  Jody, Jonathan, Jason, and James.

Q.   What is your relationship to Jody Goodman?

Page 17

A.   He's my brother.

Q.   Okay.  What is your relationship to John Goodman?

A.   I am John.  Do you mean Jonathan?

Q.   Oh, sorry.  I wrote John down.  Sorry.  Ja- --

A.   That's all right.

Q.   What's your relation to Jason?

A.   My brother.

Q.   Okay.  And what is your relationship to James?

A.   My brother.

Q.   Okay.  At the time you were asked by your brothers to help with Goodman Networks, were you a shareholder in Goodman Networks?

A.   Yes.

Q.   What -- do you recall what your shareholding interest was at that time?

A.   I don't recall exactly, but it would be somewhere between, if I remember the cap table correctly, from a common perspective, there was a variety of -- of ownership.  So you would have had preferred, you would have had common, and I believe the common ownership would have been somewhere around 15 to 19 percent.  I -- I don't remember exactly, Scott, but it -- it was somewhere in that range, I believe.

Q.   Amongst your brothers, was there one brother

PAPP0891

Page 18

who had a larger shareholding interest in Goodman Networks in 2022?

A.   Again, that's going to depend on the preferred and the common.  And if there would have been a larger shareholder, it would have been James, but I would need to look at the cap table just to confirm that.

THE WITNESS:  Cat, get down.  Get off the table.

Q.   (BY MR. SCHMOOKLER)  Okay.  Did you, at any time in 2022, hold any seat on the board of directors for Goodman Networks?

A.   I did not.

Q.   Okay.  Bear with me one minute.  Just finding something.

A.   While you're looking for something, I do have a quick question.  I have a -- a timing issue at 1:00 p.m. Is -- is this deposition -- do y'all expect it to go past 1:00 p.m. Central Time?

Q.   I hope not.

A.   So do I.

Q.   Is that fair?  I will do my -- how about this, I will do my very best.

A.   All right.  Well, I mean, I can get back on and do another one.  I just have a commitment with my son for school.  I just wanted to let everybody know, but I

Page 19

do appreciate y'all accommodating me this morning.

Q. So in 2022, at any time, were you a director of the board of directors for Goodman Networks?

A. No.

Q. At any time in 2022, were you an officer of the bo- -- officer of Goodman Networks?

A. No.

Q. At any time in 2022, were you the member of any advisory board for Goodman Networks?

A. So as I said earlier, I started working as a consultant in late '22 based on the request from the family members. But I -- I need you to clarify "advisory board" versus a "consultant."

Q. Sure. Did you serve as any sort of advisory -- any sort of subcommittee of the board of directors?

A. No, I was not on the subcommittee of the board of directors.

Q. Are you a lawyer?

A. I am not an attorney, no, sir.

Q. Okay. Is it fair to say, then, that you have never served as in-house general counsel for Goodman Networks?

A. That would be correct.

Q. Okay. Do you know who Madison Goodman is?

A. I do.

Page 20

Q. And who's Madison Goodman?

A. She's my brother, Jody's, daughter.

Q. Okay. And she served as in-house counsel for Goodman Networks; is that correct?

A. I do not know what position she served. I know she worked there, that I learned about in late '22, but I do not know what her role was.

Q. Okay. Give me a few minutes. Did you at any time in 2022 serve as a risk manager for Goodman Networks?

A. No.

Q. Did you at any time in 2022 act in any capacity where you were designated to represent Goodman Networks for purposes of obtaining insurance?

A. So I'll answer the question a little bit differently. And if you need me to clarify, please do so. After becoming a consultant at Goodman, there was a D&O policy or an extension that I was notified about and was advised by the existing law firm and the insurance company, and the consulting -- the other consulting group that we should extend the policy, in which I instructed them to extend the policy and make payment on that policy.

Q. Okay. But for purposes of obtain- -- or of effecting insurance, did Goodman Networks work through

PAPP0894

Page 21

an insurance broker?

A.  Did Goodman Networks work for an insurance broker or --

Q.  Yeah.  No, work through -- work through, with.

A.  That, Scott, I do not recall.

Q.  Okay.  At any time in 2022, were you involved in the submission of insurance applications or, sort of, the day-to-day of obtaining insurance?

A.  No.  Outside of extending the D&O existing policy, no.

Q.  And for purposes of obtaining the D&O extension, you -- you approved the obtaining of that insurance; is that correct?

A.  I -- let me make sure I'm really clear.  It was recommended by the existing law firm and the other consulting group that we extend the policy, and I believe I made the final decision to extend it.

Q.  Okay.  Were you involved at any time in securing crime insurance on behalf of Goodman Networks?

A.  No, unless in that tail extension there was a crime policy in it.

Q.  Okay.  Did you ever -- strike that.

Are you aware that Goodman Networks submitted an insurance claim on a crime insurance policy?

PAPP0895

Page 22

A.   I am today, yes.

Q.   And did you learn of that through this deposition process or otherwise?

A.   I believe I learned about it through one of the typical mailings that come in, that continuously come into my mailbox.

Q.   Okay.  Did you have anything to do with the submission of any claim on the crime insurance policy?

A.   No, I did not.

Q.   Did you ever direct the submission of a claim on the crime insurance policy?

A.   No, I do not believe I did.

Q.   Okay.  Did you at any time reach the conclusion that there was a basis for a claim on a crime insurance policy?

A.   No, I wouldn't have.  That wouldn't have been my job or responsibility.

Q.   Did you ever direct anyone else on behalf of Goodman Networks to submit a claim on a crime insurance policy?

A.   No, I would not have, because the company would have already been in the bankruptcy at that point.

Q.   Okay.

A.   My consulting as an independent consultant ended, I think, three or four months after I started,

Page 23

and then the company was in a full Chapter 7.

Q.  Okay.  Prior to the petition for involuntary bankruptcy, did you ever, as a consultant or otherwise, direct anyone on behalf of Goodman Networks to make a claim on a crime insurance policy?

A.  No, not to my knowledge, I did not.

Q.  Okay.  Did you ever learn of any transactions prior to the petition for involuntary bankruptcy that you believed provided a basis for a claim on a crime insurance policy?

A.  I learned a lot of transactions, Scott, so I learned a lot when I got there.  But there was -- there wasn't a way for me to determine, and I'm not an attorney, nor am I any type of forensic accountant or a prosecutor for me to determine if a crime was comitted or not.  I didn't have enough details to be able to answer that question.  And to answer your question, no.  I guess, the -- the answer is "no."  I was not aware of a -- of a legal crime.

Q.  Okay.  Did you ever -- did you ever learn of any transactions prior to the petition for involuntary bankruptcy that you concluded constituted a theft from either Goodman Networks or its subsidiaries?

A.  No, I did not.  I could not have come to that conclusion.

Page 24

Q.   Okay.  I would like to show you what I'm going to mark as Exhibit 1.

(Exhibit Number 1 was marked.)

A.   Sure.

MR. SCHMOOKLER:  And Conor, this is the Docket Entry 88, which is your complaint against us, just for orientation purposes.

Q.   (BY MR. SCHMOOKLER)  Okay.  So I'm showing you what I'm marking as Exhibit 1, which is the complaint that was served upon my client filed in the adversary proceeding as Docket Entry 88.  I will turn to the first page of the complaint just to show you the caption.

A.   When was -- when was this filed?

Q.   That was filed on September 20th of 2024.

A.   Thank you.

Q.   Okay?  And I would like to orient you to a specific set of -- a specific transaction that's alleged in the complaint just for orientation purposes today.  Okay?

A.   Sure.

Q.   All right.  And for the record purposes, I will be turning to Paragraph 30.  And if you want, again, sir, if -- you know, if you need me to zoom in or out, you let me know.

A.   I -- I can see Section C, the $4.4 million

PAPP0898

Page 25

transfer out of Number 30, I can read that very clearly.

Q.   Great.   In Paragraph 30, it says, and I read, "Separately, on January 4, 2022, Multiband wired $4,400,000 to MGR from Multiband's account at East West Bank."   Do you see where I've read from, sir?

A.   I do.

Q.   And if you look at Paragraph 33, it says, and I quote, "The 4.4 million transfer was recorded by the debtor on its books and records as a loan from the debtor to MGR."   Do you see that, sir?

A.   I do see that, yes.

Q.   Okay.   And do you see the acronym that's used, "MGR"?

A.   If you're referring to the first sentence, The 4.4 million transfer was recorded by the debtor on both these records as a loan from the debtor to MGR.   Period.

Q.   Okay.   Do you see the reference to Multiband in that same Section 30, Paragraph 30?

A.   Paragraph 30.   I do see -- yes, Multiband wired 4.4 to MGR.   I'm -- that's what I'm reading on the document.

Q.   Yeah.   I'm just orienting you for this moment.

A.   Sure.

Q.   Now, I'm going to talk -- turn up, so you can see what those references are to.   At the bottom of

Page 26

Page 1 in the introductory paragraph, there's a reference right at the bottom of Page 1, and beginning on Page 2 to Multiband Field Services, Inc.  And then it says, in quotes, "Multiband."  Do you see that?

A.  Could you put your -- there you go.  Okay. (Reading.)  I read that, yes.

Q.  Are you familiar with an entity called Multiband Field Services, Inc.?

A.  I recognize the name now, but I need to understand what this is saying.  It's saying a trustee of Goodman Networks, together with GNET ATC, and Multiband Field Services, Inc., with the trustee and GNET ATC collectively the file -- let me finish reading this, please.

Q.  Sure.

A.  (Reading.)  Okay.  Yeah.  So Multiband -- I'm trying to remember if -- was that the actual legal name of our multiband division.  We had GNET ATC, we had Goodman Networks, and we had Multiband.  I'm assuming it was Multiband Field Services if that's what it says here.  It was --

Q.  Okay.  Let me just -- let me ask it this way. Are you familiar, from your experience in 2022, with Goodman Networks with a -- an operation entitled Multiband Field Services?

PAPP0900

Page 27

A.  I am, but, Scott, I need to be really, really clear here.  There was a couple of things that I learned after I got back to Goodman when I was working as a consultant, that there were multiple entities somewhere out there named something similar to Multiband.  I just want to be really clear here that we're talking about the legal entity that Goodman Networks owned that was named Multiband.  I just need that clarified for me.  Is that what you're referring to?

Q.  Yeah.  Yeah.  Is the en- -- is the Multiband operation owned and operated by Goodman Networks, was it called Multiband Field Services?

A.  I believe so.

Q.  Okay.  Then there was an entity that Frinzi created called Multiband Global Resources; is that correct?

A.  I -- I learned of that after I got back, so I don't know if Frinzi created it himself or who else created it, but I learned of the entity.  Yes.

Q.  Okay.  So when you were a consultant at Goodman Networks in 2022, did you learn that there were two entities that had "Multiband" in their name?

A.  That is correct after I returned as a consultant.

Q.  Okay.  After you returned to Goodman Networks

PAPP0901

Page 28

in 2022 as a consultant, did you learn that one of the entities that had "Multiband" in their name was being operated by Goodman Networks?

A.   I want to be clear here.  Multiband Field Services, Inc., would've been run by Goodman Networks.

Q.   Okay.  Did you learn that in 2022 when you returned as a consultant?

A.   Did I learn that in 2022?

Q.   Yes.

A.   No, I would have known that Multiband Field Services would've -- was purchased by Goodman Networks back in 2014, and it would have been operating under Goodman Networks the entire time.

Q.   Okay.  Were you --

A.   If we're talk- -- if we're talking about the same entity that was purchased while I was CEO of the public company that we took private.

Q.   Okay.  Were you aware in 2022 when you were serving as a consultant that Goodman Networks continued to own and operate Multiband Field Services?

A.   Let me -- let me be really clear on this, and that is that I don't recall when the assets of Multiband Field Services were sold to MasTec, so I don't know if it was just a shell of a business or if it was still an operating division.

PAPP0902

Page 29

Q.   Okay.   Whether it was an operating division or just a shell, were you aware when you were serving as a consultant for Goodman Networks in 2022 that Goodman Networks had an entity at least called Multiband Field Services?

A.   I believe so.   I believe they still had, at that time, I would have -- we had it.   We still had a operating entity by the name of Multiband Field Services.   It was a legal entity.

Q.   Okay.   And were you aware when you were serving as a consultant in 2022 that $4.4 million was transferred from the Multiband Field Services account to an entity called Multiband Global Resources?

A.   I would have learned that sometime in 2022. I'm not sure when, but I am sure I would have learned that.

Q.   Let me stop sharing for a moment.   Okay.   I'd like to show you -- see if I can refresh your recollection to pin down the date.   Do you know -- have you ever heard of an entity or consultant called CFGI?

A.   Yes.

Q.   Okay.   And were you aware in 2022 that CFGI acted as a consultant for Goodman Networks?

A.   I would have learned that, yes.

Q.   And do you know who Howard Konicov is?

Page 30

A.  I have spoken to, and I'm not sure if I've met Howard in person, but I would have spoken to him by phone and via e-mail.

Q.  Okay.  And do you know who Mr. Baum is?

A.  Joseph Baum, yes.  I would have either spoken to Joseph on the phone or in person, and I think more than likely through e-mail.

Q.  Were Mr. Konicov and Mr. Baum employed with CFGI?

A.  To my knowledge, Howard was.  I'm not sure that Joseph was employed by them.  I know he was involved with the company, but I would not know if he was actually an employee of CFGI.

Q.  Did Mr. Baum and Mr. Konicov provide you information when you were acting as a consultant for Goodman Networks?

A.  I believe they did.  Primarily, I think it would have been Mr. Konicov.  Is that how you say his name?  But I'm -- I'm not sure what information Joseph would've provided me.  I'd have to look back at it.

Q.  Okay.  That's fair.  Bear with me one minute.

THE WITNESS:  Do you guys mind if I grab a cup of coffee real quick?

MR. SCHMOOKLER:  Go for it.  Want to just take five minutes?

PAPP0904

Page 31

THE WITNESS:  Maybe two?

MR. SCHMOOKLER:  Yeah, two's fine.

THE WITNESS:  All right.  Thanks.

THE REPORTER:  Going off the record at 11:18 a.m.

(Recess taken from 11:18 a.m. to 11:22 a.m.)

THE REPORTER:  Going back on the record at 11:22 a.m.

Q.  (BY MR. SCHMOOKLER)  Sir, when we last left off, I was asking you about a $4.4 million -- or I oriented you to a $4.4 million transfer from Multiband Field Services to Multiband Global Resources.  Do you recall that, sir?

A.  I do.

Q.  Okay.  And I'm showing you -- can you see a PDF?

A.  I can see that, yes.

Q.  Okay.  I'm showing you what I'm marking as Exhibit 2.

(Exhibit Number 2 was marked.)

Q.  (BY MR. SCHMOOKLER)  Exhibit 2, for purposes of the record, is an e-mail produced to us identified as "TRUSTEE_GRSM_0575501," and then continuing onward with the attachment.  Sir, at the top of the page, you will

Page 32

see an e-mail from Howard Konicov to Joseph Baum dated
September 19th, 2022.  Do you see that?

A.  I do.

Q.  And copied to that are a series of additional
e-mail addresses.  Do you see that?

A.  I do.

Q.  One of which is jg@goodmannetworks.net.  Do you
see that?

A.  I do.

Q.  Is that your e-mail address?

A.  I do believe that is the e-mail address that
was set up for me, yes.  It also has -- looks like a
secondary e-mail address.  I believe that -- I believe
that's mine, Scott.

Q.  Okay.  And then there's another one, John
Goodman, but it doesn't have the -- you know, the actual
ty- -- the actual details of the address, correct?

A.  Right.

Q.  Okay.  Just let me make a note.  In this
document -- in this e-mail -- sorry -- Mr. Konicov
writes to Mr. Baum and -- and others, and he -- and I
read, it says, quote, "This document includes conveyance
of the $4.5MM loan receivable to 18920."  Do you see
that?

A.  I do.

PAPP0906

Page 33

Q.   Okay.  Now, do you remember a discussion in September of 2022 over a $4.5 million loan receivable?

A.   No, I do not.  I'm assuming that this was a question that, maybe, I had asked or that someone had asked me.  I don't know.  I'd have to see the rest of the document to follow it.

Q.   Okay.  Bear with me one second.  Let me show you one more thing.

A.   Okay.

Q.   I will now show you what I'm marking as Exhibit 3.

(Exhibit Number 3 was marked.)

A.   That was dated September 19th.  Is that -- is that the correct date on that document?

Q.   (BY MR. SCHMOOKLER)  Yes, sir.

A.   From my recollection.

Q.   It is.  I'm just having di- -- or the -- I am having challenges with the exhibits.  Just bear with me, sir.

A.   Okay.

Q.   Okay.  I will show you now what I'm marking as Exhibit 3.  And, sir, I will orient you, and then let you look at this for a minute, and then I'll orient you to what I want to talk about.  But you want to read this to yourself just to orient yourself, that would be fine.

PAPP0907

Page 34

A.   Sure.  Let me -- let me read this real quick. (Reading.)  That was from Joseph Baum to Howard, and I don't recall who Steve Norowitz is.  Okay.  So these are questions that I sent from the GTH company to Joseph Baum.  (Reading.)  Okay.  Can you scroll up?  I'm at Number 8, please.  Okay.

Q.   Okay.  Have you had a chance to review this to yourself -- for yourself?

A.   I have.

Q.   Okay.  One -- the e-mail string that we're looking at includes an e-mail that you sent to Joseph Baum dated September 10th, 2022, at 6:23 p.m., correct?

A.   That's -- yes, that's the date.

Q.   Okay.  And during this time, you were acting as a consultant for Goodman Networks, correct?

A.   You know what, Scott, I believe so.  I need to look at the exact date that I signed the consulting agreement.  I don't remember if I started helping before the consulting agreement was actually executed or when it was -- or after it was executed.  But regardless, yes, I was -- I was still trying to help the company at that point in time.

Q.   Okay.  And one of the questions -- these -- the e-mail that you sent on September 10th has a series of questions from Mr. Baum, correct?

PAPP0908

Page 35

A.   The questions are from me.  The answers are from him, right?

Q.   Yes.  Correct.

A.   Okay.

Q.   So did you send questions to Mr. Baum on September 10th via e-mail?

A.   Yes.  According to this e-mail, I did.

Q.   Okay.  In one of the questions, you asked Question Number 2, you -- and I quote, it says, What's the name of the entity regarding the, open quote, [a] $22 million of loan receivables were conveyed to the preferred stockholder in March 2022, end quote.  Do you see that?

A.   I do, yes.

Q.   So one of the questions you asked on September 10th related to a loan receivable conveyed to a preferred stockholder, correct?

A.   That's what this appears to say, yes.

Q.   Okay.  And then in Question 3, you'll see that the e-mail references that the loan receivable was due from Multiband Global Resources.  Do you see that?

A.   I do see that, yes.

Q.   Does this refresh your recollection that by September 10th, you were at least aware of a loan receivable due from Multiband Global Resources?

Page 36

A.   It appears to say that, yes.  But I want to make something really clear here is that these were questions that I would have been submitting trying to understand transactions that had occurred at some point in '22 or '21 that I was trying to get information on.

Q.   Okay.  Were you ever aware that James Frinzi directed a $4.4 million transfer from Multiband Field Services to Multiband Global Resources prior to the institution of the involuntarily bankruptcy proceeding?

A.   I believe I would have been.  I don't remember the exact date, but I -- I have to believe I would have -- would have -- would have known that by then.

Q.   Okay.  Isn't it -- hold on one second.  I'm going to go back to Exhibit 2, sir.  So, sir, I showed you Exhibit 3, and we agreed that during the September of 2022 period, you were in --

A.   I'm looking at your screen.  It's just showing me expanded.  I don't see --

Q.   Oh, sorry.

A.   -- if you're showing me something.

Q.   I am.

A.   Oh, I thought you were showing me another document.

Q.   I am going to -- I am going to.  I just screwed up.  Don't worry.

Page 37

But let me just ask you one question first. I showed you Exhibit 3, and I think you and I agree that in September of 2022, you were inquiring about a loan receivable involving Multiband Global Resources, correct?

A.   One of the -- yeah, one of the items that I was referring -- I mean, inquiring about, sure.  Yes.

Q.   Okay.  So in September of 2022, you were inquiring about, amongst other things, a loan receivable due from Multiband Global Resources, correct?

A.   Can you pull the e-mail back up?  I want to read it again.  I think I was referring to a loan receivable that went to Multiband Global Resources that, then, was conveyed to a separate stockholder.  This says the "loan receivable due."  I was asking what is the name of the entity.  I wasn't aware on September 10th or until September 10th who the entity was.

I wanted to know -- okay.  So I see the -- I'm asking, what is the name of the entity that this loan was conveyed to?  He answered, the loan receivable due from Multiband Global Resources was converted to the preferred stockholder in March of 2022 whom -- I don't know if he put 18920 or if I put 18920.

Q.   Okay.

A.   I would have learned on September 10th that the

PAPP0911

Page 38

loan receivable due was from Multiband Global Resources, but I don't see the amount there on the 10th.  Is that up above?

Q.  We're going to get to that in a moment.  So let's just -- I'm just trying to break this down into small bits.

A.  Yeah, I'm not trying to be difficult.  I'm just trying to make sure that as we step through -- it's been a long time since I've looked at this -- that I'm following, specifically, where you're going with Multiband Global Resources, so I can give you a -- a proper and correct answer.

Q.  Agreed.  So, first step, you were aware that there was a loan due from Multiband Global Resources by September 10th in this -- through this e-mail exchange with Mr. Baum, correct?

A.  I believe so.

Q.  And during this period, meaning in September 2022, you were inquiring of Mr. Baum about that loan receivable and its transfer to a preferred stockholder, correct?

A.  Correct.  That's the way I read Number 3.  Yes, sir.

Q.  And you'll see above in the e-mail dated September 11th, 2022, Mr. Baum says he's answered some

800-567-8658                                           973-410-4098

PAPP0912

Page 39

questions in red. Do you see the word "red"?

A. I do. So he's the one that put in the 18920 NW. Okay.

Q. Okay. Now, let me stop sharing. Now, I believe you said you do not recall as you sit here today years later what -- the amount of the loan to Multiband Global Resources, correct?

A. No, I didn't -- not off the top of my head until you bring up the documents. But I think the last two documents you showed me, one said 4.4, and the other said 4.5.

Q. Okay. Now, I'm going to go back to Exhibit 2. This is an e-mail sent from September 19th. We looked at this earlier. Do you recall that, sir?

A. Yeah. Nine days later, yes.

Q. So nine days later, Mr. Konicov sends to Mr. Baum and you an e-mail and he says, "This document includes conveyance of the 4.5 million loan receivable to 18920." Do you see that?

A. I do see that.

Q. Okay. Now, I'm going to show you down -- and I'm going to go down into the e-mail, sir. Hold on. I'll just orient you again so I'm not confusing you. Do you see that Mr. Konicov under the attachments has an attachment to his e-mail?

PAPP0913

Page 40

A.   Yeah.  It says, "A1 Shares settlement signed-jnf.pdf."

Q.   Okay.  And if you scroll down to the next page, which is Bates stamped 575502, you'll see a security agreement.  Do you see that, sir?

A.   I do see the -- can you scroll -- yeah, I can see Number 2 that says "Grant of Security Interest."

Q.   Okay.  And if you look in the introductory paragraph, it says, "The security agreement is made by Multiband Field Services, Inc., a wholly owned subsidiary of Goodman Networks, Inc., in favor of 18920 NW 11th LLC."  Do you see that?

A.   I do see that, effective March 9th, 2022.

Q.   Okay.  Great.  Now, attached to this security agreement is a settlement agreement.  Do you see that, sir?

A.   I see this titled as "Settlement Agreement," yes.

Q.   Okay.  Do you see that the introductory to that settlement agreement says, "This settlement agreement is made by Goodman Networks, Inc., in favor of 18920 NW 11th LLC"?

A.   I do see that, yes, sir.

Q.   Okay.  Okay.  Now, underneath that, you'll see a series of witness -- a series of introductory

PAPP0914

Page 41

"whereas" clauses.  Do you see that?

A.  I do see that.

Q.  Okay.  The fifth whereas clause says, and I quote, Whereas the Assignor is the parent company for Multiband Field Services, Inc., open paren, open quote, MFS, close quote, close paren, and MFS is a wholly owned subsidiary of Assignor.  Do you see that?

A.  I do see that.

Q.  Okay.  The next whereas clause says, Whereas the MFS is the holder of secured promissory note issued by Multiband Global Resources, LLC, open paren, open quote, MGS, close quote, close paren, in the principal amount of $4.5 million.  Do you see that?

A.  I do see that.

Q.  Okay.  Does this settlement agreement provided to you by Mr. Konicov refresh your recollection that you were aware in 20- -- in September of 2022 or at least by September 19th, 2022, that there was a $4.5 million loan from Multiband Field Services to Multiband Global Resources?

A.  I -- that's what the e-mail says, so I must have seen it if this is what the e-mail says.  I can't tell you -- Scott, in all honesty, if I read every bit of this or if I understood all of it, because at that point, it's like drinking from a firehose.  You're

PAPP0915

Page 42

reading things trying to understand them and go through them, and then trying to identify a bunch of acronyms across a lot of companies, and then trying to figure out who's who, how do these occur, and you almost have to put flowcharts together, which I did not.  I depended on the company counsel to try to help me understand these documents.

Q.  Okay.  Were you aware at any time prior to the institution of the involuntary bankruptcy proceeding that --

A.  Which would have been in -- refresh my memory when -- was it December or was it February?  Because we filed the Chapter 11, and then we were invol- -- are you talking about the involuntary -- are you talking about the Chapter 11 or the Chapter 7?  They were at different times.

Q.  Okay.  I'll rephrase.  Were you aware at any time prior to the institution of any bankruptcy proceeding that James Frinzi owned Multiband Global Resources?

A.  I believe that I would have been --

MR. WHITE:  Hey, I'm -- I'm going to object to vague.

Scott, I'm going to remind you that there was a 2017 bankruptcy.

PAPP0916

Page 43

MR. SCHMOOKLER:  Okay.  Fair.  Fair.  Okay. I'll rephrase.

Q.  (BY MR. SCHMOOKLER)  Sir, were you aware at any time prior to the institution of a bankruptcy proceeding in 2022 that James Frinzi owned Multiband Global Resources?

A.  I believe I would have been.

Q.  Okay.  And was it -- did you learn of that at or around this September 19th e-mail exchange with Mr. Baum about the loan?

A.  I think I did, Scott.  I -- because I was provided -- I believe, I was provided with some financials and I was trying to clarify who was who, and trying to figure out what transactions happened and who the entities were.  I don't recall if it was before the 10th, on the 19th.  But to answer your question, I believe that, yes, I probably would've learned at some point that -- if the question was did Jim Frinzi own -- was it called MGS, and had a loan from MFS, I believe so I would have before the 2022 bankruptcy.

Q.  You don't recall with specificity, sir, on what date you would've learned that?

A.  I -- I do not.  I'm sure there are e-mails somewhere in there, but I do not recall exactly what date I learned that.

PAPP0917

Page 44

Q.   Okay.   Do you know if you learned that before midnight on October 30th of 2022?

A.   I do not.   I'm sure, again, there -- there's some type of e-mails, but I do not remember if it was before October 30th of 2022 or if it was after.

Q.   I'll rephrase.   Let me rephrase that.   Do you know if it was before midnight on October 30th of 2022?

A.   I do not recall the exact time I learned that. Like I said, it was either prior or after.   I just -- I just don't remember, but I'm sure there's some type of documentation that you could show me.

Q.   Do you recall whether or not your consulting agreement with Goodman Networks executed in 2022 called for you to act as CEO of the company?

A.   I do not recall if it specifically said to act as CEO.   If you have it, we can pull it up, and take a look at it.   I just don't --

Q.   Yeah, I don't -- yeah, that's fair.   I just want to understand what you recall.   All right.   Before we get to that, are you familiar with GNET ATC?

A.   I am if you're referring to the subsid iary of Goodman Networks.

Q.   Okay.   What was the background -- what was the business of GNET ATC?

A.   They were essentially a minority provider

Page 45

product to FedEx.

Q.   Okay.  Did GNET ATC have a relationship with FedEx Supply Chain?

A.   Yes, they did.

Q.   Okay.  And was the business -- the business with FedEx Supply Chain -- strike that.

Do you know if Goodman Networks had any business relationship with FedEx Supply Chain?

A.   Not until -- to my knowledge and to my recollection, I don't believe that Goodman Networks, Inc., had a relationship with FedEx other than using FedEx as a carrier until the time that it acquired GNET ATC.

Q.   I guess my question is this, and I'll try to -- to break it down:  Do you know if the contract with FedEx Supply Chain was through GNET or Goodman Networks?

MR. WHITE:  Objection, lack of foundation.

THE WITNESS:  I'm sorry, Conor, I didn't hear you.

MR. WHITE:  I just objected to lack of foundation.  You can answer the question.

A.   I do -- so, Scott, can you repeat it one more time so that I'm --

Q.   (BY MR. SCHMOOKLER)  Sure.

A.   -- very clear on my answer for you.

PAPP0919

Page 46

Q.   You are -- you are -- you're aware that -- that there was a business relationship other than just acting as a -- a transportation company between -- with FedEx Supply Chain in 2022, correct?

A.   I'm going to answer this exactly --

Q.   That was a bad question.  That's, like, a horrible question.  Let me try this again.

A.   Okay.  Please do.

Q.   I'll try this a different way.  Do you know if Goodman Networks or any of its subsidiaries provided services to FedEx Supply Chain?

A.   Yes.

Q.   Okay.  What were those services?

A.   Goodman Networks owned GNET ATC as a wholly owned subsidiary, GNET ATC provided services to FedEx contractually.

Q.   Okay.  That was my question.  The services provided to FedEx were provided by GNET ATC, not by Goodman Networks; is that correct?

A.   The legal -- from what I recall, the legal relationship was between GNET ATC and FedEx.  Goodman Networks owned GNET ATC, and Goodman Networks effectively executed and operated GNET ATC from an executive level.

Q.   Okay.  Bear with me.  I need to find one more

Page 47

thing.  Are you familiar with how -- are you familiar with the various bank accounts that were maintained by Goodman Networks?

A.  I cannot tell you the digits of the bank accounts.  I know of the banks that we did business with, but those would have been managed and maintained by John Davis, our CFO, and our controller at the time I was there.  I am not aware of any transactions or directions, or nor was I involved in any of them between the time I left and until the time I would have come back.

Q.  Okay.  Do you know whether amounts payable to GNET ATC were deposited into Goodman Networks' bank accounts for administrative ease?

A.  I cannot answer that question because I -- I do not know.  And by the way, I am not trying to be rude at all, but could you clarify so that I can try to answer it what you mean "deposited into Goodman Networks from GNET ATC for administrative ease"?

Q.  Sure.  Do you know if amounts paid by FedEx to GNET ATC were deposited into a Goodman Networks bank account?

A.  From my best recollection, I -- can you -- can you help me with the name of the banks just that you're specifically referring to in the transactions, because

Page 48

it's a -- I'm not --

Q.   Okay.

A.   -- I'm trying to be really general, and I don't know if you're talking about Prosperity Bank, are you talking about East West Bank.  Where are you -- what accounts and what transactions are you referring to?

Q.   I'm just trying to get a foundation.  Do you know if that ever happened?

A.   I do recall that there was administrative fees that were more than likely charged to GNET ATC from Goodman Networks.  I do not know if those fees or that -- those funds would have been intermingled at the time of those administrative fees.  Any time you have a parent company that has subsidiaries, typically, you hold the executive team, and most of the oper- -- most of the administrative operations in the parent company, and the operations stay in the subsidiary, and you typically charge a transition services agreement fee or a general administrative fee.

So it's possible.  I just -- I wouldn't know of any specific transaction.  I'm happy to answer it a different way if you ask it a different way, I just want to be clear on it.

Q.   Yeah.  I think I'm asking a slightly different question, and I'm just trying to -- admittedly, I'm

PAPP0922

Page 49

trying to ask it in a -- in a broad way, because I'm --
I'm trying to get to a broad point.  So I -- I guess,
let me break this down.  You and I agree that from a
contracting perspective, FedEx Supply Chain had a
contract for services with GNET ATC, correct?

A.  Yes.

Q.  And in exchange for the services provided by
GNET ATC, FedEx -- FedEx was to pay GNET ATC some sort
of fee, correct?

A.  Correct.

Q.  Do you know whether the amounts paid by FedEx
to GNET ATC were deposited into a bank account in the
name of Goodman Networks?

MR. WHITE:  I'm going to object to vague.

A.  I do not know if the payments from FedEx
bypassed GNET ATC's bank accounts and were paid directly
into Goodman Networks' accounts.  I do not recall if
they went into GNET ATC, and then GNET ATC would've paid
Goodman or how those transactions would've occurred,
because the money management, as I said earlier, at
least in my tenure, was always managed by the CFO and
the controller and the finance department.

Q.  (BY MR. SCHMOOKLER)  I want to show you what
I'm now going to mark as Exhibit 4 --

(Exhibit Number 4 was marked.)

PAPP0923

Page 50

A. And by the way, you -- and by the way, Scott, if you could help me by giving me dates of when I knew of something and when I didn't, that would be better, because there are going to be times and dates when you're asking me a vague question. And I'm not insinuating anything. They could be true at one point, and I would have no knowledge at another point.

Q. (BY MR. SCHMOOKLER) That's fair. I -- I just want to pin something down. Give me a moment.

MR. SCHMOOKLER: Amber, am I on Number 4?

THE REPORTER: Yes.

Q. (BY MR. SCHMOOKLER) Sir, I am going to show you now what I'm marking as Exhibit 4 which is a bank statement from December of 2021 from Prosperity Bank. Do you see this?

A. I -- Prosperity Bank, Goodman Networks, Inc., Control Disbursement Account, 12/31/21, Account Number 4352. Yes.

Q. Okay. Do you see a series of deposits in the middle of the page all with a description that includes FedEx supply?

A. I do see deposits and other credits. And 1, 2, 3, 4, 5, 6 ACH deposits from FedEx Supply Chain that looks like they're coming into the 4352 account of Goodman Networks.

Page 51

Q.  Do you know why amounts paid by FedEx Supply Chain were deposited into the 4352 account?

MR. WHITE:  Again, the lack of foundation and speculation.

Q.  (BY MR. SCHMOOKLER)  You may answer, sir.

A.  Oh, I did.  I'm sorry you didn't hear me.  I said, "I do not."

Q.  Okay.  And when you took on the role of a consultant, did you, at any time, investigate whether payments by FedEx Supply Chain to GNET ATC had been deposited into an account for Goodman Networks, Inc.?

MR. WHITE:  Objection, vague.

A.  No, I would not have even investigated it, not as a consultant.  And I had no reason to investigate the payments between all of the entities, but rather, trying to figure out where the company was and do my best to help the company at that point in time.

MR. SCHMOOKLER:  Okay.  Thank you.  All right.  I need to take 10 minutes, sir, because a document I wanted to show you did not have the attachment, and I'd like to get that attachment so I can show it to you because I know you're going to want to see it.  Can we just take 10 minutes and come back at, maybe, 10 minutes after noon?

THE WITNESS:  Sure.  Works for me.

Page 52

THE REPORTER:  Going off the record at 11:58 a.m.

(Recess taken from 11:58 a.m. to 12:18 p.m.)

THE REPORTER:  Going back on the record at 12:18 p.m.

Q.  (BY MR. SCHMOOKLER)  All right.  Sir, I'm going to show you what I'm marking as Exhibit 5.

(Exhibit Number 5 was marked.)

MR. SCHMOOKLER:  Amber, am I on the right number?

THE REPORTER:  Yes.

MR. SCHMOOKLER:  Great.  Amazing.

Q.  (BY MR. SCHMOOKLER)  Showing you what I'm marking as Exhibit 5, which is a consent of a majority of the managers of the general partner of Goodman MBE Group, LP.  Do you know what -- do you see that at the top, sir?

A.  I do, yes.

Q.  Okay.  Do you know what Goodman MBE Group, LP, is?

A.  Yes, I do.

Q.  Okay.  What is that?

A.  It's an entity that was set up during the 2017 bankruptcy for the family to continue to hold 51 percent

PAPP0926

Page 53

of the common stock in order for us to be -- continue to be certified as a minority business entity.  So with Goodman MBE Group, essentially, the MBE stands for "minority business entity."

So we collectively held our stock into that entity, so that legally we could be -- we could maintain our minority business entity certification.  That was an agreement with the bondholders in the restructuring of the 2017 Chapter 11 reorganization.

Q.  Okay.  And you'll see in this Resolution Paragraph 3, it was resolved that John Goodman, as manager of the general partner, is authorized for and on behalf of the general partner too.  And then Number Paragraph 3, Cause that John A. Goodman shall be designated as the provider of services to be provided by the partnership under the consulting agreement.  Do you see that?

A.  I do.

Q.  So when you said that you acted as a consultant --

A.  Uh-huh.

Q.  -- is it true that the consulting agreement that you acted under was actually a consulting agreement between Goodman MBE Group, LP, and Goodman Networks?

A.  Let me make sure I understand what you're

PAPP0927

Page 54

saying.  This -- this document, essentially, the majority shareholders of a business that owns the business elected me or asked me or employed me to operate the company, Goodman Networks, as a consultant, and there was a consulting agreement that governed that. Now, I don't see the consultant agreement on here, but I'm happy to go through it.

Q.  Give me one moment.  We're going to get there in a second.  Was that consulting agreement executed by you personally or through Goodman MBE Group, LP?

A.  I think by both.  I'd have to look at it, but I believe I executed it, and then a majority of the partners executed it.

Q.  Okay.  And you'll see there are signature lines for the managers?

A.  Yes, I do see that.

Q.  And I'm sorry -- your relatives, correct?

A.  That is correct.

Q.  Okay.  I'm now going to turn to Exhibit 6, which is a consulting agreement or titled a consulting agreement.  Do you see that, sir?

(Exhibit Number 6 was marked.)

A.  I do see that, yes.

Q.  (BY MR. SCHMOOKLER)  And if you could just peruse this, and let me know when you're done, I just

PAPP0928

Page 55

want to ask you principally about the services under this consulting agreement.  But I'm happy to show you as much of the document as you wish.

A.  Okay.  Please continue.

Q.  Do you want me to go -- show you the rest of it or do you want me to ask my questions?

A.  Yeah, I'm sorry.  When I say "continue," can you scroll down?  Okay.  Can you scroll down some more?  Go back up to Number 4.  I'm sorry.  One more.  Right there.  Okay.  Can you continue down to Number 7, and below?  Okay.  Could you please go to Number 9?  Okay.  Could you please continue down?  Okay.  That's fine.  You can continue with any questions you have.

Q.  On Page 1 of this consulting agreement, Exhibit 6, there's a description of your services or of the services to be provided.  Do you see that, sir?

A.  I do.

Q.  Okay.  And earlier, you said, in 2022, you were acting as a consultant for Goodman Networks, correct?

A.  That is correct.

Q.  Okay.  The services that you provided to Goodman Networks when you were a consultant, are those the services described in ex- -- in Paragraph 1 of this consulting agreement?

A.  I can't say that every single one of these were

PAPP0929

Page 56

or were not provided, but, I mean, this is a document that was there.

Q.  Does Section 1 fairly describe the services you intended to provide as a consultant for Goodman Networks in 2022?

A.  Yeah.  I would say that reasonably, yes.

Q.  Okay.  Now, in Paragraph 5 of this agreement, there's a section entitled "Independent Contractors." Do you see that?

A.  I do.

Q.  Okay.  And in particular, the last sentence says, and I quote, "Neither party nor the parties' employees, agents, or representatives will be or deem to be employees, agents, or representatives of the other party for any purpose, including without limitation federal or state tax purposes."  Do you see that?

A.  I do see what you read.

Q.  Okay.  Is it true, then, that when you were acting as a consultant for Goodman Networks, you were not acting as an employee, agent -- or an employee or agent as Goodman Networks, but instead were acting as an independent contractor?

A.  I don't -- I don't legally know how to define an agent.  I was hired by the controlling shareholders of a Texas corporation in which the controlling

PAPP0930

Page 57

shareholders held more than 51 percent of the company. Therefore, they asked me to come in and be a consultant and provide these services, so that's what I was doing.

I can't say, Scott, and I'm not trying to be vague. I don't want to get into legal terms, because I chose not to have a legal representation here, and I'm just going to say that I don't fully understand that, but I acted as a consultant to the best of my abilities to the items that were described as the services that I was contracted for.

Q. Okay. Do you -- were you at any time in 2022 appointed as an officer of Goodman Networks or its subsidiaries?

A. I was not.

Q. Okay. Were you at any time appointed in 2022 as a member of the board of directors of Goodman Networks?

A. I was not.

Q. Okay. Thank you, sir. Let's go back to a document for a moment. I'd like to go back to Exhibit 1, sir. Bear with me. Earlier, sir, I showed you Exhibit 1. Exhibit 1 was the complaint. I don't know if you recall, but it was. I'll represent that to you. I want to call your attention to Paragraph 74 of the complaint, which is for orientation purposes only.

Page 58

I'm sorry.  74.  If you could read Paragraph 74?

A.  (Reading.)

Q.  Yeah, you can just read it to yourself.  Sorry.

A.  Okay.

Q.  Okay.  Let me know when you've had a chance to read that.

A.  I have read it.

Q.  Okay.  Earlier, when I asked you about the complaint and I asked you about Paragraphs 30 and 33, they looked -- we talked about that $4.4 million transfer?

A.  I do recall a 4.4 and a 4.5.

Q.  Okay.  Did you learn of those transfers in September of 2022?

A.  I believe the e-mails that we looked at on the September 10th and September 19th between CGFI and what they sent me identified those transfers in detail -- not in detail, but showed me who the transfers -- how the tran- -- who the transfers went to, and then who they were assigned to.

Q.  Did you conclude in September of 2022 that those transfers -- or strike that.

At the time you received the September 11th and September 19th communications from CGFI, did you conclude that Mr. Frinzi had perpetrated or stolen from

PAPP0932

Page 59

Goodman Networks or its subsidiaries?

A.   I don't remember if that was -- if it was exactly at that time, because I was still trying to understand everything, but it could have been in the month of September.  This says September 2022.  It doesn't give a specific date.  But I do believe that -- that Mr. Frinzi did make transfers that I thought could have been fraudulent, and I'm not sure who I -- I remember sharing that with, and I don't remember the exact date.  But sure, I -- I could have at that point in that month.

Q.   Okay.

A.   Because as we saw from the earlier documents, I only found out some of the details as I got the e-mails.

Q.   Okay.  And at that time, you were not either an officer or a director of Goodman Networks, correct?

A.   No, I was not an officer or director at that time.

Q.   Okay.  And at any time when you concluded that Mr. Frinzi had stolen from Goodman Networks, were you an officer or director of Goodman Networks or any of its subsidiaries?

A.   No.

MR. SCHMOOKLER:  Okay.  I have nothing further today, sir.  I appreciate your time.  I tried to

PAPP0933

Page 60

be very quick.

THE WITNESS: I appreciate it.

Conor, I've probably got an hour -- or I can easily go an hour. I'll just drive a little faster and hope I don't get a ticket. How's that sound --

MR. WHITE: I appreciate that. Well, let me tell you what, I hope this won't take an hour, so the last thing I want to do is put you in a position where you may get a ticket. So what I'll do is I'll try and be as quick as I can. I don't expect this will take an hour, but if everybody's ready to go, I think I'm ready too.

MR. SCHMOOKLER: Sure.

EXAMINATION

BY MR. WHITE:

Q. Good afternoon, Mr. Goodman. Just to reiterate, my name is Conor White. I represent Mr. Seidel in this case, and he is the Chapter 7 trustee. Do you understand who Mr. Seidel is?

A. I do.

Q. Have you spoken with anybody in preparation for this deposition?

A. I have not.

Q. You haven't spoken with me or anybody at my office?

PAPP0934

Page 61

A.   I have not.

Q.   You haven't spoken with Mr. Frinzi?

A.   I have not.

Q.   You haven't spoken with your brothers?

A.   I have not.

Q.   Do you understand what the substance of this deposition is relating to, that -- that complaint that you've reviewed with Mr. --

A.   I -- actually, Conor, I really don't.  I -- my personal counsel that's representing me and FedEx --

Q.   Before you -- before you continue, I don't want -- I don't want to get into any details of what you've discussed with your counsel or what they've told you, so --

A.   I wasn't going to.  I understand.

Q.   Okay.

A.   I -- they just told me that they -- did I want them to receive service?  Did I need them to represent me?  I said, Please receive service.  I don't think I need you to represent me.  I'm happy to do the deposition.  But I have not spoken to any other counsel or anybody else in reference to this deposition.

Q.   Understood.  I'll represent to you, then, that the substance of the claims that we have made, "we" being Mr. Seidel, against Federal Insurance relates to

PAPP0935

Page 62

the coverage provided by a Federal Insurance policy for theft and crime coverage, particularly theft and forgery. We are focusing primarily on this $4.4 million that you've referred to that went to Multiband Global Resources, and we are seeking to recover that money from Federal as covered under the crime policy here today.

With that in mind, I'd like to start a little bit with how we got here. So you were brought on as a consultant in September of 2022. Do you recall if there was anybody else at Goodman Networks when you were brought back on as a consultant?

A. There was Stephanie Elmore, who was working as consultant, and Samantha Sondrup whom, I believe, was working as a consultant at Goodman, and also working for Mr. Frinzi at -- in another position.

Q. Do you recall if that other position would have been at AMRR or American Metals Recycling and Resources?

A. It's -- I believe it was at -- I thought it was at both. I'd have to look, but -- it was either at AMRR, and at the same time I thought it was also the other Multiband Global Services company that -- that he formed. From my understanding, he was running them both or working them both.

Q. Do you have an understanding of the relationship between AMRR and MGR, the Multiband Global

PAPP0936

Page 63

Resources entity?

A. I believe I do. It may not be exact, but what I recalled and what I looked into was that Mr. Frinzi had acquired Multiband -- Multiband Global Resources from an entity out of California, and then which he changed the name, and then he folded, I believe, Multiband Global Services into AMRR. But that's my high-level understanding. I don't remember exactly, but I believe that was the -- the structure.

Q. In essence, then, Mr. Frinzi controlled both AMRR and Multiband Global Resources; is that your understanding?

MR. SCHMOOKLER: Objection, form.

A. That is my understanding.

Q. (BY MR. WHITE) What -- at the time that you were brought on as consultant, what was your understanding of what Samantha Sondrup's role at Goodman Networks was?

A. Well, if you look at the e-mails and if you look at her title, it says Senior Vice President or SVP, as well as chief of staff, and that she was still -- she was working alongside of Stephanie, but she was also working for Mr. Frinzi at Global Band -- Multiband Global Re- -- Resources. I'm trying to remember the acronym.

PAPP0937

Page 64

Q.  And what was your understanding of Ms. Elmore's position at Goodman Networks?

A.  She was, essentially, handling, I believe, AP and AR trying to wind down in, I think, a lot of the financial issues, the payments, and trying to manage the company financially.

Q.  And is -- to the best of your recollection, is that consistent with the role that they had as the debtor prior to when you were brought on as consultant?

A.  At the time that I was brought on?

Q.  Correct.  And let me rephrase.

A.  Okay.

Q.  Yeah, let me rephrase a little bit.  Were Ms. Elmore's and Ms. Sondrup's positions when you were a consultant for Goodman Networks in 2022 the same role that they had been in prior to when you were brought on as a consultant?

A.  To the best of my knowledge, yes.

Q.  And with respect to their -- their roles, do you know if they were in any position to -- let's start with Ms. Elmore.  Let me -- let me start there.  Did Ms. Elmore look at the details of certain transfers or transaction for why they're being made or what the -- what the business rationale behind them were?

MR. SCHMOOKLER:  Object to form.

PAPP0938

Page 65

A. I do not know in what detail she would have looked at the transactions other than getting permission to either make one or not make one.

Q. (BY MR. WHITE) And do you have any understanding as to whether Ms. Sondrup would've been making those same kinds of determinations?

MR. SCHMOOKLER: Object to form.

A. I believe that Ms. Sondrup was also making decisions that were being directed and guided by Mr. Frinzi.

Q. (BY MR. WHITE) I'm going to start, and put up what we're going to mark as Exhibit 7 here.

(Exhibit Number 7 was marked.)

Q. (BY MR. WHITE) Let me know if you can see my screen here. Is this -- this is a document that should be an e-mail from you to Ms. Elmore and Ms. Sondrup on September 16th of 2022. Do you see that?

A. Conor, I can't -- could you enlarge it a little bit, please?

Q. Yes. Is that better?

A. That is better. Okay. Now, can you give me an opportunity to read this, please?

Q. Absolutely. You tell me how much time you need.

A. Okay. Okay. I see what I sent to them.

PAPP0939

Page 66

Q.   We'll scroll down.   I'm going to ask you a question here.   Just take a moment to look at this also.

A.   Okay.

Q.   And do you recognize this document?

A.   I do.

Q.   Is this a true and correct copy of an e-mail conversation between you, Ms. Elmore, and Ms. Sondrup on September 16th, 2022?

A.   Yes, I believe it is.

Q.   Mr. Schmookler asked you earlier today about whether or not an e-mail jg@goodmannetworks.net was your e-mail at Goodman Networks.   Do you recall that?

A.   Yes, I do.

Q.   Does this e-mail that we're looking at right here refresh your recollection, just to confirm, that that was, in fact, your e-mail address?

A.   Yes, it does.

Q.   And I'd like to go up to this first page, this 6 o'clock p.m., Central Time e-mail that you sent to Ms. Elmore and Ms. Sondrup.   That third-to-last paragraph from the bottom, do you see where it starts with, "I will be appointing a chief restructuring officer"?

A.   I do.

Q.   Do you recall whether or not you ended up

PAPP0940

Page 67

appointing a chief restructuring officer?

A. I did not. I attempted to appoint and bring an individual in, but they declined. And I can't remember if there was a second one that was declined as well. But I -- I did not -- I don't believe I ever appointed a CRO.

Q. You don't have any recollection whether Mr. Konicov at CFGI was ever appointed formally as a CRO at Goodman Networks?

A. They were already -- I believe he had been appointed by Mr. Frinzi in the beginning. That's why he was handling all of the financials himself, and Joseph Baum and CFGI had control of all of the financials and were managing all of the financials.

Q. So it was your understanding as of the time that you were appointed as a consultant that they were acting in the role of CRO?

A. Absolutely.

Q. I'm going to turn your attention to what we'll mark as Exhibit 8.

(Exhibit Number 8 was marked.)

Q. (BY MR. WHITE) We'll zoom in on this a little bit. Do you recognize this document? And it's okay if you don't.

A. I recognize the East West statements. I'm not

PAPP0941

Page 68

sure -- let me look at this.  I don't recognize this particular document, but I know who East West Bank is.

Q.  And do you have an understanding of whether or not Goodman Networks -- or excuse me -- Multiband Field Services had an East West Bank account?

A.  Quite frankly, Conor, I do not recall if they had a direct one.  As I said earlier, John Davis, our -- the CFO when I was there, we had been working on a new facility with East West Bank, and yeah.  I -- I don't know.  I mean, that was Ja- -- that was in January of 2022, so I wouldn't -- I wouldn't have seen this document.

Q.  Before your time -- well, after and before your time, so I understand.  But what I'd like to focus on, though, is just for your context.  Is this outgoing wire here on January 4th, do you see that where it goes to Multiband Global Resources?

A.  I -- I do see that for 4.4 million.

Q.  Well, that 4.4 million is the four-and-a-half million, $4.4 million loan that we had been referring to today just for your benefit.  And I want to highlight that because the numbers are very similar here.  You have a transaction for 44 million with AMRR, and then a separate 4.4 million to Multiband Global Resources. Does that make sense?

PAPP0942

Page 69

A. Yes, it does.

Q. Now, the reason I want to talk about that is -- well, I'll bring up what Mr. Schmookler showed you as Exhibit 2 earlier. And this is the e-mail from Mr. Konicov to Joseph Baum, and you're copied there on September 19th. And it says, "This document includes the conveyance of the 4.5 million loan receivable to 18920." Do you see that?

A. I do.

Q. And I'll move us down back to that recital page where it says, "MFS is the holder of a secured promissory note issued by Multi- -- Multiband Global Resources, LLC, in the principal amount of $4.5 million." Do you see that?

A. I do.

Q. Do you recall if you ever saw a loan document between Multiband Field Services and Multiband Global Resources for the amount of $4.5 million?

A. I do not believe I ever did.

Q. Okay. Do you recall if anybody else at Goodman Networks had ever seen or told you about a -- an executed $4.5 million document for that loan?

MR. SCHMOOKLER: Object to form -- oh, sorry. Object to form.

A. I do not recall that, no, and I -- I don't

Page 70

recall seeing one.  I don't recall anyone ever telling me they did see one.

Q.  (BY MR. WHITE)  And I will represent to you, we have never located a signed or executed or even an unsigned and executed version of that four-and-a-half-million dollar promissory note.  The reason I'm asking about that is, do you have any recollection, other than this document right here, this settlement agreement, that refers to that $4.4 million transfer as anything as a loan?

MR. SCHMOOKLER:  Object to form.

A.  I do not --

THE WITNESS:  I'm sorry.  Go ahead, Scott. I didn't hear you.

MR. SCHMOOKLER:  I'm just objecting to form.

THE WITNESS:  Okay.

A.  I do not -- ask me one more time, Conor, so that I make sure I understand your question, please.

Q.  (BY MR. WHITE)  Sure.  Other than this settlement agreement, are you aware of any other document that identifies that $4.4 million transfer to MGR as a loan?

A.  I -- I do not.  I am not, I guess I should say.

Q.  And this is going to be a broad question, so I

Page 71

apologize, but hopefully we can narrow it down if necessary.  Do you recall having any conversations with anybody about whether that $4.4 million was authorized to be made?

A.   Yes, but I don't -- so I know on -- I sent e-mails to the brothers as I was giving them updates, and I do remember talking to Ackerman.  Once I started understanding -- based on the information that started coming from CFGI, I was trying to put everything together.  And as I saw capital going out, and as they started sharing with me that these loans were made, the only -- you know, there was not any explanation, and no one could tell me what this was for, and what that was for, so I started to track names.

And, you know, I'm not a forensic auditor, and I'm also -- you know, I was just trying to put two and two together, and I couldn't understand why this money was going to an attorney and to different people out in California.  And then I started to track on the internet who these entities were, and why this company was formed.

And I'm just going to give y'all guys -- all you guys my opinion, and I believe that that money was sent to acquire an entity in California, was then -- the name was, then, changed, and I've made it very clear

Page 72

that there were transactions that were made by
Mr. Frinzi that I think were improper, and that were
unapproved and undocumented by the company.

Q.   And that's helpful.  And I want to -- I want to
take one step back and -- and ask you about something
you said there.  You said that money was used to acquire
an entity.  Are you referring to the $44 million that
went to AMRR?

A.   No --

MR. SCHMOOKLER:  Object to form.

A.   No, I'm not.

Q.   (BY MR. WHITE)  What money are you referring
to?

A.   I'm referring to the 4.5 or 4.4 that -- that
was shown in the previous documents.

Q.   And do you have any understanding of whether or
not Goodman Networks received any value for that
$4.4 million transfer?

MR. SCHMOOKLER:  Objection.

A.   Outside of -- outside of the settlement
documents, I've never seen any consideration or anything
that was documented showing that Goodman Networks
received any consideration for that 4.4 or 4.5 million.

Q.   (BY MR. WHITE)  So that 4.4 million was
directed by Mr. Frinzi for his own benefit to use

PAPP0946

Page 73

somewhere else?

MR. SCHMOOKLER:  Object to form.

A.  I believe it was.  In everything that I've seen, personally, that's my personal opinion that it was.

Q.  (BY MR. WHITE)  And I'm going to pick up on something you mentioned.  You -- you said you were e-mailing the brothers with updates, and I believe --

MR. WHITE:  Amber, are we on Exhibit 9 now?

THE REPORTER:  Yes, 9 is next.

Q.  (BY MR. WHITE)  Okay.  I will mark this as Exhibit 9.  Do you see this e-mail?  Do you need -- need me to zoom in?

(Exhibit Number 9 was marked.)

A.  No, I can -- I can see it.

Q.  (BY MR. WHITE)  The top e-mail is a Saturday 20- -- a Saturday e-mail on October 29th of 2022 from you to James Goodman, Joseph Goodman, JEG 23, and JAG America.  Do you see that?

A.  I do see that.

Q.  And do you recognize this document?

A.  I do.

Q.  Is this a true and correct copy of the e-mail that you sent to your brothers on October 29th of 2022?

A.  I believe it is.

PAPP0947

Page 74

Q.  Just quickly, do you recall who JEG 23 is?

A.  Yeah, that's Jonathan Goodman.  That's his personal e-mail address.

Q.  And then do you have a recollection of who JAG America is?

A.  Jason Goodman.  That's his personal e-mail address.

Q.  And I want to scroll down here, because this is a forwarded e-mail of the Exhibit 2 that we looked at earlier.  Is that -- does that look to be correct?

A.  It does.

Q.  And the attachments to this e-mail, this is -- this looks to be you forwarding along this document that you received from Mr. Konicov identifying the settlement agreement, and this transaction between Goodman Networks and 18920.  Does that look to be correct?

A.  It does.

Q.  And I'm asking because you were having conversations ongoing with your brothers about what you were learning as you were learning this information; is that right?

A.  That's correct.

Q.  Do you recall a conversation that you had with your brother, James Goodman, about whether or not Mr. Frinzi may have forged his signature on certain

PAPP0948

Page 75

documents?

A.   I do.

Q.   What do you remember about those conversations?

A.   I, specifically, asked and I told him one of the documents I saw.  I think it was the $44 million transfer.  Had his name on it, and I asked him about it, and he said -- he told me that that was forged, and it was lifted and copied from some other document.

Q.   Do you know if that conversation happened on or around September 27th of 2022?  And I have a document to show you if you don't.

A.   You know, I -- I don't, but I -- I'd love to see the document, because I know we had the conversation.  I just don't remember the exact date.

Q.   I'll show you what we'll mark as Exhibit 10, and I'll zoom this in for you.

(Exhibit Number 10 was marked.)

Q.   (BY MR. WHITE)  And we'll -- we'll get to this base e-mail from Mr. Baum that's just a subject line of $44 million Note and Security Agreement.  But do you see that the top e-mail is an e-mail from you to David Parham and Ackerman on October 29th of 2022?

A.   I do see that, yes.

Q.   Does this look to be a true and correct copy of an e-mail chain with you involved that starts with

PAPP0949

Page 76

Mr. Baum of CFGI, and then you, that you forward to mis- -- to James Goodman, and then he responds to you on?

A. Yes.

Q. This e-mail right here on September 27th of 2022, it's from James Goodman to you. Do you see where he says, "James Frinzi forged my signature"?

A. I do.

Q. And the subject line is referring to the $44 million note. Is -- does that refresh your recollection about when you had this conversation with James?

A. Yes, based on the e-mail date. Yes.

Q. So was -- would this be around the time that you were figuring out with CFGI and, maybe, your brothers about the nature of these transactions that Mr. Frinzi was entering into?

A. Yes, that was the -- one of the first things I was trying to do was figure out what happened to all the funds in that company, what entities did they go to, what was the rationale behind them, who authorized them? I was trying to figure out what the fina- -- true financial situation of the company was with.

Q. And so you may have been aware that these transactions occurred as early as September 10th or

PAPP0950

Page 77

September 19th, but there was money moving out of Goodman Networks and going to other places, but you might not have known why as of that time?

A. I wouldn't have known why, and I believe I stated that earlier to Scott that I was trying to figure things out.

Q. And -- let's see here. You sent -- well, let's move on to Exhibit 11, I believe.

(Exhibit Number 11 was marked.)

Q. (BY MR. WHITE) Oh, that's not right. Sorry. I'm fumbling around here for just a moment. Okay. Do you recognize this document?

A. Can you make it a little bigger, please? I can't read the header.

Q. Okay.

A. I can there.

Q. Okay.

A. (Reading.)

Q. Do you recognize this document?

A. I do.

Q. Is this a true and correct copy of an e-mail that you sent on October 29th of 2022 to your brothers?

A. Yes.

Q. And I -- I want to ask just briefly to confirm that this conversation that we just looked at between

PAPP0951

Page 78

you and your brother, James, is referring to the $44 million note, not the 4.4 million?  I'm just --

A.  That is -- that is correct.  It was the 44 million, not the 4.4 or 4.5.

Q.  And I'm asking just to start setting up the timing of when you started learning the natures of these transactions and why they were made.  And the reason I'm asking is we'll move quickly to Exhibit 12.

(Exhibit Number 12 was marked.)

Q.  (BY MR. WHITE)  Let me make this a little larger for you.  Do you recognize this document?  And I can go to the bottom if that might be easier for you to look at.

A.  Would you please go to the bottom, and then I'll read it out.

Q.  Sure.

A.  Okay.  One second.  Okay.  You can go to the next page up top.  Yeah, right there.  Yes, I do recognize this e-mail.

Q.  Is this a true and correct copy of an e-mail chain with -- between you, CFGI, and Ackerman regarding a potential submission for claims to an insur- -- excuse me -- to an insurance carrier?

A.  Yes, it is.

Q.  And do you recall your involvement in creating

Page 79

and putting together a claims statement to be submitted for an insurance policy claim?

A. I'm sorry. Re- -- are you talking about this e-mail or a formal claim?

Q. Just generally, do you recall being involved with CFGI in putting together what would be, I guess, a narrative or an explanation for a potential insurance policy claim?

A. I don't -- Conor, I believe that -- that they had all the information and they put it together for us, and then asked for my review.

Q. Got ya. And then that would have been, I guess, informed by these conversations that you had had through middle of September through October, learning about the nature of these transactions and what these monies were moved for; is that right?

MR. SCHMOOKLER: Object to form.

A. Yes.

Q. (BY MR. WHITE) I'm going to show you a different e-mail that is specific to an actual submission. So I'm going to move down here to the bottom, and you tell me how much time you need or if you need to review any other parts of this e-mail, and I can move this as you need.

A. Can you start at the bottom so I can read it --

PAPP0953

Page 80

Q.   Yeah, and it ends there.

A.   Okay.  All right.  Let me start here then. It's from Howard to Robert.  He was the broker, I believe.  Let me read this.  Okay.  And what was the question regarding the e-mail, again, please?

Q.   Well, we'll start simple here.  Who is Robert DiRico?

A.   I believe he was the -- the broker that was working with the D&O policy provider and the insurance company.

Q.   Would Robert DiRico and his company have been who you would have expected to maintain Goodman Networks' insurance?

A.   Sure.  That's what a broker typically does is they will look at the prices and help you renew and get your extensions.

Q.   And the last e-mail that we looked at, that e-mail chain between you and Mr. Konicov about the revisions to those proposed submissions, this is dated the same day as that last e-mail; is that right, October 28th?

A.   I -- I believe so, if that's what it says. I...

Q.   Well, I'd like to scroll up just a little bit, and you can take a -- a moment here to read this, and

PAPP0954

Page 81

I'll show you the next e-mail in the chain also.

A. Okay. I've read it.

Q. And then --

A. Okay. Looks like he forgot to copy Howard. Okay.

Q. And then at the very top, do you see where Mr. Konicov forwards that e-mail from Mr. DiRico to you, Joseph Baum, Andrea Hartley, and David Parham?

A. I do.

Q. Does this look like a true and correct copy of that e-mail chain ending on October 31st of 2022?

A. Yes, it does.

Q. Do you see here on this October 28th, 7:00 p.m. e-mail from Robert DiRico to specialtyclaims@chubb.com? Do you -- well, let me -- let me re- -- start at Square 1. Do you see that e-mail that I have up on the screen?

A. I do see the e-mail you have on the screen.

Q. Do you see where there are a couple of regarded lines here. You have the subject line in the e-mail itself, which is regarding Goodman Networks Potential Claims Under D&O Policy. Do you see that?

A. I do.

Q. And then just below that, it's a regarding line Goodman Networks, Inc., Management Liability Package,

PAPP0955

Page 82

Including Crime.  Do you see that?

A.  I do see that.

Q.  Do you recall that Goodman Networks' D&O policy included crime coverage in the year of 2022?

A.  I don't -- I don't.  I think Scott asked me that earlier, and my answer was that D&O was advised by our legal counsel to extend the tail, and I do not recall if it had a crime policy in it or not.

Q.  Understood.  Well, you -- you see that it references this liability package, including crime, correct?

A.  I do.

Q.  And it includes some narrative here in this first e-mail including that $4.4 million loan -- well, "loan," in quotation marks to Multiband Global Resources.  Do you see that?

MR. SCHMOOKLER:  Objection, form.

A.  I see that.

MR. SCHMOOKLER:  Sir, just let me get my objections in.  I apologize for interrupting.

THE WITNESS:  I'm sorry, Scott.  Go ahead.

MR. SCHMOOKLER:  You're good.

Q.  (BY MR. WHITE)  I'll rephrase that.  The base e-mail references the $4.4 million transfer to Multiband Global Resources, correct?

PAPP0956

Page 83

A. Correct.

Q. And prior to this October 28th timeline, we looked as some of these e-mails where you discussed the possibility of other documents being forged with your brother's signature, and you were looking into the -- the nature of these transactions. Do you recall whether or not you started forming the belief that some of these transactions were potentially theft or unauthorized prior to this submission on October 28th?

MR. SCHMOOKLER: Object to form.

A. Yes, I did believe that, because I could not find at the time, and I don't recall -- I couldn't find any documents or any approvals or any communication, and I couldn't get -- I didn't have any information that showed me what they were for, and what the consideration of the company was receiving for them.

Q. (BY MR. WHITE) Did you share that belief and understanding with CFGI?

MR. SCHMOOKLER: Object to form.

A. I did --

THE WITNESS: I'm sorry, Scott.

A. I did share it with CFGI, and I shared it with Ackerman, and I believe I shared with it my brothers.

Q. (BY MR. WHITE) Did that belief extend to that $4.4 million that was transferred to Multiband Global

Page 84

Resources?

MR. SCHMOOKLER: Object to form.

A. Yes, it did.

MR. WHITE: I think, very quickly, I'm just going to ask you a couple of lawyer questions just to confirm everything. Scott, do you remember what exhibit number the consulting agreement was?

MR. SCHMOOKLER: 6.

Q. (BY MR. WHITE) I'm going to show you what we've marked already as Exhibit 6 here. And I don't know if Mr. Schmookler asked you these questions or not, but does this -- do you recognize this document?

A. Yes, it's a consulting agreement between -- that I had to consult for Goodman Networks.

Q. And I'm going to scroll here to the bottom real quick. You see that this is unsigned as this form? Do you see that?

A. I do, yes.

Q. But does this otherwise look to be a true and correct copy of the consulting agreement between Goodman Networks and Goodman MBE Group?

A. I believe so. It looks like the same document we looked at earlier.

Q. And I'm going to show you a separate e-mail to explain, maybe, why it's unsigned.

PAPP0958

Page 85

MR. SCHMOOKLER: Is this 13, Conor?

MR. WHITE: I believe so, yeah. This should be 13.

(Exhibit Number 13 was marked.)

THE WITNESS: Could you expand that? I cannot see that.

MR. WHITE: Yes, of course.

Q. (BY MR. WHITE) And I'm not planning to ask you about the body of the e-mail, but I am going to ask you about attachments to this e-mail if that helps you.

A. Can you scroll down on it where it says, "Lastly, I spoke with Silverstein today."

Q. Yes.

A. Is there any -- I can't see the right side of the full e-mail. Can you -- that's perfect. Thank you. Okay.

Q. So I'm going to start at this last e-mail in the chain. Do you recognize this document?

A. I do.

Q. Does this look to be a true and correct copy of an e-mail chain between you, Ackerman, and CFGI on September 23rd of 2022?

A. It does.

Q. And do you see the first line in your e-mail where it says, "It took a bit of time for these to get

PAPP0959

Page 86

executed," and you -- you see under the attachments, there are several PDFs attached to the e-mail?

A.   I do see that.

Q.   Okay.  I'm going to show you one of them.  The first one looks like a signature page.  Do you see that?

A.   I do.

Q.   And it's signed by Joseph Goodman?

A.   I do.

Q.   Does this look to be a true and correct copy of the signature page to the consent of the managers signed by Joseph Goodman of the Goodman MBE Group?

A.   It does.

Q.   And then the next attachment looks to be a signed signature page of the consulting agreement on behalf of Goodman MBE Group by Joseph Goodman.  Do you see that?

A.   I do.

Q.   Does this look to be a true and correct copy of a signed signature page of the consulting agreement?

A.   It does.

Q.   And the next page is, again, the signature -- what looks to be the signature page for the Goodman MBE Group consent signed by Jonathan Goodman.  Do you see that?

A.   I do.

Page 87

Q.   Is this a true and correct copy of the signature page of the Goodman MBE Group consent signed by Jonathan Goodman?

A.   Yes, I believe it is.

Q.   And I apologize for the robotic nature of these questions, but the questions have to be asked.  And you see here that -- that the following pages are the unsigned version of the consent of the Goodman MBE Group.  Do you see that?

A.   I do.

Q.   And then the next page --

A.   Can you make it -- oh, okay.  Never mind.

Q.   The next page is a full version of that consent of the Goodman MBE Group.  Does -- do you see that?

A.   I do.

Q.   With the fi- -- the final page in this document being a signature page by Jason Goodman; is that correct?

A.   Yes -- yes, it is.  His signature is always recognizable.

Q.   Is this a true and correct copy of the signature page for the Goodman MBE Group consent signed by Jason Goodman?

A.   Yes, I believe it is.

Q.   To wrap this up, do you recall having any

Page 88

conversation at any point when you were a consultant for Goodman Networks in September of 2022 or October of 2022 where -- well, let me -- let me restart this.

Following your return to the company as a consultant in 2022, do you recall anybody informing you or you being told by anybody else or forming an understanding on your own that that $4.4 million was authorized by anybody other than James Frinzi?

MR. SCHMOOKLER:  Object to form.

A.  I -- I need you to ask me the question one more time, please.

Q.  (BY MR. WHITE)  Sure.  Other than Mr. Frinzi, James Frinzi, is it your understanding that anybody else ever authorized the transfer of $4.4 million to Multiband Global Resources?

A.  I do not believe or I do not have any information or nothing that led me to believe that it was approved or executed or signed by anybody other than Mr. Frinzi.

MR. WHITE:  I believe that will be all for me, Scott, so I will pass the witness.  Thank you very much for your time today, Mr. Goodman.

THE WITNESS:  Thank you, Conor.

MR. SCHMOOKLER:  All right.  Sir, I have a few questions that I want to ask you, and I'll just try

PAPP0962

Page 89

to jump around a little bit.  But if you want to see any documents, you let me know, and we'll look at documents and see.  And there is one I want to show you, but we'll get to that in a moment.

FURTHER EXAMINATION

BY MR. SCHMOOKLER:

Q.  Earlier, I had asked you, and if you want to see it in the complaint, I'm happy to, but I just want to orient you for purposes of time frame about the $4.4 million transfer.  And per the complaint, that transfer occurred on January 4th of 2022.  Okay?  Just for timing purposes.

You were not a member of the board of directors for Goodman Networks on January 4th of 2022, correct?

A.  That is correct.

Q.  Do you know if Goodman Networks had any members of the board of directors on January 4th of 2022 other than Mr. Frinzi?

A.  Not at the to- -- not off the top of my head, Scott.  I'd have to see some type of document.

Q.  Okay.  So you were asked by Conor whether anyone else authorized a $4.4 million transfer.  Do you know if there was any members of the board of directors on January 4th, 2022, who could authorize it other than

PAPP0963

Page 90

Mr. Frinzi?

A. I do not.

Q. Do you know if any of your brothers continued to serve as members of the board of directors of Goodman Networks on January 4th, 2022, at the time of the $4.4 million transfer?

A. I -- off the top of my head, I do not. I'd have to look at the documents.

Q. You were asked about conclusions you reached about whether the $4.4 million transfer was -- and I think the words were "unapproved" and "undocumented." Do you remember those questions, sir?

A. I remember not the exact words that you repeated, but I remember the question.

Q. And I want to break this down. So as I understand it, between September 11th and September 19th, you learn of the $4.4 million transfer; is that correct?

A. I believe, if that's what the dates were on the documents. I -- I believe so.

Q. Okay. And at some point thereafter, you were unable to locate documentation showing that that transfer was a loan, correct?

A. I was unable to locate any information regarding the loan other than what I learned from CF- --

PAPP0964

Page 91

CGFI -- or CFGI.

MR. SCHMOOKLER:  Now, Conor, if you could pull up Exhibit 12, which is one of the documents you used.

MR. WHITE:  Yeah.  Give me one moment here.

MR. SCHMOOKLER:  I could go find it, but it'd be faster if -- if you just call it up.

MR. WHITE:  That would've been -- was that the actual e-mail from DiRico to --

MR. SCHMOOKLER:  Yeah, it's the e-mail string you showed him dated October 27th, I believe.

MR. WHITE:  This one, Scott?

MR. SCHMOOKLER:  Now, if you could -- yeah. If you could scroll all the way to the bottom.  That right there.  Perfect.

Q.  (BY MR. SCHMOOKLER)  Okay.  Sir, earlier you were showed Exhibit 12, which is an e-mail exchange between --

MR. SCHMOOKLER:  I'm sorry.  This is Exhibit 11 or 12, Conor?

MR. WHITE:  I thought this was 12.

MR. SCHMOOKLER:  Okay.  12.  Great.

Q.  (BY MR. SCHMOOKLER)  An e-mail exchange between Robert DiRico and amongst others, you.  Do you see that, sir?

PAPP0965

Page 92

A.   I do see what's on the screen, yes, sir.

Q.   Okay.  And in his e-mail, you'll see the subject line is entitled "Potential Claims Under D&O Policy."  Do you see that, sir?

A.   I do see that.

Q.   Okay.  Mr. DiRico, in his e-mail in the second sentence says, and I quote, "You recommended that this information be timely furnished to D&O insurer."  Do you see that?

A.   Give me one second to make sure.

Q.   You know what, scroll up a little bit.  This is an e-mail to Mr. DiRico.  I'm sorry.  I don't want to confuse you.

A.   I'm looking at the e-mail from Howard to Mr. DiRico on the 28th at 2:54 p.m.

Q.   Okay.  Yes.  Was it your understanding in October that Mr. DiRico recommended that the information contained in this e-mail be provided to Goodman Networks' D&O insurer?

A.   I'm sorry.  I -- Scott, can you please repeat the question?  I didn't fully understand it.

Q.   Sure.  Sure.  Did Mr. DiRico, in October of 2022, recommend notice to Goodman Networks' D&O insurer?

A.   Are you asking me was he the -- was it under his direction that we send notice?

PAPP0966

Page 93

Q.  No.  Was -- I'll ask it again.

Did Mr. DiRico recommend notice of claim to the D&O insurer?

A.  I believe that initially David Ackerman recommended that we notify D&O, and then we contacted CFGI to provide a summary, in which CFGI then provided to Robert DiRico.  And then in this e-mail, Robert DiRico was summarizing the claim that -- that we should submit or that he was going to submit, and that's how we got to this point.  I -- if you could clarify your question one more time.  I'm not trying to be difficult. I just don't ful- -- I don't really understand what you're saying.

Q.  I want to understand the context of this discussion.  So is it correct that Ackerman recommended notice to Goodman Networks' D&O insurer in October of 2022?

A.  I know I had a conversation with Ackerman, we had subs- -- subsequent conversation with CFGI in which -- because we couldn't find documentation or information, we thought it was appropriate to notify the insurance company.  CFGI wrote up a summary based on their knowledge.  They submit it across to me.  I don't know who else was copied on it unless you pull up the document.  That summary was, then, copied by the -- by

800-567-8658                                                    973-410-4098

PAPP0967

Page 94

DiRico, and DiRico, I believe, provided it to the insurance company.

Q. Okay. And I want to be more specific. This e-mail references D&O insurance. Do you see that?

A. So would you -- are you talking about Line 2 where it says that "this information be timely furnished to the D&O insurer"?

Q. Yes. Do you see where it says "D&O insurance"?

A. That's what he wrote, yes. I can confirm that's -- that's his e-mail.

Q. The discussions you had with Ackerman, did they revolve around notice under a particular form of insurance?

A. I do not recall that, Scott. I know that they recommended that we get the notice out based on the lack of information and documented information that -- that was not present in reference to monies that were sent to different parties. I do not recall if there was a conversation that directly said D&O and crime policy.

Q. Okay. Well, I don't -- I'm not asking about crime. I'm going to get to crime in a minute, so just stay with me so hopefully we can get you on the road.

Did you have a specific conversation with Ackerman about making a claim under any sort of commercial crime policy?

Page 95

A.   Quite honestly, Scott, I don't remember that. I -- I remember having a conversation about making a claim under our existing D&O policies, not one policy.

Q.   Okay.  That's fair.  But the conversations you had related to D&O insurance, is that correct, whether it be one policy or multiple policies?

A.   I will be as clear as I ever could be here. D&O, to me, is -- it's, like, a blanket to me.  Okay? I'm not a dummy, but at the end of the day, I understand what D&O insurance is.  But D&O insurance, to me, is a whole blanket that covers you for crime, it covers you for violating fiduciary duties as an officer, it covers a whole gamut.

So this says D&O.  I can't explain how or why they wrote it, but I am confident that there were conversations around was this proper, was it a crime, was it a fiduciary -- a breach of fiduciary duty?  There were lots of conversations that were going on between me and the attorneys and how to react to what was happening.

MR. SCHMOOKLER:  I'm going to move to strike.  I asked a different question, sir.

Q.   (BY MR. SCHMOOKLER)  My question to you is this:  Did you have a specific conversation with anyone at Ackerman about making a claim under a commercial

Page 96

crime insurance policy?

A.   I do not recall a specific conversation with them, specifically, referencing a crime policy.

Q.   Okay.  Did you have any discussions with anyone at the broker, Mr. DiRico's office, about how to make a claim under a commercial crime policy?

A.   I do not recall a specific conversation.

Q.   And did you have -- did you direct anyone to provide a notice of a loss under a commercial crime policy?

A.   If you'll go back to my previous e-mail, I believe what I directed them to do was make -- was to notify the company -- I mean, to notify the insurance on exactly what's written below.  That we believe that -- well, exactly what it says.  I don't need to repeat it, but, I mean, I think it's self-explanatory.

MR. SCHMOOKLER:  Conor, if you could scroll up, please.

Q.   (BY MR. SCHMOOKLER)  Okay.  Now, Mr. DiRico, then, provides an e-mail to specialtyclaims@chubb.com.  Do you see that?

A.   I do see that.

Q.   And he says in his e-mail, "Please see below description of a recent circumstance, which may give rise to a claim that we wish to report under the Chubb

PAPP0970

Page 97

policy referenced above."  Do you see that?

A.  I do see that.

Q.  Okay.  Following notice of this recent circumstance, did you direct anyone at Goodman Networks to provide any sort of documentation to support a claim under the crime coverage part of the policy referenced in this e-mail?

A.  No.

Q.  Okay.  And do you know if anyone at Goodman Networks went forward to provide any proof of loss in support of any claim under the crime coverage part of the policy referenced in this e-mail?

A.  I don't recall that.  I would need to look back at communication between Ackerman, myself, DiRico, and CFGI.

MR. SCHMOOKLER:  Okay.  You can take that down, Conor.

Q.  (BY MR. SCHMOOKLER)  Now, you were asked about Ms. Sondrup.  And in particular, you said that she held the title SVP.  Is that senior vice president?

A.  That's what's normally referred to, yes.

Q.  So Ms. Sondrup was, in fact, an officer of Goodman Networks in the 2022 time frame; is that correct?

MR. WHITE:  Object to the legal conclusion.

Page 98

A.   Can I go forward with my answer now?

Q.   (BY MR. SCHMOOKLER)  You may.

MR. WHITE:  Yes.

A.   I -- I do not know.  I know that she said she was assigned or promoted to senior vice president of the company.  That was her title, and that was her role.

Q.   (BY MR. SCHMOOKLER)  Okay.  Now, at one point in the beginning of Conor's questions, I thought I understood you to say there was a period when you understood that Mr. Frinzi was working both for Goodman Networks, and for AMRR.  Did I understand that correctly?

A.   I think my answer was that I believed that he was at Multiband Global Services, and at the same time, he was also directing and working with AMRR, and he was also directing Samantha Sondrup at Goodman Networks.

Q.   So there was a period when you understood Mr. Frinzi was working for both AMRR and Goodman Networks?

A.   Yes, I -- that's what I believe.  That I believe that he was -- I didn't say he would -- I don't believe he was working, because he had turned in his resignation in September of 2022, but I still -- I believe based on communication that I had with Samantha Sondrup, that he was still directing her to do certain

PAPP0972

Page 99

things, and to work for him at the same time she was holding a role at Goodman Networks.

Q. When did you first learn that?

A. I don't know. It would have been conversations with Samantha, probably, September, October, somewhere in that time frame.

Q. What did Ms. Sondrup tell you?

MR. WHITE: Objection, hearsay.

A. I don't remember specifically, but a lot of times when I would ask her questions or ask her for things, she said she would need to talk to Jim or ask Jim. And, you know, Jim was filling all the -- I believe he was filling mo- -- most of the bank signature cards, so she was having to get approvals for him for certain things, so... That's my opinion, and based on what she shared with me, I believe that to be true.

Q. (BY MR. SCHMOOKLER) You were asked by Mr. White about whether you had reached a conclusion that Mr. Frinzi engaged in crime or theft. I don't remember exactly what word was used. Do you remember questions of those natures?

A. I believe so.

Q. Were you, at the time you reached that conclusion, an officer or director or Goodman Networks?

A. I was not an officer or a director. I was a

Page 100

consultant.

MR. SCHMOOKLER:  No further questions. Thank you, again, for your time.  I will pass the witness.

MR. WHITE:  I've got nothing else, so I think we're --

MR. SCHMOOKLER:  Okay.  Mr. Goodman, you have the right to either review the transcript and sign it, or alternatively, you can waive your right to review and sign the transcript.  Which do you prefer today?

THE WITNESS:  I prefer to review it, and then elect to make any corrections or changes that I may have, and then execute it.

MR. SCHMOOKLER:  Okay.  That's fine.

So I will get Amber your e-mail address to facilitate that.

THE WITNESS:  Okay.  You -- please send it to my personal e-mail address.

THE REPORTER:  Okay.  One second.  Give me just a second so we can go off the record, and I'll get it off the record.

Mr. White, would you like to purchase a copy of this transcript?

MR. WHITE:  Yes, please.

THE REPORTER:  Okay.  Going off the record

PAPP0974

Page 101

at 1:30 p.m.

(End of proceedings at 1:30 p.m.)

PAPP0975

Page 102

CHANGES AND SIGNATURE

WITNESS NAME: JOHN GOODMAN          DATE: JANUARY 9, 2026

PAGE LINE        CHANGE              REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Job No. CS7834181

Veritext Legal Solutions

800-567-8658                                    973-410-4098

PAPP0976

Page 103

I, JOHN GOODMAN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.


_____

JOHN GOODMAN

Job No. CS7834181

PAPP0977

Page 104

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re:                              )
                                    ) Case No. 22-31641-mvl-7
GOODMAN NETWORKS, INC.,             )
                                    ) (Chapter 7)
     Debtor                         )
_____     ) _____
                                    )
SCOTT M. SEIDEL, TRUSTEE;           )
GNET ATC, LLC; Multiband            )
Field Services, INC.,               ) ADVERSARY PROCEEDING
                                    ) NO.: 23-03036
     Plaintiffs,                    )
                                    )
v.                                  )
                                    )
JAMES FRINZI; MULTIBAND             )
GLOBAL RESOURCES, LLC; and          )
FEDERAL INSURANCE COMPANY,          )
                                    )
     Defendants.                    )


                REPORTER'S CERTIFICATION
                   ORAL DEPOSITION OF
                     JOHN GOODMAN
                    JANUARY 9, 2026
                   (REPORTED REMOTELY)


     I, Amber Garcia, Notary Public in and for the State
of Texas, hereby certify to the following:
     That the witness, JOHN GOODMAN, was duly sworn by
the officer and that the transcript of the oral
deposition is a true record of the testimony given by

Page 105

the witness;

I further certify that pursuant to FRCP Rule 30 (e) (1) that the signature of the deponent:

____x_____ was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

_____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Subscribed and sworn to on this the 27th day of January, 2026.

_____
Amber Garcia, Notary ID No. 13426953-9
My commission expires:  3-24-2027
VERITEXT LEGAL SOLUTIONS
Firm Registration No. 571
300 Throckmorton Street, Suite 1600
Fort Worth, Texas 76102
(817) 336-3042
(800) 336-4000

PAPP0979

Page 106

JOHN GOODMAN

January 27, 2026

RE: Goodman Networks, Inc v. Seidel, Scott M., Et Al

1/9/2026, John Goodman (#7834181)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Erratas-CS@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

                    Yours,

                    Veritext Legal Solutions

**[& - 2022]**                                                                                                 Page 1

**&**

**&**   2:3

**0**

**000663**   3:19
**000670**   3:19
**001141**   3:15
**001142**   3:15
**0013266**   4:4
**0013267**   4:5
**0013380**   4:12
**0013382**   4:13
**0038567**   4:10
**0038575**   4:11
**0040503**   4:8
**0040504**   4:9
**0083806**   4:6
**0083822**   4:7
**013231**   3:21
**013236**   3:21
**03090**   3:15,15
**0575501**   3:13
  31:24
**0575514**   3:13

**1**

**1**   3:11 24:2,3,9
  26:1,2 50:22
  55:14,23 56:3
  57:21,22,22
  81:16 105:3
**1/9/2026**   106:5
**10**   4:4 51:19,23
  51:24 75:15,17

**10/28/2022**   4:8
**10/29/2022**   4:3
  4:4,6
**10/31/2022**
  4:12
**102**   3:6
**104**   3:7
**10:38**   1:22 5:4
**10th**   34:12,24
  35:6,16,24
  37:16,17,25
  38:2,15 43:16
  58:16 76:25
**11**   4:6 42:13,15
  53:9 77:8,9
  91:20
**11:18**   31:5,6
**11:22**   31:7,9
**11:58**   52:2,3
**11th**   38:25
  40:12,22 58:23
  90:16
**12**   4:8 78:8,9
  91:3,17,20,21
  91:22
**12/31/2021**
  3:16
**12/31/21**   50:17
**12:18**   52:4,6
**13**   4:10 85:1,3
  85:4
**13426953-9**
  105:21

**14**   4:12,24
**15**   17:22
**1600**   2:10
  105:23
**16th**   65:17 66:8
**18920**   32:23
  37:23,23 39:2
  39:19 40:11,21
  69:8 74:16
**19**   17:23
**19th**   32:2 33:13
  39:13 41:18
  43:9,16 58:16
  58:24 69:6
  77:1 90:17
**1:00**   18:16,18
**1:30**   1:22 101:1
  101:2
**1st**   14:20,24,24

**2**

**2**   3:3,12 9:18
  9:20 26:3
  31:20,21,22
  35:9 36:14
  39:12 40:7
  50:22 69:4
  74:9 94:5
**20**   41:17 73:17
**2000**   12:8,15,22
  12:24 13:1
**2014**   12:8,15,22
  12:24 13:2,8,9
  13:10,12 28:12

**2015**   13:15
  14:3
**2016**   13:15
  14:4
**2017**   12:8,15
  13:8,12 42:25
  52:24 53:9
**2019**   10:10
**2020**   12:8,9,16
  14:13
**2021**   14:17,18
  50:14
**2022**   14:16,20
  15:1,5,14,17,18
  16:11 18:2,10
  19:2,5,8 20:9
  20:12 21:6
  25:3 26:23
  27:21 28:1,6,8
  28:18 29:3,11
  29:14,22 32:2
  33:2 34:12
  35:12 36:16
  37:3,8,22
  38:19,25 40:13
  41:17,18 43:5
  43:20 44:2,5,7
  44:13 46:4
  55:18 56:5
  57:11,15 58:14
  58:21 59:5
  62:9 64:15
  65:17 66:8
  68:11 73:17,24

**[2022 - 76102]**                                                  Page 2

75:10,22 76:6
77:22 81:11
82:4 85:22
88:2,2,5 89:11
89:14,18,25
90:5 92:23
93:17 97:23
98:23
**2024**  11:24,25
11:25 24:14
**2026**  1:15,21
5:3 102:2
104:18 105:18
106:3
**20th**  24:14
**21**  36:5
**214**  2:5
**22**  19:11 20:6
35:11 36:5
**22-31641**  1:3
5:7 104:3
**23**  3:15,15
73:18 74:1
**23-03036**  1:8
5:11 104:8
**23-03072**  3:19
3:19
**23rd**  85:22
**24**  3:11
**27**  106:3
**27th**  75:10 76:5
91:11 105:17
**28th**  80:21
81:13 83:2,9

92:15
**29th**  73:17,24
75:22 77:22
**2:54**  92:15

**3**

**3**  3:14 33:11,12
33:22 35:19
36:15 37:2
38:22 50:23
53:11,14
**3-24-2027**
105:21
**30**  24:22 25:1,2
25:18,18,19
58:9 105:2,6
106:16
**300**  105:23
**30th**  44:2,5,7
**31**  3:12
**312**  2:11,11
**31st**  81:11
**32830**  105:20
**33**  3:14 25:7
58:9
**336-3042**
105:24
**336-4000**
105:24

**4**

**4**  3:16 25:3
49:24,25 50:10
50:13,23 55:9

**4,400,000**  25:4
**4.4**  24:25 25:8
25:15,20 29:11
31:11,12 36:7
39:10 58:10,12
62:3 68:18,19
68:20,24 70:9
70:22 71:3
72:14,18,23,24
78:2,4 82:14
82:24 83:25
88:7,14 89:10
89:23 90:6,10
90:17
**4.5**  33:2 39:18
41:13,18 69:7
69:14,18,22
72:14,23
**4.5.**  39:11
58:12 78:4
**4.5mm**  32:23
**4000**  2:4
**4352**  50:18,24
51:2
**44**  68:23 72:7
75:5,20 76:10
78:2,4
**49**  3:16
**4th**  68:16 89:11
89:14,18,25
90:5

**5**

**5**  3:4,17 50:23
52:8,9,15 56:7
**500**  2:4
**51**  52:25 57:1
**52**  3:17
**54**  3:20
**565-6511**  2:11
**571**  105:22
**575502**  40:4

**6**

**6**  3:20 50:23
54:19,22 55:15
66:19 84:8,10
**60**  3:5
**60606**  2:10
**65**  3:22
**67**  3:24
**6:23**  34:12

**7**

**7**  1:3,4 3:22 5:7
5:19 11:22
23:1 42:15
55:10 60:18
65:12,13 104:3
104:4
**73**  4:3
**74**  57:24 58:1,1
**75**  4:4
**75201**  2:5
**76102**  105:23

**[77 - alternatively]**                                                            Page 3

| | | | |
|---|---|---|---|
| **77** 4:6 | **able** 6:21 7:21 | **acronym** 25:12 | **advised** 20:19 |
| **78** 4:8 | 23:16 | 63:25 | 82:6 |
| **7834181** 106:5 | **above** 1:21 | **acronyms** 42:2 | **advisory** 19:9 |
| **7:00** 81:13 | 38:3,24 97:1 | **act** 20:12 44:14 | 19:13,14 |
| **8** | 103:2 106:6 | 44:15 | **affix** 103:1 |
| **8** 3:24 34:6 | **absolutely** | **acted** 29:23 | **afternoon** |
| 67:20,21 | 65:23 67:18 | 53:19,23 57:8 | 60:16 |
| **800** 105:24 | **accommodati...** | **acting** 30:15 | **agent** 56:20,21 |
| **817** 105:24 | 19:1 | 34:14 46:2 | 56:24 |
| **85** 4:10 | **account** 25:4 | 55:19 56:19,20 | **agents** 56:13,14 |
| **88** 24:6,11 | 29:12 47:22 | 56:21 67:17 | **agree** 37:2 49:3 |
| **880-1085** 2:5 | 49:12 50:17,17 | **action** 105:13 | **agreed** 36:15 |
| **89** 3:5 | 50:24 51:2,11 | 105:16 | 38:13 |
| **9** | 68:5 | **actual** 26:17 | **agreement** 3:20 |
| **9** 1:15,21 4:3 | **accountant** | 32:16,17 79:20 | 13:11 34:18,19 |
| 55:11 73:9,10 | 23:14 | 91:9 | 40:5,9,15,15,17 |
| 73:12,14 102:2 | **accounts** 47:2,5 | **actually** 8:21 | 40:20,20 41:15 |
| 104:18 | 47:14 48:6 | 30:13 34:19 | 44:13 48:18 |
| **9/11/2022** 3:14 | 49:16,17 | 53:23 61:9 | 53:8,16,22,23 |
| **9/16/2022** 3:22 | **accuracy** 106:9 | **additional** 32:4 | 54:5,6,9,20,21 |
| **9/19/2022** 3:12 | **accurately** 7:22 | **address** 32:10 | 55:2,14,24 |
| **9/23/2022** 4:10 | **ach** 50:23 | 32:11,13,17 | 56:7 70:9,21 |
| **980-6779** 2:11 | **ackerman** 71:7 | 66:16 74:3,7 | 74:15 75:20 |
| **9th** 5:3 40:13 | 75:22 78:21 | 100:15,18 | 84:7,13,20 |
| **a** | 83:23 85:21 | **addresses** 32:5 | 86:14,19 |
| **a.m.** 1:22 5:4 | 93:4,15,18 | **administrative** | **ahead** 70:13 |
| 31:5,6,7,9 52:2 | 94:11,24 95:25 | 47:14,19 48:9 | 82:21 |
| 52:3 | 97:14 | 48:13,16,19 | **akard** 2:4 |
| **a1** 40:1 | **acknowledg...** | **admittedly** | **al** 5:8,8 106:4 |
| **abilities** 57:8 | 106:12 | 48:25 | **alleged** 24:17 |
| **ability** 6:13 | **acquire** 71:24 | **adversary** 1:7 | **allotted** 106:19 |
| | 72:6 | 5:10 24:10 | **alongside** 63:22 |
| | **acquired** 45:12 | 104:7 | **alternatively** |
| | 63:4 | | 100:9 |

Veritext Legal Solutions

PAPP0983

**[amazing - aware]** Page 4

| | | | |
|---|---|---|---|
| **amazing** 52:13 | **anybody** 60:21 | **asked** 6:15 | **atc's** 49:16 |
| **amber** 1:22 | 60:24 61:22 | 16:12,16 17:11 | **attached** 40:14 |
| 5:12 7:21 | 62:10 69:20 | 33:4,5 35:8,15 | 86:2 105:7 |
| 50:10 52:10 | 71:3 88:5,6,8 | 54:3 57:2 58:8 | 106:11 |
| 73:9 100:15 | 88:13,18 | 58:9 66:10 | **attachment** |
| 104:21 105:21 | **ap** 64:3 | 75:4,6 79:11 | 31:25 39:25 |
| **america** 73:19 | **apologize** 71:1 | 82:5 84:11 | 51:21,21 86:13 |
| 74:5 | 82:20 87:5 | 87:6 89:7,22 | **attachments** |
| **american** 62:17 | **appearances** | 90:9 95:22 | 39:24 74:12 |
| **amount** 38:2 | 3:3 5:14 | 97:18 99:17 | 85:10 86:1 |
| 39:6 41:13 | **appears** 35:18 | **asking** 8:25 | **attempted** 67:2 |
| 69:13,18 | 36:1 | 31:11 37:15,19 | **attention** 57:24 |
| **amounts** 47:12 | **applicable** | 48:24 50:5 | 67:19 |
| 47:20 49:11 | 106:8 | 70:7 74:18 | **attorney** 19:19 |
| 51:1 | **applications** | 78:5,8 92:24 | 23:14 71:18 |
| **amrr** 62:17,20 | 21:7 | 94:20 | 105:11,15 |
| 62:25 63:7,11 | **appoint** 67:2 | **asset** 10:11 | 106:13 |
| 68:23 72:8 | **appointed** | **assets** 28:22 | **attorneys** 95:19 |
| 98:11,15,18 | 57:12,15 67:5 | **assigned** 58:20 | **auditor** 71:15 |
| **analysis** 3:24 | 67:8,11,16 | 98:5 | **authorize** |
| **andrea** 81:8 | **appointing** | **assignor** 41:4,7 | 89:25 |
| **answer** 6:14,23 | 66:22 67:1 | **assume** 6:14 | **authorized** |
| 7:4,11,12,19 | **appreciate** 19:1 | **assuming** 26:19 | 53:12 71:3 |
| 14:7 20:15 | 59:25 60:2,6 | 33:3 | 76:21 88:8,14 |
| 23:17,17,18 | **appropriate** | **atc** 1:7 15:12 | 89:23 |
| 38:12 43:16 | 93:21 | 26:11,13,18 | **available** 106:6 |
| 45:21,25 46:5 | **approvals** | 44:20,24 45:2 | **aware** 15:10,14 |
| 47:15,17 48:21 | 83:13 99:14 | 45:13 46:14,15 | 21:23 23:18 |
| 51:5 82:6 98:1 | **approved** | 46:18,21,22,23 | 28:18 29:2,10 |
| 98:13 | 21:12 88:18 | 47:13,19,21 | 29:22 35:24 |
| **answered** | **approximately** | 48:10 49:5,8,8 | 36:6 37:16 |
| 37:20 38:25 | 5:3 6:6 | 49:12,18,18 | 38:13 41:17 |
| **answers** 35:1 | **ar** 64:4 | 51:10 104:7 | 42:8,17 43:3 |
| | | | 46:1 47:8 |

PAPP0984

**[aware - briefly]** Page 5

70:21 76:24

**b**

**back** 10:14
12:16 13:6
14:4,8 18:23
27:3,17 28:12
30:20 31:8
36:14 37:11
39:12 47:11
51:23 52:5
55:9 57:19,20
62:11 69:10
72:5 96:11
97:13
**background**
7:25 44:23
**bad** 46:6
**band** 63:23
**bank** 3:16,24
25:5 47:2,4,13
47:21 48:4,5
49:12,16 50:13
50:14,16 68:2
68:5,9 99:13
**bankruptcy**
22:22 23:3,8
23:22 36:9
42:9,18,25
43:4,20 52:25
**banks** 47:5,24
**base** 75:19
82:23

**based** 19:11
71:8 76:13
93:22 94:15
98:24 99:15
**basis** 22:14
23:9
**bates** 40:4
**baum** 3:14 30:4
30:5,8,14 32:1
32:21 34:2,5
34:12,25 35:5
38:16,19,25
39:17 43:10
67:13 69:5
75:19 76:1
81:8
**bear** 18:13
30:21 33:7,18
46:25 57:21
**becoming**
20:17
**beginning** 26:2
67:11 98:8
**behalf** 5:16,18
7:8 21:19
22:18 23:4
53:13 86:15
**belief** 83:7,17
83:24
**believe** 8:23
11:24 12:1
13:13 14:4
17:21,24 21:17
22:4,12 27:13

29:6,6 30:17
32:11,13,13
34:16 36:10,11
38:17 39:5
42:21 43:7,12
43:17,19 45:10
54:12 58:15
59:6 62:13,18
63:2,6,9 64:3
65:8 66:9 67:5
67:10 69:19
71:23 73:3,8
73:25 77:4,8
79:9 80:4,8,22
83:11,23 84:22
85:2 87:4,24
88:16,17,20
90:19,20 91:11
93:4 94:1
96:12,14 98:20
98:21,22,24
99:13,16,22
**believed** 23:9
98:13
**benefit** 68:21
72:25
**best** 6:13 7:16
16:15 18:22
47:23 51:16
57:8 64:7,18
**better** 50:3
65:20,21
**bidders** 10:14

**bigger** 77:13
**bit** 10:9 20:15
41:23 62:8
64:13 65:19
67:23 80:24
85:25 89:1
92:11
**bits** 38:6
**blanket** 95:8,11
**bo** 19:6
**board** 10:13
12:18,19,25
13:1,4 14:5,6,8
14:13 18:10
19:3,9,13,15,16
57:16 89:13,18
89:24 90:4
**body** 85:9
**bondholders**
53:8
**books** 25:9
**bottom** 25:25
26:2 66:21
78:12,14 79:22
79:25 84:15
91:14
**bought** 10:17
**breach** 95:17
**break** 38:5
45:15 49:3
90:15
**brief** 7:24 8:4
**briefly** 77:24

Veritext Legal Solutions

**[bring - clarify]** Page 6

**bring** 39:9 67:2
 69:3
**broad** 49:1,2
 70:25
**broker** 21:1,3
 80:3,8,14 96:5
**brother** 17:1,8
 17:10,25 20:2
 74:24 78:1
**brother's** 83:5
**brothers** 17:12
 17:25 61:4
 71:6 73:8,24
 74:19 76:16
 77:22 83:23
 90:3
**brought** 62:8
 62:11 63:16
 64:9,10,16
**bunch** 42:2
**business** 8:6,14
 8:15 9:25
 28:24 44:24
 45:5,5,8 46:2
 47:5 53:2,4,7
 54:2,3 64:24
**bypassed** 49:16

**c**

**c** 2:1 5:1 24:25
**california** 63:5
 71:19,24
**call** 57:24 91:7

**called** 9:9 15:11
 26:7 27:12,15
 29:4,13,20
 43:19 44:13
**cap** 17:18 18:6
**capacity** 20:12
**capital** 8:13
 10:16 71:10
**caption** 24:12
**cards** 99:14
**carrier** 45:12
 78:23
**case** 1:3 5:7
 60:18 104:3
**cat** 18:7
**cat's** 10:2 13:17
**cause** 1:21
 53:14 105:15
**central** 18:18
 66:19
**ceo** 12:24,24
 15:11,23 16:1
 16:4,7 28:16
 44:14,16
**certain** 64:22
 74:25 98:25
 99:15
**certificate** 3:7
**certification**
 53:7 104:15
**certified** 53:2
**certify** 104:22
 105:2,11

**cf** 90:25
**cfgi** 29:20,22
 30:9,13 67:8
 67:13 71:9
 76:1,15 78:21
 79:6 83:18,22
 85:21 91:1
 93:6,6,19,22
 97:15
**cfo** 47:7 49:21
 68:8
**cgfi** 58:16,24
 91:1
**chain** 45:3,6,8
 45:16 46:4,11
 49:4 50:23
 51:2,10 75:25
 78:21 80:18
 81:1,11 85:18
 85:21
**chairman** 13:1
 13:3
**challenges**
 33:18
**chance** 34:7
 58:5
**change** 14:7
 102:3
**changed** 63:6
 71:25
**changes** 3:6
 100:12 102:1
 105:7,8 106:10

**chapter** 1:4
 5:19 11:22
 23:1 42:13,15
 42:15 53:9
 60:18 104:4
**charge** 48:18
**charged** 48:10
**check** 12:1 14:9
**checking** 3:25
**chicago** 2:10
**chief** 63:21
 66:22 67:1
**chose** 57:6
**chubb** 96:25
**chubb.com**
 81:14
**chubb.com.**
 96:20
**circumstance**
 96:24 97:4
**civil** 1:25
**claim** 21:24
 22:8,10,14,19
 23:5,9 79:2,4,8
 93:2,8 94:24
 95:3,25 96:6
 96:25 97:5,11
**claims** 61:24
 78:22 79:1
 81:22 92:3
**clar** 14:22
**clarified** 27:8
**clarify** 8:25
 11:2 16:2

**[clarify - contacted]**

19:12 20:16 43:13 47:17 93:10
**clause** 41:3,9
**clauses** 41:1
**clear** 21:14 27:2,6 28:4,21 36:2 45:25 48:23 71:25 95:7
**clearly** 25:1
**client** 24:10
**clients** 8:17,21
**close** 41:6,6,12 41:12
**coffee** 30:23
**collectively** 26:13 53:5
**college** 8:2,5
**come** 16:12 22:5,5 23:24 47:10 51:23 57:2
**coming** 50:24 71:9
**comitted** 23:15
**commercial** 3:24 94:25 95:25 96:6,9
**commission** 105:21
**commitment** 18:24

**common** 17:19 17:21,22 18:4 53:1
**communication** 83:13 97:14 98:24
**communicati...** 58:24
**companies** 8:12 9:20 10:4 42:3
**company** 1:11 1:20 2:7 5:17 6:1 8:9 9:2,5 9:18 10:10,10 10:15,21 11:13 13:5,23 15:11 16:14 20:20 22:21 23:1 28:17 30:12 34:4,21 41:4 42:6 44:14 46:3 48:14,16 51:16,17 54:4 57:1 62:21 64:6 71:20 72:3 76:20,23 80:10,11 83:16 88:4 93:22 94:2 96:13 98:6 104:11
**company's** 9:8
**complaint** 24:6 24:9,12,18 57:22,25 58:9

61:7 89:8,10
**completed** 106:16
**completion** 105:5,10
**computer** 7:3
**conclude** 58:21 58:25
**concluded** 23:22 59:19
**conclusion** 22:13 23:25 97:25 99:18,24
**conclusions** 90:9
**confident** 95:15
**confirm** 18:6 66:15 77:24 84:6 94:9
**confuse** 92:13
**confusing** 39:23
**conor** 2:3 5:18 7:7 24:5 45:18 60:3,17 61:9 65:18 68:6 70:18 79:9 85:1 88:23 89:22 91:2,20 96:17 97:17
**conor's** 98:8
**consent** 3:17 52:15 86:10,23 87:2,8,13,22

**consideration** 72:21,23 83:15
**consistent** 64:8
**constituted** 23:22
**consult** 84:14
**consultant** 8:8 9:15,21 16:9 16:10 19:11,13 20:17 22:24 23:3 27:4,20 27:24 28:1,7 28:19 29:3,11 29:20,23 30:15 34:15 51:9,14 53:20 54:4,6 55:19,22 56:4 56:19 57:2,8 62:9,11,13,14 63:16 64:9,15 64:17 67:16 88:1,5 100:1
**consulting** 3:20 8:10,16,21 9:13 20:20,20 21:16 22:24 34:17,19 44:12 53:16,22,23 54:5,9,20,20 55:2,14,24 84:7,13,20 86:14,19
**contacted** 93:5

**[contained - current]**

| | | | |
|---|---|---|---|
| **contained** 92:18 | **conversation** 66:7 74:23 | 32:17 33:14 | **course** 85:7 |
| **contains** 105:8 | 75:9,14 76:11 | 34:12,15,25 | **court** 1:1 5:9 |
| **context** 68:15 | 77:25 88:1 | 35:3,17 37:5 | 7:14 104:1 |
| 93:14 | 93:18,19 94:19 | 37:10 38:12,16 | **courtesy** 7:20 |
| **continue** 52:25 | 94:23 95:2,24 | 38:21,22 39:7 | **coverage** 62:1,2 |
| 53:1 55:4,7,10 | 96:2,7 | 46:4,19 49:5,9 | 82:4 97:6,11 |
| 55:12,13 61:11 | **conversations** | 49:10 54:17,18 | **covered** 62:6 |
| **continued** 4:1 | 71:2 74:19 | 55:19,20 59:16 | **covers** 95:11,11 |
| 28:19 90:3 | 75:3 79:13 | 64:11 66:6 | 95:12 |
| **continuing** | 95:4,16,18 | 73:23 74:10,16 | **covid** 10:13 |
| 31:24 | 99:4 | 74:22 75:24 | **created** 11:13 |
| **continuously** | **converted** | 77:21 78:3,20 | 27:15,18,19 |
| 22:5 | 37:21 | 81:10 82:11,25 | **creating** 78:25 |
| **contract** 45:15 | **conveyance** | 83:1 84:20 | **credits** 50:22 |
| 49:5 | 32:22 39:18 | 85:20 86:9,18 | **crime** 21:19,21 |
| **contracted** | 69:7 | 87:1,18,21 | 21:24 22:8,11 |
| 57:10 | **conveyed** 35:11 | 89:15,16 90:18 | 22:14,19 23:5 |
| **contracting** | 35:16 37:14,20 | 90:23 93:15 | 23:9,15,19 |
| 49:4 | **copied** 32:4 | 95:5 97:24 | 62:2,6 82:1,4,8 |
| **contractor** | 69:5 75:8 | 103:2 | 82:10 94:19,21 |
| 56:22 | 93:24,25 | **corrections** | 94:21,25 95:11 |
| **contractors** | **copies** 106:14 | 100:12 | 95:16 96:1,3,6 |
| 56:8 | **copy** 66:6 | **correctly** 17:19 | 96:9 97:6,11 |
| **contractually** | 73:23 75:24 | 98:12 | 99:19 |
| 46:16 | 77:21 78:20 | **corresponden...** | **critical** 14:10 |
| **control** 50:17 | 81:4,10 84:20 | 16:6 | **cro** 67:6,8,17 |
| 67:13 | 85:20 86:9,18 | **counsel** 5:13 | **cs** 9:10 106:15 |
| **controlled** | 87:1,21 100:23 | 19:21 20:3 | **cs7834181** 1:25 |
| 63:10 | **corporation** | 42:6 61:10,13 | 102:25 103:25 |
| **controller** 47:7 | 3:11 56:25 | 61:21 82:7 | **csl** 9:9,14 |
| 49:22 | **correct** 10:25 | 105:12 106:14 | **ct** 3:11 |
| **controlling** | 19:23 20:4 | **couple** 9:4,16 | **cup** 30:23 |
| 56:24,25 | 21:13 27:16,23 | 12:21 27:2 | **current** 8:17 |
| | | 81:19 84:5 | |

**[currently - disbursement]**     Page 9

**currently** 8:7
**cwhite** 2:6

**d**

**d** 5:1
**d&o** 20:18 21:9
21:11 80:9
81:22 82:3,6
92:3,8,19,23
93:3,5,16 94:4
94:7,8,19 95:3
95:5,8,10,10,14
**dallas** 1:2 2:5
5:10 104:2
**date** 12:1 15:17
29:19 33:14
34:13,17 36:11
43:22,25 59:6
59:10 75:14
76:13 102:2
105:6
**dated** 32:1
33:13 34:12
38:24 80:19
91:11
**dates** 13:11
14:23 50:2,4
90:19
**daughter** 20:2
**david** 75:21
81:8 93:4
**davis** 47:7 68:7
**day** 21:8,8
80:20 95:9

105:17
**days** 39:15,16
105:6 106:16
**debtor** 1:5 25:9
25:10,15,16
64:9 104:5
**december**
42:12 50:14
**decided** 10:11
**decision** 21:17
**decisions** 65:9
**declined** 67:3,4
**deem** 56:13
**defendant** 1:19
2:7
**defendants**
1:12 104:12
**define** 56:23
**degree** 8:5,6
**department**
11:2,11 49:22
**depend** 18:3
**depended** 42:5
**deponent** 105:3
105:4,9 106:13
**deposing**
106:13
**deposited**
47:13,18,21
49:12 51:2,11
**deposition** 1:14
1:18 4:25 5:4,6
6:3,3 18:17
22:3 60:22

61:7,21,22
103:1 104:16
104:25 105:5
105:10
**deposits** 50:19
50:22,23
**describe** 56:3
**described**
55:23 57:9
**description**
3:10 4:2 7:24
50:20 55:15
96:24
**designated**
20:13 53:15
**detail** 58:17,18
65:1
**details** 23:16
32:17 59:14
61:12 64:22
**determinations**
65:6
**determine**
23:13,15
**di** 33:17
**different** 8:12
13:14 42:15
46:9 48:22,22
48:24 71:18
79:20 94:18
95:22
**differently**
20:16

**difficult** 38:7
93:11
**difficulties** 7:2
**digits** 47:4
**direct** 22:10,18
23:4 68:7 96:8
97:4
**directed** 36:7
65:9 72:25
96:12
**directing** 98:15
98:16,25
**direction** 92:25
**directions** 47:9
**directly** 9:1
49:16 94:19
**director** 19:2
59:16,17,21
99:24,25
**directors** 10:13
18:10 19:3,15
19:17 57:16
89:14,18,24
90:4
**dirico** 80:7,11
81:7,14 91:9
91:24 92:6,12
92:15,17,22
93:2,7,8 94:1,1
96:19 97:14
**dirico's** 96:5
**disbursement**
50:17

PAPP0989

**[discussed - elmore]**

| | | | |
|---|---|---|---|
| **discussed** 61:13 83:3 | 89:21 93:25 | 32:1,5,10,11,13 | 55:18 57:21 |
| **discussion** 33:1 93:15 | **documentation** 44:11 90:22 | 32:20 34:10,11 34:24 35:6,7 | 58:8 59:13 66:10 68:7 |
| **discussions** 94:11 96:4 | 93:20 97:5 | 35:20 37:11 38:15,24 39:13 | 69:4 74:10 77:5 82:6 |
| **district** 1:1,1 5:9,10 104:1,1 | **documented** 72:22 94:16 | 39:17,22,25 41:21,22 43:9 | 84:23 89:7 91:16 |
| **divest** 10:11 11:6 | **documents** 6:18,20,22 | 43:23 44:4 58:15 59:14 | **early** 11:24 12:9,15 76:25 |
| **divested** 10:15 11:11 | 12:16 39:9,10 42:7 59:13 | 63:19 65:16 66:6,11,12,14 | **ease** 47:14,19 **easier** 78:12 |
| **divestiture** 11:12 12:18 | 72:15,21 75:1 75:5 83:4,13 | 66:16,19 69:4 71:6 73:8,12 | **easily** 60:4 **east** 3:24 25:4 |
| **division** 1:2 5:10 10:17,20 | 89:2,2 90:8,20 91:3 | 73:16,17,23 74:3,6,9,12 | 48:5 67:25 68:2,5,9 |
| 10:21,24 11:1 26:18 28:25 | **doing** 14:11 57:3 | 75:19,21,21,25 76:5,13 77:21 | **educational** 7:25 |
| 29:1 104:2 | **dollar** 70:6 **double** 14:9 | 78:19,20 79:4 79:20,23 80:5 | **effecting** 20:25 **effective** 40:13 |
| **docket** 24:6,11 **document** | **drinking** 41:25 **drive** 60:4 | 80:17,18,20 81:1,7,11,14,16 | **effectively** 46:23 |
| 25:21 32:20,22 33:6,14 36:23 | **due** 35:20,25 37:10,15,21 | 81:18,20 82:14 82:24 83:3 | **eight** 6:7 **either** 9:3 12:17 |
| 39:17 51:20 54:1 55:3 56:1 | 38:1,14 **duly** 1:20 | 84:24 85:9,10 85:15,17,21,24 | 23:23 30:5 44:9 59:15 |
| 57:20 65:15 66:4 67:23 | 104:23 **dummy** 95:9 | 86:2 91:9,10 91:17,23 92:2 | 62:19 65:3 100:8 |
| 68:2,12 69:6 69:16,22 70:8 | **duties** 95:12 **duty** 95:17 | 92:6,12,14,18 93:7 94:4,10 | **elect** 100:12 **elected** 10:14 |
| 70:22 73:21 74:13 75:8,10 | **e** | 96:11,20,23 97:7,12 100:15 | 54:3 **elmore** 62:12 |
| 75:13 77:12,19 78:11 84:12,22 | **e** 2:1,1 3:12,14 3:22 4:3,4,6,8 | 100:18 105:2 **earlier** 19:10 | 64:21,22 65:16 66:7,20 |
| 85:18 87:16 | 4:10,12 5:1,1 30:3,7 31:23 | 39:14 49:20 | |

PAPP0990

**[elmore's - facilitate]**

**elmore's** 64:1 64:14
**employed** 8:7,8 30:8,11 54:3 105:12
**employee** 12:3 12:6 14:9 30:13 56:20,20 105:14
**employees** 56:13,14
**employer** 9:12 9:13
**employment** 13:11
**en** 27:10
**ended** 22:25 66:25
**ends** 80:1
**engaged** 99:19
**enlarge** 65:18
**entering** 76:17
**entire** 28:13
**entities** 27:4,22 28:2 43:15 51:15 71:20 76:20
**entitled** 26:24 56:8 92:3
**entity** 26:7 27:7 27:14,19 28:16 29:4,8,9,13,20 35:10 37:16,17 37:19 52:24

53:2,4,6,7 63:1 63:5 71:24 72:7
**entry** 24:6,11
**errata** 106:11 106:13,16
**erratas** 106:15
**essence** 63:10
**essentially** 44:25 53:3 54:1 64:3
**et** 5:8,8 106:4
**events** 14:15
**everybody** 18:25
**everybody's** 60:11
**ex** 55:23
**exact** 34:17 36:11 44:8 59:10 63:2 75:14 90:13
**exactly** 12:1 13:10 15:17 17:17,23 43:24 46:5 59:3 63:8 96:14,15 99:20
**examination** 3:4,5,5 5:23 60:14 89:5
**except** 103:2
**exchange** 38:15 43:9 49:7 91:17,23

**excuse** 68:4 78:22
**execute** 16:14 100:13
**executed** 34:19 34:20 44:13 46:23 54:9,12 54:13 69:22 70:4,5 86:1 88:18
**executive** 46:24 48:15
**exhibit** 3:11,12 3:14,16,17,20 3:22,24 4:3,4,6 4:8,10,12,24 24:2,3,9 31:20 31:21,22 33:11 33:12,22 36:14 36:15 37:2 39:12 49:24,25 50:13 52:8,9 52:15 54:19,22 55:15 57:21,22 57:22 65:12,13 67:20,21 69:4 73:9,12,14 74:9 75:15,17 77:8,9 78:8,9 84:6,10 85:4 91:3,17,20
**exhibits** 3:9 4:1 33:18

**existing** 20:19 21:9,15 95:3
**expand** 85:5
**expanded** 36:18
**expect** 18:17 60:10
**expected** 80:12
**experience** 26:23
**expires** 105:21
**explain** 10:9 84:25 95:14
**explanation** 71:12 79:7
**explanatory** 96:16
**extend** 7:19 20:21,22 21:16 21:17 82:7 83:24
**extending** 21:9
**extension** 20:18 21:12,20
**extensions** 80:16
**extent** 6:11,14 6:19,22,25 7:8 7:10

**f**

**facilitate** 100:16

PAPP0991

**[facility - frankly]**

**facility** 68:9

**fact** 66:16
  97:22

**fails** 106:18

**fair** 6:16 18:21
  19:20 30:21
  43:1,1 44:18
  50:8 95:4

**fairly** 56:3

**familiar** 26:7
  26:23 44:20
  47:1,1

**family** 16:12,16
  16:18,19 19:12
  52:25

**fashion** 7:20

**faster** 60:4 91:7

**favor** 40:11,21

**fax** 2:11

**february** 42:12

**federal** 1:11,19
  1:24 2:7 5:17
  6:1 56:16
  61:25 62:1,6
  104:11

**fedex** 45:1,3,6,8
  45:11,12,16
  46:3,11,15,18
  46:21 47:20
  49:4,8,8,11,15
  50:21,23 51:1
  51:10 61:10

**fee** 48:18,19
  49:9

**fees** 48:9,11,13

**fi** 87:16

**fiduciary** 95:12
  95:17,17

**field** 1:7 3:24
  26:3,8,12,20,25
  27:12 28:4,10
  28:20,23 29:4
  29:8,12 31:13
  36:7 40:10
  41:5,19 68:4
  69:17 104:7

**fifth** 41:3

**figure** 42:3
  43:14 51:16
  76:19,22 77:5

**figuring** 76:15

**file** 26:13

**filed** 11:22 12:2
  24:10,13,14
  42:13

**filling** 99:12,13

**fina** 76:22

**final** 21:17
  87:16

**finally** 7:14

**finance** 49:22

**financial** 11:18
  11:19 64:5
  76:23 105:16

**financially** 64:6

**financials**
  43:13 67:12,13
  67:14

**find** 46:25
  83:12,12 91:6
  93:20

**finding** 18:13

**fine** 14:10 31:2
  33:25 55:12
  100:14

**finish** 7:18 8:4
  26:13

**firehose** 41:25

**firm** 20:19
  21:15 105:22

**first** 12:19,20
  14:19,24 24:11
  25:14 37:1
  38:13 66:18
  76:18 82:14
  85:24 86:5
  99:3

**five** 6:7 30:25

**flowcharts** 42:5

**focus** 68:14

**focusing** 62:3

**folded** 63:6

**follow** 33:6

**following** 38:10
  87:7 88:4 97:3
  104:22

**foregoing**
  103:1

**forensic** 23:14
  71:15

**forged** 74:25
  75:7 76:7 83:4

**forgery** 62:3

**forgot** 81:4

**form** 63:13
  64:25 65:7
  69:23,24 70:11
  70:16 72:10
  73:2 79:17
  82:17 83:10,19
  84:2,16 88:9
  94:12

**formal** 79:4

**formally** 67:8

**formed** 62:22
  71:21

**forming** 83:7
  88:6

**fort** 105:23

**forward** 76:1
  97:10 98:1

**forwarded** 74:9

**forwarding**
  74:13

**forwards** 81:7

**found** 59:14

**foundation**
  45:17,21 48:7
  51:3

**founding** 13:24

**four** 13:5 22:25
  68:19 70:6

**frame** 89:9
  97:23 99:6

**frankly** 68:6

PAPP0992

**[fraudulent - goodman]**

**fraudulent**
59:8
**frcp** 105:2
**fredericksburg**
5:5
**frinzi** 1:10 5:8
15:8,10,15,19
15:22,25 16:5
16:13 27:14,18
36:6 42:19
43:5,18 58:25
59:7,20 61:2
62:15 63:3,10
63:23 65:10
67:11 72:2,25
74:25 76:7,17
88:8,12,13,19
89:19 90:1
98:10,18 99:19
104:10
**ful** 93:12
**full** 23:1 85:15
87:13
**fully** 57:7 92:21
**fumbling** 77:11
**funds** 48:12
76:20
**furnished** 92:8
94:6
**further** 3:5
59:25 89:5
100:2 105:2,11
105:14

**g**

**g** 5:1
**gamut** 95:13
**garcia** 1:22
5:12 104:21
105:21
**general** 3:18
19:21 48:3,19
52:16 53:12,13
**generally** 79:5
**getting** 65:2
**give** 7:24 20:8
38:11 50:9
54:8 59:6
65:21 71:22
91:5 92:10
96:24 100:19
**given** 104:25
**giving** 50:2
71:6
**global** 1:11
27:15 29:13
31:13 35:21,25
36:8 37:4,10
37:13,21 38:1
38:11,14 39:7
41:11,19 42:19
43:5 62:4,21
62:25 63:4,7
63:11,23,24
68:17,24 69:12
69:17 82:15,25
83:25 88:15

98:14 104:11
**gnet** 1:7 15:12
26:11,13,18
44:20,24 45:2
45:12,16 46:14
46:15,18,21,22
46:23 47:13,19
47:21 48:10
49:5,8,8,12,16
49:18,18 51:10
104:7
**go** 6:8,19 7:20
18:17 26:5
30:24 36:14
39:12,22 42:1
54:7 55:5,9,11
57:19,20 60:4
60:11 66:18
70:13 76:20
78:12,14,17
82:21 91:6
96:11 98:1
100:20
**goes** 68:16
**going** 6:10,18
7:15 14:6 18:3
24:1 25:24
31:4,8 36:14
36:24,24 38:4
38:10 39:12,21
39:22 42:22,24
46:5 49:14,24
50:4,12 51:22
52:1,5,7 54:8

54:19 57:7
61:15 65:11,12
66:1 67:19
70:25 71:10,18
71:22 73:6
77:2 79:19,21
84:5,9,15,24
85:9,17 86:4
93:9 94:21
95:18,21
100:25
**good** 5:25
60:16 82:22
**goodman** 1:4
1:15,18 3:4,18
3:22 4:3,4,6,10
5:6,6,19,25
9:24,25 10:5,5
10:11,18,19,21
10:23,24 11:3
11:4,6,7,12,15
11:19,21 12:3
12:6,10,23
13:7,15,24
14:17,21 15:6
15:11,15,19,23
16:1,7,11,22,25
17:3,12,13
18:1,11 19:3,6
19:9,21,24
20:1,4,9,13,17
20:25 21:2,19
21:23 22:19
23:4,23 26:11

**[goodman - hope]**                                                    Page 14

26:19,24 27:3
27:7,11,20,25
28:3,5,11,13,19
29:3,3,23
30:16 32:16
34:15 40:11,21
44:13,22 45:7
45:10,16 46:10
46:14,19,21,22
47:3,13,18,21
48:11 49:13,17
49:19 50:16,25
51:11 52:16,20
53:3,11,14,24
53:24 54:4,10
55:19,22 56:4
56:19,21 57:12
57:16 59:1,16
59:20,21 60:16
62:10,14 63:17
64:2,15 66:12
67:9 68:4
69:20 72:17,22
73:18,18 74:2
74:6,15,24
76:2,6 77:2
80:12 81:21,25
82:3 84:14,20
84:21 86:7,11
86:11,15,15,22
86:23 87:2,3,8
87:14,17,22,23
88:2,22 89:14
89:17 90:4

92:18,23 93:16
97:4,9,23
98:10,16,18
99:2,24 100:7
102:2 103:1,5
104:4,17,23
106:1,4,5
**goodmannet...**
  66:11
**goodmannet...**
  32:7
**gordon** 2:9
**governed** 54:5
**grab** 30:22
**grad** 8:1
**graduated** 8:1
  8:2
**grant** 40:7
**great** 25:2
  40:14 52:13
  91:22
**ground** 6:9
**group** 3:18
  11:19 20:21
  21:16 52:17,20
  53:3,24 54:10
  84:21 86:11,15
  86:23 87:2,9
  87:14,22
**grsm** 3:13,13
  4:4,5,6,7,8,9,10
  4:11,12,13
  31:24

**grsm.com** 2:12
**gth** 9:17,19,23
  34:4
**guess** 23:18
  45:14 49:2
  70:24 79:6,13
**guided** 65:9
**guys** 13:17
  30:22 71:22,23

**h**

**half** 14:19,25
  68:19 70:6
**handling** 64:3
  67:12
**happened**
  11:21 14:16
  43:14 48:8
  75:9 76:19
**happening**
  95:20
**happy** 48:21
  54:7 55:2
  61:20 89:8
**harder** 7:17
**hardt** 2:3
**harr** 2:3
**hartley** 81:8
**head** 39:8
  89:20 90:7
**header** 77:14
**hear** 7:1 45:19
  51:6 70:14

**heard** 7:4 29:20
**hearsay** 99:8
**held** 15:15 53:5
  57:1 97:19
**help** 8:12,14
  16:12,14 17:12
  34:21 42:6
  47:24 50:2
  51:17 80:15
**helpful** 72:4
**helping** 34:18
**helps** 85:10
**hey** 42:22
**high** 8:1 63:8
**highlands** 8:2
**highlight** 68:21
**hired** 56:24
**hold** 12:23 13:7
  13:15 14:16,20
  15:2 16:1
  18:10 36:13
  39:22 48:15
  52:25
**holder** 41:10
  69:11
**holding** 16:2
  99:2
**holdings** 9:24
  10:1,5,18,24
  11:4,7,13,15,21
**honestly** 95:1
**honesty** 41:23
**hope** 18:19
  60:5,7

**[hopefully - january]**

| | | | |
|---|---|---|---|
| **hopefully** 7:21 71:1 94:22 | **including** 56:15 82:1,10,14 | 21:24 22:8,11 22:14,19 23:5 | **involuntarily** 36:9 |
| **horrible** 46:7 | **independent** | 23:10 61:25 | **involuntary** |
| **hour** 60:3,4,7 60:11 | 8:9 10:12,21 11:1,18,19 | 62:1 78:23 79:2,7 80:9,13 | 23:2,8,21 42:9 42:14 |
| **house** 19:21 20:3 | 22:24 56:8,22 | 93:22 94:2,4,8 94:13 95:5,10 | **involved** 13:24 21:6,18 30:11 |
| **how's** 60:5 | **index** 3:1 | 95:10 96:1,13 | 47:9 75:25 |
| **howard** 3:12 | **individual** 67:3 | 104:11 | 79:5 |
| 4:8,12 29:25 | **infinitely** 7:17 | **insurer** 92:8,19 | **involvement** |
| 30:2,10 32:1 | **information** | 92:23 93:3,16 | 78:25 |
| 34:2 80:3 81:4 | 30:15,19 36:5 | 94:7 | **involving** 37:4 |
| 92:14 | 71:8 74:20 | **intended** 56:4 | **issue** 18:16 |
| **hr** 8:15 | 79:10 83:14 | **interest** 17:16 | **issued** 41:10 |
| **huh** 53:21 | 88:17 90:24 | 18:1 40:7 | 69:12 |
| **i** | 92:8,17 93:21 | 105:16 | **issues** 64:5 |
| **iary** 44:21 | 94:6,16,16 | **intermingled** | **it'd** 9:4 91:7 |
| **identified** | **informed** 79:13 | 48:12 | **items** 37:6 57:9 |
| 12:14 16:6 | **informing** 88:5 | **internet** 7:2,2 | **j** |
| 31:23 58:17 | **initially** 93:4 | 71:20 | **ja** 17:5 68:10 |
| **identifies** 70:22 | **inquiring** 37:3 | **interposes** 7:9 | **jag** 73:18 74:4 |
| **identify** 42:2 | 37:7,9 38:19 | **interrupting** | **james** 1:10 5:8 |
| **identifying** | **insinuating** | 82:20 | 15:8 16:22,23 |
| 74:14 | 50:6 | **introductory** | 16:24 17:9 |
| **illinois** 2:10 | **instance** 1:19 | 26:1 40:8,19 | 18:5 36:6 |
| **improper** 72:2 | **institution** 36:9 | 40:25 | 42:19 43:5 |
| **improving** 8:13 | 42:9,18 43:4 | **investigate** | 73:18 74:24 |
| **include** 16:22 | **instructed** | 51:9,14 | 76:2,6,7,12 |
| **included** 82:4 | 20:22 | **investigated** | 78:1 88:8,13 |
| **includes** 32:22 | **insur** 78:22 | 51:13 | 104:10 |
| 34:11 39:18 | **insurance** 1:11 | **investors** 11:17 | **january** 1:15 |
| 50:20 69:6 | 1:20 2:7 5:17 | 11:18 | 1:21 5:3 14:19 |
| 82:13 | 6:1 20:14,19 | **invol** 42:13 | 14:22,24 25:3 |
| | 20:25 21:1,2,7 | | |
| | 21:8,13,19,24 | | |

PAPP0995

**[january - likely]**

68:10,16 89:11
89:14,18,25
90:5 102:2
104:18 105:18
106:3
**jason** 16:21,24
17:7 74:6
87:17,23
**jeg** 73:18 74:1
**jg** 32:7 66:11
**jim** 16:13 43:18
99:11,12,12
**jnf.pdf.** 40:2
**job** 1:25 7:17
22:17 102:25
103:25
**jobs** 8:16
**jody** 16:21,23
16:25
**jody's** 20:2
**john** 1:15,18
3:4,22 4:3,4,6
4:10 5:6 17:2,4
17:5 32:15
47:7 53:11,14
68:7 102:2
103:1,5 104:17
104:23 106:1,5
**jonathan** 16:21
16:23 17:4
74:2 86:23
87:3
**joseph** 3:14
30:5,6,11,19

32:1 34:2,4,11
67:12 69:5
73:18 81:8
86:7,11,15
**july** 14:20,24
**jump** 89:1
**jumping** 10:2

**k**

**kinds** 65:6
**knew** 50:2
**know** 6:7,12,21
7:3 14:3 15:8
18:25 19:24
20:5,5,7 24:23
24:24 27:18
28:23 29:19,25
30:4,11,12
32:16 33:5
34:16 37:18,23
44:1,7 45:7,15
46:9 47:5,12
47:16,20 48:4
48:8,11,21
49:11,15 51:1
51:22 52:17,20
54:25 56:23
57:23 58:5
64:20 65:1,14
68:2,10 71:5
71:12,15,16
75:9,12,13
84:11 89:2,17
89:24 90:3

92:11 93:18,24
94:14 97:9
98:4,4 99:4,12
**knowledge**
15:3 16:15
23:6 30:10
45:9 50:7
64:18 93:23
**known** 28:10
36:12 77:3,4
**konicov** 3:13
4:8,12 29:25
30:8,14,18
32:1,20 39:16
39:24 41:16
67:8 69:5
74:14 80:18
81:7
**kopf** 2:3

**l**

**l** 2:8 9:11
**lack** 45:17,20
51:3 94:15
**larger** 18:1,4
78:11
**larry** 9:11
**lastly** 85:12
**late** 19:11 20:6
**law** 20:19
21:15
**lawyer** 19:18
84:5

**learn** 15:18
22:2 23:7,20
27:21 28:1,6,8
43:8 58:13
90:17 99:3
**learned** 15:16
20:6 22:4
23:11,12 27:2
27:17,19 29:14
29:15,24 37:25
43:17,22,25
44:1,8 90:25
**learning** 74:20
74:20 78:6
79:14
**led** 88:17
**left** 13:10 31:10
47:10
**legal** 23:19
26:17 27:7
29:9 46:20,20
57:5,6 82:7
97:25 105:22
106:23
**legally** 53:6
56:23
**letter** 9:10
**level** 46:24 63:8
**liability** 81:25
82:10
**lifted** 75:8
**likely** 30:7
48:10

**[limitation - make]**

**limitation**
  56:15
**line**  75:19 76:9
  81:20,24 85:24
  92:3 94:5
  102:3
**lines**  54:14
  81:20
**litigation**  6:2
**little**  10:9 20:15
  60:4 62:8
  64:13 65:18
  67:22 77:13
  78:10 80:24
  89:1 92:11
**llc**  1:7,11 40:12
  40:22 41:11
  69:13 104:7,11
**llp**  2:9
**loan**  25:9,16
  32:23 33:2
  35:11,16,20,24
  37:3,9,12,15,20
  37:20 38:1,14
  38:19 39:6,18
  41:18 43:10,19
  68:20 69:7,16
  69:22 70:10,23
  82:14,15 90:23
  90:25
**loans**  71:11
**locate**  90:22,24
**located**  5:5
  70:4

**long**  38:9
**look**  9:22 12:16
  13:6,11 14:4,8
  18:6 25:7
  30:20 33:23
  34:17 40:8
  44:17 54:11
  62:19 63:19,20
  64:22 66:2
  68:1 74:10,16
  75:24 78:13
  80:15 81:10
  84:19 85:20
  86:9,18 89:2
  90:8 97:13
**looked**  38:9
  39:13 58:10,15
  63:3 65:2 74:9
  77:25 80:17
  83:3 84:23
**looking**  18:15
  34:11 36:17
  66:14 83:5
  92:14
**looks**  32:12
  50:24 74:13
  81:4 84:22
  86:5,13,22
**loss**  96:9 97:10
**lot**  10:14 23:11
  23:12 42:3
  64:4 99:9
**lots**  95:18

**love**  75:12
**lp**  3:18 52:17
  52:20 53:24
  54:10

**m**

**m**  1:6 5:8 104:6
  106:4
**machine**  1:24
**made**  21:17
  40:9,21 61:24
  64:23 71:4,11
  71:25 72:1
  78:7
**madison**  19:24
  20:1
**mail**  3:12,14,22
  4:3,4,6,8,10,12
  30:3,7 31:23
  32:1,5,10,11,13
  32:20 34:10,11
  34:24 35:6,7
  35:20 37:11
  38:15,24 39:13
  39:17,22,25
  41:21,22 43:9
  65:16 66:6,11
  66:12,14,16,19
  69:4 73:12,16
  73:17,23 74:3
  74:6,9,12
  75:19,21,21,25
  76:5,13 77:21
  78:19,20 79:4

  79:20,23 80:5
  80:17,18,20
  81:1,7,11,14,16
  81:18,20 82:14
  82:24 84:24
  85:9,10,15,17
  85:21,24 86:2
  91:9,10,17,23
  92:2,6,12,14,18
  93:7 94:4,10
  96:11,20,23
  97:7,12 100:15
  100:18
**mailbox**  22:6
**mailing**  73:8
**mailings**  22:5
**mails**  43:23
  44:4 58:15
  59:14 63:19
  71:6 83:3
**maintain**  53:6
  80:12
**maintained**
  47:2,6
**majority**  3:17
  16:20 52:15
  54:2,12
**make**  7:17 8:25
  20:22 21:14
  23:4 32:19
  36:2 38:8
  53:25 59:7
  65:3,3 68:25
  70:19 77:13

PAPP0997

**[make - multiband]**                                                   Page 18

78:10 87:12
92:10 96:5,12
100:12
**making** 65:6,8
94:24 95:2,25
**manage** 64:5
**managed** 47:6
49:21
**management**
8:16 10:16
12:20 49:20
81:25
**manager** 20:9
53:12
**managers** 3:18
52:16 54:15
86:10
**managing**
67:14
**mansukhani**
2:9
**march** 35:12
37:22 40:13
**mark** 24:2
49:24 65:12
67:20 73:11
75:15
**marked** 4:25
24:3 31:21
33:12 49:25
52:9 54:22
65:13 67:21
73:14 75:17
77:9 78:9

84:10 85:4
**marking** 24:9
31:19 33:10,21
50:13 52:8,15
**marks** 82:15
**mastec** 28:23
**master's** 8:3
**matter** 5:7
**mbe** 3:18 52:16
52:20 53:3,3
53:24 54:10
84:21 86:11,15
86:22 87:2,8
87:14,22
**mean** 17:4
18:23 37:7
47:18 56:1
68:10 96:13,16
**meaning** 38:18
**medical** 13:23
**member** 12:25
14:8,13 19:8
57:16 89:13
**members** 16:19
19:12 89:17,24
90:4
**memory** 42:11
**mentioned** 73:7
**met** 30:1
**metals** 62:17
**mfs** 41:6,6,10
43:19 69:11
**mgr** 25:4,10,13
25:16,20 62:25

70:23
**mgs** 41:12
43:19
**middle** 50:20
79:14
**midnight** 44:2
44:7
**million** 24:25
25:8,15 29:11
31:11,12 33:2
35:11 36:7
39:18 41:13,18
58:10 62:3
68:18,19,20,20
68:23,24 69:7
69:14,18,22
70:6,9,22 71:3
72:7,18,23,24
75:5,20 76:10
78:2,2,4 82:14
82:24 83:25
88:7,14 89:10
89:23 90:6,10
90:17
**mind** 30:22
62:7 87:12
**mine** 32:14
**minority** 44:25
53:2,4,7
**minute** 18:13
30:21 33:23
94:21
**minutes** 20:8
30:25 51:19,23

51:24
**mis** 76:2
**mo** 99:13
**moment** 25:22
29:17 38:4
50:9 54:8
57:20 66:2
77:11 80:25
89:4 91:5
**money** 49:20
62:5 71:18,23
72:6,12 77:1
**monies** 79:16
94:17
**month** 59:5,11
**months** 9:4
12:21 22:25
**morning** 5:25
19:1
**move** 69:10
77:8 78:8
79:21,24 95:21
**moved** 79:16
**moving** 77:1
**multi** 69:12
**multiband** 1:7
1:10 3:24 25:3
25:17,19 26:3
26:4,8,12,16,18
26:19,20,25
27:5,8,10,12,15
27:22 28:2,4
28:10,20,22
29:4,8,12,13

PAPP0998

**[multiband - number]**

31:12,13 35:21
35:25 36:7,8
37:4,10,13,21
38:1,11,14
39:6 40:10
41:5,11,19,19
42:19 43:5
62:4,21,25
63:4,4,7,11,23
68:4,17,24
69:12,17,17
82:15,24 83:25
88:15 98:14
104:7,10
**multiband's**
  25:4
**multiple**  27:4
  95:6
**munsch**  2:3
**munsch.com**
  2:6
**mutual**  6:9
**mvl**  1:3 5:7
  104:3

**n**

**n**  2:1,4,9 5:1
**name**  5:12,25
  9:8 26:9,17
  27:22 28:2
  29:8 30:19
  35:10 37:16,19
  47:24 49:13
  60:17 63:6

71:25 75:6
  102:2
**named**  27:5,8
**names**  71:14
**narrative**  79:7
  82:13
**narrow**  71:1
**nature**  76:16
  79:15 83:6
  87:5
**natures**  78:6
  99:21
**necessary**  71:2
**need**  6:22 8:12
  11:25 12:16
  13:11 14:4,9
  18:5 19:12
  20:16 24:23
  26:9 27:1,8
  34:16 46:25
  51:19 61:18,20
  65:24 73:12,12
  79:22,23,24
  88:10 96:15
  97:13 99:11
**neither**  56:12
  105:11
**networks**  1:4
  5:6,19 10:6,11
  10:19,22,24
  11:3,6,19 12:4
  12:6,10,23
  13:7,16,25
  14:17,21 15:6

15:11,15,19,23
16:1,7,11
17:12,13 18:2
18:11 19:3,6,9
19:22 20:4,10
20:13,25 21:2
21:19,23 22:19
23:4,23 26:11
26:19,24 27:7
27:11,21,25
28:3,5,11,13,19
29:3,4,23
30:16 34:15
40:11,21 44:13
44:22 45:7,10
45:16 46:10,14
46:19,22,22
47:3,13,18,21
48:11 49:13,17
50:16,25 51:11
53:24 54:4
55:19,22 56:4
56:19,21 57:12
57:17 59:1,16
59:20,21 62:10
63:18 64:2,15
66:12 67:9
68:4 69:21
72:17,22 74:15
77:2 80:13
81:21,25 82:3
84:14,21 88:2
89:14,17 90:5
92:19,23 93:16

97:4,10,23
98:11,16,19
99:2,24 104:4
106:4
**never**  19:21
  70:4 72:21
  87:12
**new**  68:8
**nine**  39:15,16
**noon**  51:24
**normally**  97:21
**norowitz**  34:3
**northern**  1:1
  5:9 104:1
**notary**  1:23
  104:21 105:21
**note**  4:24 32:19
  41:10 69:12
  70:6 75:20
  76:10 78:2
  106:10
**noted**  103:2
**notice**  92:23,25
  93:2,16 94:12
  94:15 96:9
  97:3
**notification**
  3:11
**notified**  20:18
**notify**  93:5,21
  96:13,13
**number**  5:7,11
  24:3 25:1
  31:21 33:12

**[number - oper]**

34:6 35:9
38:22 40:7
49:25 50:10,18
52:9,11 53:13
54:22 55:9,10
55:11 65:13
67:21 73:14
75:17 77:9
78:9 84:7 85:4
**numbered**  1:21
**numbers**  68:22
**nw**  39:3 40:12
40:21

**o**

**o**  5:1
**o'clock**  66:19
**object**  7:8
42:22 49:14
64:25 65:7
69:23,24 70:11
72:10 73:2
79:17 83:10,19
84:2 88:9
97:25
**objected**  45:20
**objecting**  70:15
**objection**  7:9
7:12,19 45:17
51:12 63:13
72:19 82:17
99:8
**objections**
82:20

**obtain**  20:24
**obtaining**
20:14 21:8,11
21:12
**occur**  42:4
**occurred**  36:4
49:19 76:25
89:11
**october**  44:2,5
44:7 73:17,24
75:22 77:22
79:14 80:21
81:11,13 83:2
83:9 88:2
91:11 92:17,22
93:16 99:5
**offer**  8:11
**offered**  8:20
**office**  60:25
96:5
**officer**  12:10,13
14:12 15:6
19:5,6 57:12
59:16,17,21
66:23 67:1
95:12 97:22
99:24,25
104:24
**oh**  17:5 36:19
36:22 51:6
69:23 77:10
87:12
**okay**  5:21 6:8
6:23,24 7:12

7:13,22 8:5,7
8:10,20 9:5,12
9:23 10:23
11:3,6,15 12:3
12:22 13:14
14:2,19 15:5
15:10,14,18,22
15:25 16:10
17:2,9,11 18:9
18:13 19:20,24
20:3,8,24 21:6
21:18,22 22:7
22:13,23 23:2
23:7,20 24:1,8
24:16,19 25:12
25:17 26:5,16
26:22 27:14,20
27:25 28:6,14
28:18 29:1,10
29:17,22 30:4
30:21 31:16,19
32:15,19 33:1
33:7,9,20,21
34:3,5,6,7,10
34:14,23 35:4
35:8,19 36:6
36:13 37:8,18
37:24 39:3,4
39:12,21 40:3
40:8,14,19,24
40:24 41:3,9
41:15 42:8,17
43:1,1,8 44:1
44:23 45:2,5

46:8,13,17,25
47:12 48:2
50:19 51:8,18
52:20,23 53:10
54:14,19 55:4
55:8,10,11,11
55:12,18,21
56:7,11,18
57:11,15,19
58:4,5,8,13
59:12,15,19,24
61:16 64:12
65:21,25,25
66:3 67:23
69:20 70:17
73:11 77:11,15
77:17 78:17,17
80:2,4 81:2,4,5
85:16 86:4
87:12 89:11,22
90:21 91:16,22
92:2,6,16 94:3
94:20 95:4,8
96:4,19 97:3,9
97:16 98:7
100:7,14,17,19
100:25
**once**  71:7
**ongoing**  74:19
**onward**  31:24
**open**  35:10
41:5,5,11,11
**oper**  48:15

**[operate - personally]**

operate  9:5
  11:3 16:14
  28:20 54:4
operated  27:11
  28:3 46:23
operating
  28:12,25 29:1
  29:8
operation
  26:24 27:11
operations  8:14
  48:16,17
opinion  71:23
  73:4 99:15
opportunity
  65:22
oral  1:14,18
  104:16,24
order  53:1
orderly  7:20
orient  24:16
  33:22,23,25
  39:23 89:9
orientation
  24:7,18 57:25
oriented  31:12
orienting  25:22
outgoing  68:15
outside  21:9
  72:20,20
overlooked
  10:12
own  28:20
  43:18 72:25

88:7
owned  10:19
  11:15 27:7,11
  40:10 41:6
  42:19 43:5
  46:14,15,22
ownership
  11:20 17:20,22
owns  54:2

**p**

p  2:1,1,3 5:1
p.c.  2:3
p.m.  1:22 18:16
  18:18 34:12
  52:4,6 66:19
  81:13 92:15
  101:1,2
package  81:25
  82:10
page  3:2,10 4:2
  24:12 26:1,2,3
  31:25 40:3
  50:20 55:14
  66:18 69:10
  78:18 86:5,10
  86:14,19,21,22
  87:2,11,13,16
  87:17,22 102:3
  105:7
pages  87:7
paid  9:20 47:20
  49:11,16,18
  51:1

paragraph
  24:22 25:2,7
  25:18,19 26:1
  40:9 53:11,14
  55:23 56:7
  57:24 58:1
  66:21
paragraphs
  58:9
paren  41:5,6,11
  41:12
parent  41:4
  48:14,16
parham  75:22
  81:8
part  13:9,11,12
  97:6,11
particular
  56:11 68:2
  94:12 97:19
particularly
  62:2
parties  56:12
  94:18 105:13
partner  3:18
  52:16 53:12,13
partners  54:13
partnership
  53:16
parts  79:23
party  10:17
  56:12,15 105:4
  105:10

pass  88:21
  100:3
past  8:23,24
  9:4 18:18
pay  49:8
payable  47:12
payment  20:22
payments
  49:15 51:10,15
  64:5
pdf  31:17
pdfs  86:2
pending  6:2
people  71:18
percent  17:23
  52:25 57:1
perfect  85:15
  91:15
performed  8:22
performing  9:1
  9:2
period  12:13
  25:16 36:16
  38:18 98:9,17
permission
  65:2
perpetrated
  58:25
person  30:2,6
personal  61:10
  73:4 74:3,6
  100:18
personally
  54:10 73:4

**[perspective - providing]**

**perspective**
8:15 17:19
49:4
**peruse** 54:25
**petition** 23:2,8
23:21
**phone** 2:5,11
30:3,6
**pick** 73:6
**pickett** 11:17
**pin** 29:19 50:9
**places** 77:2
**plaintiff** 2:2
**plaintiffs** 1:8
7:8 104:8
**planning** 85:8
**please** 5:13
6:12,20 7:3
16:2 20:16
26:14 34:6
46:8 55:4,11
55:12 61:19
65:19,22 70:19
77:13 78:14
80:5 88:11
92:20 96:18,23
100:17,24
**point** 10:7,18
15:11,16 22:22
34:22 36:4
41:25 43:18
49:2 50:6,7
51:17 59:10
88:1 90:21

93:10 98:7
**policies** 95:3,6
**policy** 20:18,21
20:22,23 21:10
21:16,21,25
22:8,11,15,20
23:5,10 62:1,6
79:2,8 80:9
81:22 82:3,8
92:4 94:19,25
95:3,6 96:1,3,6
96:10 97:1,6
97:12
**position** 12:20
13:7,15 14:16
20:5 60:8
62:15,16 64:2
64:20
**positions** 12:22
14:20 15:2,15
64:14
**possibility** 83:4
**possible** 48:20
**potential** 78:22
79:7 81:21
92:3
**potentially**
8:13 83:8
**prefer** 100:10
100:11
**preferred**
17:21 18:3
35:12,17 37:22
38:20

**preparation**
60:21
**present** 5:13
94:17
**president** 63:20
97:20 98:5
**previous** 72:15
96:11
**prices** 80:15
**primarily** 9:19
13:22 16:21
30:17 62:3
**primary** 16:19
**principal** 41:12
69:13
**principally**
55:1
**prior** 9:13 23:2
23:8,21 36:8
42:8,18 43:4
44:9 64:9,16
83:2,9
**private** 28:17
**probably** 9:16
43:17 60:3
99:5
**procedure** 1:25
**proceed** 5:22
**proceeding** 1:7
5:10 24:11
36:9 42:9,19
43:4 104:7
**proceedings**
101:2

**process** 3:11
10:12 22:3
**produced** 1:18
31:23
**product** 45:1
**promissory**
41:10 69:12
70:6
**promoted** 98:5
**proof** 97:10
**proper** 38:12
95:16
**proposed** 80:19
**prosecutor**
23:15
**prosperity** 3:16
48:4 50:14,16
**provide** 30:14
56:4 57:3 93:6
96:9 97:5,10
**provided** 4:24
10:3 23:9
30:20 41:15
43:12,12 46:10
46:15,18,18
49:7 53:15
55:16,21 56:1
62:1 92:18
93:6 94:1
**provider** 44:25
53:15 80:9
**provides** 96:20
**providing** 9:13

PAPP1002

**[public - received]** Page 23

**public** 1:23 28:17 104:21
**pull** 9:21 37:11 44:16 91:3 93:24
**purchase** 100:22
**purchased** 10:8 28:11,16
**purpose** 56:15
**purposes** 20:14 20:24 21:11 24:7,18,21 31:22 56:16 57:25 89:9,12
**pursuant** 1:24 105:2
**put** 26:5 37:23 37:23 39:2 42:5 60:8 65:11 71:9,16 79:10
**putting** 79:1,6

**q**

**question** 6:14 6:15 7:4,11,18 14:7 18:16 20:15 23:17,17 33:4 35:9,19 37:1 43:16,18 45:14,21 46:6 46:7,17 47:15 48:25 50:5

66:2 70:19,25 80:5 88:10 90:14 92:21 93:11 95:22,23
**questions** 6:11 6:12,23 7:1 34:4,23,25 35:1,5,8,15 36:3 39:1 55:6 55:13 84:5,11 87:6,6 88:25 90:12 98:8 99:10,21 100:2
**quick** 18:16 30:23 34:1 60:1,10 84:16
**quickly** 7:22 74:1 78:8 84:4
**quite** 68:6 95:1
**quotation** 82:15
**quote** 25:8 32:22 35:9,10 35:12 41:4,5,6 41:12,12 56:12 92:7
**quotes** 26:4

**r**

**r** 2:1 5:1
**raised** 10:16
**raising** 8:13
**range** 17:24

**rather** 51:15
**rationale** 64:24 76:21
**reach** 22:13
**reached** 90:9 99:18,23
**react** 95:19
**read** 25:1,2,5 26:6 32:22 33:24 34:1 37:12 38:22 41:23 56:17 58:1,3,6,7 65:22 77:14 78:15 79:25 80:4,25 81:2 103:1 106:9
**reading** 25:20 26:6,13,16 34:2,5 42:1 58:2 77:18
**ready** 60:11,11
**real** 30:23 34:1 84:15
**really** 21:14 27:1,1,6 28:21 36:2 48:3 61:9 93:12
**reason** 7:1,11 51:14 69:2 70:7 78:7 102:3 106:11
**reasonably** 56:6

**reasons** 105:8
**recall** 15:4 16:8 16:15 17:15,17 21:5 28:22 31:14 34:3 39:5,14 43:15 43:21,24 44:8 44:12,15,19 46:20 48:9 49:17 57:23 58:12 62:9,16 66:12,25 68:6 69:16,20,25 70:1,1 71:2 74:1,23 78:25 79:5 82:3,8 83:6,12 87:25 88:5 94:14,18 96:2,7 97:13
**recalled** 63:3
**receipt** 105:6 106:17
**receivable** 32:23 33:2 35:16,20,25 37:4,9,13,15,20 38:1,20 39:18 69:7
**receivables** 35:11
**receive** 61:18 61:19
**received** 9:18 58:23 72:17,23

**[received - representing]**

74:14
**receiving** 83:16
**recent** 96:24
  97:3
**recess** 31:6
  52:3
**recital** 69:10
**recognizable**
  87:20
**recognize** 26:9
  66:4 67:23,25
  68:1 73:21
  77:12,19 78:11
  78:19 84:12
  85:18
**recollection**
  29:19 33:16
  35:23 41:16
  45:10 47:23
  64:7 66:15
  67:7 70:8 74:4
  76:11
**recommend**
  92:23 93:2
**recommended**
  21:15 92:7,17
  93:5,15 94:15
**record** 5:2 7:10
  7:21 24:21
  31:4,8,23 52:1
  52:5 100:20,21
  100:25 104:25
  105:15

**recorded** 25:8
  25:15
**records** 25:9,16
**recover** 62:5
**recuse** 12:17
**recycling** 62:17
**red** 39:1,1
**rees** 2:9
**reference** 25:17
  26:2 61:22
  94:17
**referenced** 97:1
  97:6,12 106:6
**references**
  25:25 35:20
  82:10,24 94:4
**referencing**
  96:3
**referred** 62:4
  97:21
**referring** 16:17
  25:14 27:9
  37:7,12 44:21
  47:25 48:6
  68:20 72:7,12
  72:14 76:9
  78:1
**refers** 70:9
**refresh** 29:18
  35:23 41:16
  42:11 66:15
  76:10
**regarded** 81:19

**regarding**
  35:10 78:21
  80:5 81:21,24
  90:25
**regardless**
  34:20
**registration**
  105:22
**reiterate** 60:17
**related** 10:5
  35:16 95:5
  105:12
**relates** 61:25
**relating** 61:7
**relation** 17:7
**relationship**
  16:25 17:2,9
  45:2,8,11 46:2
  46:21 62:25
**relative** 105:14
**relatives** 54:17
**remember** 9:19
  12:19 13:3,9
  13:10 14:5
  15:17 17:18,23
  26:17 33:1
  34:18 36:10
  44:4,10 59:2,9
  59:9 63:8,24
  67:3 71:7 75:3
  75:14 84:6
  90:12,13,14
  95:1,2 99:9,20
  99:20

**remind** 42:24
**remotely** 1:16
  104:19
**renew** 80:15
**reorganization**
  53:9
**repeat** 45:22
  92:20 96:15
**repeated** 90:14
**rephrase** 6:13
  42:17 43:2
  44:6,6 64:11
  64:13 82:23
**report** 96:25
**reported** 1:16
  1:23 104:19
**reporter** 5:2,21
  7:14 31:4,8
  50:11 52:1,5
  52:12 73:10
  100:19,25
**reporter's** 3:7
  4:24 104:15
**represent** 5:14
  6:1 20:13
  57:23 60:17
  61:18,20,23
  70:3
**representation**
  57:6
**representatives**
  56:13,14
**representing**
  5:12 61:10

PAPP1004

**[request - school]** Page 25

**request** 19:11
**requested**
  105:4,9
**resign** 12:17
  14:12
**resignation**
  98:23
**resigned** 12:19
  12:20 14:5
  15:19,22,25
  16:5,13
**resolution**
  53:10
**resolved** 53:11
**resources** 1:11
  27:15 29:13
  31:13 35:21,25
  36:8 37:4,10
  37:13,21 38:1
  38:11,14 39:7
  41:11,20 42:20
  43:6 62:5,17
  63:1,4,11,24
  68:17,24 69:13
  69:18 82:16,25
  84:1 88:15
  104:11
**respect** 64:19
**responds** 76:2
**responsibility**
  22:17
**rest** 33:5 55:5
**restart** 88:3

**restructuring**
  53:8 66:22
  67:1
**retained** 11:20
**return** 9:21
  88:4 106:13,16
**returned** 27:23
  27:25 28:7
  105:5,7
**review** 34:7
  79:11,23 100:8
  100:9,11 106:7
**reviewed** 61:8
**revisions** 80:19
**revolve** 94:12
**right** 17:6
  18:23 24:21
  26:2 31:3
  32:18 35:2
  44:19 51:19
  52:7,10 55:9
  66:14 70:8
  74:21 76:5
  77:10 78:18
  79:16 80:2,20
  85:14 88:24
  91:15 100:8,9
**rise** 96:25
**risk** 20:9
**road** 94:22
**robert** 80:3,6
  80:11 81:14
  91:24 93:7,7

**robotic** 87:5
**role** 13:2 15:19
  15:23 16:10
  20:7 51:8
  63:17 64:8,15
  67:17 98:6
  99:2
**roles** 64:19
**rude** 47:16
**rule** 105:2
**rules** 1:24 6:9
**run** 28:5
**running** 13:23
  62:22

**s**

**s** 2:1 5:1
**samantha**
  62:13 63:17
  98:16,24 99:5
**saturday** 73:16
  73:17
**saw** 59:13
  69:16 71:10
  75:5
**saying** 26:10,10
  54:1 93:13
**says** 25:2,7
  26:4,20 32:22
  35:9 37:14
  38:25 39:17
  40:1,7,9,20
  41:3,9,21,22
  56:12 59:5

  63:20 69:6,11
  76:7 80:22
  85:11,25 92:7
  94:6,8 95:14
  96:15,23
**schmookler** 2:8
  3:4,5 5:16,16
  5:24 6:1 11:10
  13:20 18:9
  24:5,8 30:24
  31:2,10,22
  33:15 43:1,3
  45:24 49:23
  50:8,10,12
  51:5,18 52:7
  52:10,13,14
  54:24 59:24
  60:13 63:13
  64:25 65:7
  66:10 69:3,23
  70:11,15 72:10
  72:19 73:2
  79:17 82:17,19
  82:22 83:10,19
  84:2,8,11 85:1
  88:9,24 89:6
  91:2,6,10,13,16
  91:19,22,23
  95:21,23 96:17
  96:19 97:16,18
  98:2,7 99:17
  100:2,7,14
**school** 8:1
  18:25

PAPP1005

**[scott - serve]**

**scott** 1:6 2:2,8
5:7,16,18,25
11:17 14:3
17:23 21:5
23:11 27:1
32:14 34:16
41:23 42:24
43:11 45:22
50:1 57:4
70:13 77:5
82:5,21 83:21
84:6 88:21
89:21 91:12
92:20 94:14
95:1 104:6
106:4
**screen** 6:19
36:17 65:15
81:17,18 92:1
**screwed** 36:24
**scroll** 34:5 40:3
40:6 55:8,8
66:1 74:8
80:24 84:15
85:11 91:14
92:11 96:17
**scully** 2:9
**seat** 18:10
**second** 33:7
36:13 54:9
67:4 78:17
92:6,10 100:19
100:20

**secondary**
32:13
**section** 24:25
25:18 56:3,8
**secured** 41:10
69:11
**securing** 21:19
**security** 40:4,7
40:9,14 75:20
**see** 6:20,21,22
14:8 24:25
25:5,10,11,12
25:17,19,25
26:4 29:18
31:16,18 32:1
32:2,5,8,23
33:5 35:13,19
35:21,22 36:18
37:18 38:2,24
39:1,19,20,24
40:4,5,6,7,12
40:13,15,17,19
40:23,24 41:1
41:2,7,8,13,14
50:15,19,22
51:23 52:17
53:10,17 54:6
54:14,16,21,23
55:16 56:9,16
56:17 65:14,17
65:25 66:21
68:16,18 69:8
69:14 70:2
73:12,15,19,20

75:13,20,23
76:6 77:7 81:6
81:13,16,18,19
81:22 82:1,2,9
82:16,18 84:16
84:17 85:6,14
85:24 86:1,3,5
86:16,23 87:7
87:9,14 89:1,3
89:8,21 91:24
92:1,2,4,5,9
94:4,8 96:21
96:22,23 97:1
97:2
**seeing** 70:1
**seeking** 62:5
**seen** 41:22
68:11 69:21
72:21 73:4
**seidel** 1:6 2:2
5:8,19 60:18
60:19 61:25
104:6 106:4
**seidelfrinzi**
3:21,21
**self** 96:16
**send** 16:5 35:5
92:25 100:17
**sends** 39:16
**senior** 63:20
97:20 98:5
**sense** 68:25
**sent** 34:4,11,24
39:13 58:17

65:25 66:19
71:5,24 73:24
77:7,22 94:17
106:14
**sentence** 25:14
56:11 92:7
**separate** 11:13
37:14 68:24
84:24
**separately** 25:3
**september**
24:14 32:2
33:2,13 34:12
34:24 35:6,16
35:24 36:15
37:3,8,16,17,25
38:15,18,25
39:13 41:17,18
43:9 58:14,16
58:16,21,23,24
59:5,5 62:9
65:17 66:8
69:6 75:10
76:5,25 77:1
79:14 85:22
88:2 90:16,17
98:23 99:5
**series** 6:10 32:4
34:24 40:25,25
50:19
**serve** 13:2
19:14 20:9
90:4

**[served - sort]**

| | | | |
|---|---|---|---|
| **served** 19:21 20:3,5 24:10 | **shared** 83:22 83:23 99:16 | 72:22 90:22 | 51:5,19 52:7 52:18 54:21 |
| **service** 3:11 61:18,19 | **shareholder** 17:13 18:5 | **shown** 72:15 **side** 85:14 | 55:16 57:19,21 57:21 59:25 |
| **services** 1:7 3:24 8:10,21 | **shareholders** 16:20 54:2 | **sign** 100:8,10 106:12 | 82:19 88:24 90:12 91:16,25 |
| 8:22 9:14 10:3 26:3,8,12,20,25 | 56:24 57:1 | **signature** 3:6 54:14 74:25 | 92:1,4 95:22 **sit** 39:5 |
| 27:12 28:5,11 28:20,23 29:5 | **shareholding** 17:15 18:1 | 76:7 83:5 86:5 86:10,14,19,21 | **situation** 76:23 **slightly** 48:24 |
| 29:9,12 31:13 36:8 40:10 | **shares** 40:1 **sharing** 29:17 | 86:22 87:2,17 87:19,22 99:13 | **small** 10:17 38:6 |
| 41:5,19 46:11 46:13,15,17 | 39:4 59:9 71:11 | 102:1 103:1 105:3,7,20 | **sold** 28:23 **solutions** |
| 48:18 49:5,7 53:15 55:1,15 | **sheet** 106:11 **shell** 28:24 29:2 | **signed** 34:17 40:2 70:4 86:7 | 105:22 106:23 **son** 18:24 |
| 55:16,21,23 56:3 57:3,9 | **shorthand** 1:24 **show** 6:18 24:1 | 86:10,14,19,23 87:2,22 88:18 | **sondrup** 62:13 65:5,8,16 66:7 |
| 62:21 63:7 68:5 69:17 | 24:12 29:18 33:7,10,21 | 106:19 **silverstein** | 66:20 97:19,22 98:16,25 99:7 |
| 98:14 104:7 **servicing** 8:18 | 39:21 44:11 49:23 50:12 | 85:12 **similar** 27:5 | **sondrup's** 63:17 64:14 |
| **serving** 28:19 29:2,10 | 51:20,22 52:8 55:2,5 75:11 | 68:22 **simple** 80:6 | **sorry** 10:2 13:17 17:5,5 |
| **set** 24:17 32:12 52:24 | 75:15 79:19 81:1 84:9,24 | **simultaneously** 11:9 | 32:20 36:19 45:18 51:6 |
| **setting** 78:5 | 86:4 89:3 | **single** 55:25 | 54:17 55:7,9 |
| **settlement** 40:1 40:15,17,20,20 | **showed** 36:14 37:2 39:10 | **sir** 19:19 24:23 25:5,10 31:10 | 58:1,3 69:24 70:13 77:10 |
| 41:15 70:9,21 72:20 74:14 | 57:21 58:18 69:3 83:15 | 31:14,25 33:15 33:19,22 36:14 | 79:3 82:21 83:21 91:19 |
| **several** 86:2 **share** 6:19 | 91:11,17 **showing** 24:8 | 36:14 38:23 39:14,22 40:5 | 92:12,20 **sort** 19:14,15 |
| 83:17,22 | 31:16,19 36:17 36:20,22 52:14 | 40:16,23 43:3 43:21 50:12 | 21:7 49:8 |

PAPP1007

94:24 97:5
**sound** 60:5
**speaking** 11:9
**specialtyclaims**
  81:14 96:20
**specific** 24:17
  24:17 48:21
  59:6 79:20
  94:3,23 95:24
  96:2,7
**specifically**
  38:10 44:15
  47:25 75:4
  96:3 99:9
**specificity**
  43:21
**speculation**
  51:4
**spoke** 85:12
**spoken** 30:1,2,5
  60:21,24 61:2
  61:4,21
**spring** 11:25
**square** 81:16
**sschmookler**
  2:12
**staff** 63:21
**stamped** 40:4
**stands** 53:3
**start** 6:8 62:7
  64:20,21 65:11
  78:5 79:25
  80:2,6 81:15
  85:17

**started** 8:3 13:5
  19:10 22:25
  34:18 71:7,8
  71:11,14,19
  78:6 83:7
**starts** 66:21
  75:25
**state** 1:23 5:13
  56:16 104:21
**stated** 77:5
**statement** 3:16
  50:14 79:1
**statements**
  67:25
**states** 1:1 5:9
  104:1
**stay** 48:17
  94:22
**step** 38:8,13
  72:5
**stephanie**
  62:12 63:22
**steve** 34:3
**stock** 53:1,5
**stockholder**
  35:12,17 37:14
  37:22 38:20
**stolen** 58:25
  59:20
**stop** 29:17 39:4
**street** 2:4,9
  105:23
**strike** 21:22
  45:6 58:22

95:22
**string** 34:10
  91:11
**structure** 63:9
**styled** 1:21
**subcommittee**
  19:15,16
**subject** 75:19
  76:9 81:20
  92:3
**submission**
  21:7 22:8,10
  78:22 79:21
  83:9
**submissions**
  80:19
**submit** 22:19
  93:9,9,23
**submitted**
  21:24 79:1
**submitting**
  36:3
**subs** 93:19
**subscribed**
  105:17
**subsequent**
  93:19
**subsid** 44:21
**subsidiaries**
  23:23 46:10
  48:14 57:13
  59:1,22
**subsidiary**
  40:11 41:7

46:15 48:17
**substance** 61:6
  61:24
**suite** 2:4,10
  105:23
**summarizing**
  93:8
**summary** 8:4
  93:6,22,25
**summer** 8:24
**supply** 45:3,6,8
  45:16 46:4,11
  49:4 50:21,23
  51:1,10
**support** 97:5
  97:11
**sure** 7:23 8:1
  8:25 10:10
  14:24 16:3
  19:14 21:14
  24:4,20 25:23
  26:15 29:15,15
  30:1,10,19
  34:1 37:7 38:8
  43:23 44:3,10
  45:24 47:20
  51:25 53:25
  59:8,10 60:13
  68:1 70:19,20
  78:16 80:14
  88:12 92:10,22
  92:22
**svp** 63:20 97:20

PAPP1008

**[swear - today]**

swear  5:15
sworn  1:20
  5:20 104:23
  105:17

**t**

table  10:2
  13:18 17:18
  18:6,8
tail  21:20 82:7
take  6:2 7:15
  7:21 15:22
  30:25 44:16
  51:19,23 60:7
  60:10 66:2
  72:5 80:25
  97:16
taken  1:20 6:3
  31:6 52:3
  105:13
talk  7:16 25:24
  28:15 33:24
  69:2 99:11
talked  58:10
talking  27:6
  28:15 42:14,14
  48:4,5 71:7
  79:3 94:5
tax  9:21 56:16
team  10:16
  48:15
tech  8:3
technical  7:1

telecom  9:24,25
  10:3,5,17,18,23
  11:4,7,12,15,21
tell  41:23 47:4
  60:7 65:23
  71:13 79:22
  99:7
telling  70:1
tenure  49:21
terms  57:5
testimony
  104:25 105:13
  106:9,17
texas  1:1,23 2:5
  5:5,10 6:2 8:2
  8:2 56:25
  104:1,22
  105:23
thank  5:21
  14:11 24:15
  51:18 57:19
  85:15 88:21,23
  100:3
thanks  31:3
theft  23:22
  62:2,2 83:8
  99:19
therefor  105:8
thing  33:8 47:1
  60:8
things  27:2
  37:9 42:1
  76:18 77:6
  99:1,11,15

think  8:23 9:17
  12:17 14:3
  22:25 30:6,17
  37:2,12 39:9
  43:11 48:24
  54:11 60:11
  61:19 64:4
  72:2 75:5 82:5
  84:4 90:11
  96:16 98:13
  100:6
third  10:16
  66:20
thought  36:22
  59:7 62:18,20
  91:21 93:21
  98:8
three  13:5
  22:25
throckmorton
  105:23
ticket  60:5,9
time  5:3 7:7
  8:20 11:16
  12:1 13:6,21
  13:22 14:6
  15:5,18 17:11
  17:16 18:10,18
  19:2,5,8 20:9
  20:12 21:6,18
  22:13 28:13
  29:7 34:14,22
  38:9 42:8,18
  43:4 44:8

45:12,23 47:7
  47:10,10 48:13
  48:13 51:9,17
  57:11,15 58:23
  59:3,15,18,19
  59:25 62:20
  63:15 64:10
  65:23 66:19
  67:15 68:13,14
  70:18 76:14
  77:3 79:22
  83:12 85:25
  88:11,22 89:9
  90:5 93:11
  97:23 98:14
  99:1,6,23
  100:3 106:18
timeframe
  106:8
timeline  83:2
timely  92:8
  94:6
times  6:6,7
  42:16 50:4
  99:10
timing  18:16
  78:6 89:12
title  63:20
  97:20 98:6
titled  40:17
  54:20
today  5:2 6:3,4
  6:11,18 7:15
  8:11,19 14:15

**[today - understanding]**

22:1 24:18
39:5 59:25
62:6 66:10
68:21 85:12
88:22 100:10
**together** 26:11
42:5 71:10,17
79:1,6,10
**told** 7:10 61:13
61:17 69:21
75:4,7 88:6
**took** 28:17 51:8
85:25
**top** 31:25 39:8
52:18 73:16
75:21 78:18
81:6 89:20
90:7
**track** 71:14,19
**tran** 58:19
**transaction**
24:17 48:21
64:23 68:23
74:15
**transactions**
23:7,11,21
36:4 43:14
47:8,25 48:6
49:19 65:2
72:1 76:16,25
78:7 79:15
83:6,8
**transcript**
100:8,10,23

104:24 105:6
106:6,19
**transfer** 25:1,8
25:15 31:12
36:7 38:20
58:11 70:10,22
72:18 75:6
82:24 88:14
89:10,11,23
90:6,10,17,23
**transferred**
29:12 83:25
**transfers** 58:13
58:17,18,19,22
59:7 64:22
**transition**
48:18
**transportation**
46:3
**tried** 59:25
**true** 50:6 53:22
56:18 66:6
73:23 75:24
76:22 77:21
78:20 81:10
84:19 85:20
86:9,18 87:1
87:21 99:16
103:2 104:25
**trustee** 1:6 2:2
3:13,13,15,15
3:19,19 4:4,5,6
4:7,8,9,10,11
4:12,13 5:8,19

26:10,12 31:24
60:19 104:6
**try** 10:23 13:14
42:6 45:14
46:7,9 47:17
60:9 88:25
**trying** 8:23
26:17 34:21
36:3,5 38:5,7,8
42:1,2,3 43:13
43:14 47:16
48:3,7,25 49:1
49:2 51:15
57:4 59:3
63:24 64:4,5
71:9,16 76:19
76:22 77:5
93:11
**turn** 24:11
25:24 54:19
67:19
**turned** 98:22
**turning** 24:22
**two** 27:21 31:1
39:10 71:16,17
**two's** 31:2
**ty** 32:17
**type** 8:10,16
23:14 44:4,10
89:21
**typical** 22:5
**typically** 48:14
48:18 80:14

**u**

**uh** 53:21
**unable** 90:22
90:24
**unapproved**
72:3 90:11
**unauthorized**
83:8
**under** 9:6
28:12 39:24
53:16,23 55:1
62:6 81:22
86:1 92:3,24
94:12,24 95:3
95:25 96:6,9
96:25 97:6,11
**underneath**
40:24
**understand**
6:12 26:10
36:4 42:1,6
44:19 53:25
57:7 59:4
60:19 61:6,15
68:14 70:19
71:17 90:16
92:21 93:12,14
95:9 98:11
**understanding**
6:10 62:22,24
63:8,12,14,17
64:1 65:5
67:15 68:3

**[understanding - working]** Page 31

71:8 72:16
83:18 88:7,13
92:16
**understood**
6:15 7:5,5
41:24 61:23
82:9 98:9,10
98:17
**undocumented**
72:3 90:11
**united** 1:1 5:9
104:1
**university** 8:3
**unsigned** 70:5
84:16,25 87:8
**updates** 71:6
73:8
**use** 72:25
**used** 25:12 72:6
91:4 99:20
106:19
**using** 45:11
**uta** 8:3

**v**

**v** 1:9 104:9
106:4
**vague** 42:23
49:14 50:5
51:12 57:5
**value** 72:17
**variety** 8:12,15
10:3 14:17
17:20

**various** 47:2
**verify** 106:9
**veritext** 5:13
105:22 106:23
**veritext.com.**
106:15
**version** 70:5
87:8,13
**versus** 5:8
19:13
**vice** 63:20
97:20 98:5
**violating** 95:12

**w**

**w** 9:18,20
**wacker** 2:9
**wait** 7:18
**waive** 100:9
**want** 6:19,21
6:22 7:3,7
14:15 24:22
27:6 28:4
30:24 33:24,24
36:1 37:11
44:19 48:23
49:23 50:9
51:22 55:1,5,6
57:5,24 60:8
61:12,12,17
68:21 69:2
72:4,4 74:8
77:24 88:25
89:1,3,7,8

90:15 92:12
93:14 94:3
**wanted** 18:25
37:18 51:20
**way** 9:3 13:14
23:13 26:22
38:22 46:9
47:16 48:22,22
49:1 50:1,1
91:14
**we've** 84:10
**went** 37:13
49:18 58:19
62:4 72:8
97:10
**west** 3:24 25:4
48:5 67:25
68:2,5,9
**wh** 11:25
**white** 2:3 3:5
5:18,18 42:22
45:17,20 49:14
51:3,12 60:6
60:15,17 63:15
65:4,11,14
67:22 70:3,20
72:12,24 73:6
73:9,11,16
75:18 77:10
78:10 79:19
82:23 83:17,24
84:4,9 85:2,7,8
88:12,20 91:5
91:8,12,21

97:25 98:3
99:8,18 100:5
100:22,24
**wholly** 40:10
41:6 46:14
**wind** 64:4
**window** 13:21
13:22
**wire** 68:15
**wired** 25:3,19
**wish** 55:3 96:25
**witness** 1:19
5:5,15,20
13:17 18:7
30:22 31:1,3
40:25 45:18
51:25 60:2
70:13,17 82:21
83:21 85:5
88:21,23 100:4
100:11,17
102:2 104:23
105:1 106:8,10
106:12,18
**word** 7:16,16
39:1 99:20
**words** 90:11,13
**work** 8:8 20:25
21:2,4,4 99:1
**worked** 20:6
**working** 9:15
16:8 19:10
27:3 62:12,14
62:14,23 63:22

PAPP1011

**[working - zoom]**                                                     Page 32

63:23 68:8
80:9 98:10,15
98:18,22
**works**  51:25
**worry**  36:25
**worth**  105:23
**would've**  28:5
28:11 30:20
43:17,22 49:18
49:19 65:5
91:8
**wrap**  87:25
**writes**  32:21
**written**  96:14
**wrote**  17:5
93:22 94:9
95:15

**x**

**x**  105:4

**y**

**y'all**  18:17 19:1
71:22
**ya**  79:12
**yeah**  11:25
15:2 21:4
25:22 26:16
27:10,10 31:2
37:6 38:7
39:15 40:1,6
44:18,18 48:24
55:7 56:6 58:3
64:13 68:9
74:2 78:18

80:1 85:2 91:5
91:10,13
**year**  13:12,12
14:25 82:4
**years**  9:16 13:4
13:5 39:6

**z**

**zoom**  1:22 5:4
6:25 24:23
67:22 73:13
75:16

Veritext Legal Solutions

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

PAPP1013

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

PAPP1014

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

PAPP1015