Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas  75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

ATTORNEYS FOR THE PLAINTIFFS

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re:<br><br>GOODMAN NETWORKS, INC.,<br><br>Debtor. | § § § § § § § | Case No. 22-31641-mvl-7<br><br>(Chapter 7) |
| SCOTT M. SEIDEL, TRUSTEE;<br>GNET ATC, LLC; and MULTIBAND FIELD SERVICES, INC.<br><br>Plaintiffs,<br><br>v.<br><br>MULTIBAND GLOBAL RESOURCES, LLC; and FEDERAL INSURANCE COMPANY,<br><br>Defendants. | § § § § § § § § § § § § § § § § | ADVERSARY PROCEEDING NO:  23-03036-mvl |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

I.  SUMMARY  ....................................................................................................................1

II.  PROCEDURAL BACKGROUND.................................................................................2

III.  ADVERSE FIFTH AMENDMENT INFERENCES.........................................................4

   A.  THE LAW  ................................................................................................................4
   B.  THE FACTS  .............................................................................................................5
   C.  THE ADVERSE INFERENCES.....................................................................................7

IV.  FACTS  ..........................................................................................................................8

   A.  THE PLAINTIFFS, MGR, FRINZI, AND JAMES GOODMAN ...........................................8
   B.  THE $4.4 MILLION TRANSFER ................................................................................9
   C.  FRINZI CAUSED THE $4.4 MILLION TRANSFER TO BE MADE ...................................10
   D.  FRINZI USES FUNDS TO PURCHASE REAL PROPERTY AND TOYS .............................11
   E.  THE $4.4 MILLION WAS PROPERTY OF ONE OR MORFE OF THE PLAINTIFFS..........13
   F.  FRINZI STOLE THE $4.4 MILLION .........................................................................14
   G.  FRINZI LIES, CONCEALS, AND TRIES TO "DISAPPEAR" THE $4.4 MILLION
       TRANSFER BUT IT IS DISCOVERED  ........................................................................17
   H.  THE POLICY  .........................................................................................................21
   I.  PLAINTIFFS' CLAIMS AND NOTICES UNDER THE POLICY ......................................21

V.  ARGUMENTS.............................................................................................................24

   A.  SUMMARY JUDGMENT STANDARDS ......................................................................24
   B.  BREACH OF INSURANCE POLICY ELEMENTS AND PRINCIPLES ...............................25
   C.  FEDERAL HAS BREACHED THE CRIME COVERAGE UNDER THE POLICY .................26
   D.  CONDITIONS PRECEDENT TO COVERAGE ARE SATISFIED.......................................35

       1. Timely Notice Was Provided ........................................................................35
       2. Proof of Loss .................................................................................................38

           (i)  *Policy Provisions* ........................................................................38
           (ii)  *The Law*........................................................................................39
           (iii)  *Waiver and Estoppel of "Proof of Loss" Requirement* .................41
           (iv)  *Federal Cannot Show Prejudice of "Proof of Loss"*.....................44

   E.  DENIAL OF FEDERAL'S AFFIRMATIVE DEFENSES .....................................................45

## TABLE OF AUTHORITIES

**Cases**

*Amaya v. State*, 733 S.W.2d 168, 173 (Tex. Crim. App. 1986)......................................................31

*American Teachers Life Ins. Co. v. Brugette*, 728 S.W.2d 763, 764 (Tex. 1987) .........................39

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) .........................................................24

*Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987)................................................25

*Baxter v. Palmigiano*, 425 U.S. 308, 320 (1976) ..........................................................................4

*Berry v. State*, 24 S.W.3d 579, 583 (Tex. Crim. App. 2014)...................................................32, 33

*Bituminous Cas. Corp. v. Vacuum Tanks Inc.*, 75 F.3d 1048, 1056 (5th Cir. 1996).......................44

*Black v. State*, 551 S.W.3d 819, 830 (Tex. App. – Corpus Christi, 2018)......................................33

*Blanton v. Vesta Lloyds Insurance Company*, 185 S.W.3d 607, 612
(Tex. App—Dallas 2008, no pet.) ..................................................................................................45

*Bynum v. State*, 767 S.W.2d 769, 775 (Tex.Crim.App.1989)........................................................32

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)......................................................................25

*Coleman v. State*, 131 S.W.3d 303 (Tex. App. – Corpus Christi, 2004) ........................................33

*Condom Sense Inc. v. Alshalabi*, 390 S.W.3d 734, 762 (Tex. App. – Dallas 2012).......................52

*Coplin v. State*, 585 S.W.2d 734, 735 (Tex. Crim. App. 1979) .....................................................32

*de Laurentis v. United Servs. Auto. Ass'n*, 162 S.W.3d 714, 720
(Tex. App.—Houston [14th Dist.] 2005) .......................................................................................43

*Dairyland County Mut. Ins. Co. v. Keys*, 568 S.W.2d 457, 459
(Tex. App.—Tyler 1978, *writ ref'd n.r.e.*)...............................................................................39, 40

*Employers Cas. Co. v. Glens Falls Inc. Co.*, 484 S.W.2d 570, 575 (Tex. 1972) ......................39, 43

*Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex. App. Houston [1st Dist.] 2013) ..........52

*F.D.I.C. v. Fidelity & Deposit Co. of Maryland*, 45 F.3d 969, 977 (5th Cir. 1995) .......................4

*Federal Ins. Co. v. Bock*, 382 S.W.2d 305, 307

(Tex. App. – Corpus Christ 1964, writ ref'd n.r.e.)...................................................................27, 28

*Fellers v. State*, 136 S.W.2d 217, 218 (Tex. Crim. App. 1940).......................................................33

*First Southwest Lloyds Ins. Co. v. MacDowell*, 769 S.W.2d 954, 959
(Tex. App. – Texarkana 1989).........................................................................................................40

*Floyd v. Amite Cty. School Dist.*, 581 F.3d 244, 247-48 (5th Cir. 2009)........................................24

*Francis v. International Traveler's Ass'n*, 260 S.W. 938, 946
(Tex. App. – Dallas 1924) .................................................................................................36, 39, 41

*Gearhart Indus. Inc. v. Smith Intern. Inc.*, 741 F.2d 707, 719 (5th Cir. 1984)..............................32

*Geis v. Colina Del Rio LP*, 362 S.W.3d 100, 107-8 (Tex. App. – San Antonio 2011)....................53

*Gonzalez v. State*, 954 S.W.2 98, 103 (Tex. App. – San Antonio, 1997) .......................................32

*Grinnell v. Munson*, 137 S.W.3d 706, 718 (Tex. App. – San Antonio, 2004)................................32

*GuideOne Mut. Ins. Co. v. First Baptist Church of Brownfield*,
495 F. Supp. 3d 428, 439 (N.D. Tex. 2020) ...................................................................................39

*Henry v. Aetna Cas. & Sur. Co.*, 633 S.W.2d 583 (Tex. App. – Texarkana 1982) .............39, 40, 43

*In re Enron Corp. Securities, Derivative & Erisa Litigation*,
762 F. Supp. 2d 942, 1017 (S.D. Tex. 2010)....................................................................................4

*ITT Consumer Fin. Corp. v. Tovar*, 932 S.W.2d 147, 158-59 (Tex. App. – El Paso, 1996)...........31

*Liberty Surplus Ins. Corp. v. Exxon Mobile Corp.*,
483 S.W.3d 96, 101 (Tex. App. – Houston [14th Dist.] 2015)..................................................25, 38

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).............................25

*PAJ, Inc. v. Hanover Insurance Company*, 243 S.W.3d 630, 634 (Tex. 2008) ........................37, 44

*Polen v. Vehicle*, 2017 WL 661836 at *3 (E.D. Tex. 2017) ..........................................................44

*Rad Services Inc. v. Aetna Cas. 7 Sur. Co.*, 808 F.2d 271 (3d Cir. 1986) ....................................4, 5

*Rice v. Metropolitan Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App. – Fort Worth, 2010)............25

*Solgas Energy Ltd. v. Federal Gov. of Nigeria*, 2010 WL 11679364 at *8 (S.D. Tex. 2010).......28

*State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 (5th Cir. 1990)....................................4

*Stephens v. State*, 93 S.W. 545, 546 (Tex. Crim. App. 1906)...........................................................31

*Talamantez v. State*, 790 S.W.2d 33, 37 (Tex. App. – San Antonio, 1990)....................................33

*Vilaythong v. Allstate Ins. Co.*, 2017 WL 4805522 at *3 (N.D. Tex. 2017)..............................44, 45

*Whitney Nat. Bank v. Baker*, 122 S.W.3d 204, 208 (Tex. App. – Houston [1st Dist.] 2003)........28

*Yeager v. St. Paul Fire & Marine Ins. Co.*, 166 S.W.2d 939, 941 (Tex. App. – Waco 1942) ........42

TEX. PEN. CODE § 31.02.................................................................................................................30

TEX. PEN. CODE § 31.03.................................................................................................................30

TEX. PEN. CODE § 32.45.................................................................................................................32

28 TEX. ADMIN. CODE § 102.4(f)....................................................................................................42

FED. R. CIV. P. 56(a)......................................................................................................................24

### MEMORANDUM OF LAW IN SUPPORT OF
### PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COME NOW Scott M. Seidel, Trustee (the "Trustee"), the duly appointed Chapter 7 trustee of Goodman Networks, Inc. (the "Debtor") and its bankruptcy estate (the "Estate"), GNET ATC, LLC ("GNET"), and Multiband Field Services, Inc. ("Multiband," with the Trustee and GNET, the "Plaintiffs"), and file this *Memorandum of Law In Support of Plaintiffs' Motion for Partial Summary Judgment* (the "Memorandum"), in support of the *Plaintiffs' Motion for Partial Summary Judgment* (the "Motion"), respectfully stating as follows:

### I.  SUMMARY[1]

1.      This is a first-party insurance coverage and breach of insurance policy case, whereby the Plaintiffs seek partial summary judgment against Federal Insurance Company ("Federal") to recover $4.4 million of their property stolen by James Frinzi ("Frinzi").  The Plaintiffs also seek summary judgment denying Federal's affirmative defenses asserted herein.

2.      On January 4, 2022, Frinzi took $4.4 million of the Plaintiffs' funds and transferred the funds to his wholly-owned and controlled entity, Multiband Global Resources, LLC ("MGR").  MGR then used the funds to buy the Lakehouse and the Lot, as well as several watercraft and other toys, which were then transferred to the Frinzi Family Trust (the "FFT").  Frinzi did so as the Chief Executive Officer of the Plaintiffs.  He had no authority, actual or implied, from the Plaintiffs or from their only director, James Goodman, to make the transfer, which he then hid from James Goodman and the company's advisors.  There was no legitimate business or corporate purpose, and none of the Plaintiffs received any return consideration.  This is theft by embezzlement, which is why Frinzi pled the Fifth Amendment questions concerning the $4.4 Million Transfer.

---

[1]      Capitalized terms used in this Summary and not defined herein are defined below.

3. Federal issued a $5 million employee and officer theft policy to the Plaintiffs, covering the period during which Frinzi stole the $4.4 million. This ought then to be easy: Federal insured the Plaintiffs against their CEO's embezzlement, all preconditions to coverage have been satisfied, and Federal should simply pay. But it refuses to, grasping at one baseless straw after another. Prior to the Trustee's appointment, the Plaintiffs timely informed Federal of the potential embezzlement claim. Silence followed. After his appointment, the Trustee sent more detailed demands and claims to Federal. More silence. More communications from the Trustee were met with more silence from Federal. Finally, the Trustee was forced to initiate this litigation, and still Federal refuses to honor its contract. To reiterate, this is a first-party claim: the Plaintiffs' property was stolen by its CEO and converted into luxury assets used by him and his wife. Covering such theft is precisely what the Plaintiffs paid Federal for.

4. There are no genuine issues of material fact regarding Frinzi's theft—with respect to which the Court should also order adverse inferences, regarding the fact and existence of the Policy, and regarding the satisfaction of all conditions precedent in the Policy to coverage. The Court should therefore grant the Plaintiffs partial summary judgment concluding that Federal breached the Policy by failing to pay the Plaintiffs $4.4 million for Frinzi's theft.

## II. PROCEDURAL BACKGROUND

5. On September 6, 2022, various creditors of the Debtor filed an involuntary petition against the Debtor under Chapter 7 of the Bankruptcy Code, thereby initiating Case No. 22-31641-mvl-7 and creating the Estate. The Court entered its order for relief against the Debtor on December 12, 2022. The Trustee was thereafter appointed as the Chapter 7 trustee of the Estate.[2]

6. The Plaintiffs' commenced this Adversary Proceeding by filing their original complaint on May 4, 2023. *See* docket no. 1. The original defendants were Frinzi, his wholly-

---

[2] The Court may take judicial notice of these uncontestable facts.

owned company, MGR, and his family trust, the FFT.  The original complaint asserted causes of action for the $4.4 Million Transfer in the nature of breach of fiduciary duty and fraudulent transfer, and included the FFT as a subsequent transferee.

7.    On November 27, 2023, the Plaintiffs filed their amended complaint.  *See* docket no. 30.  At this time, and after having learned more of the facts, the Plaintiffs asserted causes of action against Frinzi for theft, embezzlement, and violations of the Texas Theft Liability Act, including as it relates to the $4.4 Million Transfer.  As the Court will see below, the Trustee had made demand on Federal for coverage for the theft and was still optimistic that Federal would cooperate.  It did not.  Instead, it wholly ignored his communications.

8.    Accordingly, on September 20, 2024, the Plaintiffs filed their *Plaintiffs' Second Amended Complaint* [docket no. 88] (the "Complaint").  It was by this Complaint that the Plaintiffs asserted causes of action against Federal for breach of contract for not paying their just claim, including with respect to the $4.4 Million Transfer, as well as various causes of action under Texas statutes applicable to insurance policies and carriers (that are not the subject of the Motion).

9.    In the meantime, due to a settlement between the Trustee and the FFT approved by the Court in the Bankruptcy Case, on July 19, 2024, the Court entered a stipulated order dismissing the FFT as a defendant herein.  *See* docket no. 79.  By a separate settlement between the Trustee and Frinzi, also approved by the Court in the Bankruptcy Case, on January 16, 2025 the Court entered a stipulated order dismissing Frinzi as a defendant herein.  *See* docket no. 125. That left MGR and Federal as defendants.

10.    On April 15, 2025, the Court entered its order denying Federal's motion to dismiss various statutory claims brought against it under the insurance code.  *See* docket no. 148.

11.    Finally, by order entered on March 27, 2025, the District Court adopted this Court's report and recommendation, ruling that the reference of this Adversary Proceeding would

be withdrawn when the case is certified as trial ready, but that this Court would otherwise handle all pretrial matters.

### III.   ADVERSE FIFTH AMENDMENT INFERENCES

A.   THE LAW

12.   There is no question that it is proper, in civil litigation, to draw an adverse inference from one's invocation of the Fifth Amendment, meaning that it is proper to infer that the questioned activity occurred; why else would the person have the need to assert the privilege?  *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 320 (1976); *In re Enron Corp. Securities, Derivative & Erisa Litigation*, 762 F. Supp. 2d 942, 1017 (S.D. Tex. 2010).  The Trustee recognizes that an adverse inference cannot, standing alone, be grounds for summary judgment.  *See State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 (5th Cir. 1990).  An adverse inference may be used on summary judgment, however, in conjunction with other evidence.  That is how the Trustee requests the Court issue and use an adverse inference here.

13.   Normally, an adverse inference is used as against a party when that party invokes the Fifth Amendment, and Frinzi is no longer a party to this Adversary Proceeding.  However, an adverse inference may be used against a party when it is a non-party that invokes the Fifth Amendment.  *See F.D.I.C. v. Fidelity & Deposit Co. of Maryland*, 45 F.3d 969, 977 (5th Cir. 1995).  As summarized by the Fifth Circuit, such an adverse inference is available based on the applicable Rules of Evidence: "[b]ecause there is no constitutional bar to the admission of this evidence, it is admissible if it is relevant and not otherwise prohibited by the rules." *Id*.

14.   A relevant example is the Third Circuit's opinion in *Rad Services Inc. v. Aetna Cas. 7 Sur. Co.*, 808 F.2d 271 (3d Cir. 1986).  That case was, like here, a first-party coverage dispute, with the plaintiff seeking to recover its costs of disposing of hazardous waste from its insurer.  *See id*. at 272.  At trial, the court permitted an adverse inference against the plaintiff

because two of its employees asserted their Fifth Amendment rights regarding potential criminal dumping of hazardous waste. *See id*. Thus, like here, an adverse inference from a non-party's Fifth Amendment invocation was used in a coverage dispute, albeit by the insurer against the insured. The Third Circuit affirmed the use of the adverse inference, finding there to be no limitation in the law on the use of the inference to only when the inference is used against the person invoking the privilege. *See id*. at 277-78.

15.      Here, in order to prove coverage under the Policy, the Plaintiffs must demonstrate, to one degree or another, that Frinzi committed theft within the Crime Coverage of the Policy. That Frinzi asserted his Fifth Amendment right is admissible evidence, in a civil proceeding, that he committed theft. Period. There is no sound reason in law, fact, or logic why that same resulting inference; *i.e.* that he committed theft, cannot be used against Federal when the same underlying question is involved: did Frinzi commit theft? No one knows more about this than Frinzi and, had Frinzi testified to the effect that he was authorized to transfer the funds, etc., then Federal would surely use that to argue that he did not commit theft. By the same token, that Frinzi not only offered no testimony that he was authorized to take the funds for himself, but that he refused to deny theft and asserted his right against self-incrimination, is relevant and admissible evidence against Federal the same as it is against him.

**B.**      **THE FACTS**

16.      Frinzi was deposed over the course of several days in March, 2025 regarding several then-pending adversary proceedings (all of which, save this one, did not involve an allegation against him of theft). Frinzi answered all questions <u>except</u> for those related to the $4.4 Million Transfer, asserting his Fifth Amendment right approximately <u>thirty</u> times. The following is a sampling of the most relevant questions to which Frinzi invoked his Fifth Amendment right, after being shown the fact of the $4.4 Million Transfer:

- "Do you remember that [$4.4 Million Transfer]." PAPP555 (112:2-5).

- "Who authorized the making of this wire [$4.4 Million Transfer]." PAPP555 (112:2-22).

- "What did MGR do with this money?" PAPP555 (112:23-24).

- "MGR bought a lake house with this money, didn't it?" PAPP555-56 (112:25-113:2).

- "Then it transferred that lake house to your family trust, didn't it?" PAPP556 (113:3-5).

- "MGR bought vacant land on Horseshoe Bay with that money, didn't it?" PAPP556 (113:6-8).

- "Then it was transferred to your family trust, wasn't it?" PAPP556 (113:9-11).

- "MGR purchased some boats and Sea-Doos with that money, didn't they?" PAPP556 (13-16).

- "Did the Debtor or Multiband or GNET benefit from the making of this $4.4 Million transfer?" PAPP556 (113:17-19).

- "If a wire of this size needed two people to approve, who was the second person?" PAPP (113:22-24).

- "Did you have the authority as the CEO to make this wire?" PAPP556 (113:25-114:2).

- "Did James Goodman instruct you to make this wire?" PAPP557 (114:4-6).

- "Did any director authorize you to make this wire?" PAPP557 (114:7-9).

- "Did you discuss with James Goodman or the directors or anyone beforehand that you were going to make this wire?" PAPP557 (114:10-13).

- "Exhibit 3 shows two transfers from Goodman Networks, Inc. to the Multiband account. Do you know anything about those transfers?"[3] PAPP558 (115:1-5).

- "Was the purpose of making those transfers to then enable the $4.4 million transfer to Multiband?" PAPP558 (115:6-8).

---

[3] At the deposition, "Multiband" was Multiband Field Services, Inc., the Debtor's subsidiary, while "MGR" was Multiband Global Resources, LLC, Frinzi's company.

- "Isn't it true that the money transferred out by Multiband to MGR originated with Goodman Networks, Inc.?" PAPP559 (116:12-16).

- "Did the Debtor receive any benefit from the $4.4 million that ultimately were transferred to MGR?" PAPP560 (117:8-11).

- "Are you aware of any actions by Goodman Networks' board of directors to vet this $4.4 million transfer to MGR?" PAPP565 (215:4-24).

- "Did you cause the $4.4 million transfer that we looked at yesterday to be recorded as a loan on the Debtor's books and records?" PAPP590 (461:14-17).

- "Do you know who recorded the $4.4 million as a loan?" PAPP590 (461:23-25).

- "Why was the $4.4 million transferred to MGR?" PAPP591 (463:19-20).

- "Did Goodman Networks, Inc., at all times, to your knowledge, carry the $4.4 million as a loan?" PAPP593 (469:17-21).

- "Upon information and belief, this alleged loan was never reduced to a writing or a promissory note nor was this ever in fact a loan. Is my allegation that I just read to you true or false?" PAPP594 (470:16-22).

- "Rather, Frinzi had it recorded as such to hide his transactions and embezzlement. Is that allegation true or false?" PAPP594 (470:24-471:3).

- "And today when I'm asking you to explain the 4.4 million, you're resting on your Fifth Amendment right," the answer to which was "[t]hat's correct." PAPP592 (465:21-24).

C.      THE ADVERSE INFERENCES

17.     In light of the above caselaw and Frinzi invoking his Fifth Amendment right against self incrimination, the Plaintiffs therefore ask the Court to make the following adverse inferences against Federal:

(i)      that Frinzi caused $4.4 million of one or more of the Plaintiffs' funds to be transferred to MGR, a company which he alone owned;

(ii)     that Frinzi did so at the time that he was an officer of each of the Plaintiffs and was entrusted with access to each of the Plaintiffs' funds and bank accounts for business and corporate purposes, to whom he owed fiduciary duties;

(iii)    that Frinzi was not authorized to make the transfer by any of the Plaintiffs;

(iv)     that Frinzi, through MGR and the FFT, used the funds for his personal benefit to buy two lake properties and boats and watercraft, transfer hundreds of thousands of dollars to his personal account at a different bank, and to make improvements to his new Lakehouse;

(v)      that none of the Plaintiffs received any benefit or return consideration from the $4.4 Million Transfer;

(vi)     that the $4.4 Million Transfer was not a loan from one or more of the Plaintiffs to MGR or that, even if there was some such possible loan, no such loan was authorized by the Plaintiffs or was in any of the Plaintiffs' ordinary course business or in furtherance of their business, and was never reduced to any writing or agreement; and

(vii)    that, accordingly, Frinzi committed theft by embezzlement and stole the $4.4 million from one or more of the Plaintiffs.

18.     The Plaintiffs will present further, independent summary judgment evidence supporting each of the above facts.

## IV.  FACTS

### A.     THE PLAINTIFFS, MGR, FRINZI, AND JAMES GOODMAN

19.     At all times relevant hereto, GNET and Multiband were wholly owned subsidiaries of, and controlled by, the Debtor.  PAPP633-34 (10:23-11:9); PAPP0433 (17:6-14); PAPP0448 (32:4-5).

20.     Frinzi became the Chief Executive Officer of the Debtor, GNET, and Multiband in August or September, 2021.  PAPP553 (69:4-70:1); PAPP0-448 (32:6-9).  He left this position around June, 2022, according to him, PAPP567 (325:19-21), but his actual resignation was not until August 3, 2022 from the Debtor, PAPP012, and it is uncertain when, if ever, he resigned as CEO of GNET.

21.     In December, 2021 and January, 2022, Frinzi was the sole officer of the Debtor. PAPP364-65 (11:10-12:4).

22.     James Goodman was the sole member of the Debtor's board in December, 2021 and January, 2022.  PAPP563-64 (206:24-207:3); PAPP565-66 (215:25-216:7); PAPP632 (9:3-22).

23.     MGR was a company solely owned by Frinzi, and which he was the officer, director, and/or manager of.  PAPP615-16 (695:25-696:3); PAPP659 (36:4-6).  MGR was not related to or a part of Multiband.  PAPP0445 (29:3-5).

24.     Therefore, at the time of the $4.4 Million Transfer (January 4, 2022): Frinzi was the sole officer of Plaintiffs, and James Goodman was the sole director of the Debtor.  The evidence also conclusively establishes that Frinzi was the sole owner and manager of MGR.

B.     THE $4.4 MILLION TRANSFER

25.     The flow of funds begins with the Debtor's December 2021 bank account at Prosperity Bank.  PAPP0439 (23:7-17 (authenticating Exhibit "2")).  On December 10, 2021, the Debtor transferred $500,000.00 from that account to Multiband.  PAPP0532.  Then, on December 21, 2021, the Debtor transferred an additional $4,000,000.00 from that account to Multiband.  PAPP0533.  Multiband's December 2021 bank account at East West Bank[4] confirms receipt of these $4.5 million transfers.  PAPP0535.

26.     After the funds were now in the Multiband account, on January 4, 2022 Multiband transferred $4,400,000.00 from its account to MGR (the "$4.4 Million Transfer").[5]  PAPP0537.  Federal has admitted that Multiband wired the $4,400,000.00 from the same East West bank account to MGR on January 4, 2022.  *Compare* Docket No. 88 (Trustee's Second Amended Complaint) at ¶ 30, *with* Docket No. 155 (Federal's Answer) at ¶ 30.

27.     MGR's bank statement for January 2022 evidences its receipt of the wire from Multiband on January 4, 2022 in the amount of $4,400,000.00.[6]  PAPP0397.

---

[4]     Authenticated as deposition Exhibit "3" at PAPP0441-42 (25:23-26:10).

[5]     Authenticated as deposition Exhibit "4" at PAPP0443-44 (27:18-28:4).

[6]     This bank statement is addressed to Multiband USA LLC.  However, this is clearly an assumed name on the account, not only because MGR itself produced the statement as *its* statement but because a copy of a check included in the statement shows that the check is from, and written on the account of, MGR.  PAPP0401.

28.      Therefore, the fact of the $4.4 Million Transfer—that it was transferred by Multiband to MGR on January 4, 2022—is conclusively established.

### C.      FRINZI CAUSED THE $4.4 MILLION TRANSFER TO BE MADE

29.      At the time of the $4.4 Million Transfer, Stephanie Elmore ("Elmore") was the director of accounts payable for the Debtor.  PAPP0436 (10:5-14).  She had the same role and responsibilities for Multiband.  PAPP0443 (27:7-17).  As such, she was a "user on the bank account so every day [she] logged into the bank account checking our balances, so [she] reconciled the bank statements."  PAPP0439 (23:18-24).  It would not have been strange to her to see transfers from the Debtor to Multiband.  PAPP0441 (25:18-21).  If money transferred from the Debtor to Multiband, "[she] would be the one who entered the wire into the bank, but someone else would have to approve it."  PAPP0441 (25:8-125).  That someone, who would have to approve the transfer, was Frinzi.  PAPP0441 (25:16-18).

30.      Elmore further confirmed that Frinzi "had the sole authority" to wire the $4.4 million from the East West bank account that is the subject of the $4.4 Million Transfer.  PAPP0445 (29:17-30:1).  Frinzi alone was able to make the $4.4 Million Transfer by clicking a button; he did not need to go through any other steps or checks to cause the transfer.  PAPP0446 (30:10-18).  If Frinzi wanted to move money around, he could do so mechanically and logistically without James Goodman's authorization.  PAPP0452 (36:18-37:6).  Elmore repeatedly confirmed that "at least three weeks prior to December 14th, Mr. Frinzi had the authorization authority for the East West Bank accounts that we looked at," and that "when Ms. Todd was asking about whether it had to be somebody other than Mr. Frinzi authorizing the East West Bank account wires, that's not necessarily correct."  PAPP0501 (85:15-24).

31.      Thus, on account of the direct evidence and the requested adverse inference, the summary judgment evidence conclusively establishes that Frinzi alone caused the $4.4 Million

Transfer to be made.  This is further confirmed by the fact that Frinzi alone owned and controlled

MGR, and also by MGR's use of the funds (as evidenced below).

**D.      FRINZI USES FUNDS TO PURCHASE REAL PROPERTY AND TOYS**

32.      On January 24, 2022—less than three weeks after receiving the $4.4 Million

Transfer—MGR purchased certain real property and improvements located at 521 N. Horseshoe

Bay Blvd., Horseshoe Bay, Texas (the "Lakehouse").  *Compare* Docket No. 30 (Trustee's amended

complaint) at ¶ 43, *with* Docket No. 12 (MGR answer) at ¶ 43.  Before Frinzi invoked his Fifth

Amendment right, he did answer an interrogatory confirming that "[s]ome of the funds [$4.4

Million Transfer] were also used in the purchase of real property in Horseshoe Bay, Texas."

PAPP0348 (Interrogatory 10).

33.      MGR's bank statement shows that, on January 24, 2022, it transferred

$1,824,189.38 to Capital Title of Texas, for the Lakehouse.  PAPP0398.  This is in addition to

$50,000 on January 11, 2022. PAPP0398.  Together, these amounts make up the purchase price of

the Lakehouse.  PAPP0338 (Interrogatory 3).  It also shows a $400,000.00 payment to Capital One

for the account of Frinzi personally, on January 31, 2022.  PAPP0399.  On January 20, 2022, MGR

wrote a check for $21,600.00 to the "Club at Horseshoe Bay Resort," for "Membership."

PAPP0401.  The day after, MGR wrote a check to "Highland Lakes Watercraft" for $42,168.52 for

"Frinzi Jetskis."  PAPP0402.  On February 3, 2022, MGR transferred an additional $250,000.00

to Capital One, again for the account of Frinzi personally.  PAPP0404.  On February 11, 2022,

MGR wrote a check to a pool company for $2,500.00 for services at the same address as the

Lakehouse.  PAPP0408.  The same day MGR wrote a check for $17,777.88 to "R H Marine

Construction," with the "for" line stating "Frinzi."  PAPP0409.  And a second check to the same

company on February 20, 2022 for the same amount, for "dock."  PAPP0410.  By April 6, 2022,

MGR had a *de minimis* amount left in its account.  PAPP0416.

34.     Frinzi needed to pay $35,000 (for "Frinzi" and for "dock") to build a dock to house his new boat at his new Lakehouse so that he would look good to his new fellow country club members, all purchased with the proceeds of the $4.4 Million Transfer. And, as further relevant to how Frinzi lied about and hid his embezzlement, the Plaintiffs point the Court to Interrogatory No. 7 answered by Frinzi. The Interrogatory asks Frinzi why the $4.4 million was transferred to MGR. PAPP0347. Frinzi answers, upon objection:

> Frinzi does not recall the details and specifics for the transfer, but, generally, the funds were used to purchase and ultimately capitalize AMRR and the operating company, OnePath.

PAPP0348. Nothing about the Lakehouse, or the Lot, or the boats, or the dock, or the hundreds of thousands of dollars transferred to his personal Capital One account? Frinzi may not have "recall[ed] the details and specifics," but to not remember the real properties and toys he bought with the funds defies belief.

35.     On or about May 13, 2022, MGR transferred the Lakehouse to the Frinzi Family Trust (the "FFT"). *Compare* Docket No. 30 (Trustee's amended complaint) at ¶ 45, *with* Docket No. 12 (MGR answer) at ¶ 45.

36.     On or about April 7, 2022, MGR purchased certain undeveloped land in Llano County, Texas, consisting of .7 acres in Horseshoe Bay, Texas (the "Lot"). *Compare* Docket No. 30 (Trustee's amended complaint) at ¶ 47, *with* Docket No. 12 (MGR answer) at ¶ 47.

37.     On or about May 13, 2022, MGR transferred the Lot to the FFT. *Compare* Docket No. 30 (Trustee's amended complaint) at ¶ 49, *with* Docket No. 12 (MGR answer) at ¶ 49.

38.     With respect to the Lakehouse and the Lot, "James Frinzi executed a Special Warranty Deed dated May 13, 2022, assigning the property from Multiband Global Resources, LLC ("MGR") to FFT." PAPP0340-41 (Interrogatory 15).

39. The FFT acquired the Lakehouse and the Lot "for the use of a home." PAPP0337 (Interrogatory 1).

40. The FFT is a trust created by Frinzi and Jodi Holtz, as settlors and co-trustees, for the benefit of their children. PAPP0338 (Interrogatory 2).

41. The Lakehouse and the Lot "has been used as a vacation residence since 2021 by James Frinzi and his family, friends, and personal acquaintances." PAPP0338-9 (Interrogatory 7).

42. After the Trustee sued the FFT, the FFT and the Trustee entered into a settlement (approved by the Court) pursuant to which the FFT agreed to pay, and did pay, the Trustee $1,200,000.00, secured by deeds of trust on the Lakehouse and the Lot. *See* Bankruptcy Case docket no. 580 (order approving FFT 9019).

43. The $4.4 Million Transfer was used to purchase a lake house property, boats, and jet skis. PAPP660 (37:2-8).

44. The money was gone in little less than six (6) weeks, most of it used for the personal benefit and enjoyment of Frinzi and his family. That is damning evidence of embezzlement. This is also additional evidence to demonstrate the unauthorized and improper purpose of the $4.4 Million Transfer; *i.e.* that Frinzi stole the funds so that he and his family could have a lake house and boats.

E. **THE $4.4 MILLION WAS PROPERTY OF ONE OR MORE PLAINTIFFS**

45. The $4.4 million was in a bank account held by Multiband. As demonstrated below, these funds are therefore presumed to be the property of Multiband. *See* discussion at pp. 28-29. One point, however, where Frinzi did not assert his Fifth Amendment right was regarding the ownership of the $4.4 million before they were transferred. Asked whether the Debtor or Multiband owned the funds (insofar as they were transferred from the Debtor's account into the Multiband account), Frinzi testified "I think that Goodman Networks owned that money and it

happened to be in this account." PAPP596 (602:1-5). In fact, Multiband by then had no operations and no revenue. PAPP596 (602:6-12). And, as pointed out above, the source of the funds in Multiband's account was clearly the $4.5 million of the Debtor's funds that Frinzi caused to be transferred to Multiband.[7]

## F.   FRINZI STOLE THE $4.4 MILLION

46.   It was not the business of the Debtor or of its subsidiaries to be a lender. PAPP654 (31:4-13). There was no loan agreement with respect to the $4.4 Million Transfer. PAPP658 (35:2-5); PAPP658 (35:2-5); PAPP943 (69:16-19); PAPP765-66 (28:25-29:10). To the extent that anyone characterized the $4.4 Million Transfer as a loan from the Debtor, James Goodman would have no understanding of why anyone would have thought so. PAPP673 (50:5-13). Frinzi was never authorized to use company funds for his personal benefit. PAPP661-62 (38:25-39:3).

47.   James Goodman did not know of the $4.4 Million Transfer before it was made. PAPP643 (20:5-10). He did not know, at that time, what MGR was. PAPP643 (20:11-13). He only learned of the existence of MGR after the Debtor was placed into bankruptcy. PAPP656 (33:8-12). Frinzi used MGR "for his own gain. . . It was used outside of Goodman Networks. Goodman Networks didn't get any benefit from Multiband Global Services." PAPP656 (33:13-24). The $4.4 million "was directed by Mr. Frinzi for his own benefit." PAPP946-47 (72:24-73:5). The Debtor had no ownership interest in MGR. PAPP658 (35:7-10). James Goodman had no agreement, whether oral, written, or secret, with Frinzi to share any profits or benefits from MGR. PAPP659 (36:11-15). There was no return consideration for the funds. PAPP765-66 (28:25-29:4).

48.   James Goodman was not asked to approve the $4.4 Million Transfer. PAPP645 (22:11-14). He had no conversations with anybody (including other employees, directors, or

---

[7]   The reason for this was explained by Elmore. Frinzi had sole authority to wire funds out of the East West Bank account (where Multiband held its funds), but not from the Prosperity Bank account (where the Debtor held its funds). PAPP458-59 (42:20-43:13). This further demonstrates his scienter.

officers) about approving the $4.4 Million Transfer.  PAPP645 (22:20-24); PAPP667 (44:4-13).

He had no conversation with Frinzi about the $4.4 Million Transfer.  PAPP664 (41:23-42:2).  No

other shareholder approved of the $4.4 Million Transfer.  PAPP675 (52:13-15).  Had he been made

aware of the $4.4 Million Transfer, he would not have approved it.  PAPP661 (38:20-23).  Had he

known that the money was going to MGR for no legitimate business purpose, he would have done

something to prevent the money from going to MGR.  PAPP675 (52:7-11).  For money going to a

company not fully owned by the Debtor, that would have been something that the board would

have needed to approve:

> Yes.  And it would have needed to be vetted by the Goodman Networks', you know, lawyers, the law firm, CFGI, Jim worked with them. I mean, there would have been multiple organizations and people that would have -- would have needed to be involved in that discussion and decision-making . . .

> [n]one of that was done with respect to the $4.4 million that went to MGR.

PAPP715 (92:2-18 (subject to objection)).  John Goodman likewise confirmed that Frinzi was not

authorized to make the $4.4 Million Transfer.  PAPP962 (88:12-19).

49.     James Goodman could think of no legitimate reason for the $4.4 Million Transfer.

PAPP661 (38:15-18).  Frinzi was not authorized to use company money for his personal benefit.

PAPP661 (38:25-39:3).  James Goodman would not have authorized Frinzi to use company money

for his personal benefit.  PAPP662 (39:6-9).  Whatever transactions there may have been between

the Plaintiffs and MGR, "it was certainly not, you know, for the benefit of James Frinzi."  PAPP669

(46:9-14).

50.     James Goodman later learned that Frinzi had withheld documents from him

regarding the $4.4 Million Transfer.  PAPP664 (41:10-12).  Specifically, that Frinzi had shielded

from James Goodman information regarding the $4.4 Million Transfer.  PAPP664 (41:14-17).

James Goodman testified that Frinzi "hid" the $4.4 Million Transfer from him.  PAPP664 (41:19-

22).  It was James Goodman's opinion that Frinzi "stole all the money from Goodman Networks."
PAPP666 (43:15-25 (subject to objection)).

51.      James Goodman, as the sole director, never ratified or approved after-the-fact of the $4.4 Million Transfer.  PAPP674 (51:18-52:2).

52.      When James Goodman asked Frinzi where he got the money to buy the Lakehouse and the boats, etc., Frinzi told him that this was from profits from a COVID company that he owned.  PAPP660 (37:18-25).  This, of course, was a lie.

53.      Elmore had no reason to doubt that Frinzi was allowed to make the transfers from the Debtor's Prosperity Bank account into the Multiband East West bank account.  PAPP0466-67 (50:19-51:21).  She would have assumed that it was a valid account payable and, if she felt it was improper or unauthorized, she would have told someone about it.  PAPP0467 (51:1-25).  If she had known that the purpose of the $4.4 Million Transfer was to enable Frinzi to benefit himself by buying lake property and boats, she would have told someone about it.  PAPP0469 (53:17-54:16).

54.      Therefore, based on the direct evidence and the Fifth Amendment inference, the summary judgment evidence conclusively establishes that Frinzi stole (*i.e.* embezzled) the $4.4 million: (i) the transfer was not in the furtherance of any company business; (ii) the only human being who could approve it on behalf of the Plaintiffs, James Goodman, did not approve it, know of it, or ratify it; (iii) Frinzi pled the Fifth Amendment with respect to any of it; and (iv) extremely revealing, the funds were used to purchased luxury properties and "toys" and otherwise to transfer to Frinzi personally, all without any conceivable company purpose or benefit and all for the sole and exclusive personal benefit of Frinzi and his family.

55.      Federal may argue that there is a genuine issue of material fact with respect to the $4.4 Million Transfer being carried as a loan on the Debtor's books and records.  The Plaintiffs address below how this does not matter for embezzlement: embezzlement may occur just as easily

through an alleged "loan" of corporate funds to one's self as it may from a straight up theft. *See* Discussion at pp. 30-33. However, if the Court finds this relevant, the evidence confirms that there was no such alleged "loan."

56.     As noted above, the evidence is clear—and every witness confirmed—that there was no loan or any agreement regarding any alleged loan. PAPP658 (35:2-5); PAPP658 (35:2-5); PAPP943 (69:16-19); PAPP765-66 (28:25-29:10). The genesis of why the transfer was for a time recorded as a loan on the Debtor's books, until Frinzi had that removed in order to hide the transfer from the Plaintiffs and their creditors (as evidenced below), is very simple: the books reflected funds out and accounting principles required some return consideration to book it as:

> The company booked the cash out. So, not to get too technical with accounting, on one side of the entry, you have the cash going out. On the other side, they recorded an asset, a receivable, or a loan from the entity that received the cash.

PAPP760 (23:1-5). Thus, "I don't remember when it was booked, but it would not be unusual to book it. The money did go out and has to be accounted for. So it would not be unusual to book it even if it after it was asked for support." PAPP784 (47:11-15).

57.     Therefore, Stephanie Elmore, seeing the funds going out, simply booked the funds going out as a corresponding receivable. PAPP760-61 (23:1-24:7). However, "[f]or the appropriate (indiscernible) treatment of funds going out, there should be proper documentation from an accounting standpoint. Appropriate documentation for a loan would be a note indicating the terms, the interest rate, the maturity date." PAPP762 (25:3-7). And, as noted at length above, Frinzi never provided any such documentation.

58.     There is simply no code to book a transfer as "embezzlement, embezzlement by officer." PAPP784 (47:16-22).

**G.     FRINZI LIES, CONCEALS, AND TRIES TO "DISAPPEAR" THE $4.4 MILLION TRANSFER BUT IT IS DISCOVERED**

59.     As noted above, Frinzi remained the CEO until August or September, 2022.

60.     As also noted above, Frinzi lied to James Goodman about where he got the money to buy the Lakehouse and the boats, etc.  PAPP660 (37:18-25).  And he withheld documents from James Goodman so as to hide the $4.4 Million Transfer.  PAPP664 (41:19-22).  This was only the beginning, however.

61.     During late 2021 and early 2022, Frinzi knew that the Debtor was insolvent and would need to attempt to restructure its debt.  Towards this end, he retained CFGI as a restructuring expert and chief restructuring officer, and Akerman to provide legal advice.  PAPP751-52 (14:12-15:24).  Both of these firms quickly zeroed in, however, on the $4.4 Million Transfer.

62.     Joseph Baum ("Baum") was a partner with CFGI.  CFGI was hired by the Debtor in late 2021 or early 2022.  PAPP746-47  (9:19-10:3).  Baum was the point person.  *See id*.  CFGI was retained to consult the Debtor with respect to its insolvency, including negotiating with creditors and evaluating a bankruptcy option.  PAPP747 (10:4-10).  Baum in particular was a CPA with 25 years' experience in restructuring.  PAPP749 (12:15-21).  He is also a certified fraud examiner.  PAPP750 (13:2-6).

63.     Early on in his engagement, Baum began asking questions about the $4.4 Million Transfer.  PAPP761 (24:8-15).  He was told to ask Frinzi.  *See id*.  Baum asked Frinzi about the transfer several times, including requesting any documents supporting the transfer, but Frinzi was never able (or willing) to explain the same:

> We questioned Mr. Frinzi several times for, to, to provide us with the documentation, the note.  He didn't do so.  And we questioned the business purpose of these funds, and we never received a, a satisfactory explanation.

PAPP762 (25:2-11).

64.     As a result, Baum found the transfer "questionable."  PAPP764 (27:1).  Baum therefore continued to ask for documentation.  PAPP764 (27:3-8).  In response, Frinzi "did not provide us any documentation.  He kept kind of pushing it off and saying he's working on getting

the documentation, but we never saw anything." PAPP764 (JB 27:9-12). "Frinzi kept pushing us off, saying he would provide it to us -- would provide it to us. We never got it." PAPP765 (28:2-4). In the end, Baum was never provided, and never saw, any promissory note or written agreement regarding the $4.4 Million Transfer. PAPP766 (29:1-10). As a result, "[w]e kind of gave up and reported it to the creditors." PAPP768 (31:18-19). He also concluded that "we didn't believe that there were appropriate reasons for such transaction." PAPP770 (33:2-4). And, Baum was never able to find any resolution or document authorizing Frinzi to make the $4.4 Million Transfer. PAPP771-72 (34:23-35:13). Furthermore, the fact that Multiband and MGR had the same name was "suspicious" to Baum. PAPP774-75 (37:24-38:1).

65.     Recalling that Baum is a Certified Fraud Examiner, he was asked whether he found it surprising that Frinzi asserted his Fifth Amendment right at deposition, to which he answered "no." PAPP775 (38:17-23). Explaining why:

> A transaction to a related party requires significant scrutiny, and in this case it was, not only it was to a related party with a common name, but there was no supporting backup documentation evidencing any such transaction. . . [and] no readily apparent business purpose for the transaction.

PAPP776 (39:2-11). Baum went so far as to discuss the transfer with Mr. Parham at Akerman, who all "expressed our concern with this transaction." PAPP789 (52:2-9).

66.     Not only did Frinzi stall Baum and not provide support, but he instructed Baum to remove the $4.4 million from the Debtor's books to avoid further questions and scrutiny. Namely, Frinzi told Baum that the $4.4 million alleged "loan" had been conveyed to his buddy Zakharyayev of 18920 (itself a fraudulent transfer) and that it was no longer debtor property and needed to be removed from the books and records, and that it should therefore be removed from a presentation that Baum was to give the bondholders. PAPP790-92 (53:23-55:5). Baum found this to be "suspicious." PAPP792 (55:11-12). Acting as a professional nonetheless, Baum included the

transfer in his presentation to the Bondholders *not* as an asset, pursuant to Frinzi's instructions, but rather as a *disbursement*, which Frinzi apparently did not catch.  PAPP794 (57:2-20).

67.    With specific reference to the October 28, 2022 notice to Federal (discussed below), Baum testified how CFGI worked with John Goodman and Akerman to prepare the notice, the purpose of which was to "notify any and all potential insurance carriers of possible claims relating to these transfers," which included claims under a crime and employee theft policy. PAPP804 (67:1-13).

68.    After Frinzi resigned, John Goodman was brought on as a consultant for the Debtor and its subsidiaries in September, 2022.  PAPP890 (16:5-15).  This was at the request of the Goodman family, which owned the Debtor.   PAPP (16:10-23).   At that time, he began communicating with CFGI, a financial advisor hired by the Debtor, to understand the transfers that had taken place before he became a consultant.  PAPP903-04 (29:17-30:20).  In September, 2022, in reviewing the transfers and discussing them with CFGI and legal counsel, John Goodman formed the opinion that "Mr. Frinzi did make transfers that I thought could have been fraudulent." PAPP933 (59:5-8).  This was because he "only found out some of the details as [he] got the e-mails."  PAPP933 (59:13-14).

69.    John Goodman confirmed that he discussed the matter with Akerman and that "there was not any explanation, and no one could tell me what this was for . . . and I've made it very clear that there were transactions that were made by Mr. Frinzi that I think were improper, and that were unapproved and undocumented by the company."  PAPP945-46 (71:5-72:3).  Asked whether the $4.4 million was directed by Frinzi for Frinzi's benefit, John Goodman testified (subject to objection) that "I believe it was."  PAPP946-47 (72:24-73:5).

70.    Ultimately, by October 28, 2022, John Goodman, formed "the belief that some of these transactions were potentially theft," and that he shared his belief with CFGI and with

Akerman.  PAPP957 (83:2-23).  This expressly included the $4.4 Million Transfer.  PAPP957

(83:14-84:3).  With specific reference to that transfer, John Goodman confirmed that no one other

than Frinzi "authorized the transfer of $4.4 million to Multiband Global Resources."  PAPP962

(88:12-19).  As he confirmed, "I do not believe or I do not have any information or nothing that

led me to believe that it was approved or executed or signed by anybody other than Mr. Frinzi."

PAPP962 (88:16-19).  And, when John Goodman approved the October 28, 2022 notice of claims

to Federal, in his mind it included a potential claim from crime coverage.  PAPP969 (95:4-20).  As

he summarized the lack of information and resulting confusion, but knowledge that a claim should

be made: "was it a crime, was it a fiduciary -- a breach of fiduciary duty? There were lots of

conversations that were going on between me and the attorneys and how to react to what was

happening."  PAPP969 (95:16-20) (subject to motion to strike).  Ultimately it was John Goodman,

working with CFGI and Akerman, who decided to make an insurance claim.

**H.     THE POLICY**

71.     Federal issued that certain insurance policy, Policy Number 8262-4874 (the

"Policy").  Appendix Exhibit "A."  The Policy includes all endorsements and exclusions.

PAPP0105  (Admission 2).  The Policy was not subsequently modified or amended.  PAPP0105

(Admission 3).  The "Policy Period" of the Policy is October 30, 2021 to October 30, 2022.

PAPP0008  The Policy contains a *Crime Coverage Part* (the "Crime Coverage").  PAPP0079.  It

provides for "Employee Theft Coverage" of $5,000,000.00.  PAPP0079.  Details of the Policy, and

of the Crime Coverage in particular, will be addressed below.

**I.     PLAINTIFFS' CLAIMS AND NOTICES UNDER THE POLICY**

72.     As discussed above, it was only after Frinzi left in August or September, 2022, that

John Goodman, working with CFGI and Akerman and now that Frinzi was no longer able to

conceal or "disappear" the $4.4 Million Transfer from the books, that the Plaintiffs learned that

---

Frinzi had embezzled their funds.  The process of discovering this theft began in mid-September, 2022.

73.    On October 28, 2022, the Debtor's insurance broker transmitted, by e-mail and pursuant to instructions in the Policy, notice of potential claims under the Policy.  PAPP0358.  Said notice included the following:

> In January 2022, the Frinzi authorized the Company to advance $4.4M in loans to Multiband Global Resources, a subsidiary to AMMR.

> *        *        *

> Frinzi authorized the Company to make certain payments to third party professional service firms whose services were performed on behalf of AMMR and/or Multiband Global Resources.

> As a result of the above there may be claims under the policy.

PAPP0359-60.

74.    Even if this notice did not explicitly state that it was making a claim under the Crime Coverage, it does reference the Policy by number and it describes the Policy as "Management Liability Policy including Crime."  PAPP0358 (emphasis added).  And, as noted above, the notice concludes that "there may be claims under the policy" which, because it describes the whole of the Policy and references "Crime" necessarily means a notice of claim under the Crime Coverage.

75.    After the Trustee's appointment, on April 27, 2023, the Trustee transmitted an additional notice of potential claims to Federal.  PAPP0361.  This notice "amends and supplements the notice of circumstances provided on October 28, 2022."  PAPP0361.  This notice references a "[l]oan to Multiband Global Resources," although it focuses on breach of duty claims at that time.  PAPP0361.  Federal did not respond to the April notice.  PAPP1025 (¶ 11).

76.    Thus, on May 9, 2023, the Trustee followed the notice up with yet an additional notice.  PAPP0368.  Again, Federal did not respond.  PAPP1025 (¶ 11).

77.     Thus, on September 29, 2023, the Trustee again followed up with an additional notice to Federal.  PAPP0385.  This notice expressly references the $5 million Crime Coverage.  PAPP0386.  This notice makes clear that the prior notices asserted claims under both the D&O part and the Crime Coverage part of the Policy.  PAPP0387.  Again Federal did not respond.  PAPP1025 (¶¶ 11-12).

78.     Counsel for the Trustee went so far as to reach out to someone at Federal on November 30, 2023 asking:

> Are you the adjuster assigned to the first party crime coverage claim? If so, can you provide a claim number, explain what investigation of this claim has been undertaken, and identify whether you need any further information regarding the claim, and whether your carrier agrees to accept or reject the claim. We have been trying to get this information since September of this year.

PAPP1017.

79.     Federal responded asking for the claim and policy number.  PAPP1017.  Counsel for the Trustee noted that he was unaware of a claim number, and attached the declarations page for the Crime Part of the Policy.  PAPP1016 & PAPP1018.

80.     The person at Federal copied another Federal employee asking whether there is an open claim.  PAPP1020.  The response was "[w]e were also asked to review the matter under the Crime section and that claim is currently open under claim number KY23K290938X and is being reviewed by Catherine Pensanti, copied on this email."  PAPP1020.  There were no further communications from Federal.  However, it is now known that there was a crime claim opened under the Policy as of November 30, 2023.

81.     Instead, on March 14, 2024, Federal sent a letter to Samantha Sondrup at the Debtor—despite knowing that the Debtor was in Chapter 7 and that the Trustee was its trustee—referencing the Trustee's September 29, 2023 notice.  PAPP0388.  This notice was a Reservation of Rights notice for a claim apparently made under the Policy related to a completely separate

litigation matter initiated by Arris Solutions, Inc. and a lawsuit filed by Arris against the Debtor. PAPP0388.

82.     Taking the November 30, 2023 e-mail and the March 14 letter together, they both reference claim number KY23K290938X.  Thus, it appears that Federal did not understand, for whatever reason, that the Debtor and the Trustee were making a claim under the Crime Part of the Policy related to the $4.4 Million Transfer or anything else, but were instead still considering the matter as some other claim made before related to litigation commenced by Arris.

83.     In any event, at no time prior to the filing of the Complaint did Federal respond to the *Trustee's* notices or his request for whether Federal needed anything further regarding the claim (or whether Federal accepted coverage).  At no time prior to the filing of the Complaint did Federal provide any "proof of loss" form or other document to the Trustee, or otherwise engage with the Trustee regarding his Crime Coverage claims.  PAPP1025-26 (¶¶ 11-19).  This is despite the November 30, 2023 communication from the Trustee and the response from Federal that a crime claim had been opened.

## V.  **ARGUMENTS**

### A.     SUMMARY JUDGMENT STANDARDS

84.     The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment is appropriate only where "no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Floyd v. Amite Cty. School Dist.*, 581 F.3d 244, 247-48 (5th Cir. 2009).  Under Rule 56, the inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A party seeking summary judgment bears the initial burden of identifying portions of

pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the non-moving party to show that summary judgment should not be granted. *See id*. at 324-25. In meeting its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id*. at 587.

## B.   BREACH OF INSURANCE POLICY ELEMENTS AND PRINCIPLES

85.   Insurance policies are contracts. *See Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987). As such, they "are controlled by rules of construction which are applicable to contracts generally." *Id*. And, the same elements of a breach of contract apply to a breach of an insurance policy. The elements of a breach of contract claim are: " (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) resulting damages to the plaintiff." *Rice v. Metropolitan Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App. – Fort Worth, 2010). To the extent any portion of the Policy is ambiguous, it "is construed against the insurer and in favor of coverage." *Liberty Surplus Ins. Corp. v. Exxon Mobile Corp.*, 483 S.W.3d 96, 101 (Tex. App. – Houston [14th Dist.] 2015).

86.   There ought not to be any question about elements: (1) and (4); the Policy is a valid contract, and the damages to the Plaintiffs are the funds under the Crime Coverage of the Policy that Federal has refused to pay resulting from the $4.4 Million Transfer. With respect to breach of contract and performance by the Plaintiffs; *i.e.* conditions precedent under the Policy, the Plaintiffs discuss those elements below.

**C.**     <u>F<small>EDERAL</small> H<small>AS</small> B<small>REACHED THE</small> C<small>RIME</small> C<small>OVERAGE</small> U<small>NDER THE</small> P<small>OLICY</small></u>

**Insuring Clause**

87.     Under Insuring Clause A, "Employee Theft Coverage," a subpart of the Crime

Coverage:

> The Company [Federal] shall pay the **Parent Organization** [the Debtor] for direct
> loss of **Money**, **Securities** or **Property** sustained by an **Insured** resulting from
> **Theft** or **Forgery** committed by an **Employee** acting alone or in collusion with
> others.

PAPP0080 (§ I(A)).

**Limit of Liability**

88.     The limit of liability under the Crime Coverage for "Employee Theft Coverage,"

Insuring Clause A, is $5,000,000.00. PAPP0079. The Plaintiffs' demands for $4.4 million of

payment under this Clause is therefore within the policy limits.

**Policy Period**

89.     The Crime Coverage contains the "Loss Discovered" option. PAPP0079. As such,

"coverage will be available for loss sustained at any time and **Discovered** during the **Policy**

**Period**." PAPP0092 (§ X(B)(1)). Furthermore, the Crime Coverage excludes "loss unless

sustained prior to the termination of this Coverage Part and **Discovered** within one (1) year

following such termination if the termination results from the voluntary liquidation or voluntary

dissolution of the **Parent Organization**." PAPP0088.

90.     Under the Policy, the "policy period" was October 30, 2021 through October 30,

2022. PAPP0008. Any "loss," therefore, obviously occurred during the "policy period." Any

"discovery" could not have occurred prior to the loss, with the claim being reported on October

28, 2022, which is prior to termination also within the "policy period," meaning that "discovery"

had occurred by then."

91.     The Trustee also has an alternative argument on this point. While Federal admits that it received the original October 28, 2022 notice of potential claim on that day, PAPP106 (Admissions 7 & 8), it appears to dispute whether this was proper notice under the Policy. Yet as shown above, the Crime Coverage contains an endorsement that extends the reporting deadline to one (1) year after termination of the Policy, *i.e.* October 28, 2023. To the extent that the October 28 notice was somehow deficient, the Trustee's demands of April 27, 2023, May 9, 2023, and September 29, 2023 were not. And all of these were made during the extended, one (1) year period.

**The Parties Under Insuring Clause A**

92.     The definitions of Company (Federal) and the Parent Organization (the Debtor) should not be controversial. PAPP0008 (identification of "Parent Organization"). Neither should the definition of "Insured," which means "any Organization and any Sponsored Plan." PAPP0083. "Organization," in turn, means "the Parent Organization and any Subsidiary." PAPP0010. "Parent Organization" means "the entity named in Item 1 of the GTC Declarations," PAPP0010, which is "Goodman Networks, Inc. & Subsidiaries." PAPP0008. "Subsidiary" means "any entity while more than fifty percent (50%) of the outstanding securities representing the present right to vote for election of or to appoint directors, trustees, managers, members of the Board of Managers or equivalent positions of such entity are owned, or controlled, by the Parent Organization." PAPP0011. It is therefore beyond dispute that the Debtor, Multiband, and GNET are all "insureds" within the Crime Coverage.

**"Direct Loss"**

93.     "Direct loss" is not defined in the Policy. Texas caselaw, however, has given it a more precise meaning: "that cause which in a natural and continuous sepauence unbroken by any new and intervening cause, produces a loss, and without which the loss would not have occurred." *Federal Ins. Co. v. Bock*, 382 S.W.2d 305, 307 (Tex. App. – Corpus Christi 1964, writ ref'd n.r.e.).

As a result of the $4.4 Million Transfer, one or more of the Plaintiffs lost $4.4 million.  That is certainly a "loss" and is certainly a "direct" loss; *i.e.* it is the unbroken result of the transfer without intervening cause:

> A proper definition of 'direct loss' is 'loss proximately caused by the peril insured against', and the term 'proximate cause' as applied in insurance cases has essentially the same meaning as it does in negligence cases, except that in insurance cases, the element of foreseeableness or anticipation of the injury as the result of the peril insured against is not required.

*Id.*

94.     Federal insured the Plaintiffs against thefts committed by employees; that was the very "peril insured against."

95.     Under Texas law, "[t]he name on an account is prima facie proof of ownership of the account." *Whitney Nat. Bank v. Baker*, 122 S.W.3d 204, 208 (Tex. App. – Houston [1st Dist.] 2003).  *Accord Solgas Energy Ltd. v. Federal Gov. of Nigeria*, 2010 WL 11679364 at *8 (S.D. Tex. 2010).  Here, the name on the account from which the $4.4 million were transferred was Multiband.  PAPP537.  While the Trustee believes that the funds actually belonged to the Debtor— which Frinzi confirmed[8]—that is not necessary for the Court to determine to grant summary judgment, because both the Debtor and Multiband are "insureds" under the Policy.

96.     Federal will have to present evidence to overcome this prima facie proof of ownership, which it will not be able to do.  It will argue that the funds were the proceeds of a minority owned business "scam" between the Debtor and FedEx, which is a baseless argument that the Trustee addresses below with respect to Federal's affirmative defense on this point.  *See* Discussion at pp. 51-53.  Furthermore, the Crime Coverage provides that, for purposes of Insuring Clause A, Employee Theft Coverage, "the Company's liability under this Coverage Part shall only

---

[8]     PAPP596 (602:1-5).  In fact, Multiband by then had no operations and no revenue.  PAPP596 (602:6-12).

apply to **Money**, **Securities** or **Property** owned by an **Organization** or for which the **Organization** is legally liable, or held by the **Organization** in any capacity whether or not the **Organization** is liable." PAPP0091 (§ IX(A)). Even if Federal's "scam" argument has any merit, which it does not, there can be no question that the funds were "held" by the Plaintiffs "in any capacity."

**"Money" or "Property"**

97.     "Money" is defined as "currency, coin, bank notes and bullion." PAPP0083. Federal has admitted "that the funds the subject of the $4.4 Million Transfer were 'money,' as defined in the Policy." PAPP0108 (Admission 20). And, there is no question that the $4.4 million was transferred to MGR, as evidenced both by the bank statements and Federal's admission in its answer. *See* Discussion at pp. 9-10. Thus, and returning to the definition of "direct loss" furnished by Texas caselaw, the $4.4 Million Transfer constituted a "direct loss" of "money" in the amount of $4.4 million.

**"Employee"**

98.     "Employee" is defined as a "natural person in the regular service of an Organization in the ordinary course of such Organization's business, whom such Organization governs and directs in the performance of such service, including a part-time, seasonal, leased and temporary employee, intern or volunteer." PAPP0082. That Frinzi was a natural person in the regular service of the Debtor, Multiband, and GNET cannot be disputed ("Organization" is discussed above). "Employee" also includes an "Executive while performing acts within the scope of the usual duties of an Employee." PAPP0082. "Executive" is a "natural person" "duly elected or appointed director, officer, trustee, in-house general counsel or duly constituted committee member of any Organization incorporated in the United States of America." PAPP0083. Frinzi

was a duly appointed officer of each of the Debtor, Multiband, and GNET—all organizations incorporated in the United States.  PAPP553 (69:4-70:1); PAPP0-448 (32:6-9).

**Theft**

99.     The Crime Coverage defines "theft" as "the unlawful taking of Money, Securities or Property to the deprivation of: (A) an Insured, solely for the purposes of Insuring Clause (A), Employee Theft Coverage . . ."  PAPP0084.  "Money," "property," and "insured are discussed above.  That the taking was "to the deprivation" of an Insured cannot be doubted: Frinzi took the money, whereafter the Plaintiffs were left without it, and he used it to purchase property and toys and for his and his family's use.  That leaves the requirement that the "taking," which Frinzi certainly did, was "unlawful."

100.     Texas has, by statute, abrogated various common-law categories and subcategories of theft and not provides that "[t]heft . . . constitutes a single offense superseding the separate offenses previously known as theft . . . embezzlement . . ."  TEX. PEN. CODE § 31.02.  "Theft" is defined as an offense if one "unlawfully appropriates property with intent to deprive the owner of property."  *Id*. at § 31.03(a).  "Appropriation of property is unlawful if: (1) it is without the owner's effective consent."  *Id*. at § 31.03(b).

101.     The owner of the funds was one or more of the Plaintiffs.  Each of them, and in particular the Debtor, was managed by the board of directors, and James Goodman was the sole director.  Although Frinzi was entrusted with the funds, they were not his and they could be used only as authorized by this sole human being.  The summary judgment evidence, even without resort to the adverse inference, is that James Goodman was never asked to approve the $4.4 Million Transfer, that he did not approve it, that he did not know of it, that he did not ratify it, and that the making of any such transfer—whether as a loan or to enable Frinzi to buy toys for himself and his family and to transfer hundreds of thousands of dollars into his Capital One account—were not

possibly in the furtherance of the Plaintiffs' businesses.  That Frinzi (through MGR and the FFT) used the funds to purchase luxury real and personal property for his use and that of his family is the essence of embezzlement.

102.     Importantly, this same conclusion applies even if the Court finds that there is some credible summary judgment evidence that someone recorded the $4.4 Million Transfer as a loan. Frinzi was no more authorized by his principal to loan himself the money than to take it in a duffle bag out the front door.  Indeed, the law knows that an unauthorized loan by an officer is embezzlement (*i.e.* theft) all the same.  *See, e.g., ITT Consumer Fin. Corp. v. Tovar*, 932 S.W.2d 147, 158-59 (Tex. App. – El Paso, 1996) (bank officer embezzled funds "by creating fictitious loans"); *Amaya v. State*, 733 S.W.2d 168, 173 (Tex. Crim. App. 1986) (concluding that loaning money to one's self may be embezzlement, but that it was not proven under the facts of the case); *Stephens v. State*, 93 S.W. 545, 546 (Tex. Crim. App. 1906) (money entrusted for specific purpose used instead as a loan was embezzlement).

103.     Here, the Court should remember who it is dealing with: someone who took a very large amount of money from an insolvent company, entrusted to his care, to purchase toys for himself for no possible corporate or business purpose, and who then lied about how he purchased his toys to James Goodman, and who then pled the Fifth Amendment when asked any question about it.  It is no defense for a person to go into someone else's home and unlawfully take a lawnmower or cash money to later claim that he was merely "loaning" it to himself.  Thieves do not readily admit their thefts, and courts are not powerless to look behind a label that a thief puts on his otherwise clearly unlawful taking.

104.     There is also a more specific statute applicable to fiduciaries, which provides that "[a] person commits an offense if he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary or property of a financial institution in a manner that involves substantial

risk of loss to the owner of the property or to a person for whose benefit the property is held."
TEX. PEN. CODE § 32.45(b).  A "fiduciary" includes "any other person acting in a fiduciary
capacity."  *Id*. at § 32.45(a)(1)(C).  "Misapply" means to "deal with property contrary to: (A) an
agreement under which the fiduciary holds the property; or (B) a law prescribing the custody or
disposition of the property."  *Id*. at § 32.45(a)(2).  "[P]roperty may be deemed misapplied only if
it is handled in a manner giving rise to a substantial risk of loss and in contravention of an
established duty to do otherwise."  *Bynum v. State*, 767 S.W.2d 769, 775 (Tex.Crim.App.1989).

105.    "'[A]ny other person acting in a fiduciary capacity' embraces any fiduciary."
*Coplin v. State*, 585 S.W.2d 734, 735 (Tex. Crim. App. 1979) (joint venturer is a fiduciary within
the statute).  "Fiduciary" under the statute has its plain meaning, which is "holding, held, or
founded in trust or confidence."  *Gonzalez v. State*, 954 S.W.2 98, 103 (Tex. App. – San Antonio,
1997).  Likewise with respect to "fiduciary capacity": "[o]ne is said to act in a 'fiduciary capacity'
or to receive money or contract a debt in a 'fiduciary capacity,' when the business which he
transacts, or the money or property which he handles, is not his or for his own benefit, but for the
benefit of another person."  *Gonzalez*, 954 S.W.2d at 103.

106.    There is no question of course that Frinzi, as an officer of the Debtor—indeed, its
Chief Executive Officer—was a fiduciary of the Debtor.  *See, generally, Gearhart Indus. Inc. v.
Smith Intern. Inc.*, 741 F.2d 707, 719 (5th Cir. 1984); *Grinnell v. Munson*, 137 S.W.3d 706, 718
(Tex. App. – San Antonio, 2004) ("Corporate officers owe fiduciary duties to the corporations they
serve").  "Fiduciary" and "fiduciary capacity" are given their plain meanings.  *See Berry v. State*,
424 S.W.3d 579, 583 (Tex. Crim. App. 2014).  "[O]ne acts in a 'fiduciary capacity' for purposes
of the misapplication statute if his relationship with another is based not only on trust, confidence,
good faith, and utmost fair dealing, but also on a justifiable expectation that he will place the

interests of the other party before his own." *Black v. State*, 551 S.W.3d 819, 830 (Tex. App. –

Corpus Christi, 2018) (quoting *Berry v. State*, 24 S.W.3d 579, 585 (Tex. Crim. App. 2014)).

107.    The second element of the crime is to "misapply," which requires breach of

"(A) an agreement under which the fiduciary holds the property; or (B) a law prescribing the

custody or disposition of the property." *Id.* at 827.  "A fiduciary [] commits an offense only if he

deals with the property contrary to the agreement under which he holds it." *Talamantez v. State*,

790 S.W.2d 33, 37 (Tex. App. – San Antonio, 1990).  The agreement under which Frinzi had access

to the funds was simply that he would use them for legitimate, corporate purposes and not for his

personal benefit.  PAPP661-62 (38:25-39:3).  This agreement is also imposed by law, as it is

beyond dispute that a corporate officer, whether by agreement with the corporation or by duties

imposed by law, may not, without the affirmative consent of the corporation, put corporate

property to his personal use.  Indeed, taking corporate funds to buy luxury items is the essence of

embezzlement.[9]

108.    In *Coleman v. State*, 131 S.W.3d 303 (Tex. App. – Corpus Christi, 2004), the

officer of a company diverted royalty payments payable in trust to royalty holders to the company,

and used the funds for other purposes.  Looking at the requirement to "misapply," and that property

is misapplied "if it is handled in a manner giving rise to a substantial risk of loss and in

contravention of an established duty to do otherwise," the court upheld the conviction because the

defendant misused the property for his company's needs with a substantial risk that the company

---

[9]      Although embezzlement is not itself a named crime any longer, it being subsumed within the various
crimes of theft, it is telling how Texas courts analyzed embezzlement, which case law still aids in guiding the inquiry:

> In order to sustain a prosecution for embezzlement against an agent of a private person or
> corporation, four distinct propositions of fact must be established in evidence . . . 1. That the
> defendant was the agent of the person or corporation as alleged, and by the terms of his employment
> was charged with the duty of receiving the money of his principal. 2. That he did so receive money
> belonging to his principal. 3. That he received it in the course of his employment. 4. That he
> embezzled, misapplied, or converted it to his own use.

*Fellers v. State*, 136 S.W.2d 217, 218 (Tex. Crim. App. 1940).

would not be able to pay the funds to the royalty holders. *See id*. at 310-11. "While the State is not required to prove how appellant spent the money, it is required to prove the money was not used in compliance with the agreement." *Id*. at 311. In that case, the defendant used the money in a way to make it unlikely that the royalty owners would be paid. *See id*.

109.     And, if the Court looks to scienter, it is clear that Frinzi knew that what he was doing was wrongful. He lied to James Goodman about where he got the funds to purchase the Lakehouse and the boats, and he intentionally tried to hide the fact of the $4.4 Million Transfer, including by creating a company with the same first word in its name as the transferor (Multiband) and by transferring funds from the Debtor to Multiband, where he had unhindered authority to wire the funds out without requiring a second person to approve it.

110.     Likewise, while proof of how misapplied funds were used is not necessary under Texas law to prove theft by a fiduciary, it is certainly highly revealing and telling. Perhaps a corporate officer transfers funds to himself in trust for the company to purchase an asset without informing the market of the company's interest. Perhaps the officer uses corporate funds to purchase a lake house at which to entertain important clients of the company. Perhaps the officer even uses corporate funds to buy a lottery ticket in a desperate gamble to win a jackpot to pay off the company's debts. But in no rational world does the officer use corporate funds to purchase a Lakehouse, a vacant Lot, to transfer hundreds of thousands of dollars to himself, to build a boat ramp, to by boats, and to buy country club memberships—all while the company is insolvent, of course—for his personal benefit without it being embezzlement, plain and simple.

111.     Finally, should there be any doubt that Frinzi committed theft with the $4.4 Million Transfer, the requested adverse inference from his Fifth Amendment right should be the final proof necessary to find there to be no genuine issue of material fact on theft. After all, who other than

Frinzi—who has rested on his Fifth Amendment right—could Federal possibly call as a witness to demonstrate otherwise?

**D.      CONDITIONS PRECEDENT TO COVERAGE ARE SATISFIED**

**1.      Timely Notice Was Provided**

112.    The Crime Coverage of the Policy contains the following:

It is a condition precedent to coverage hereunder that, upon Discovery, the Parent Organization will:

> (1) give written notice to the Company at the earliest practicable moment, and in no event later than 180 days after such Discovery;
>
> (2) furnish affirmative proof of loss with full particulars to the Company at the earliest practicable moment, and in no event later than 180 days after such Discovery;
>
> (3) submit to examination under oath at the Company's request;
>
> (4) produce all pertinent records at such reasonable times and places as the Company shall designate; and
>
> (5) provide full cooperation with the Company in all matters pertaining to a loss or claim.

PAPP0090 (§ VI(B)).[10]

113.     "Discovery" is defined as "knowledge acquired by an Executive or Insurance Representative of an Insured which would cause a reasonable person to believe a covered loss has occurred or an occurrence has arisen that may subsequently result in a covered loss."  PAPP0082. "**Insurance Representative** means an **Employee**, as defined in Subsections (A) and (B) of the

---

[10]      Points (3), (4), and (5) should not be in dispute.  Federal never asked for an examination under oath of the Plaintiffs, and whatever depositions were requested in this litigation were complied with.  Likewise with respect to the production of documents: Federal never requested this prior to litigation and the Plaintiffs have complied with all document requests in this litigation.  PAPP1026 (¶¶ 17-19).  And, with respect to "full cooperation," the Plaintiffs never failed to do something or provide something that Federal requested.  *See id.*  The problem was simply that Federal did not make any request prior to litigation, since it simply ignored the Debtor's and the Trustee's communications.

definition of **Employee**, including a risk manager, designated to represent an **Insured** for the purpose of effecting and maintaining insurance." PAPP0083.

114. The Plaintiffs first informed Federal of a potential claim resulting from the $4.4 Million Transfer on October 28, 2022. PAPP0358. That notice expressly references that "[i]n January 2022, the Frinzi authorized the Company to advance $4.4M in loans to Multiband Global Resources." PAPP0359. That these were not loans is immaterial; the insureds put Federal on notice of a potential claim.

115. And, while the notice states "Potential Claims under D&O Policy" in the subject line, the notice also states that, "[a]s a result of the above there may be claims under the policy." Moreover, the notice expressly identifies the following policy:

> Goodman Networks, Inc.
> Management Liability Package including Crime
> Policy Period: 10/30/2021 – 10/30/2022
> Federal Ins. Co. Policy No.: 8262-4874

PAPP0358.

116. Thus, the notice is not limited to the D&O coverage part but instead asserts a claim under the "policy," which is the whole of the Policy identified by number and is even defined as "including Crime." Texas law on this point is likewise clear: the making of a claim under one part of a policy satisfies and suffices any requirement for the making of a claim under a different part of the same policy. *See Francis v. International Traveler's Ass'n*, 260 S.W. 938, 946 (Tex. App. – Dallas 1924), *aff'd* 119 Tex. 1 (Tex. 1930) ("even if required to furnish immediate notice of the accident, and to file proof of death within 91 days, appellant, having furnished all of this data under the health policy, was not required to furnish duplicate notice and proof under the accident policy").

117. That the October 28, 2022 notice is a "written notice" is obvious. And, it was e-mailed precisely as provided for in the Policy. PAPP106 (Admission 7).

118.    Here, it is important to recount who discovered the embezzlement, why, how, and when.  *See* Discussion at pp. 18-21.  While he was CEO, Frinzi was able to use his authority to hide the truth of the $4.4 Million Transfer.  He lied to James Goodman about it, he hid it from James Goodman, he stalled Baum and failed to provide any documentation, and he then instructed Baum to remove it from the Debtor's books and records so that the creditors would not learn of it.  Only after Frinzi resigned and John Goodman came on board was John Goodman able to discuss the matter with Baum and with Akerman, at which point he realized that the $4.4 Million Transfer was likely fraudulent and theft, and at which point he had the October 28 notice issued to Federal.  This process took between mid-September, 2022 and October 28, 2022, which is not surprising: (i) given the need to uncover a fraud and theft; (ii) consult with legal counsel; (iii) ensure that an unjust allegation would not be made; and (iv) prepare the proper claim notification.  Such is the nature of fraud, and of theft when the person committing the theft is a trusted officer: it is not readily apparent and it takes time to uncover.

119.    Thus, "written notice to the Company at the earliest practicable moment, and in no event later than 180 days after such Discovery," was provided, the purpose of which was to "notify any and all potential insurance carriers of possible claims relating to these transfers," which included claims under a crime and employee theft policy.  PAPP804 (67:1-13).

120.    However, to the extent that Federal argues that this notice should have been provided earlier, that 5 weeks was too long and that instead it should have been 2 weeks, or anything of the sort, Texas law on this point is clear.  With respect to any alleged deficiency with this notice, Federal must prove actual prejudice resulting from any such deficiency or delay, absent which the condition remains satisfied.  *See PAJ, Inc. v. Hanover Insurance Company*, 243 S.W.3d 630, 634 (Tex. 2008).  This it will be unable to do.  *See* Discussion at pp. 44-45.

## 2.  **Proof of Loss**

### (i)  *Policy Provisions*

121.    The Crime Coverage part requires an insured to "furnish affirmative proof of loss with full particulars to the Company at the earliest practicable moment, and in no event later than 180 days after such Discovery." PAPP0090. Federal has taken the position that the Plaintiffs failed to satisfy this element. The Plaintiffs argue that the original October 2022 notice to Federal sufficed, not to mention the subsequent communications. Furthermore, Federal can show no prejudice from any arguable deficiency with respect to this and the Trustee's notices. The Plaintiffs will therefore address this condition in some detail.

122.    Importantly, the Policy does not define this phrase or the term "proof of loss." PAPP0128 (Admission 115). And, equally as importantly, Federal at no time: (i) sent the Plaintiffs any forms for a proof of loss; (ii) informed the Plaintiffs of what it expected by way of a sufficient proof of loss; (iii) raised any argument of any deficiency with the Plaintiffs' information with respect to a proof of loss; or (iv) asserted that the Plaintiffs had failed to provide sufficient information to constitute a proof of loss, at least prior to litigation. PAPP1026 (¶¶ 16-19). Here, the Trustee reiterates that any ambiguity—and what constitutes a sufficient "proof of loss" is ambiguous—is construed against Federal and in favor of coverage as a matter of law. *See Liberty Surplus Ins. Corp. v. Exxon Mobile Corp.*, 483 S.W.3d 96, 101 (Tex. App. – Houston [14th Dist.] 2015). And, the Plaintiffs remind the Court of the Trustee's counsel's communication to Federal on November 30, 2023 asking, among other things, "whether you need any further information regarding the claim." PAPP1017. At no time did Federal respond with any request. PAPP1026 (¶¶ 16-19).

123.    Taking a step back, when a CEO steals money from the company, and the company learns of the theft, what more proof is there than the fact of the transfer? The "loss" is $4.4 million.

The balance of the legitimate issues relate to whether the "loss" is "theft," but other than telling Federal that the CEO took $4.4 million, and when, and who it was transferred to, what more could the Plaintiffs have furnished at that time—especially when Federal asked for nothing more and utterly refused to engage the Plaintiffs in any discussion, instead wholly ignoring their communications?  Yet Federal now seeks to exploit some as-yet unnamed deficiency with the information that it was provided, and with respect to which it sought nothing additional.

**(ii)** *The Law*

124. "[A]ll that the insurance company is entitled to receive by way of a proof of loss is to be apprised of the facts." *Dairyland County Mut. Ins. Co. v. Keys*, 568 S.W.2d 457, 459 (Tex. App.—Tyler 1978, *writ ref'd n.r.e.*).  *Accord Francis v. International Traveler's Ass'n*, 260 S.W. 938, 946 (Tex. App. – Dallas 1924), *aff'd* 119 Tex. 1 (Tex. 1930) (concluding that proof of loss with respect to death was met by mere notice that there was an accident and resulting death).  The purpose of the requirement is "to enable an insurer to investigate the circumstances [ ] while the matter is fresh in the minds of the witnesses so that it may adequately prepare to adjust or defend any claims that may be then or thereafter asserted against persons covered by its policy." *Employers Cas. Co. v. Glens Falls Inc. Co.*, 484 S.W.2d 570, 575 (Tex. 1972).

125. Texas law is likewise clear that only "substantial compliance" with a proof of loss condition is required—especially where, as here, the Policy does not prescribe the form of the proof of loss.  *See, e.g., American Teachers Life Ins. Co. v. Brugette*, 728 S.W.2d 763, 764 (Tex. 1987).  *GuideOne Mut. Ins. Co. v. First Baptist Church of Brownfield*, 495 F. Supp. 3d 428, 439 (N.D. Tex. 2020) ("[a] proof of loss only requires substantial compliance").

126. *Henry v. Aetna Cas. & Sur. Co.* is instructive.  633 S.W.2d 583 (Tex. App. – Texarkana 1982).  There, the auto victim's mother sent notice to the insurer of the insured's name and particulars, the date of the accident, the make and model of the car, the probable damages, the

limits of coverage, and that her son was hospitalized with personal injuries. *See id*. at 584. Only much later did the insurer send the necessary proof of loss forms to the insured, after which the insurer argued that these forms were not timely submitted. *See id*. Noting that "substantial compliance" with a proof of loss requirement was all that was required, the court concluded that this had been met: "[w]ithout doubt the notice provided by Mr. Henry initially furnished Aetna the necessary information to enable it to investigate the accident and resulting claims and to ultimately determine its liability for policy benefits." *Id*.

127.    In *Dairyland*, a proof of loss was required, but the policy failed to specify any particular proof of loss. *Dairyland*, 568 S.W.2d at 459. In that case, the loss was a stolen car where the owner timely informed the carrier of the basic facts. The insured submitted a report, which the insurer later argued was insufficient. The court rejected this argument and found that the requirement for a proof of loss was conclusively met from the initial report:

> The report listed the name, address and phone number of the insured; the policy number; the name and address of the insurance agent; date of the loss or accident; place of the loss or accident; the description and serial number of the automobile, etc. Near the end of the report a blank space was provided for the insured to state briefly what happened. In this space appellee furnished the following information: 'Car was stolen on October 17 or 18 . . .

*Id*. *See also First Southwest Lloyds Ins. Co. v. MacDowell*, 769 S.W.2d 954, 959 (Tex. App. – Texarkana 1989) ("[t]he MacDowells supplied First Southwest with a complete inventory of the items damaged or destroyed during the fire within one week of the fire. . . The MacDowells were not required to formally label the inventory a proof of loss. The MacDowells supplied First Southwest with sufficient information to evaluate their claim and thereby substantially complied with the proof of loss requirement").

128.    Here, the original notice from the Debtor identified the insured and the policy number. It identified the culprit: "James Frinzi." PAPP359. It referenced the policy as "including Crime." PAPP358. It referenced the date of the wrong as "January 2022," and it stated the wrong

as "Frinzi authorized the Company to advance $4.4 million in loans to Multiband Global Resources." PAPP359. It therefore also identified the recipient of the wrong. This was enough information—indeed, all of the information then available—to enable Federal to investigate the facts and circumstances as much as it wished and to determine its liability under the Policy: the "who" (Frinzi and MGR), the "when" (January 2022); the "what" (transfer of $4.4 million and the Policy by name and number), and the "why" (Frinzi making unauthorized transfers). The Plaintiffs struggle to see what more information they could have provided at that time. Certainly, instead of its silence, Federal could have sought more information or taken some action, but any such failure is its fault and not the fault of the Plaintiffs.

129.    And, to the extent Federal argues that the Debtor's notice was insufficient as a proof of loss because that notice was focused on the D&O coverage and not Crime Coverage, Texas law is clear that notice under one part of a policy is sufficient for the whole of the policy: "even if required to furnish immediate notice of the accident, and to file proof of death within 91 days, appellant, having furnished all of this data under the health policy, was not required to furnish duplicate notice and proof under the accident policy." *Francis v. International Traveler's Ass'n*, 260 S.W. 938, 946 (Tex. App. – Dallas 1924), *aff'd* 119 Tex. 1 (Tex. 1930).

130.    Therefore, the original October 28, 2022 notice, and each of the Trustee's subsequent communications, substantially satisfied any requirement for a "proof of loss" in the Policy because those communications informed Federal of all underlying facts and enabled Federal to immediately investigate the facts and circumstances, had it so chosen.

### (iii)    *Waiver and Estoppel of "Proof of Loss" Requirement*

131.    To the extent of any deficiency with respect to the "proof of loss" requirement, Federal has waived that requirement or is estopped to argue that this requirement defeats coverage. As noted above, Federal ignored not one, or two, or three, but <u>four</u> notices from the Debtor or the

Trustee.  While perhaps the first three may have not been clear that a claim for crime coverage was being made, the Trustee's September 29, 2023 notice clearly referenced the Crime Coverage and clarified that coverage under this part had been triggered, concluding with: "[w]e again ask that you contact the insured."  PAPP387.  And when counsel followed up this silence by proactively trying to contact someone at Federal on November 30, 2023 to see, among other things, whether the claim had been received and accepted and "whether you need any further information regarding the claim," Federal stayed silent.  *See* Discussion at pp. 22-24.  If Federal felt that there was some deficiency with any undefined proof of loss, it could have specified what it was looking for years ago, and well prior to the initiation of this litigation.  It did not.

132.    First, by statute, Texas requires that "[w]hen a claimant contacts an insurance carrier and requests a response on their claim, the response must be verbally provided or sent in writing by the insurance carrier within five working days of receiving the request, unless the request is redundant or the response duplicates information previously provided."  28 TEX. ADMIN. CODE § 102.4(f).  Not only was Federal's silence prejudicial and baffling, but it violated an express statute governing Federal.  Perhaps Federal was confused by the number of claims that had been asserted, or perhaps the 'left hand' did not know what the 'right hand' was doing as between D&O and crime coverage, but Federal is one company, and a large and sophisticated one engaging in a highly regulated business, and it could not outright ignore multiple communications from a highly respected coverage attorney writing on behalf of a federal bankruptcy trustee.

133.    Second, "it is settled that such provisions . . . relating to the timely furnishing of a sworn proof of loss, may be waived and the insurer may be estopped from asserting or relying upon the breach of such conditions or provisions as a defense."  *Yeager v. St. Paul Fire & Marine Ins. Co.*, 166 S.W.2d 939, 941 (Tex. App. – Waco 1942).  With specific reference to a proof of loss requirement, it is waived as a matter of law if the insurer denies a claim before a proof of loss is

required to be submitted: " [i]t is enough that the actions of the insurance company would reasonably lead the insured to believe that the company is not going to pay the claim because of some reason other than failure to file the required proof of loss." *de Laurentis v. United Servs. Auto. Ass'n*, 162 S.W.3d 714, 720 (Tex. App.—Houston [14th Dist.] 2005).  Normally, such actions entail an insurer leading the insured to believe that no action on its part was required.  But there is no reason why silence cannot suffice.

134.    Third, "[w]here the insurance company considers the notice of loss inadequate or defective it must within a reasonable time object to the proof and point out the defects so that the insured may correct the same." *Henry v. Aetna Cas. & Sur. Co.*, 633 S.W.2d 583, 584 (Tex. App. – Texarkana 1982).  This is all the more important here where the Policy does not define "proof of loss."  PAPP0128 (Admission 115).  Was there some form that Federal had for the insured to execute?  How would the insured know if Federal completely ignored the communications from its insured?  Yet Federal never responded to the Trustee's communications.  "Waiver of a condition precedent is evaluated according to what the insured reasonably would have thought under the circumstances." *de Laurentis v. United Servs. Auto Ass'n*, 162 S.W.3d 714, 720 (Tex. App. – Houston [14th Dist.] 2005).  What could the insured here have reasonably expected from Federal's silence other than that it did not want further information by way of proof of loss or anything else?[11]

135.    Estoppel is particularly appropriate here considering the purpose of a proof of loss: to investigate the matter while still fresh in everyone's memories. *See Employers Cas. Co. v. Glens Falls Inc. Co.*, 484 S.W.2d 570, 575 (Tex. 1972).  By its silence, Federal demonstrated that it had no interest in investigating these circumstances and facts.  It was informed that Frinzi transferred

---

[11]     This is precisely why Texas law requires a response from an insurer within five days, so that there be no "guessing game."

$4.4 million to MGR. Had it any interest in investigating further, it could easily have responded to any of the Debtor's or the Trustee's communications. Federal should be estopped from asserting any reliance on a condition that it itself was utterly uninterested in. *See Bituminous Cas. Corp. v. Vacuum Tanks Inc.*, 75 F.3d 1048, 1056 (5th Cir. 1996) (holding that insurer can waive notice requirement by "inaction").

### (iv)   *Federal Cannot Show Prejudice of "Proof of Loss" Requirement*

136.    Even if the Court concludes that the October, 2022, notice was insufficient by way of "proof of loss," it is a fact that it informed Federal of many of the underlying facts concerning the $4.4 Million Transfer. It is not as though *no* information was timely provided, or as though information was *withheld*.

137.    The Supreme Court of Texas has held that an insurer may not deny coverage based on an insured's failure to comply with a provision in the policy without actual prejudice to the carrier: "[f]ailure to comply with the policy will only defeat the claim where the insurer demonstrates that it was prejudiced by the insured's failure to comply, <u>regardless of whether the provision in the policy is a condition precedent</u>." *Vilaythong v. Allstate Ins. Co.*, 2017 WL 4805522 at *3 (N.D. Tex. 2017) (emphasis added) (*citing PAJ, Inc. v. Hanover Insurance Company*, 243 S.W.3d 630, 634 (Tex. 2008)). *See also Polen v. Vehicle*, 2017 WL 661836 at *3 (E.D. Tex. 2017) (explaining how Texas law no longer considered a "proof of loss" as an absolute condition precedent to coverage and, if a sufficient proof of loss is not provided, instead placed the burden on the insurer to "to show prejudice caused by the insured's failure to comply with the contract regardless of whether the terms at issue is a covenant, condition precedent, exclusion, or provision").

138.    "To demonstrate prejudice, the insurer must prove that one of the recognized purposes of the provision has been frustrated." *Id*. (*citing Blanton v. Vesta Lloyds Insurance*

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT—Page 44

*Company*, 185 S.W.3d 607, 612 (Tex. App—Dallas 2008, no pet.)).  In *Vilaythong*, the District Court reviewed multiple recent opinions where the insurer argued that there was a failure to provide a sufficient proof of loss, noting that in each instance the argument had been rejected "because Texas law requires the insurer to show prejudice, which Allstate did not show." *Id*.  The insured provided the insurer "ample opportunity and time to inspect the alleged damage, determine the validity of the insured's claims, and engage in settlement discussions." *Id*.  In *Vilaythong*, the insured conceded that he failed to provide a proof of loss.  However, he timely provided the insurer with notice of the loss (storm damage).  The insurer failed to show any prejudice from the failure to submit *any* proof of loss; hence the District Court denied the insurer's motion to dismiss.

140.     Federal cannot possibly show any prejudice here.  But even if it tries to, the Plaintiffs again point out Federal's own inaction and silence.  To the extent that there was any prejudice because the Debtor did not furnish Federal anything more on October 28, 2022 than it did, the prejudice is the result solely of Federal's own inaction and silence (which again goes to the estoppel argument).

140.     But there is a more somber reason why Federal cannot demonstrate any prejudice. By the time that it was learned that the $4.4 Million Transfer was theft, after Frinzi hid the truth for as long as he could, he had already spent the money.  There was nothing that Federal could have done, other than to chase the proceeds, which is what the Trustee did.  At least the Trustee recovered $1.2 million from the FFT, which he agrees would be a credit against any judgment against Federal (albeit in net amount, as it took considerable litigation to recover the $1.2 million).

E.     **DENIAL OF FEDERAL'S AFFIRMATIVE DEFENSES**

**First Affirmative Defense: Partner Exclusion**

141.     Federal asserts that the Policy does not cover loss due to theft committed by a partner of an organization.  Docket No. 155 at p. 17.  The Policy does not define "partner."  Federal

refused to identity who the alleged "partner" was in its affirmative defense—raising serious Rule 11 issues, despite Federal having the burden of proof.  (Rog 8).  In any event, Frinzi was an officer; not a director, shareholder, member, or anything else that could be construed as a "partner." PAPP323 (Interrogatory 8).

**Second Affirmative Defense: Loss of Income**

142.     Federal asserts that the Policy does not cover "loss of income not realized as the result of a covered loss."  Docket No. 155 at p. 17.  Federal argues that, because the $4.4 Million Transfer originated from Multiband, and "[b]ecause the claimed transfers were not from an account in the name of Goodman Networks and did not (for the reasons detailed below) derive from funds owned by Goodman Networks, Goodman Networks did not sustain the claimed loss."  PAPP323 (Interrogatory 9).  This affirmative defense is baseless.  First, Multiband is a plaintiff herein and is an insured under the Policy.  Second, the funds that Multiband used to make the transfer clearly originated from the Debtor on or two weeks before.  Third, no part of the Plaintiffs' claim is for "loss of income."  It is for the theft of their property; not for lost profits or consequential damages.

**Third Affirmative Defense: Exclusion for Defense Fees and Costs**

143.     Federal asserts that the Policy does not cover "fees, costs, or expenses incurred or paid in defending or prosecuting any legal proceeding or claim."  Docket No. 155 at p. 17.  Again, Federal refused to provide any support in its interrogatory response despite it being its burden of proof.  PAPP324 (Interrogatory 10).  No part of the Plaintiffs' claim is for litigation fees or expenses.  It is for the theft of their property.

**Fourth Affirmative Defense: Loss By One Insured to the Advantage of Another**

144.     Federal asserts that the Policy excludes "loss sustained by one Insured to the advantage of any other Insured."  Docket No. 155 at p. 18.  In support, Federal asserts that "the Trustee asserted that the $4.4 Million Transfer was funded by a December 16, 2021 transfer from

an account at Prosperity Bank . . . Goodman Networks cannot claim a loss based upon a transfer from its account to the account of GNET if GNET qualifies as an Insured." PAPP324 (Interrogatory 11). This is nonsense. The Trustee has not argued that one of the Plaintiffs stole the property of another.

**Fifth Affirmative Defense: Losses Caused By Broker, Etc.**

146. Federal asserts that the Policy does not cover "loss caused by any broker, factor, commission merchant, consignee, contractor, independent contractor (other than a Contractual Independent Contractor), or other agent or representative of the same general character." Docket No. 155 at p. 18. Federal failed to offer any support for this defense, instead resting on baseless objections—again, what was Federal's Rule 11 basis to assert the defense in the first place? PAPP325 (Interrogatory 13). In any event, the evidence is clear that Frinzi, who caused the "loss," was not a broker, factor, or any of the other excluded persons, and that, while he was an agent, he was not an agent "of the same general character."

**Sixth Affirmative Defense: Knowledge of Prior Theft**

146. Federal asserts that the Policy does not cover loss "after an Executive or Insurance Representative became aware that Frinzi committed a Theft; Forgery; or other fraudulent, dishonest or criminal act, which is valued at one thousand dollars ($1,000) or more." Docket No. 155 at p. 18. Here, Federal asserts that "Sandra Sondrup," allegedly the Plaintiffs' "Insurance Representative," became aware of a transfer of $500,000.00 that Frinzi orchestrated to the Stauber Law Firm which predated the $4.4 Million Transfer, and which $500,000.00 the Trustee has asserted in this litigation to be theft, or fraudulent, dishonest, or criminal act.[12] PAPP325 (Interrogatory 14).

---

[12] Both the Trustee and Federal tried to find Sondrup to depose her. After significant efforts, the Trustee was not able to locate her. Federal informed the Trustee that it, too, was not able to locate her to subpoena

147.    In support, Federal offers Frinzi's deposition testimony that Sondrup was aware of the $500,000 transfer no later than December 15, 2021 and that this was solely from the referenced e-mail. *See id.* Frinzi, of course, has no foundation or ability to opine that Sondrup "was aware" of anything. The other support that Federal gives in support of this affirmative defense is an internal e-mail from December 15, 2021. PAPP0394. This e-mail discusses a transfer of $500,000.00 from the Plaintiffs to Stauber Law Offices which Frinzi describes as "an escrow account used for the acquisition of AMRR." PAPP0394. Sondrup is copied on the e-mail chain. *See id.* But there are several critical problems for Federal's argument.

148.    First, the exclusion requires actual awareness. There is no evidence—and there can be none since Sondrup was not deposed—that Sondrup actually received or reviewed or understood this e-mail. It is not even known whether Sondrup was even still with the Debtor as of that date. Second, Sondrup was not an "executive," and Federal will not be able to show that she was an "Insurance Representative" within the meaning of the Policy.

149.    Third, and more critically, the exclusion does not say that an Insurance Representative must be aware of a *transfer*, but rather of a "theft," "forgery," or other "fraudulent," "dishonest," or "criminal" act. Even if Sondrup knew of the fact of the $500,000 transfer—which there is no evidence that she actually did—nothing about that itself would lead to any "red flag." It is true that the Trustee later alleged that there was something wrong with this transfer, but that does not mean that Sondrup knew or should have known that it was fraudulent in December, 2021. All that she knew from this e-mail was that AMRR was being acquired; not that it would turn out that Frinzi (through MGR) was acquiring it, as opposed to the Debtor, or that Frinzi later transferred $44 million for that acquisition. Nothing about the e-mail itself, as of December 15,

---

her, even after the Trustee agreed to extend discovery to give Federal more of a chance to find her. The Truste's last information was that she was in Florida, which would place her outside of a trial subpoena.

2021, would have led a reasonable employee to conclude that her Chief Executive Officer was fraudulently transferring the $500,000.00, such as to trigger a prior "bad acts" exclusion.

150.     And, Elmore, who worked closely with Sondrup for years, testified that she believed that Sondrup "would have said something" if "she felt that she was asked to do something improper -- or inappropriate."  PAPP0438 (22:7-10).

151.     Simply put, without presenting evidence from Sondrup herself—and this is Federal's burden of proof of course—that she received the e-mail or knew of the transfer, and believed (or had reason to believe perhaps) that the transfer was theft, or a fraudulent, dishonest, or criminal act, Federal has no evidence in support of this affirmative defense.  Thus, the Court should deny this affirmative defense because it is Federal's burden of proof and because Federal has not and cannot present any evidence to support it, especially to overcome Elmore's testimony,

**Seventh Affirmative Defense: Discover During the Policy Period**

152.     Federal asserts that the Policy applies only to a loss if "Discovery" occurred during the Policy Period.  Docket No. 155 at p. 18.  This is addressed by the Plaintiffs above.  *See* Discussion at pp. 26-27.

**Eighth Affirmative Defense: Loss In Excess of Deductible**

153.     Federal asserts that the Policy covers a loss only if in excess of the deductible. Docket No. 155 at p. 19.  The Trustee has not been able to locate any deductible in the Policy, including the Crime Coverage Part.  Instead, there is a $50,000.00 retention.  PAPP0079.  Nor has the Trustee been able to locate any exclusion of the type asserted by Federal in the Policy— although obviously a loss must exceed a deductible.  In any event, there being no deductible in the Policy, and the Trustee seeking to recover almost the whole limit of coverage, this affirmative defense is baseless and should be denied as a matter of law.

---

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT—Page 49

**Ninth Affirmative Defense: Loss Must Be Setoff By Recoveries**

154.    Federal asserts that any loss must be reduced, offset and/or set off by all recoveries," and that "[a]fter application of recoveries, Plaintiff cannot recover because any loss is below the deductible." Docket No. 155 at p. 19. However, when the Plaintiffs asked Federal to identify the recoveries that it seeks to apply, it failed to provide a factual answer, asserting that somehow this was privileged—again raising Rule 11 issues. PAPP0328 (Interrogatory 16). For this reason, the Court should deny this affirmative defense. The only legitimate issue is whether Federal should be entitled to a setoff related to the Trustee's recovery of $1.2 million from the FFT settlement, albeit in a lower amount once the Trustee's costs of litigating that result are considered.

**Eleventh Affirmative Defense: Money Not Owned by Insured**

155.    Federal asserts that the Plaintiffs cannot recover to the extent that they seek "to recover Money, Securities and Property that it did not own or hold." Docket No. 155 at p. 18. Clearly, either the Debtor or Multiband owned and/or held the $4.4 million that was transferred. *See* Discussion at pp. 28-29.

**Twelfth Affirmative Defense: Liquidation or Dissolution of Parent Organization**

156.    Federal asserts that the Policy excludes a loss arising prior to the Policy, or arising after the termination of the Policy. Docket No. 155 at p. 19. The loss occurred during the Policy Period and could therefore not have existed prior to the inception of the Policy, and the Policy was not terminated (it expired). This affirmative defense is baseless and should be denied.

**Thirteenth Affirmative Defense: Failure to Comply With Conditions Precedent**

157.    Federal asserts as an affirmative defense a failure to comply with various conditions precedent in the Policy consisting of timely notice after "discovery" and providing a timely "proof of loss." Docket No. 155 at p. 20. These issues are addressed above. *See* Discussion at pp. 35-45.

**Fourteenth Affirmative Defense: Ratification**

158. Federal asserts that "Goodman approved and ratified Frinzi's conduct." Docket No. 155 at p. 20. Goodman testified as to the very opposite: that there was no approval or ratification (or even knowledge of) the $4.4 Million Transfer. PAPP674 (51:18-52:2). Unless Federal has some evidence to the contrary to place this issue in dispute—and recalling that it is Federal's burden of proof—the Court should deny this defense based on the clear summary judgment evidence.

**Fifteenth Affirmative Defense: Unclean Hands, Waiver, Etc.**

159. Federal asserts that "[t]he doctrines of unclean hands, alter ego, ratification, unjust enrichment, waiver and estoppel preclude Plaintiff's claims." Docket No. 155 at p. 20. As its sole support, Federal asserts that the underlying funds were the result of a Minority Owned Business "scam" with FedEx. Here, the sole evidence in support of any such "scam" is Frinzi's testimony, where he testified that he felt that use of the MBE was "an unethical scam." PAPP552 (59:16-25). Namely, Frinzi felt that, although the purpose of MBE was to provide business to minority owned enterprises, here it was used by FedEx and Arris to simply claim to be supporting minority businesses through a high volume of equipment run through the Debtor. *See id*. But the Debtor was properly a minority owned business and it did provide certain value-added additions to FedEx's products, which FedEx was then able to use, in part, to demonstrate its commitment to minority owned businesses. PAPP918-19; PAPP926. Whatever Frinzi—or anyone else for that matter—thinks of this program, it is neither illegal, unethical, or wrong.

160. In any event, "alter ego," "ratification" (for the reasons evidenced above), and "waiver" may be immediately denied, as they have nothing to do with the alleged "scam."

161.     Unjust enrichment generally requires that "a person has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain," such as "when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage." *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex. App. Houston [1st Dist.] 2013).  Nothing about any alleged "scam" means that the Plaintiffs have obtained any wrongful benefit from *Federal*. Federal lacks any standing to assert that the Plaintiffs were unjustly enriched by FedEx or the broader MBE program overall.

162.     With respect to estoppel, Federal does not identify which type of estoppel it is relying on.  In general, however, estoppel requires that one's own action or inaction has improperly induced another into a detrimental position, or where one is estopped to contradict a prior statement or action.  Nothing having to do with the alleged "scam" has anything to do with the issuance of the Policy or with Federal's decision to sell its product to the Debtor.  And, nothing having to do with the alleged "scam" has anything to do with any change in argument or position by the Trustee in this litigation.

163.     That leaves "unclean hands."  "The doctrine of unclean hands closes the doors of a court of equity to one tainted with inequitableness or bad faith *relative to the matter in which he seeks relief*, however improper may have been the behavior of the defendant."  *Condom Sense Inc. v. Alshalabi*, 390 S.W.3d 734, 762 (Tex. App. – Dallas 2012) (emphasis added).  Nothing about the alleged "scam" has anything to do with the procurement of the Policy at issue.  That a prostitute may have purchased his or her house from the fruits of illegal or unethical behavior does not mean that, if the house burns down for a reason having nothing to do with the prostitution, the insurer of the house gets off its contractual commitment.  Or, is Federal actually suggesting contract law and insurance coverage cases should be decided by one's subjective societal view of the insured?  Seen for what it is, Federal's argument of "scam" is grasping at straws.  Indeed, a cursory review of

Chubb (which Federal is a part of) articles on-line demonstrates that it, too, has a strong commitment to minority businesses, which it is proud of—and rightfully so. The Trustee doubts that Federal would characterize these programs as a "scam."

164.    Finally, to the extent that Federal actually argues that there was something illegal about the contract between the Debtor and FedEx, which is in the nature of *in pari delicto*, Federal, as a stranger to the transaction and to the agreement cannot benefit from any such equitable doctrine because the doctrine applies only to the parties to the illegal contract. *See, e.g., Geis v. Colina Del Rio LP*, 362 S.W.3d 100, 107-8 (Tex. App. – San Antonio 2011). In other words, it is only the party to an unenforceable or illegal contract that can assert equity as a defense to its performance of the contract. There is nothing illegal about the Policy.

**Sixteenth Affirmative Defense: Fidelity Bonds Exempt from TPPCA**

165.    Federal asserts that fidelity bonds are exempt from the Texas Prompt Payment of Claims Act. Docket No. 155 at p. 20. To the extent this is even an affirmative defense, the Court has rejected this argument when raised by Federal in its motion to dismiss. *See* Docket No. 148 (order denying motion to dismiss). The Court should likewise deny this affirmative defense, as the issue is identical, and Federal will then have all available appellate remedies.

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs respectfully request that the Court grant the Motion, or so much of it as is properly grantable, and that the Court grant them such other and further relief to which they may be justly entitled.

RESPECTFULLY SUBMITTED this 18th day of March, 2026.

**MUNSCH HARDT KOPF & HARR P.C.**

By: /s/ Davor Rukavina

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Conor P. White, Esq.
Texas Bar No. 24125722
500 North Akard St., Ste. 3800
Dallas, Texas  75201
Telephone: (214) 855-7500
drukavina@munsch.com

**ATTORNEYS FOR THE PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 18th day of March, 2026, true and correct copies of this document were electronically served on all parties in this Adversary Proceeding by and through their counsel of record, including on Federal.

By: /s/ Davor Rukavina

Davor Rukavina, Esq.