# EXHIBIT 9

**Federal App. 0290**

Page 334

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

IN RE:                         §   CASE NO. 22-31641-mvl-7
                               §
GOODMAN NETWORKS, INC.,        §   (Chapter 7)
                               §
      Debtor.                  §
_____

                                    **Related Adversary

                                    Proceedings Listed

                                    on Pages 2-3

      -------------------------------------------

      ORAL AND VIDEOTAPED DEPOSITION OF

              JAMES FRINZI

            MARCH 20, 2025

            (VOLUME 2 OF 3)

      **CONFIDENTIAL TRANSCRIPT**

      -------------------------------------------

          ORAL AND VIDEOTAPED DEPOSITION of JAMES FRINZI, produced as a witness at the instance of the Plaintiff(s) and duly sworn, was taken in the above-styled and numbered cause on March 20, 2025, from 9:02 a.m. to 4:48 p.m., before Molly Carter, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of Munsch Hardt Kopf & Harr, P.C., 1717 West 6th Street, Suite 250, Austin, Texas, pursuant to the Federal Rules of Civil Procedure.

Page 335

RELATED ADVERSARY PROCEEDINGS:

SCOTT M. SEIDEL, TRUSTEE;      §
GNET ATC, LLC; and MULTIBAND   §
FIELD SERVICES, INC.,          §
      Plaintiffs,              §
                               §
VS.                            §   Adv. No. 23-03036-mvl
                               §
MULTIBAND GLOBAL RESOURCES,    §
LLC and FEDERAL INSURANCE      §
COMPANY,                       §
      Defendants.              §
_____

SCOTT M. SEIDEL, TRUSTEE;      §
and GNET ATC, LLC,             §
      Plaintiffs,              §
                               §
VS.                            §   Adv. No. 23-03072-mvl
                               §
18920 NW 11TH, LLC; JAMES      §
GOODMAN; STEVEN ZAKHARYAYEV;   §
EVELINA PINKHASOVA; PEOPLE NQ  §
INC.; JJC & PEOPLE LLC; GDMN   §
FAMILY INVESTMENTS 2, LLC,     §
      Defendants.              §
_____

SCOTT M. SEIDEL, TRUSTEE,      §
      Plaintiff,               §
                               §
VS.                            §   Adv. No. 24-03037-mvl
                               §
MSOUTH EQUITY PARTNERS III,    §
L.P.; 1PATH MANAGED SERVICES,  §
LLC; ONEPATH ITDS HOLDINGS,    §
LLC; ONEPATH ITDS BUYER,       §
INC.; ONEPATH HOLDINGS, LLC;   §
ONEPATH HOLDING CORPORATION;   §
and ONEPATH SYSTEMS OF NC,     §
LLC,                           §
      Defendants.              §

Page 336

SCOTT M. SEIDEL, TRUSTEE,      §
      Plaintiff,               §
                               §
VS.                            §   Adv. No. 24-03039-mvl
                               §
JAMES GOODMAN; JASON GOODMAN;  §
and JOSEPH GOODMAN,            §
      Defendants.              §
_____

SCOTT M. SEIDEL, TRUSTEE,      §
      Plaintiff,               §
                               §
VS.                            §   Adv. No. 23-03090-mvl
                               §
HUDSON CLEAN ENERGY            §
ENTERPRISES, LLC; ALLIANCE     §
TEXAS HOLDINGS, LLC; NEIL Z.   §
AUERBACH; JUDITH AUERBACH;     §
AUERBACH PARTNERS, L.P.;       §
JAMES GOODMAN; GOODMAN         §
INVESTMENT HOLDINGS, LLC;      §
GENESIS NETWORKS, INC.;        §
GENESIS NETWORKS GLOBAL        §
SERVICES, LLC; AUERBACH        §
CHILDRENS DYNASTY TRUST U/A/D  §
OCTOBER 9, 2012; AUERBACH      §
FAMILY DYNASTY TRUST U/A/D     §
OCTOBER 9, 2012; AND           §
SHALOM AUERBACH                §
      Defendants.              §

Page 337

A P P E A R A N C E S

FOR THE PLAINTIFF(S):
      Davor Rukavina
      Conor P. White
      Anne-Alise "Ali" Hinckley
      MUNSCH HARDT KOPF & HARR, P.C.
      500 North Akard Street, Suite 4000
      Dallas, Texas 75201-6659
      (214) 855-7500
      drukavina@munsch.com
      cwhite@munsch.com
      ahinckley@munsch.com

FOR JAMES FRINZI:
      Paul T. Elkins
      WICK PHILLIPS GOULD & MARTIN,LLP
      100 Throckmorton Street, Suite 1500
      Fort Worth, Texas 76102
      (817) 984-7422
      paul.elkins@wickphillips.com

      Jason M. Rudd
      WICK PHILLIPS GOULD & MARTIN,LLP
      3131 McKinney Avenue, Suite 500
      Dallas, Texas 75204
      (214) 692-6200
      jason.rudd@wickphillips.com

FOR DEFENDANT(S) FEDERAL INSURANCE COMPANY:
      Scott Louis Schmookler
      Iga Wiktoria Todd (via Zoom)
      GORDON REES SCULLY MANSUKHANI, LLP
      One North Wacker, Suite 1600
      Chicago, Illinois 60606
      (312) 565-1400
      sschmookler@grsm.com
      itodd@grsm.com

Page 338

FOR DEFENDANT(S) JAMES GOODMAN; GOODMAN INVESTMENT HOLDINGS, LLC; GENESIS NETWORKS, INC.; GENESIS NETWORKS GLOBAL SERVICES, LLC; PEOPLE NQ INC. and JJC & PEOPLE LLC:

    Randall A. Pulman
    Matthieu Belanger-Coast
    PULMAN, CAPPUCCIO & PULLEN, LLP
    2161 Northwest Military Highway, Suite 400
    San Antonio, Texas 78213
    (210) 222-9494
    rpulman@pulmanlaw.com
    matthieu@pulmanlaw.com

FOR DEFENDANT(S) MSOUTH EQUITY PARTNERS III, L.P.; 1PATH MANAGED SERVICES, LLC; ONEPATH ITDS HOLDINGS, LLC; ONEPATH ITDS BUYER, INC.; ONEPATH HOLDINGS, LLC; ONEPATH HOLDING CORPORATION and ONEPATH SYSTEMS OF NC, LLC:

    Dale K. Cathell
    Sima G. Fried (via Zoom)
    DLA PIPER LLP (US)
    650 Exeter Street, Suite 1100
    Baltimore, Maryland 21202
    (410) 580-3000
    dale.cathell@us.dlapiper.com
    sima.fried@us.dlapiper.com

FOR DEFENDANT(S) 18920 NW 11th, LLC; STEVEN ZAKHARYAYEV; EVELINA PINKHASOVA; HUDSON CLEAN ENERGY ENTERPRISES, LLC; ALLIANCE TEXAS HOLDINGS, LLC; NEIL Z. AUERBACH; JUDITH AUERBACH; AUERBACH PARTNERS, L.P.; AUERBACH CHILDRENS DYNASTY TRUST U/A/D 10/9/2012 and AUERBACH FAMILY DYNASTY TRUST U/A/D 10/9/2012;

    Brittainie J. Zinsmeyer
    JORDAN, LYNCH & CANCIENNE PLLC
    1980 Post Oak, Suite 2300
    Houston, Texas 77056
    713-955-4793
    bzinsmeyer@jlcfirm.com

Page 339

FOR THE DEFENDANT(S) JASON GOODMAN AND JOSEPH GOODMAN:

    Robert A. Simon

    David A. Skeels

    WHITAKER CHALK SWINDLE & SCHWARTZ, PLLC

    301 Commerce Street, Suite 3500

    Fort Worth, Texas 76102

    (817) 878-0500

    rsimon@whitakerchalk.com

    dskeels@whitakerchalk.com

ALSO PRESENT:

    Mr. Stephen Pinkston, Videographer

Page 340

I N D E X

Appearances ........................................ 337

JAMES FRINZI
    Examination by Mr. Cathell ..................... 347
    Examination by Mr. Schmookler .................. 408
    Re-Examination by Mr. Rukavina ................. 455
    Re-Examination by Mr. Schmookler ............... 471
    Examination by Mr. Simon ....................... 472
    Re-Examination by Mr. Rukavina ................. 581
    Examination by Mr. Pulman ...................... 603

Signature and Changes .............................. 607
Reporter's Certificate ............................. 608

            EXHIBITS
NUMBER      DESCRIPTION                         PAGE
Exhibit 32 ........................................ 352
    9/22/21 Emails Re: OIS Acquisition Opportunity
Exhibit 33 ........................................ 354
    9/22/21 Emails Re: OIS - CIM & Executed NDA
Exhibit 34 ........................................ 359
    10/22/21 Emails Re: OIS
Exhibit 35 ........................................ 361
    11/30/21 Emails Re: OIS - Second Round Process Letter
Exhibit 36 ........................................ 363
    12/04/21 Emails Re: LOI

Page 341

Exhibit 37 ........................................ 364
    12/13/21 Email Re: Signed LOI
Exhibit 38 ........................................ 366
    2/1/22 Email Re: Initial Draft - OIS Carve-out
Exhibit 39 ........................................ 368
    1/22/22 Text Messages
Exhibit 40 ........................................ 370
    12/31/21 Emails Re: Confidential - Acquisition Status
Exhibit 41 ........................................ 375
    2/1/22 Unit Purchase Agreement By and Among American Metals Recovery and Recycling, Inc. OnePath Systems, LLC, and AMR Resources, LLC
Exhibit 42 ........................................ 378
    2/1/22 Transition Services Agreement
Exhibit 43 ........................................ 389
    7/18/22 Letter from AMRR Re: Demand for OnePath Systems LLC to Cure Its Breach of Contract
Exhibit 44 ........................................ 392
    1/31/23 Membership Interest Transfer Agreement
Exhibit 45 ........................................ 393
    2/1/22 Acquisition of AMR Resources, LLC by Multiband Global Resources, LLC - Purchase Price Allocation **Attorney Eyes Only**
Exhibit 46 ........................................ 395
    AMRR Balance Sheet as of December 2022 **Attorney Eyes Only**
Exhibit 47 ........................................ 396
    1/21/22 Secured Promissory Note
Exhibit 48 ........................................ 399
    2/13/23 Engagement Letter from Layer 7 Capital LLC

Page 342

Exhibit 49 ........................................ 411
11/10/21 Insurance Application

Exhibit 50 ........................................ 417
Plaintiff's Second Amended Complaint in
Adv. No. 23-03036

Exhibit 51 ........................................ 422
Defendant James Frinzi's Answers and
Objections to First Set of
Interrogatories in Adv. No. 23-03036

Exhibit 52 ........................................ 427
5/8/24 Limited Settlement and Release
Agreement

Exhibit 53 ........................................ 429
11/2/22 Emails Re: Wire instructions -
EWB Goodman Networks, Inc. account

Exhibit 54 ........................................ 433
10/12/20 Emails Re: Brief Description of
Fed Ex Business

Exhibit 55 ........................................ 435
GNET ATC - Restructure Presentation 09/21

Exhibit 56 ........................................ 437
Letter from Samantha Sondrup, Final
Filing and Cancellation Request

Exhibit 57 ........................................ 439
1/28/22 Emails Re: Request List

Exhibit 58 ........................................ 441
8/3/22 Goodman Networks et al. Financial
Presentation

Exhibit 59 ........................................ 445
Cash Statements

Exhibit 60 ........................................ 450
Mutual Settlement and Release Agreement
Filed 11/12/24

Exhibit 61 ........................................ 473
11/1/19 Letter from Frinzi to Goodman
Re: Retainer for Consulting Services

Page 343

Exhibit 62 ........................................ 475
2/25/20 World Conquest, LLC Invoice to
Goodman Networks

Exhibit 63 ........................................ 476
4/14/20 Emails Re: Bond Deal

Exhibit 64 ........................................ 478
3/9/21 Letter from World Conquest Capital
to Scot Brunke, CFO Goodman Solutions

Exhibit 65 ........................................ 481
8/2/21 Email Re: Solutions

Exhibit 66 ........................................ 485
8/3/21 Email Re: Staging the Turnaround

Exhibit 67 ........................................ 490
8/14/21 Emails Re: Go Public Now

Exhibit 68 ........................................ 491
8/26/21 Emails Re: Org Roles

Exhibit 69 ........................................ 494
9/9/21 Email Re: Restructure Draft

Exhibit 70 ........................................ 497
9/10/21 Email Re: Shell

Exhibit 71 ........................................ 498
9/9/21 Email Re: Public Shell and
Investor

Exhibit 72 ........................................ 501
9/17/21 Email Re: Goodman Board
Recommendations

Exhibit 73 ........................................ 503
9/20/21 Emails Re: GNET ATC Spin-Off
Diligence and Considerations

Exhibit 74 ........................................ 504
9/20/21 Emails Re: GNET ATC Spin-Off
Diligence and Considerations

Exhibit 75 ........................................ 506
9/20/21 Emails Re: Follow-up re Financial
Statements

Page 344

Exhibit 76 ........................................ 508
9/21/21 Emails Re: Please Review

Exhibit 77 ........................................ 511
9/22/21 Emails Re: 0IS Acquisition
Opportunity

Exhibit 78 ........................................ 515
9/22/21 Emails Re: Winstead Engagement
Letter - GNET ATC, LLC

Exhibit 79 ........................................ 516
9/29/21 Emails Re: GNET-ATC Income
Statement

Exhibit 80 ........................................ 519
9/29/21 Email Re: Presentation - GNET ATC
Restructure Plan

Exhibit 81 ........................................ 521
9/30/21 Analysis

Exhibit 82 ........................................ 524
9/30/21 Analysis

Exhibit 83 ........................................ 527
10/1/21 Emails Re: Introduction - Letter
of Intent - Repository Services

Exhibit 84 ........................................ 531
10/15/21 Email Re: Notes for Call -
Confidential

Exhibit 85 ........................................ 533
10/18/21 Emails Re: Bond Indenture

Exhibit 86 ........................................ 534
10/20/21 Unanimous Written Consent of the
Board of Directors of Goodman Networks
Incorporated DBA Goodman Solutions

Exhibit 87 ........................................ 535
10/27/21 Emails Re: Payment Claim
Letter_Oct 26 2021

Exhibit 88 ........................................ 538
10/27/21 Emails Re: AMRR Closing

Page 345

Exhibit 89 ........................................ 540
10/28/21 Email Re: Creditor- Confidential

Exhibit 90 ........................................ 543
11/5/21 Emails Re: Notice Under Escrow
Agreement dated October 6, 2021

Exhibit 91 ........................................ 545
11/10/21 Emails Re: Confidential - GNET
ATC Banking

Exhibit 92 ........................................ 546
11/10/21 Emails Re: Confidential - GNET
ATC Banking

Exhibit 93 ........................................ 547
11/16/21 Emails Re: FedEx - Confidential

Exhibit 94 ........................................ 552
11/17/21 Emails Re: Confidential

Exhibit 95 ........................................ 554
11/17/21 Emails Re: Confidential

Exhibit 96 ........................................ 555
11/17/21 Email Re: Confidential

Exhibit 97 ........................................ 557
11/23/21 Email Re: Confidential- Payments

Exhibit 98 ........................................ 560
11/23/21 Current Report of Goodman
Networks Incorporated

Exhibit 99 ........................................ 562
12/1/21 Written Consent of the Sole
Member of GNET ATC, LLC

Exhibit 100 ........................................ 562
9/27/21 East West Bank Supplement to
Business Account Signature Card for
Goodman Networks Inc Account

Exhibit 101 ........................................ 563
12/8/21 Emails Re: Note UFS GS

Exhibit 102 ........................................ 564
12/8/21 Emails Re: Note UFS GS



Page 346

Exhibit 103 ........................................ 566
12/9/21 Emails Re: Confidential - Turnaround

Exhibit 104 ........................................ 573
12/13/21 Emails Re: Update from Prosperity Bank

Exhibit 105 ........................................ 574
12/29/21 Emails Re: Goodman Stock Value

Exhibit 106 ........................................ 577
GNET ATC December 2021 Situational Overview and Alternatives (Draft) from Sierra Constellation Partners

Exhibit 107 ........................................ 578
1/17/22 GNET ATC, LLC Financial Presentation from CFGI

Exhibit 108 ........................................ 603
Notice of Subpoenaed Deposition of James Frinzi in Adv. No. 23-03090-mvl

Exhibit 109 ........................................ 603
James E. Goodman's Cross-Notice of Intention to Take the Oral Deposition of James Frinzi in Adv. No. 24-03039-mvl

Exhibit 110 ........................................ 603
James E. Goodman's Cross-Notice of Intention to Take the Oral Deposition of James Frinzi in Adv. No. 23-03090-mvl

Page 347

THE VIDEOGRAPHER:  Today's date is March 20th, 2025.  The time is 9:02 a.m. Central.  We are on the record.  This is Volume 2 of the deposition of James Frinzi.  You may swear in the witness.

JAMES FRINZI, having been first duly sworn, testified as follows:

E X A M I N A T I O N

BY MR. CATHELL:

Q   Good morning, Mr. Frinzi.

A   Good morning.

Q   My name is Dale Cathell.

A   Yeah.

Q   Appreciate you being here for Day 2.

A   Sure.

Q   Going to be a long day today.  Let me tell you who I represent.

A   Okay.

Q   So my clients, I'm going to read their names, and then we'll kind of have a way where I don't have to say their names each time.  Okay?

A   That would be great.  Super.

Q   So I represent MSouth Equity Partners and the various OnePath entities --

A   Okay.

Q   -- that have been sued in connection with a

Page 348

fraudulent conveyance claim brought by the Trustee in connection with the sale of the OIS unit that OnePath owned at one point in time, two entities that you owned.

And so for purposes of today, if I say MSouth, that's the abbreviation for MSouth Equity Partners III, LP.

A   Okay.

Q   And if I say the OnePath entities, there's like five entities that are --

A   I understand that.

Q   -- Defendants.  Okay.

And let me just also say, I'm sure you got plenty of instructions about the deposition process yesterday --

A   That's right.

Q   -- from multiple attorneys.  It's not a marathon.  I've talked with the Trustee's Counsel.  I've agreed that I'm not going to ask more than two-and-a-half hours of time -- of questions today.

A   Okay.

Q   Hopefully I'll be shorter than that.

A   Let's go.

Q   I'm going to try to be efficient.

To the extent that some of the stuff is repetitive, I apologize ahead of time because I wasn't

Page 349

here yesterday.  But I'm going to try to be as efficient as possible.

To the extent you need a break, bathroom break or anything like that, you just let me know and we'll stop.

A   Okay.  Thank you.

Q   So, Mr. Frinzi, I want to first just kind of understand a little bit regarding your role, when I say your role, really your title of the various entities that I've seen in a lot of pleadings at the time that the OIS division of OnePath was sold --

A   Okay.

Q   -- to AMRR.  Do you know what I mean when I say AMRR?

A   Of course I do, yes.

Q   Okay.  That's American Metals Recovery --

A   Yes, sir.

Q   -- and Recycling.

A   I know what you mean.

Q   So the sale of the OnePath OIS unit occurred in February 2022.

A   Yeah, that's right.

Q   Okay.  And at that time, were you the CEO of Goodman Networks, Inc.?

A   I don't re- -- you know what, I may have been,

Page 350

yeah.

Q   And are you familiar with an entity called GNET ATC --

A   Of course.

Q   -- LLC?

A   Yes.

Q   What was that entity, just from a 10,000-foot level?

A   It was a reseller of -- a reseller and I guess, yeah, of equipment, telecom equipment.

Q   And at the time of the OnePath sale, were you the CEO of GNET ATC, LLC?

A   Yes, sir.

Q   And are you familiar with an entity called Multiband Field Services, Inc.?

A   I am.

Q   What was that entity, again, from a high level?

A   They installed home internet and TV services for DirecTV and AT&T.

Q   And at the time of the sale of OnePath, the OnePath unit, were you the CEO of Multiband Field Services, Inc.?

A   Actually, I think that was -- that entity was sold before then.

Q   Okay.  And are you familiar with an entity

Page 351

called Multiband Global Resources, LLC?

A   I am.

Q   What was that entity, again from a high level?

A   It was just a holding, it was like an SPV to buy AMRR.

Q   Okay.  And were you the sole manager and sole member of Multiband Global Resources, LLC, at the time of the sale of the OnePath unit?

A   Yes, sir.

Q   And, you know, I'm obviously focusing on the sale --

A   Fine, sure.

Q   -- of the OnePath unit.  When I say OnePath unit, I'm talking about the OIS unit, but it doesn't come out that easy, so I'm just going to say the OnePath unit.

A   I understand.  I fully understand all the acronyms you're going to have for me.  It's no problem. I got you.

Q   So at the time of the sale of the OnePath unit to AMRR, were you the CEO of AMRR?

A   Yes.

Q   How did you learn about the possibility of acquiring the OnePath unit?

A   Well, I had first been introduced to OnePath through James Goodman, because I believe he bought one of

Page 352

the other business units in that -- that OIS, that OnePath ecosystem.  And then I got connected to the acquisition process through Layer 7.

Q   And who is Layer 7?

A   A consulting or some financial broker, matchmaker company, based on the east coast, I believe.

Q   Like investment bankers?

A   I guess so, sure.

Q   For OnePath?

A   Yes.

Q   Let me show you what I'm going to have marked as Frinzi Exhibit 32.

A   Okay.

(Exhibit 32 marked for identification.)

MR. WHITE:  I'm sorry, Dale, I just got an email.  We do have people on a different Zoom link. Could we get them on real quick?

MR. CATHELL:  Yeah, yeah.

MR. ELKINS:  Off the record.

THE VIDEOGRAPHER:  The time is 9:08 a.m. Central.  We are off the record.

(Recess.)

THE VIDEOGRAPHER:  The time is 9:23 a.m. Central.  We are on the record.

Q   (By Mr. Cathell) Back, Mr. Frinzi, we are with

Page 353

the exhibit that we ended with.

A   Yes.

Q   So could you identify Exhibit 32 for the record, please?

A   Sure.  It's an email between -- including myself, some individuals from Layer 7, and Jay Bock from Genesis Networks.

Q   Right.  And who's Jay Bock?

A   He was an employee of Genesis Networks.

Q   And is this email consistent from a time perspective when you first learned about the OnePath opportunity?

A   Yes.

Q   And did you ultimately sign an NDA?

A   I don't recall.

Q   And when you say Mr. Bock was an employee at Genesis, what was he at Genesis?

A   I have no idea.

Q   And at the time you were the CEO of Goodman Networks?

A   Yes.

Q   Also CEO of ATC?

A   Yes.

Q   When I say ATC --

A   I understand.

Page 354

Q   Okay.  Let me show you what I'm going to have marked as Exhibit 33.

(Exhibit 33 marked for identification.)

(Discussion off the record.)

Q   And Mr. Frinzi, do you see, Exhibit 33 is an email from someone named Kavi Packiam at Layer 7 to you and Jay Brock [sic]?

A   Yeah, I see that.

Q   And you see it's got a package about the OnePath sale?

A   I do.

Q   Do you remember receiving this email?

A   I don't remember, but I believe this is a true and correct copy of it.

Q   Okay.  And would it have been something that you would have read?

A   Yeah, I'm sure.

Q   So kind of explain to me how the sale process worked, for you, with respect to acquiring the OnePath unit.  You probably signed an NDA.  You get this package.  Kind of explain what happened next.

A   That's kind of a broad question.  I'm sorry.

Q   Okay.  You can give me a broad answer.

A   Okay.  So we -- I mean, I'm sure that we -- "we" being me and James and --

Page 355

Q   Can I stop you real quick?

A   James Goodman.

Q   Thank you.

A   Looked through it and evaluated it.  I remember the customer base was pretty interesting because we wanted to get in with Lockheed Martin and Google Fiber.  In fact, I think that originally we wanted to just buy the Lockheed and Google Fiber businesses.  And there wasn't really a huge interest in the low-voltage wiring.

But that's just -- it wasn't an option for the Layer 7 people to sell or split it up like that.  So we had to make an offer for the entire, the entire enterprise.

But yeah, you know, we looked through the memo that was provided by Layer 7, evaluated it, and based on the memo, there was interest in proceeding through the sale process.

Q   Did you retain professionals to help you with the sale process?

A   Yeah, and I forgot which ones, because we had a lot of -- we had a variety of consultants.  But yeah, so -- and I don't recall which ones.  It would have either been Sierra or CFGI.  I don't recall.  It's been, you know, about four years.

Q   And when you say Sierra or CFGI, who are they?

Page 356

Are they financial advisors?

A   Yeah, basically financial advisors.

Q   Okay.  Did you also have lawyers representing you?

A   Yes.

Q   Who represented -- when I say you, I'm talking about the buyer.

A   I understand.

Q   Who represented you?

A   You know, I don't recall exactly because, you know, I've had such a massive ecosystem of lawyers over the past five years, so I don't recall exactly which one was involved in this process.

Q   Do you remember someone named Joey Bell?

A   Oh, yes.

Q   So who is Joey Bell?

A   So Joey O'Bell was the lawyer for AMRR.  So he would have been one of the lawyers that would have been consistent.  But of the other law firms, I don't recall which one would have.

Q   But you do believe there were other law firms that were involved as well?

A   Yes.

Q   Now, with respect to the sale process itself, do you remember submitting multiple letters of intent or

Page 357

indications of interest?

A   Yes.

Q   Explain to me how that process worked.

A   That's kind of a broad question.  I don't know how to describe a process of sending a letter.

Q   Did you -- how many letters of intent did you send?

A   I don't recall.  You know, again, I feel like initially we asked if we could just buy Google business unit and Lockheed business unit.  And so I believe that there was iterations, but again, that's, you know, almost five years ago.  At least four years ago.  So I don't recall the process on that.

Q   Okay.  And when you say "we asked," you're talking about you had negotiations?

A   Yeah, with Layer 7.

Q   That was going to be my next question, who were the negotiations with.

A   Yes.

Q   Were they always with Layer 7?

A   Generally.  It didn't get involved with the actual individuals at OnePath until much further down the line.

Q   Let's talk about the interactions with OnePath individuals.  Who did you interact with at OnePath?

Page 358

A   Opal, I think Ferraro or something of that nature. She was a finance person. And then Jeff Spranger. And I'm sorry, I forget the other guy's name. He was, I think he was Korean. And I don't remember what his name was. But -- I don't recall. I remember seeing, I remember their faces from Zoom and such, but I don't remember all their names. I remember Opal because that's a unique name.

Q   Sure. And do you remember what you discussed with -- let's start with Opal.

A   You know, again, it's four years ago. I had a lot of discussions with Opal. And so I can't, I mean, that's pretty broad still.

Q   Do you remember any of the topics?

A   Well, one of the -- what I remember a lot is over Lockheed. And so I felt that they represented the transition of Lockheed was going to be easier than it actually ended up being. And so -- and I felt that as we progressed in the discussions, Opal was pretty evasive and difficult about the Lockheed topic actually.

So, I mean, that's -- and again, these are a lot of conversations, four years ago. I don't remember, you know, specific conversations. But in terms of a theme, I remember that Opal was a difficult individual, and I felt evasive about the conveyance of the Lockheed

Page 359

contract. And -- but I have nothing specific for conversations. I mean, if you have a more specific question around a conversation, I could respond to it better, I think.

Q   The problem is I don't know what conversations you had, so it's kind of hard to be specific.

A   It's tough, yeah.

Q   Yeah. So how about Mr. Spranger, did you have conversations with Mr. Spranger, Jeff Spranger?

A   Yeah. You know, Jeff Spranger, more about, you know, finance, backlog, work in progress, things of that, of that nature.

Q   And the other gentleman, the third gentleman you didn't remember his name --

A   No.

Q   -- you thought he had a Korean American last name or something along --

A   Yes.

Q   Do you remember any of the topics you discussed with him?

A   I don't remember.

Q   Let me show you what I'm going to have marked as Exhibit 34.

(Exhibit 34 marked for identification.)

Q   Mr. Frinzi, do you see this is an email chain,

Page 360

you're involved in the bottom part of the chain, emailing a gentleman named Kavi Packiam --

A   That's right.

Q   -- P-A-C-K-I-A-M, at Layer 7. And there's an October 22nd, 2021, indication of interest letter attached to it?

A   Yes.

Q   Are you familiar with the indication of interest letter?

A   Yes.

Q   Is that your signature on the second page?

A   It is.

Q   And we were talking earlier about letters of intent and other things. Is this the first indication of interest, letter of intent, however you want to call it, letter that you submitted in connection with the OnePath purchase?

A   Based on the exhibit you just gave me, I'm going to agree with that. It's highly likely that this is the first one. But I don't recall all my correspondences from 2021.

Q   Okay. And you signed it as the CEO of Multiband Global Resources; is that correct?

A   Yes.

Q   And why did you -- why was the buyer at this

Page 361

time Multiband Global Resources?

A   I think it was before we acquired the public shell, AMRR.

Q   AMRR?

A   Yes.

Q   And do you see on the first page, you have a purchase price of $26 million?

A   Yes.

Q   And where did you come up with that amount?

A   You know, I think that -- I mean, Jay Bock was instrumental in that, but I conferred with James Goodman and Jay Bock on that. And I don't recall the formula or how we derived on that. But I think that was based on primarily intelligence from Jay Bock and James Goodman on what OnePath would sell for.

Q   Now, after you submitted this indication of interest letter that's been marked as Exhibit 34, what happened next, if you remember?

A   I don't remember.

Q   Let me show you what I'm going to have marked -- and you may have been shown this yesterday.

A   Okay.

Q   But I don't have the number.

A   That's fine.

Q   As Exhibit 35.

Page 362

(Exhibit 35 marked for identification.)

Q   Have you seen this email exchange before?

A   Yeah, I saw this yesterday.

Q   And my understanding, and I could be wrong because I was not here yesterday, but my understanding yesterday is that you don't believe the statement in the first sentence that the highest offer received in the first round was in the mid 30s?  You don't think that was accurate?

A   Actually, I was told that was not accurate.

Q   Okay.  But you don't know if it was accurate, you personally.

A   I personally have no idea.  I'm relying on what I learned yesterday in my deposition, that our offer was actually the only offer, and there wasn't another offer in the mid 30s, is what I was told.

Q   And when you say "learned" -- when you say "learned," you were told that by an attorney.  You don't know that, though.

A   Correct.

Q   Okay.  Now, after you got this email, did you submit another letter of intent with a higher offer, purchase price?

A   I'm sure I did.

Q   What was the actual purchase price that you

Page 363

ultimately paid?

A   I don't recall.  We went over that yesterday exhaustively.

Q   About 40 million?

A   Around that.

Q   I'm not -- yeah, I'm not -- it's not a pop quiz.

A   Okay.  Okay.

Q   Let me show you what I'm going to have marked as 36.

(Exhibit 36 marked for identification.)

Q   Mr. Frinzi, have you seen this document before?

A   I didn't see it yesterday, but I am on this email.

Q   And at the top it's an email from you to Steve Lee, Isabella Montani --

A   Yes.

Q   -- and Kavi Packiam?

A   Okay.  That's what it says.

Q   And do you remember this email, sitting here today?

A   Again, it's been four years ago.  This is a true and correct copy of this email, in my impression.

Q   Okay.  And who's Isabella Montani?

A   She is an advisor from Sierra Constellation

Page 364

Partners, so that answers the question from before which advisor worked with us.

Q   Okay.  And at the top, in the email, you say, "We have over $40 million cash on hand right now, but our plan is to finance 60 to 70 percent of the costs through debt."

A   Okay.  That's what it says.

Q   And was that a true statement when you said it?

A   Yes.

Q   And when you said, "We have over $40 million cash on hand," who are you talking about?

A   GNET ATC.

Q   And when you said your plan was to finance 60 to 70 percent of the costs through debt, who was going to finance -- who was going to be the lender for that debt?

A   Whoever we could find.  That's why we had Isabella Montani on the email, to help source debt.

Q   Okay.  Let me show you what I'm going to have marked as Exhibit 37.

(Exhibit 37 marked for identification.)

MR. PULMAN:  Is this 37 or 38?

MR. CATHELL:  37.

Q   (By Mr. Cathell) And so just for the record, Mr. Frinzi, this is an email from you dated December 13th, 2021, to people at Larry -- Layer 7?

Page 365

A   Yes.

Q   With a CC to Joseph O'Bell?

A   Yes.

Q   Okay.  And is this a true and correct copy of the email with the attachment that you sent?

A   Yes.

Q   And this attachment, could you identify what the attachment is for the record?

A   Sure.  It's a letter of intent posed to Layer 7 Capital to the attention of Kavi Packiam.

Q   And this is the second layer of intent -- letter of intent that we talked about previously?

A   Yes.

Q   And you see that you've got a, on the first -- actually, let's go to the second page first.

A   Okay.

Q   Third page.

A   Okay.

Q   Is that your signature on the third page?

A   That is.

Q   Okay.  And you signed it on behalf of Multiband Global Resources, LLC?

A   Yes.

Q   Okay.  And if you go to the first page, you see the purchase price is $38 million?

Page 366

A    Yes, I do.

Q    And where did you come up with the $38 million number?

A    Well, after we got the response back, with the other bids were in the mid 30s, we wanted to acquire OnePath, so we went to the higher end of mid 30s.

Q    Did you hire anyone to estimate the value of OnePath?

A    Yeah, we worked with -- we worked with Sierra Constellation.

Q    Did you hire anyone else to do a valuation?

A    I don't think so.

Q    Have you ever heard of a company called Scalar?

A    Oh, yes.  Okay, I guess we did then.

Q    So I'm going to have this marked as Exhibit 38. You don't have to worry.  I'm not going to ask you about the whole thing.

A    Okay.

(Exhibit 38 marked for identification.)

Q    So Mr. Frinzi, just for the record, this is an email from Christian Sorenson at Scalar, to you, with a CC to a bunch of people at Layer 7.  Is that correct?

A    I see that.

Q    And is this a true and correct copy of the email you received in February --

Page 367

A    Yes.

Q    -- 2022?

A    Yes.

Q    And you see on the first page of the email, there's a statement in there that says, "This along with some other needed adjustments have led us to a median conclusion of $48.4 million"?

A    I see that.

Q    And why did you hire Scalar?

A    To get a valuation on OnePath to rationalize the value paid.

Q    It's part of the due diligence that you were doing before closing on the sale; is that fair?

A    Yes, that's fair.

Q    And is it also fair that if this valuation had come in, say, for example, at $10 million, that that could have impacted your decision with respect to the purchase of OnePath for $38 million?

A    Yes.

Q    But it didn't come in at $10 million, did it?

A    It came in at 48.4.

Q    And at the time, did you think that that number was accurate?

A    Based on the memo from Layer 7 and the information that was presented to us from OnePath, we

Page 368

felt like there wouldn't be any reason to not believe it.

Q    Just go back to that.  What's the date of that? Is that February again, 2022, the email?

A    It is February 2022.

Q    So I'm going to show you what I'm going to have marked as Exhibit 39.

A    Okay.

(Exhibit 39 marked for identification.)

Q    Mr. Frinzi, I know there was an exhibit yesterday that I think has a whole bunch of these --

A    Yes.

Q    -- look like text messages --

A    Yes.

Q    -- or Signal messages.

A    Yes.

Q    So I pulled one out.  I apologize if this was in a long chain and you went through it.

A    That's no problem.

Q    Could you identify what this document is for the record?

A    It's a Signal record.

Q    And it's between -- who are the participants on it?

A    Myself and James Goodman.

Q    Okay.  If you go to -- by the way, the date of

Page 369

this, it looks like it's multiple days, right?  It's like a chain.

A    It looks like that.

Q    At the top of the first page, it says January 22nd, 2022?

A    Yes.

Q    And if you go to the third page -- let me just ask you actually on the first page, the color coding.

A    Yes.

Q    Is James Goodman gray or is he blue?

A    He's gray.

Q    You're blue?

A    Correct.

Q    Got it.  And so if you go to the third page --

A    Okay, third page.

Q    Yep.  You see there's a discussion about OnePath?

A    Yes.

Q    And then if you go to the -- one, two -- third complete blue one --

A    Yes.

Q    -- you see where it says, "No. 24," it starts out with?

A    Pardon me?  Oh, I see.  Yeah, yeah, yeah.  I see.  Gotcha.

Page 370

Q   And then, and then you say -- this is you speaking, correct?

A   Yeah.

Q   Then it says, "Then I guess my bid was allegedly the lowest.  Originally we estimated 40 million, and I believe Jay thought they'd want low 40s."

A   Uh-huh.

Q   Who's the Jay you're talking about there?

A   Jay Bock.

Q   Jay Bock.  And when you say "estimated 40 million," you thought at this time when you were sending this to James Goodman that the OnePath unit was worth approximately $40 million?

A   Yes.

Q   And that was in the ballpark range of what the valuation you ultimately got after this exchange confirmed, correct?

A   That's right.

Q   So I'm going to show you what I'm going to have marked as Exhibit 40, and I'm reasonably confident you were showed it yesterday, but again, it would take longer to get it out.

A   Sure.  Got it.

(Exhibit 40 marked for identification.)

Page 371

Q   Was this document shown to you yesterday?

A   It was.

Q   Could you identify this document again for the record?

A   Sure.  It's an email from myself to Kavi Packiam, copied to Joseph O'Bell.

Q   And what was the purpose of this email?

A   To provide general proof of funds that we can execute the transaction with OnePath.

Q   And this is a true and correct copy of the email that you sent?

A   It is a true and correct copy.

Q   If you go to the top email, second paragraph starting with "as stated previously" --

A   Yes.

Q   -- it says, "As stated previously, in the worst case scenario, I am prepared to have GNET ATC bridge loan the full amount of the acquisition."

A   Yes.

Q   "And I can refinance with my traditional banks later."

A   Yes.

Q   And I want to focus on "I am prepared to have GNET ATC bridge loan the full amount of the acquisition."

A   Okay.

Page 372

Q   Was that true when you said it?

A   Yeah.

Q   And is that what ultimately happened?

A   No.

Q   What ultimately happened?

A   GNET lent the money and we were planning to -- so then we reverse merged it into AMRR, the public shell.  And then -- the idea was then when we were public, we'd have easier access for debt.

And then the carve-out audit of OnePath was so much more onerous than anyone even expected, and so that led to one of AMRR's 10-Ks or one of their quarterly filings to be late.  And then that created a substantial problem on the, on the OTC market, which led to -- ultimately it just dragged down the stock price and created a crisis.

So the re- -- the carve-out audit of OnePath, again, we didn't expect it to be what it was, and that ruined our stock rating, which made it hard to borrow to refinance the debt.

Q   Okay.  So I want to go back to the email and kind of break it up.

A   Which one?

Q   The one you've got in front of you, at the top --

Page 373

A   Okay, okay.

Q   -- in that sentence that I read.

A   I'm reading it.

Q   So I'm going to read one specific part to you.

A   Okay.

Q   Okay?  And then forget about the rest of the email, because my question is only going to be on one specific part.

A   Gotcha.

Q   You say, "I am prepared to have GNET ATC bridge loan the full amount of acquisition."

A   Okay.

Q   That was a -- was that a true statement at the time you said it?

A   Yes.

Q   And that's what ultimately happened with respect to the loan, correct?

A   Correct.

Q   Okay.  So GNET ATC loaned the money to buy the OnePath unit.

A   That's right.

Q   Now, I'll be honest with you, because sometimes I was confusing you, you confused me with the rest of your answer about what happened afterwards.  Can you explain that again to me?

Page 374

A   Sure. So when AMRR bought OnePath to fold their earnings into AMRR as the public company, the finances at the overall OnePath organization had to be split up and carved out so that the parts that AMRR bought, their financial information went with AMRR.

After buying OnePath, there were a lot of shared expenses and incomes within the OnePath ecosystem before we bought it. And so it became a substantially bigger deal to extract the financial records from the part that AMRR bought and enter it into AMRR's finances.

So, for instance, you know, there was a Lockheed division, there's a Google division, a low-voltage division, but they also had some other kind of IT stuff. So there had to be the allocation of insurance costs to Lockheed versus this division or that division, the allocation of HR, the allocation of IT expenses, allocation of office expenses.

And so when AMRR bought OnePath, it wasn't abundantly clear that extracting the piece that AMRR was buying would be such a onerous task to get that financial asset, asset/liability information moved over to AMRR post-transaction. And that created late public filings, which killed the stock price and then ultimately got it delisted.

Q   When you say killed the stock price and

Page 375

delisted, you're talking about AMRR?

A   AMRR stock price, yes. Because the whole point of buying it was to put it into a public -- put OIS into a public shell. Then we would have liquid equity -- AMRR would have liquid equity. With liquid equity you could go to a bank or investment bankers and you could have actual collateral, and then we could re- -- AMRR could refinance and pay back GNET ATC.

But the difficulty in allocation created a -- allocation of expenses and, you know, incomes and financial data, that created a substantial problem. And also the conveyance of Lockheed became a huge issue for AMRR and for OnePath as well.

Q   Thanks for that explanation. That -- I got it now.

A   Okay.

Q   I promise there's not a ton. But some of them are thick.

A   I gotcha.

Q   All right. I'm going to show you, which I'm sure you were shown, but I'm going to have it marked again, Exhibit 41.

(Exhibit 41 marked for identification.)

Q   If you go to Page Number 20 -- it's right after 29, so it's going to be like the 31st page in. I'm

Page 376

looking for your signature.

MR. ELKINS: I think it's --

THE WITNESS: I see it. Yeah.

Q   (By Mr. Cathell) And so we're at Bates label 2004EX_17821?

A   Yes, I see that.

Q   And is that your signature?

A   It is.

Q   And you signed as CEO of American Metals Recovery and Recycling?

A   That's right.

Q   And could you identify what this document is, for the record?

A   It is the Unit Purchase Agreement By and Among American Metals Recovery and Recycling, OnePath Systems, and AMRR Resources.

Q   All right. This is the sale contract for --

A   Yes.

Q   -- buying the OnePath unit.

A   (Nodding head.)

Q   Is this a true and correct copy of it?

A   It is.

Q   Who drafted the agreement? And let me be more specific.

A   Okay.

Page 377

Q   Did you have attorneys representing you in connection with this document?

A   Yes.

Q   And they would have been negotiating with attorneys from OnePath?

A   Yes, that's right.

Q   And do you agree with me that this transaction was a fully arm's length transaction?

A   Yes.

MR. WHITE: Objection, calls for a legal conclusion.

A   Yeah, I didn't have a pre-existing relationship with OnePath, so...

Q   (By Mr. Cathell) Fair to say you were trying to negotiate the best deal for you? When I say "you," for AMRR?

A   That's right.

Q   And fair to say that you believe that OnePath was trying to negotiate the best deal for them?

A   Yes.

Q   Do you know how long it took to get to the signed agreement? When I say that, ballpark again. Did it take a couple months of negotiating?

A   Probably two, three months, I suppose.

Q   Show you what I'm going to have marked as 42.

Page 378

(Exhibit 42 marked for identification.)

Q   Mr. Frinzi, I'm going to direct -- I'm going to go Bates label, because I don't see a page number on it.

A   Okay.

Q   2004EX_17746.

A   Okay.  Got it.

Q   Is that your signature?

A   It is.

Q   And could you identify what this document is for the record?

A   Yeah, Transition Services Agreement between OnePath and AMRR.

Q   And is this a true and correct copy of the Transition Services Agreement that you executed?

A   It is.

Q   And this was executed as a part of a sale to AMRR of the OnePath unit?

A   That's right.

Q   And what was the purpose of the Transition Services Agreement?

A   To do exactly that, is transition the services because it's hard to just have a line in the sand where, you know, we take over -- we have to pair -- we had to pair off, you know, HR and IT stuff and, you know, just mutual services that needed to be pulled from the overall

Page 379

OnePath enterprise into ours, being AMRR.

Q   And I think you, when you were explaining to me the other issue that I didn't understand with regard to the previous exhibit, you were talking about the ecosystem at OnePath.  Is the Transition Services Agreement part of the process to help facilitate the OIS unit coming out of OnePath and into AMRR?

A   That's right.  It was a transitional term to extract the parts that were shared services out of, out of OnePath into AMRR.

Q   And did AMRR pay for the transition services it received from OnePath?

A   Yes.

Q   So I want to kind of bring us post-closing with respect to the OnePath unit.  Who was in charge of running the OnePath unit after it was acquired by AMRR?

A   So from the -- so when it was in -- it still remained William Bailey and Jeff Spranger reporting to Samantha Sondrup at AMRR.

Q   So management, in connection with the OnePath unit, stayed the same at OnePath?

A   Yes.

Q   And then did they report to you?

A   They reported to Samantha Sondrup.

Q   Okay.

Page 380

A   Who reported to me.

Q   Okay.  And how did the business perform after you acquired it?

A   So the Lockheed business performed fine.  The Google business performed fine.  Ultimately, we got fired from Job Corps because OnePath employees basically sabotaged it and stole it back somehow.  And then the structured cabling was a complete disaster.

Q   I'm going to focus on the two negative ones --

A   Okay.

Q   -- that you mentioned.  So with Job Corps you said after you acquired it, OnePath employees sabotaged it and stole it.  What do you mean by that?

A   I forgot the employee's name.  There was -- there were employees that literally sabotaged it by complaining to the prime contractor, and we kept on getting negative calls from the prime contractor about the people at Job Corps complaining about the transition to AMRR.

And then I believe a couple of the employees quit, and then competed and got the work out from under us.  So I think we maybe had Job Corps for like six months before the OnePath employees that worked for us left and poached that work.

Q   Okay.  And that was a negative impact of a

Page 381

OnePath business you had purchased.

A   That's right.

Q   Do you have a estimation as to the financial impact of losing the Job Corps work?

A   It was substantial.  It was -- well, yeah, it was probably 8, $10 million in revenue.

Q   And with respect to these employees that poached it, or whatever they did with it --

A   Yes.

Q   -- did you pursue any action against them?

A   Yeah, I think we sent a cease and desist and -- but the prime contractor, they had a relationship with these guys already, and I don't know what we could have done.  I think we did evaluate potentially suing the prime contractor for allowing it to happen, but I don't recall where that went.  But I do recall that AMRR looked at the -- the prime contractor was called n2grate, like the letter N, the number 2, then G-R-A-T or G-R-A-T-E or whatever.  And -- so we did look at suing them, but didn't feel there was the ROI to pursue that.

Q   When you say ROI, return on investment?

A   Right.  Yes.

Q   And then you also mentioned the structured cabling business was a complete mess or --

A   Disaster.

Page 382

Q  Disaster.  Disaster.

A  Yes.

Q  Explain that to me.

A  There was a lot more -- so there were way many more costs than what was conveyed.  A lot of the projects, the finances were recognized as more profitable than they really were.

So, for instance, there would be a job that was presented to us on paper that, when it was completed, there would maybe be a $200,000 profit at the end of it.  But then when rectifying the reality of the job, at best it would be a $400,000 loss.

So the accounting of the low voltage, the low-voltage structured cabling business was completely off.  And after review, we determined, and we just actually resigned from several of the jobs that were basically sandbagged and we just gave up on them.  And we picked the handful of jobs that you could actually make a profit from.

It was more of having to salvage the disastrous business than anything.  But the structured cabling business was, the accounting was -- it wasn't right.

Q  Two things I want to make sure I understand.  So when you say "the accounting wasn't right," who -- you're suggesting somebody improperly booked the entries

Page 383

that showed projects being more profitable than you think that they should have been.  Is that what you're saying?

A  That's what I'm saying.

Q  And who are you saying put in the bad accounting records?

A  What we determined was that it went down to the project manager level.  So whoever was running a project that was on site and was in charge of, you know, the purchasing and the labor, ultimately there was a handful, and if I recall right, you could probably pick five of the project managers that were responsible for everything that was unfairly weighed in its accounting.

And then there was a handful that their projects were actually true, correct, and within a reasonable tolerance of financial expectation.

And then ultimately Jeff Spranger was the CFO, and in my opinion, Jeff Spranger knew about this.  So --

Q  So are you saying that this was happening before you acquired OnePath?

A  Yes.

Q  And you believe that the information that OnePath provided to you regarding this low-voltage cable business was inaccurate?

A  I'm confident that the information OnePath provided was -- on low-voltage structured cabling was

Page 384

inaccurate.

Q  And you think Jeff Spranger would be someone who would have knowledge of that?

A  Yes.

Q  Who else?

A  William Bailey.  But I believe he's deceased now.

Q  Okay.  Anybody else?

A  Whoever the project managers are, and I don't recall.  Perhaps -- I forgot that other person's name.  Oh, Tommy Mullins, M-U-L-L-I-N-S.  But Jeff Spranger would be the primary person, other than William Bailey, who's deceased.

Q  Okay.  And you also said you resigned from various jobs, and I think the word you used was "sandbagged"?

A  Yes.

Q  What did you mean by that?

A  It would be a job that, if you looked at it on paper again, it would convey that if you finished it, there would be a $200,000 profit at the end.  When you actually evaluated it, it would cost you $600,000 to finish it.  So what AMRR did is say, okay, well, I don't want to spend $600,000 to lose $400,000, so we'll resign, let the customer take a claim against the retention bond,

Page 385

and move on with our life.

Q  And can you ballpark what you think the impact was as a result of this accounting issue that you've raised here today?

A  Substantial.  It was 8 figures.

Q  Did anyone ever do a calculation?

A  I'm sure somebody did.  I don't recall.  I mean, I recall that it was done.  I don't recall the figures.  And I'm sure, through some level of discovery, they could be found, but I don't, I don't recall.

Q  And did you ever assert any claims associated with this against anyone?

A  You know, I feel like we did send a demand letter to Opal Ferraro actually.

Q  On this topic?

A  Yes.  And we actually sent -- I'm fairly sure -- I know we sent her one on Lockheed, which was also misrepresented.  But I believe we sent a claim, or at least a demand, because we tried to get back some of that working capital adjustment because they, you know, sandbagged the low-voltage structured cabling business.

Do you mind if I take a break?

MR. CATHELL:  Oh, yeah, not a problem.  Now is a good time.

THE VIDEOGRAPHER:  The time is 10:14 a.m.

Page 386

Central. We are off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 10:20 a.m. Central. We are on the record.

Q (By Mr. Cathell) So Mr. Frinzi, I want to go back to what we were just talking about before the break with what I'm calling the alleged accounting issue that we were talking about.

When did you first learn about this alleged misstatement associated with the low-voltage cable business?

A Probably not for maybe six months.

Q Six months?

A Yeah.

Q And you believe you ultimately sent a notice letter to OnePath about this?

A Yes.

Q Or something else?

A Not -- well, both actually. So I know for sure AMRR sent a letter regarding the transference of Lockheed, and I believe that -- and I can't recall. It's been, it's been some time. But I feel like AMRR did send something about the matters pertaining to the accounting for low-voltage and structured cabling.

Q And did you have any discussions with OnePath

Page 387

about this low-voltage cabling business issue?

A Yeah. Yes.

Q And what did they say to you?

A We interfaced -- or AMRR interfaced with Opal and again, very difficult, evasive, adversary, unproductive conversations with her.

Q Fair to say she didn't agree with what you said?

A That's fair. Well, actually, you know what, I take that back. I can't say that she didn't necessarily agree or not. I felt more like she didn't care to hear about it.

Q Did she tell you that, yes, we misstated the financial records?

A She did not.

Q Before I forget about it, with respect to AMRR, who has AMRR's books and records right now?

A The SEC, I suppose. It was a publicly-traded company, so all of its books and records would be with them. Otherwise -- it's a dead company. I have no idea where any other piece of information would be available. But all of the audits, financials, up until the point of it being delisted would be available through the SEC.

Q Okay. And how about the records of the OnePath business unit that you purchased, where would those

Page 388

records be?

A Perhaps in the same filings as the, that you would find on the SEC.

Q And I want to make sure I'm clear. I'm not talking about SEC filings. I'm talking about like accounting records, for example?

A Yeah, I think you have to file those -- I don't know, man. I don't know where those would be or who would have it at this point. Maybe the last auditor that AMRR had would have it, I suppose.

Q What ultimately happened to the OnePath business unit that you purchased?

A It was -- the structured cabling was closed down. The Job Corps n2grate project was stolen. The Google Fiber business was sold and the Lockheed Martin business was sold.

Q Who was the Google business sold to?

A Alliance Telecom or some nature. The Trustee for this case sold the Google business to a third party.

Q And when it was sold, employees and all or --

A Yes.

Q -- was it just a contract?

A No, no. It was their whole -- as a business unit.

Q And how about the Lockheed Martin business?

Page 389

A That was sold to Albers Aerospace.

Q And was that done by the Trustee as well?

A Yes.

Q And how much was the sale price for these?

A I have no idea. I didn't sell it.

THE REPORTER: Who did you say Lockheed Martin was sold to?

THE WITNESS: Albers, A-L-B-E-R-S.

THE REPORTER: Thank you.

THE WITNESS: Aerospace.

Q (By Mr. Cathell) Now, when I was asking you about the post-sale operations of the OnePath unit, you mentioned that the Google business was fine.

A Yes.

Q The Lockheed Martin business was ultimately fine, but you had an issue I guess transferring it?

A Yeah. The Lockheed Martin business -- I mean, both Google and Lockheed Martin were and are good businesses.

Q Let me show you what I'm going to have marked as Exhibit 43.

(Exhibit 43 marked for identification.)

Q And you can take a second to read it, Mr. Frinzi. When you're done, just let me know.

A (Reviewing document.) Yeah, I remember this.

Page 390

Q   And just for the record, Mr. Frinzi, could you identify what this document is?

A   Yeah, it's a demand letter for OnePath to cure its breach of contract pertaining to the transference of Lockheed Martin project.

Q   Okay. This is dated July 18th, 2022?

A   Yes.

Q   And is this a true and correct copy of it?

A   It is.

Q   And is this the breach letter you were talking about earlier?

A   One of them.

Q   Okay. There's more than one?

A   I believe that there's additional, but I specifically remember this one because this was probably the biggest problem.

Q   And what was the problem? Kind of explain to me the problem.

A   Well, so AMRR bought Lockheed, and OnePath didn't convey the entire business unit as was described in the purchase agreement. And so what had to happen, it created a really big problem, because technically the way the contract was being performed was outside what was allowed in the structure of this type of business. Because the Lockheed business is -- it's

Page 391

security clearance and classified, and so OnePath never conveyed the asset, so technically the security clearance was being held by OnePath, and they were subcontracting it to AMRR, which technically wasn't allowed. So both of us could have been -- both AMRR and OnePath could have been fired for that.

And Lockheed would have to pay OnePath first. OnePath would sit on the money and hold it. Then AMRR would have to ask to be paid for the money due to them from the project that they bought from OnePath.

And it also created insurance issues in terms of just -- there was so -- it created so many issues and it was such a risk and such a disaster, and Opal was combative, aggressive, dismissive, just -- I don't even -- I'm not even sure if she cared. But yeah, it was an awesome business. I'm sure that Albers is doing really well with it right now. There was nothing wrong with the business itself. It's just that Opal, in our opinion, kind of held it hostage and -- over our head.

Q   And with respect, with respect to the Lockheed issue, was it ultimately resolved?

A   I think at some point, maybe even like six months later. I don't recall. But I believe it was ultimately resolved.

Q   I'm going to help you out.

Page 392

A   Okay, good. Thank you.

Q   Let me show you what I'm going to have marked as Exhibit 44.

(Exhibit 44 marked for identification.)

Q   And I'm not going to make you read the whole thing.

A   Thank you.

Q   If you go to the Bates label second from the last page, Bates label 2004EX_14205.

A   I see that.

Q   And is that your signature?

A   It is.

Q   And is this a true and correct copy of a Membership Interest Transfer Agreement dated January 31st, 2023?

A   Yes.

Q   And is it true, Mr. Frinzi, that ultimately the Lockheed situation was resolved through this membership interest transfer agreement?

A   Yeah. And it looks like I was pretty accurate, about six months after the demand letter it took them to resolve the issue.

Q   So it did get resolved, and this is the document to memorialize it?

A   Yes.

Page 393

Q   I'm going to show you what I'm going to have marked as Exhibit 45.

A   Okay.

(Exhibit 45 marked for identification.)

Q   Have you ever seen this document before, Mr. Frinzi?

A   No.

Q   So I'm just going to read what it says for the record, and the Bates label. It's titled Acquisition of AMR Resources, LLC by Multiband Global Resources, LLC, Purchase Price Allocation for Accounting Standards Codifications 805 as of February 1st, 2022.

Did I read that correctly?

A   Yes.

Q   You see the date of the report at the bottom left is October 18th, 2022?

A   Yes.

Q   Do you know who -- I won't even try to pronounce it -- Xylinx is?

A   I have no idea.

Q   Never heard of them.

If you go to the second page, at the top you'll see there's, it looks like a letter. There's an addressee?

A   Yes.

Page 394

Q   And it's Jeremie Peterkin?

A   Peterkin.

Q   Peterkin.

A   Yes.

Q   Who is -- who is Jeremie -- who was Jeremie Peterkin at the time?

A   The CFO of what was AMRR.

Q   Do you know where Jeremie Peterkin is now?

A   No.

Q   When's the last time you talked to Jeremie Peterkin?

A   I don't know, two years ago.

Q   You can put that away.

MR. WHITE:  Also, Dale, real quick, I do want to note for the record this is marked AEO, not just confidential.  So we can take that up at some point whenever we get to the deposition designations --

MR. CATHELL:  Sure.

THE REPORTER:  The deposition what?

MR. WHITE:  The -- when we come back for the finals and we work through what we mark as confidential, I just want to make --

MR. CATHELL:  You guys reached an agreement, right, that we're going to wait till we get the transcript and we get 30 days or something like that?

Page 395

MR. WHITE:  Yes.

MR. RUKAVINA:  Well, yeah --

MR. CATHELL:  Instead of three days?

MR. RUKAVINA:  The agreement -- yeah, the agreement is that it's going to be temporarily marked confidential in full, and then --

MR. CATHELL:  That's perfect.

MR. RUKAVINA:  -- as we get the final from Madam Court Reporter, we'll have 30 days.

MR. CATHELL:  Perfect.

MR. ELKINS:  A wonderful suggestion made by somebody, I may add.

MR. RUKAVINA:  You won two against me yesterday, Paul.

MR. WHITE:  By agreement.

Q   (By Mr. Cathell) I'm going to show you what I'll have marked as 46.

(Exhibit 46 marked for identification.)

MR. WHITE:  I'll just note for the record again this is AEO as well.

Q   (By Mr. Cathell) Mr. Frinzi, you see this looks to be a balance sheet as of December 2022 for American Metals Recovery & Recycling, Inc.?

A   Yes.

Q   Have you ever seen this document before?

Page 396

A   I'm sure I have.  I don't recall.

Q   If you go to the second page, at the top there's an income statement section --

A   Yes.

Q   -- for lack of a better description.

A   Yes.

Q   You see where it says total revenue for the month 5.9 approximately million dollars?

A   Yes, yes.

Q   And for the year approximately $51 million?

A   Yes.

Q   To the best of your recollection, do those numbers look to be accurate?

A   Yes.

Q   Let me show you something I'm sure you saw yesterday, but it will be quicker just to give it to you.

A   Okay.

Q   Exhibit 47.

(Exhibit 47 marked for identification.)

Q   Could you identify this document for the record, sir?

A   Yes, it's a secured promissory note.

Q   And this is the promissory note that evidences the loan that was made to finance the acquisition of the OnePath division?

Page 397

A   That's right.

Q   And the lender is GNET ATC?

A   Yes.

Q   Is that the correct lender, or was it Goodman Networks?

A   No, it was GNET ATC.

Q   If you go to the second page, real quick --

A   Yes.

Q   -- is that your signature on the second page?

A   That is, yes.

Q   And that's Mr. Goodman's signature as well?

A   Yes.

Q   James Goodman?

A   That's right.

MR. CATHELL:  So what I'm going to do, Counsel, if it's okay with you, I'm going to take a three-minute break.  I'm getting pretty close to being done.  I'm a little ahead of time.

THE WITNESS:  Okay.

MR. CATHELL:  Just give me three minutes to get my last questions in order, and then I'll -- you'll be done with me.

THE WITNESS:  Okay.  Great.

THE VIDEOGRAPHER:  Time is 10:38 a.m. Central. We're off the record.

Page 398

(Recess.)

THE VIDEOGRAPHER: The time is 10:50 a.m. Central. We are on the record.

Q   (By Mr. Cathell) Mr. Frinzi, prior to the sale of the OnePath unit, how was Goodman Networks performing?

A   Terrible.

Q   And did you ever have any communications with anyone at MSouth regarding how Goodman Networks was performing prior to the acquisition of OnePath?

A   I don't recall.

Q   Did you have any conversations with anyone at OnePath prior to the acquisition of the OnePath business unit about Goodman Networks?

A   I don't recall.

Q   Did you have any conversations with anyone at Layer 7 prior to the closing of the sale of the OnePath unit --

A   No --

Q   -- regarding Goodman Networks?

A   I don't recall.

Q   Now after you learned about the issue with the low-voltage --

A   Structured cabling.

Q   -- structured cable, did you try to sell that business?

Page 399

A   I think so. Actually, we considered even offering William Bailey, who's now deceased, to spin it out and let him do like a management buyout of that business unit.

Q   And did you also call that business unit the Georgia low-voltage construction business?

A   I didn't. Maybe perhaps someone else did, but not myself.

Q   Have you ever heard of a business called the Georgia low-voltage construction business that you acquired from OnePath?

A   That --

Q   Is that something different?

A   That's not a vernacular that I've ever used.

Q   So let me show you what I'm going to have marked as Exhibit 48.

(Exhibit 48 marked for identification.)

A   Okay.

Q   If you go to the Bates labeled Page 2004EX_18599.

A   Okay, I'm there.

Q   Do you see there's a signature that says James Frinzi. Is that your signature?

A   That's mine.

Q   And you were signing on behalf of AMRR

Page 400

Resources LLC?

A   Yes.

Q   And have you seen this document before?

A   I don't recall it, but my name is on it and I signed it.

Q   And I want to turn to the first page.

A   I see that.

Q   Do you have any reason to believe this is not a true and accurate copy of the February 13th, 2023, letter?

A   It looks true, accurate.

Q   Okay. Can you read the first paragraph to yourself? And let me know when you're done.

A   (Reviewing document.) Okay, I read it.

Q   Do you see where I was talking -- I was using the language that's in this paragraph.

A   Yeah.

Q   It says, "Georgia low-voltage construction business that was acquired from OnePath." What business is this document talking about?

A   I don't know why it was styled as that, but presumably the low-voltage structured cabling business.

Q   That we were previously talking about?

A   Uh-huh.

Q   And --

Page 401

MR. ELKINS: Is that a yes?

THE WITNESS: Yes. Sorry.

Q   (By Mr. Cathell) And so you were looking for Layer 7, who had previously represented OnePath --

A   Yes.

Q   -- as their financial advisors in connection with the original sale, to represent you, or your business, in a sale of this cable business that we've been talking about?

A   Yes, because we were -- it was represented to AMRR that there were multiple bidders, so the thought process was that Layer 7 could go to bidder number 2, 3 or 4 and offer them the low-voltage structured cabling business.

Q   So what I'm trying to figure out is why did you go to Layer 7 after you had -- what you testified to previously is that you concluded that the information that was provided to you as a part of the sale was inaccurate regarding this business, and it was provided to you by Layer 7. So I'm kind of curious why you went back to them in February of 2023 to sell the business.

A   I think I answered the question previously, because we went back to them, because presumably there's bidder number 2, bidder 3, bidder 4, when AMRR tried to buy it. So surely, if there's multiple bidders, they

Page 402

would have a roster of people that tried to buy the same thing at the same time AMRR tried to buy it.

So if there were multiple bidders, then Layer 7 could go to the people who didn't get it and say, well, if you want just the structured cable business, you can have it now.

Q   And did you talk to anyone at Layer 7 about your allegations regarding the improper accounting associated with that business?

A   I'm sure that I've described to at least Kavi Packiam that it wasn't what we expected, and so that's why we were trying to sell it to someone that may have a use for structured cabling business.

Q   And sitting here today, do you remember if you specifically told him that you believe the information that was previously provided was not accurate?

A   Yes.

Q   You believe you did tell him that?

A   I believe I did tell him that.

Q   And that's Kavi Packiam?

A   Yes.

Q   Would you have told anyone else at Layer 7 that?

A   Probably just Kavi actually.

MR. WHITE:  I'm going to object to the extent

Page 403

it calls for speculation.

A   I didn't really speak to -- I think the other person was Steven Lee, and I didn't really speak to him too much.  Kavi was more the point of contact.  But judging by this date, AMRR would have already started stripping out the unprofitable sandbagged projects by this time.  So there were a handful of low-voltage projects that were useful that if you were in the low-voltage business, then could have provided value, you know, to expand your footprint.

Q   (By Mr. Cathell) And when you disclosed your view of the accounting records to Mr. Packiam, what did he say to you?

A   I don't recall.

Q   You're making progress, and I don't even have to ask a question.

A   Okay, well, very good.

Q   Let me just wrap up here.  You were previously sued in multiple lawsuits, either you or various entities that the Trustee brought in these bankruptcy proceedings, correct?

A   That's correct.

Q   And you've now reached a settlement with the Trustee?

A   That's right.

Page 404

Q   Okay.  And so as a part of your settlement, do you have a duty to cooperate with the Trustee by making yourself available for testimony today?

MR. WHITE:  Objection, legal conclusion.

MR. ELKINS:  Same here.

A   I'd have to ask Paul actually.

Q   (By Mr. Cathell) Do you have an understanding? I'm not asking for your legal view.  Do you have an understanding that you're supposed to be here as a part of your settlement agreement?

A   No.

Q   I'm just asking for your understanding.

A   No.  I believe I'm -- I don't -- I don't know.

Q   Okay.

A   Literally, I would ask -- I'd have to ask Paul and Jason.

Q   So the answer is you don't know?

A   That's right.

Q   Okay.  Why are you here today?

A   Because I believe if I wasn't, I would be in contempt of court and probably ultimately would have a warrant for my arrest at some point, and I need to be here.

Q   Okay.

A   That's my understanding.

Page 405

Q   Are you planning on appearing at any of the trials in these various lawsuits that are pending?

A   God willing, no.  I mean, I planned -- if I have to be there, you know.  You know -- and you missed yesterday, but I'm now a permanent resident of the United Arab Emirates.

Q   I was about to ask you that, where do you live now?

A   I am.  I live in Dubai.

Q   Oh, wow.

A   And so I flew back just for this.

Q   Okay.  So you no longer have a residence in the United States?

A   So my wife has a spa here, so she has -- we have a homestead in Austin still.  And -- but otherwise, until she sells her business, we'll have a homestead here.  But when I head back to Dubai next week -- I mean, I'm not planning to stay in Austin.  We'll keep a homestead until my wife sells her spa.  We have no more kids at home, so -- and my business is in Dubai and the Balkans.  So, yeah.

Q   And what's the address of your homestead?

MR. ELKINS:  We will stipulate that he is outside the subpoena range.

MR. CATHELL:  I just want to know the address.

Page 406

A   There's -- so I'm in the arms business, and so the people on the other side of the arms that I sell, it creates a security risk for me.  So I --

MR. PULMAN:  I designate this portion of the deposition as highly confidential.  No one will share it or publish the --

MR. ELKINS:  I appreciate that offer, but the issue is the address of his homestead, how is that relevant to his deposition today, if you have a stipulation he's not going to show up for trial?

MR. PULMAN:  You want to go off the record and he can give it to us?

MR. ELKINS:  Yeah, let's go off the record.

THE VIDEOGRAPHER:  The time is 11:00 o'clock a.m. Central.  We are off the record.

(Recess.)

THE VIDEOGRAPHER:  The time is 11:03 a.m. Central.  We are on the record.

Q   (By Mr. Cathell) So, Mr. Frinzi, let me ask my question again, and you can give me whatever your answer is.  What's the address of the homestead?

A   Well, my homestead in Austin is 9204 E-D-D-Y Cove.  And that's Austin 78735.

Q   That's what I was asking --

A   Okay.

Page 407

Q   -- the address in Austin.

A   Okay.

Q   I'm not asking the address in Dubai.

A   The address in Austin is public record.  It's fine.  As discussed off the record, there's reporters that don't like me.  There's individuals that don't like me.  There's -- there's legitimate reason to believe that there's security threats to disclose precisely where I live in United Arab Emirates.  And for my own safety and for my family, I'm -- I'd prefer not to disclose my United Arab Emirates address.

Q   Okay.  So your answer is you're not going to disclose the address in Dubai, but you've given me the address for --

A   That's right.

Q   -- here in Austin, Texas.

A   For Austin, yes, sir.

MR. CATHELL:  All right.  That's all the questions I have.  I'm going to hold open my issue with respect to the address, but we can talk separately offline for our purposes.  That's all I have.

MR. RUKAVINA:  Okay.  Let's go off the record. Let's take a restroom break, and I'll call Scott.

THE VIDEOGRAPHER:  The time is 11:04 a.m. Central.  We are off the record.

Page 408

(Recess.)

THE VIDEOGRAPHER:  The time is 11:15 a.m. Central.  We are on the record.

E X A M I N A T I O N
BY MR. SCHMOOKLER:

Q   Good afternoon, sir.  My name is Scott Schmookler, S-C-H-M-O-O-K-L-E-R, and I represent an insurance company in a first party insurance action.  My client's name is Federal Insurance Company.

I will try not to repeat many of the questions that were asked, but I do have my own questions on the transactions in our case.  Okay?

A   Okay.

Q   As I understand it, you have reached three settlements with the Trustee; is that correct?

A   I'd have to ask Paul and Jason if that's right.

Q   Okay.  As I understand it, you have had an opportunity, prior to your deposition, to speak with the Trustee's Counsel; is that correct?

A   Not directly, but through my attorneys.

Q   Was there an instance in which you met with Trustee's Counsel, Davor, and handed him documents?

A   Yes.

Q   So can you and I agree that prior to you being asked any questions yesterday, you had met with Trustee's

Page 409

Counsel, Davor?

A   Yes.

Q   And is it true, sir, that the Trustee then pursued a series of claims against you?

A   Yes.

Q   And we're going to talk about some of those claims.  But I want to talk and harken back to your time as CEO of Goodman.

A   Okay.

Q   Okay.  At the time you were the CEO, Goodman Networks was owned by the Goodmans; is that correct?

A   That's correct.

Q   At the time that you were CEO, the Goodmans controlled the board of directors for Goodman Networks; is that correct?

A   That's correct.

Q   In fact, at the time you were CEO, James Goodman was the sole board member of Goodman Networks; is that correct?

A   That's correct.

Q   In your role as CEO, it was your job to follow James Goodman's instructions, correct?

MR. WHITE:  Objection, legal conclusion.

A   Correct.

Q   (By Mr. Schmookler) As CEO, it was your role to

Page 410

execute James Goodman's instructions; is that correct?

MR. WHITE: Same objection.

A  Correct.

Q  (By Mr. Schmookler) And unlike many companies, you and Mr. Goodman would often communicate verbally; is that correct?

A  Correct.

Q  And you would often communicate over text messages through Signal; is that correct?

A  Correct.

Q  And that is the way, the method by which Mr. Goodman would provide you directions and instructions for Goodman Networks; is that correct?

A  Verbally and by Signal primarily.

Q  And as CEO, you didn't do anything without first discussing it with James Goodman, correct?

A  Correct.

Q  And as CEO, you didn't do anything without the Goodman Networks board approval; is that correct?

A  James Goodman -- yeah, sure.

Q  Well, let me ask it a different way. Mr. Goodman, James Goodman, was the sole member of the board, correct?

A  Correct.

Q  So when Mr. Goodman approved something, ipso

Page 411

facto, the board was approving it; is that correct?

A  Yes.

MR. WHITE: Objection, legal conclusion.

A  Yes.

Q  (By Mr. Schmookler) And so other than James Goodman, himself, there was no one else on the board and therefore no one else to seek board approval from; is that correct?

A  Correct.

Q  And that was true at all times when you were the CEO of Goodman Networks, or at least to the best of your knowledge; is that correct?

A  Correct.

Q  Now, I mentioned to you that I'm here on an insurance issue. And I will show you now what I am marking as Exhibit 49.

(Exhibit 49 marked for identification.)

Q  And sir, Exhibit 49 is an insurance application that was provided to my client. If you want to take a moment to look at it, that would be fine. But I will orient you to the signature page, and in particular the date of this particular application. Let me know when you're on the signature page, which would be the second to last page.

A  I see it.

Page 412

Q  And this application you will see is digitally signed by Samantha Sondrup. Have I said that correctly?

A  You did.

Q  On November 10th, 2021. Do you see that, sir?

A  I do.

Q  And at this time, were you the CEO of Goodman Networks?

A  Yes.

Q  I would like to talk about Ms. Sondrup's position. Are you familiar with her from your time as the CEO of Goodman Networks?

A  Yes.

Q  If you look at Page 1 of the application, numbered, numbered -- Roman Numeral 1 --

A  Okay.

Q  -- little -- and 3, you'll see where it says, (a) Primary insurance contact, and then there is a colon. Do you see that?

A  I do.

Q  And next to that typed is the name Samantha Sondrup. Do you see that?

A  Yes.

Q  As CEO, is it true that Ms. Sondrup was the primary insurance contact for Goodman Networks?

A  Yes.

Page 413

Q  Is it true as CEO, when you were the CEO, Ms. Sondrup was the person charged with obtaining insurance for Goodman Networks?

A  Yes.

Q  Is it true that when you were the CEO, Ms. Sondrup was the person or the employee of Goodman Networks charged with affecting insurance on behalf of the company?

A  Yes.

Q  Is it true that Ms. Sondrup at the time you were the CEO was the employee of Goodman Networks charged with maintaining insurance on behalf of Goodman Networks?

A  Yes.

Q  And both of that -- and that would be true with respect to any crime insurance procured by Goodman Networks; is that correct?

A  Yes.

Q  If you could now turn to the second page of this application --

A  Okay.

Q  -- you'll see under Roman Numeral 3 a section numbered Paragraph 3 entitled -- that addresses revenue. Do you see that?

A  I do.

Q  And you'll see that there is revenue listed

Page 414

under 3(a), it says, "Please indicate total revenues at most recent fiscal year end." And it's approximately $124 million. Do you see that, sir?

A    Yes.

Q    And I believe you testified yesterday that by this point in 2021, meaning November of 2021, Goodman Networks didn't have any substantial revenue sources or business; is that correct?

A    Correct.

Q    Is it fair to say then that at the time of this application, meaning in November of 2021, Goodman Networks didn't have legitimately $124 million in ongoing revenue?

A    Well, the question you pointed me to says, "Please indicate total revenues at most recent fiscal year end." So that is likely accurate. I think you're asking me a different question. What were the revenues at the time, is that what you're asking?

Q    Sure. I understand what the application says, and I will try not to ask you what the documents say.

A    Okay.

Q    I want to know at the time of this application, putting aside what the revenues were for the prior fiscal year, did Goodman Networks have any source of substantial revenue moving forward?

Page 415

A    No.

Q    Now, yesterday you were asked about the use of an MBE certificate. Do you remember questions of that --

A    Sure do.

Q    And I believe the questions that were asked of you revolved around the FedEx business. Do you recall that?

A    I do.

Q    Bear with me one second. I want to find one document.

I'll try to do this without a document. Did you understand that in connection with the FedEx business that FedEx was using Goodman Networks' MBE certificate to suggest that it was conducting substantial business with a minority owned business?

A    Yes.

Q    And did you understand that this FedEx relationship where FedEx was -- my word -- misusing an MBE certificate, was at the time of the application basically the sole source of Goodman Networks' revenue?

A    Yes.

Q    And so when Ms. Sondrup at the time signs this application and submits it to my client, is it fair to say that basically all of the revenue -- strike that.

I think yesterday you referred to the misuse of

Page 416

the MBE certificate as a scam. Do you recall that?

A    Yes.

Q    And in fact, the FedEx use of the MBE certificate to generate revenue for Goodman Networks was in fact a scam in your mind, correct?

A    Disingenuous and a scam.

Q    And is it fair to say then that all of the revenue that was being generated at the time of the application to my client was the product of that scam?

A    Yes.

Q    And other than the FedEx relationship that you viewed as a scam, Goodman Networks had no revenue whatsoever, legitimate revenue, correct?

A    I wouldn't say none. But like I think yesterday I said there was like a little bit of like home warranty business and some miniscule things. But in terms of anything that was meaningful, it was pretty much focused on MBE, MBE spin bloating situations, relationships.

Q    When you say MBE bloating, what you're talking about is companies wrongly using Goodman Networks' MBE certificate to suggest that they were doing business with a minority owned business; is that correct?

A    That's correct.

Q    And is it fair to say then -- and you've been

Page 417

asked lots of questions over varying transactions and buying back bonds and things of that nature. All of those transactions were funded with the proceeds of that scam, meaning monies that were being paid in by FedEx and others, correct?

A    Yes.

Q    So, for example, when you were asked yesterday about how the AMMR [sic] transactions were funded, that was funded with money that was generated from this FedEx scam, correct?

A    Yes.

Q    And when you were asked about any transactions of any sort that went out, all of that money was basically generated with the proceeds of what you deemed and have characterized a scam, correct?

A    MBE scam, yeah. Yes.

Q    Now, I want to ask you about -- I'm going to mark this as Exhibit 50.

(Exhibit 50 marked for identification.)

Q    I'll represent for the record that Exhibit 50 is a true and correct copy of the complaint filed against my client, but I did not copy the exhibits because they were not material to my questions and have decided to save some trees this morning.

A    Okay.

Page 418

Q   All right. I want to just orient you to a series of transactions that are pertinent to my client, and then I'll ask you questions about those transactions. Is that fair?

A   It is.

Q   Great. I put in front of you the complaint against my client. I would like to orient you to Paragraphs 23 and 24 of that complaint.

A   Okay.

Q   Are you with me?

A   Yes.

Q   Great. You will see -- and I will not ask you other than just orientation at this moment that Paragraphs 23 and 24 speak to a $500,000 payment to the Stauber law office. Do you see that?

A   I do.

Q   Okay. Do you recall that you were asked some questions about that yesterday --

A   I recall.

Q   -- by somebody. Great.
    You agree with me that Ms. Sondrup, the person in charge of affecting and maintaining insurance, was aware of the Stauber $500,000 transfer no later than December 15th of 2021, correct?

A   Correct.

Page 419

Q   And you agree with me that she was aware of that and know that she was aware of that because you saw yesterday an email in which she referenced it, correct?

A   Yes.

Q   And if you'd like, I can find that for you, but if you --

A   I'm fine.

Q   You and I agree that on December 15th, 2021, Ms. Sondrup, the person in charge of affecting and maintaining insurance, knew $500,000 had been transferred to fund an escrow payment for the acquisition of AMMR, correct?

A   Yes.

Q   And not only was Ms. Sondrup aware of it that day, Madison Goodman, who I believe you testified was the general counsel --

A   I don't think I testified --

MR. SIMON:  Objection, he did not give that testimony.

MR. SCHMOOKLER:  Okay. I'll rephrase.

Q   (By Mr. Schmookler) What was Ms. Madison Goodman's position at the company?

A   An attorney for Goodman Networks.

Q   Fair. Can you and I agree that at least one attorney for Goodman Networks was aware by December 15th,

Page 420

2021, that $500,000 had been transferred to fund an escrow payment to be used in connection with the acquisition of AMMR?

MR. WHITE:  Objection, speculation.

A   We can agree.

Q   (By Mr. Schmookler) Unfortunately, I have to fix this.

A   Okay.

Q   Just bear with me.

MR. SCHMOOKLER:  Conor, do you remember what exhibit number it is?

MR. WHITE:  For what?

MR. SCHMOOKLER:  The Stauber email.

MR. WHITE:  I believe it's 22 actually.

MR. SCHMOOKLER:  22? Great. I don't know if these are in order anyway. Oh, they are. Do you have it there?

MR. ELKINS:  Here.

MR. SCHMOOKLER:  All right.

Q   (By Mr. Schmookler) I'll show you -- I'll show you what's been marked previously as Exhibit 22. This is an email exchange you saw yesterday dated January 15th, 2021; is that correct?

A   Yes.

Q   One of the recipients of these emails you'll

Page 421

see is Madison Goodman, correct?

A   I see that.

Q   You know that she's a recipient because her email address mgoodman@goodmansolutions.com is used, correct?

A   That's right.

Q   And as CEO you are aware that Ms. Goodman used the mgoodman@goodmansolutions.com email, correct?

A   Correct.

Q   So you and I can agree that no later than December 15th, 2021, Ms. Goodman, an attorney for Goodman Networks, received an email disclosing the $500,000 Stauber payment to be used as escrow for the acquisition of AMMR, correct?

A   Correct.

Q   And we can agree then, sir, that the use of that $500,000 that's referenced in the complaint against my client, Exhibit 50, was disclosed to both Ms. Sondrup and Ms. Goodman prior to 2022?

A   Yes.

Q   Thank you. You can put that down.

MR. PULMAN:  What was that exhibit number?

MR. WHITE:  22.

(Discussion off the record.)

Q   (By Mr. Schmookler) I have a tendency to talk

Page 422

fast. So if I talk too fast --

A Okay.

Q -- let me know. It's not over-caffeinated --

A Okay.

Q -- it's a character flaw.

A Got it.

Q Now, you've been a party to lots of litigation in this matter. I think you will agree. Do you recall that in connection with one of the adversary proceedings you were served with interrogatories, written questions. Written questions, do you remember that?

A I'll agree with that.

Q Okay. I'll show you now what I'm marking as Exhibit 51.

(Exhibit 51 marked for identification.)

Q This is a document entitled Defendant James Frinzi's Answers and Objections to First Set of Interrogatories. Do you see that?

A Yes.

Q And, sir, just to orient you for a moment, you'll see that the complaint I handed you against my client has an adversary proceeding number 23-3036. Do you see that?

A I sure do.

Q And if you look at the interrogatories I've now

Page 423

handed you, which are Exhibit 51, you will see that the same adversary proceeding is identified on your answers to interrogatories, correct?

A That's correct.

Q Okay. Look with me for a moment on the last two pages of this document. You'll see something titled a Verification. Do you see that?

A I do.

Q And you'll see that the first numbered paragraph says, "My name is James Frinzi." Do you see that?

A I do.

Q Then in Paragraph 2, it says, and I quote, "I have read James Frinzi's Answers and Objections to First Set of Interrogatories dated September 11, 2023. The facts set forth and the responses to these interrogatories are true and correct and within my personal knowledge." Do you see that?

A I do.

Q And on the following page there's a signature. Is that your signature?

A It is.

Q Did you declare that the answers that were served on your behalf were true and correct to the best of your knowledge?

Page 424

A Yes.

Q And you had an opportunity to review them prior to serving them; is that correct?

A That's right.

Q All right. I would like to just orient you for a minute to one particular interrogatory, and in particular I'd like to ask you about Interrogatory No. 3.

A Okay.

Q Interrogatory No. 3, you'll see, references the $500,000 Stauber payment we have been talking about --

A Okay.

Q -- correct?

A Yes, it does.

Q And then Interrogatory 2 says, and I quote, "State in detail and with specificity when you learned of the $500,000 to Stauber Law Firm." Do you see that?

A Yes.

Q And in response, you verified as being correct that, and I quote, "Frinzi does not remember the details or specifics of when he learned of the transaction other than he learned of it before the transaction and approved it as directed by James Goodman." Do you see that?

MR. ELKINS: Scott, we'll stipulate that that's what the document says.

A Yeah.

Page 425

Q (By Mr. Schmookler) And you agree that that payment was in fact directed by Mr. Goodman, the sole director and owner of Goodman Networks; is that correct?

MR. ELKINS: Same, same stipulation.

A Yes.

Q (By Mr. Schmookler) Thank you. Throughout these interrogatories -- and I could point you to three or four more spots --

A Okay.

Q -- it says that the transactions were approved and directed by James Goodman. Do you recall that?

A Yes.

Q Is it fair to say that those, that the transactions referenced in these interrogatories were at all times directed and approved by James Goodman?

A Yes.

Q And is it true that Mr. Goodman approved and directed them at a time when he was the sole director and basically sole owner of the company?

A Yes.

Q I query you, as CEO, if Mr. Goodman wanted something done, anything, was there anyone to say no?

A No.

Q If Mr. Goodman, for example, and I think somebody mentioned yesterday wanted $200,000 transferred

Page 426

to him on a whim, was there anyone to say no?

A  No.

Q  Is it fair to say that James Goodman, as the sole director of the company, and basically the owner through his family, was king of this company?

A  Yes.

Q  And that went for all transactions that he wanted accomplished, correct?

A  Yes.

Q  And that's why you as CEO at all times sought out and provided him notice of everything that was happening at the company; is that correct?

A  Yes.

Q  And I'm happy to have you look at as much documents as you want.  I'm trying to be efficient with your time today.

A  Super.

Q  You had an opportunity obviously to look at the complaint, Exhibit 50, because you are part --

God bless you.

A  Yes.

Q  I'll just restart my question.  Exhibit 50, which was the complaint, includes you as a Defendant.  I will represent that to you.  You obviously had a chance to look at it.  Can you and I agree that the transactions

Page 427

that are in that complaint were undertaken at the direction and with the approval of Mr. Goodman?

A  Yes.

Q  Thank you.  All right.  Now I want to talk about the lawsuits against you.  One of the lawsuits that was filed -- well, not against you technically, but against the Frinzi Family Trust.

A  Okay.

Q  Okay.  Do you recall that?

A  Yes.

Q  And I'll show you what I'm marking as Exhibit 52.

(Exhibit 52 marked for identification.)

Q  Exhibit 52, for purposes of the record, is a Limited Settlement and Release Agreement as between Scott Seidel, as Trustee, amongst others, the Frinzi Family Trust.  Do you see that, sir?

A  I do.

Q  And if you'll look with me on the first page, there is a series of what we call whereas clauses on -- the clauses all start with the word "whereas."  Do you see that?

A  Yes.

Q  And importantly, if you look at the fourth and fifth whereas clauses, there are two references to the

Page 428

Frinzi Family Trust owning certain real estate, including a lake house and a lot.  Do you see that?

A  I do.

Q  Do you recall that one of the things the Trustee did was he pursued a claim against you on the grounds that this property had been purchased with assets that didn't belong to you?

A  I recall that.

Q  And if you look on Page 2, the last whereas clause, you, on behalf of the Frinzi Family Trust, denied any fault or liability but agreed to a settlement, correct?

MR. ELKINS:  Document speaks for itself.

A  Yes.

Q  (By Mr. Schmookler) And part and parcel of that settlement, if you look on Page 3, numbered Paragraph 7, was the payment of $1.2 million, correct?

A  Yes.

Q  And you in fact agreed to settle claims against you relating to this property dispute for 1.2 million?

A  That's right.

MR. ELKINS:  Objection.

Q  (By Mr. Schmookler) And you paid that amount of money, correct?

A  Correct.

Page 429

Q  So in connection with the Trustee's claim over the alleged purchase of these properties, you've already paid the Trustee $1.2 million, correct?

A  Correct.

Q  Were you able, as part and parcel of this settlement, to keep the properties?

A  Yes.

Q  Okay.  Do you still own them?

A  Yes.

Q  I'm going to show you now what is marked as -- Exhibit 53.

MR. WHITE:  Just real quick before you move on, is 52 the same as the version that's approved by the Court?

MR. SCHMOOKLER:  We pulled it off the docket. I don't know why it doesn't have the striping.  I don't know where else we would have gotten it.  I noticed that this morning, Conor, but I can tell you, I wouldn't know where else -- we don't have any other access to the document.

MR. WHITE:  I just wanted to make sure we were looking at the right version.

(Exhibit 53 marked for identification.)

Q  (By Mr. Schmookler) All right.  I will show you what I am marking as Exhibit 53.  This is a document I'm

Page 430

not sure I totally understand. So I'll just ask you to review it to yourself and let me know when you're done.

A   (Reviewing document.) Okay.

Q   This email exchange, as I understand it, discusses a forthcoming payment to be made to Goodman Networks. Do you see that?

A   Yes.

Q   And as I understand it, this email was sent by you from an email address MultibandGlobal.com. Do you see that?

A   I do.

Q   And did you in fact send these emails from your Multiband Global email address?

A   Yes.

Q   Is that an email address associated with AMRR?

A   Yes.

Q   And did in fact AMRR issue any repayments to the Trustee in the November of 2022 time frame?

A   So for this email, the way I recall, was that John Goodman asked for a payment for $900,000 to allegedly pay to the Trustee, which subsequently I learned that -- or I believe that he may have not actually did that.

But I understand that he maybe got some kind of consulting fee, and I don't know what he did with the

Page 431

paid legal fees. I don't recall exactly. But I believe this is a topic -- that email was when John Goodman made that $900,000 demand.

Q   Was that 900,000 in fact paid?

A   I believe --

MR. WHITE:  Objection, speculation.

A   I believe so.

Q   (By Mr. Schmookler) Okay. As CEO of AMRR, do you know whether that payment was made?

A   I said I believe so.

Q   Okay. What was AMRR repaying when it paid that 900,000?

A   I believe it was an interest payment to -- an interest payment due. I don't recall the exact circumstances, but --

Q   When you say interest payment, was it an interest payment due on the loan from Goodman Networks to AMRR?

A   Yes.

Q   Now, in the complaint against my client -- and I'm happy to orient you if you'd like.

MR. PULMAN:  Is that Exhibit 50?

MR. SCHMOOKLER:  Yeah.

Q   (By Mr. Schmookler) Exhibit 50, Paragraph 33.

A   In which --

Page 432

Q   Exhibit 50, which is the complaint against my client.

A   All right. And you said Paragraph 3?

Q   Paragraph 33.

A   Oh, 33. Okay. Okay.

Q   You'll see, and it says, I'm just orienting you for the moment, and it says, quote, "The $4.4 million transfer was recorded by the Debtor on its books and records as a loan from Debtor to MGR." Do you see that?

A   I do.

Q   Okay. As CEO of Goodman Networks, you were aware that the Goodman Networks books did identify a loan from Goodman Networks to MGR in the amount of $4.4 million, correct?

A   I'm aware of that.

Q   Okay. And so isn't it true, sir, that the transfers you were asked about from Goodman Networks to MGR were in fact booked by Goodman as a loan?

A   Right.

Q   Much the same way that the AMRR transactions were booked by Goodman Networks as a loan, correct?

A   Correct.

Q   And when the sole member of the board decided to make demand on those loans, you in your capacity as CEO of AMRR, did your best to honor the loan agreements

Page 433

that were in place; is that correct?

MR. WHITE:  Objection, vague.

MR. PULMAN:  And objection, form.

A   Correct.

Q   (By Mr. Schmookler) And so the point of Exhibit 53 that I've showed you is when demand was made on the loans, to the extent AMRR had cash, AMRR made payment, correct?

A   Correct.

Q   Now, I want to show you a few documents. Show you what I'm marking as Exhibit 54.

(Exhibit 54 marked for identification.)

MR. PULMAN:  This is Exhibit which?

MR. SCHMOOKLER:  54.

Q   (By Mr. Schmookler) Sir, I'm showing you an email exchange marked Exhibit 54, which I admit you are not on. Do you see that?

A   I see I'm not on this.

Q   But in the email, in the body of the email, you'll see a description of the FedEx business. Do you see that --

A   I do.

Q   -- series of bullet points?

A   Yes.

Q   If you could read that to yourself and let me

Page 434

know when you're done.

A   Okay.

Q   Do you know who Steve Seago is?

A   Yes.

Q   Who is that?

A   He was the salesperson for the, and I guess kind of manager of the MBE pass-through businesses.

Q   Was he an officer of the company?

A   I couldn't tell you that.

Q   Okay.  And then if you look above, you'll see -- or below, you see Jo Ella Terhesh, T-E-R-H-E-S-H. Do you see that?

A   I do.

Q   And apparently, according to her signature page, she is Vice President, Supply Chain and Logistics; is that correct?

A   I have no idea who she is, and I never met her.

Q   Well, if you look in Mr. Seago's email, his signature block says Vice President Business & Corporate Development?

A   Yeah.  I can read the email, but I'm saying that I don't know who Jo Ella is.  I do know who Steve is.

Q   Okay.  The email purports to describe this FedEx arrangement and the use of its MBE certificate.  Do

Page 435

you see that?

A   Yes.

Q   And it accurately describes how basically a MBE certificate is used, but no merchandise is actually exchanged, correct?

MR. WHITE:  Objection, foundation, speculation.

A   Well, as I read it, the interesting part of it, as I'm looking at it, it says, "The unloading, put away, picking and placement of all this material in the FedEx warehouse is performed by contract/temporary labor paid for by GNET ATC."

I don't even know if that's true, to be honest with you.  When I took over at Goodman and GNET ATC, I'm fairly confident that there were not any contractors, employees or any physical human beings doing anything. So I think that might be an exaggeration, that part of the description.  But otherwise, it's probably pretty accurate.

Q   (By Mr. Schmookler) Thank you.  You can put that down.  I'll show you now what I'm marking as Exhibit 55.

(Exhibit 55 marked for identification.)

Q   Exhibit 55 is a printout of a PowerPoint presentation you prepared for James Goodman in September of 2021, correct?

Page 436

A   Yes.

Q   And this was an overview of how you anticipated trying to turn around the company, correct?

A   Yes.

Q   If you look at the final page, which is Frinzi 2887 --

A   Yeah.

Q   -- I see a page entitled Next Steps, correct?

A   Yes.

Q   And in this, you describe in detail the plan to spin off GNET ATC, correct?

A   Yes.

Q   And in fact, you told Mr. Goodman in this presentation that you were working with lawyers on the transaction and it was already in process; is that correct?

A   Yes.

Q   So is it fair to say then that in September of 2021, Mr. Goodman was aware vis-à-vis your presentation that this spinoff transaction was in fact in process already?

A   It was -- the concept of spinning it out was in process.

Q   And at this time Mr. Goodman was the sole director of Goodman Networks and therefore the board was

Page 437

aware of the proposed spinoff; is that correct?

MR. WHITE:  Objection, legal conclusion.

A   Yes.

Q   (By Mr. Schmookler) Thank you.  You may put that down.  Now, at some point -- I'm going to fast-forward a couple months ahead.  So that presentation, to orient you, September.

A   Gotcha.

Q   We're now going to fast-forward to the new year.  And I will show you what I'm marking as Exhibit 56.

(Exhibit 56 marked for identification.)

Q   Exhibit 56, sir, is a submission to, I believe, the Texas Secretary of State by Ms. Sondrup.  I'd like you to read this to yourself and let me know when you're done.

A   (Reviewing document.)  Okay.

Q   Ms. Sondrup writes in the very first paragraph, and I read, quote, "We are writing to inform you that we are requesting our contractor registration and active status for Goodman Networks, Inc. or any of its subsidiaries, Multiband Field Services Inc. or GNET ATC, be placed in inactive/expired/withdrawn status."  Do you see that?

A   I do.

Page 438

Q   Is it true that Goodman Networks asked for its contractor registration and active status to be placed in an inactive state effective December 31st, 2021?

A   As I read this document, that's right.

Q   And Ms. Sondrup writes, "As of December 31, 2021, the company no longer has employees." Do you see that?

A   I see that on this document.

Q   Is it true then that Goodman Networks and its subsidiaries had no employees as of December 31st, 2021?

A   Yes.

Q   And isn't it true, sir, that at the time of the transactions that you've been asked about by the Trustee, Goodman Networks didn't have any employees?

A   Yes.

Q   And isn't it true, sir, that at the time of the transactions you spoke about with the Trustee, Goodman Networks was actually in an inactive, expired or withdrawn status with the State of Texas?

MR. WHITE:  Objection, speculation, foundation.

A   Yes.

Q   (By Mr. Schmookler) And this, meaning the submission of this by Ms. Sondrup, would have been a direction by Mr. Goodman, sole director of the company, correct?

Page 439

A   It would have to have been.

MR. WHITE:  Objection, speculation.

Q   (By Mr. Schmookler) Did you unilaterally, without any input from Mr. Goodman, direct Ms. Sondrup to place Goodman Networks in an inactive, expired and withdrawn status?

A   No.

Q   Do you know, as you sit here today, if Goodman Networks was in fact an authorized active corporation at the time of the transactions you were asked about yesterday?

A   I have no idea.

Q   I'll show you what I'm now marking as Exhibit 57.

(Exhibit 57 marked for identification.)

Q   We're going to move forward a little bit.

A   Okay.

Q   Now we're on January 28th of 2022.  And this is an email amongst some Goodman Networks employees and some CFGI employees.  Do you see that?

A   I do.

Q   And yesterday you mentioned Mr. Baum.  Do you remember testifying about Mr. Baum yesterday?

A   I do.

Q   Did Mr. Baum at any point become associated

Page 440

with AMRR?

A   Yes.  He became the CRO for AMRR.

Q   And was that at the Trustee's suggestion?

A   I don't recall.

Q   Do you recall whether or not any of the Trustee's representatives encouraged you as CEO of AMRR to appoint Mr. Baum as the chief risk officer?

A   I don't recall.

Q   Well, in the email, the one at the bottom, dated January 27th, 2022, at 7:05 p.m., you'll see a reference to -- on numbered Paragraph 1, Explanation of $4.4 million payment to Global Band -- Multiband -- Multiband Global in January of 2022.  Do you see that?

A   I do.

Q   And then on this email, you'll note is, again, Ms. Sondrup, who we agreed was the person in charge of affecting and maintaining insurance, correct?

A   Correct.

Q   So can we agree that by January 27th of 2022, Ms. Sondrup was aware of the $4.4 million payment to Multiband Global?

A   Yes.

Q   Who's Stephanie Elmore?

A   The financial controller within the Goodman ecosystem.

Page 441

Q   Did she have the title controller?

A   I don't recall.

Q   Is it fair to say then that Ms. Elmore also had knowledge of this $4.4 million payment to Multiband Global no later than January 27th of 2022?

A   Yes.

Q   Is it also -- is it fair to say then that both in connection with the Stauber $500,000 payment and the $4.4 million payment to Multiband Global, neither transfer was a secret within Goodman Networks, was it?

A   Right.

Q   And in fact, in presentations that were subsequently made on the finances of Goodman Networks, those transactions were referenced as an outstanding loan, were they not?

A   Right.

Q   So I will show you now what I'm marking as Exhibit 58.

A   Okay.

(Exhibit 58 marked for identification.)

Q   Fast-forwarding a bit, August of 2022.  Just bear with me a minute.

Sir, I've handed you what's marked as Exhibit 58, which is a financial presentation prepared by CFGI. Do you see that?

Page 442

A   I do.

Q   And remind me, who was CFGI?

A   A restructuring and financial advisor.

Q   And they were independent of you, I assume.

A   Right.

Q   They were independent of the financial staff at Goodman Networks, correct?

A   Correct.

Q   And they had access to all the Goodman Networks books and records so that they could do an analysis of the company's finances?

A   Yes.

Q   If you look with me on Goodman -- there's little Bates numbers at the bottom.

A   I see that.

Q   1534.

A   Okay.

Q   You'll see a cash -- you'll see a cash flow analysis timed January 1st, 2022, through July 31st, 2022.  Do you see that?

A   I do see that, yes.

Q   Do you see under Cash Disbursements, it says, "Loan Issued to AMRR"?

A   I see that.

Q   And then immediate -- and that's for

Page 443

$44 million, correct?

A   That's right.

Q   And then immediately underneath that, it says, "Loans Issued to Multiband Global Resources, 4.4 million."  Do you see that?

A   I do.

Q   So is it fair to say then that within the books and records, as reported by CFGI, both the AMRR transaction and the Multiband Global Resources transactions you were asked about were treated by Goodman Networks at all times as a loan?

A   Yes, I see that.

Q   And they were being reported as a loan by CFGI in an effort to make financial presentations; is that correct?

A   That's correct.

Q   And was the purpose of this financial presentation to solicit investments?

A   I don't recall.

MR. ELKINS:  Calls for speculation.

A   Yeah, you'd have to ask CFGI.

Q   (By Mr. Schmookler) Do you recall why this presentation was prepared?

A   Well, I don't recall.  I mean, I can speculate.

Q   I don't want you to speculate.

Page 444

A   Then --

Q   If you don't recall, great --

A   -- I don't recall.

Q   -- I'll move this along.

A   Okay.

Q   But you were in fact the CEO of Goodman at the time of this presentation, were you not?

A   Yes.

Q   Okay.  And it was your understanding, as CEO, that CFGI, in terms of presenting the financial state of the company, was going to try to present that financial state as accurately as it could, right?

A   Yes.

MR. WHITE:  Objection, speculation.

Q   (By Mr. Schmookler) And at any point does CFGI ask you for information that you refused to provide?

A   No.

Q   I want to ask you about one other document.

Oh, we'll skip it.  That's not what I was looking for.

All right.  If we could go back to Exhibit 50, if you don't mind.

A   Not at all.

Q   One final transaction in this case.  It's in Paragraph 49.

Page 445

A   Got it.

Q   You'll see a reference to a 900 -- a section called The $962K Transfer.  Do you see that?

A   I sure do.

Q   Okay.  And you were asked about that yesterday.

But importantly, if you look at Paragraph 49 with me, it says, "On or about December 31, 2021, Frinzi caused GNET ATC to enter into that certain Subcontract Services Agreement with MGR."

Do you see where I read from?

A   Yes.

Q   And you agree that that was -- there was in fact a services agreement, correct?

A   Yes.

Q   Okay.  And you agree that that was the reason for that $962,000 payment?

A   Right.

Q   Okay.  I found what I was looking for.

(Exhibit 59 marked for identification.)

Q   Paragraph -- I mean, Exhibit 59.  Now, I will represent to you, sir, we received a bunch of documents from the Trustee, some of which we call are produced in native, meaning we got them in their original electronic form.

A   Okay.

Page 446

Q   And this is one of those documents.  So it came to us in Excel.  And we printed it.

A   Okay.

Q   Which is what you have in front of you.

MR. PULMAN:  Scott, what's this one?

MR. SCHMOOKLER:  59.

MR. PULMAN:  59?

MR. SCHMOOKLER:  Yes.

Q   (By Mr. Schmookler) All right.  Are you familiar with reports of this nature in this format?

A   Yes.

Q   Okay.  Can you tell me what this report is?

A   Well, they appear to be cash statements.

Q   Who within Goodman Networks prepared these types of cash payment -- cash statements?

A   I don't know.  I have an idea, but I don't know for a fact.

Q   Were they prepared by the Accounting Department -- somebody in accounting?

A   Yes.

Q   Did you have any personal involvement in the preparation of cash statements of this nature?

A   Zero.

Q   So you'll note, for example, on Page 1, I'm just going to number them, a section called Cash

Page 447

Disbursements.  Do you see that?

A   I see that.

Q   And you'll see reference again to the loan to AMRR for 44 million, correct?

A   I see that.

Q   And you'll see the reference to loan to Multiband Global Resources for 4.4 million, correct?

A   I see that.

Q   So is it fair to say then that this report prepared using Goodman Networks' records reflect that there were in fact loans to AMRR and Multiband Global Resources?

A   Yes.

MR. WHITE:  Objection, speculation, foundation.

Q   (By Mr. Schmookler) And so in terms of the accounting personnel, not you, accounting personnel within Goodman Networks, these transactions were being booked as loans, correct?

A   Yes.

MR. WHITE:  Same objection.

Q   (By Mr. Schmookler) Is it fair to say that the plan, in terms of the turnaround of the company, was to get all of this money paid back eventually?

A   Yes.

Q   And is it fair to say that one of the reasons

Page 448

it couldn't get paid back is ultimately the OnePath acquisition financially didn't turn out the way it was intended?

A   Yes.

Q   And it was the loss of all that money on OnePath that ultimately causes the demise of AMRR and the inability to pay back these loans; is that correct?

A   I want to add to that also what I discussed this morning was that the inability to do the full financial transfer to the public shell, which delayed the filings, which enabled the stock price to get hurt, that was as much of a problem.  Because even if OnePath financials -- even if the financials didn't pan out as planned, at least if we had -- if AMRR had a healthy shell and OTC filing and the stock price was still trading, the stock was still trading, there could have still been a constructive vehicle to proceed, perhaps get bank filing.  But the carve-out audit taking too long, delaying filings, that essentially killed the whole value of being public altogether.

So if you combine the terrible structured cable business and the overestimates with their finances with -- and again, I think just as deadly, potentially more deadly, was OnePath's inability to turn over audit data in a reasonable time to get public filings made.

Page 449

Because that was the whole point of doing this in a public shell, and they ruined it.

Q   And all of that was on the OnePath side; is that correct?

A   Right.

Q   And as I understand it, and correct me if I'm wrong, you, a CEO of AMRR, went and tried to solicit business on behalf of the company, including in Kosovo?

A   Yes.

Q   And as I understand it, from whatever -- online, you went and made public -- you went and made presentations in foreign countries trying to get business to make OnePath and AMRR as successful as you could so you could pay back these loans, correct?

A   That's right.

Q   Okay.

MR. RUKAVINA:  It's about 12:15, so please find a convenient break.

MR. SCHMOOKLER:  I need about ten minutes and I'm going to be done.

MR. RUKAVINA:  Oh, wow.

THE WITNESS:  Okay.

MR. RUKAVINA:  Tick-tock, tick-tock.

MR. SCHMOOKLER:  Famous last words.  But in Illinois we only get three hours for a deposition.

Page 450

That's why I talk fast.

THE WITNESS:  Okay.

MR. SCHMOOKLER:  That's where I'm from.

MR. PULMAN:  We're slow talkers in Texas.

Q   (By Mr. Schmookler) I'll show you what I'm marking as Exhibit 60.

(Exhibit 60 marked for identification.)

Q   All right.  Exhibit 60 -- well, I'll show you what I've marked as Exhibit 60.  Exhibit 60 is another settlement agreement you entered into with the Trustee.  Do you see that, sir?

A   I sure do.

Q   Okay.  And in this one, if you look at Paragraph 4 --

A   Okay.

Q   -- which is on Page 2 --

A   Uh-huh.

Q   -- involves the payment of $5 million.  Do you see that?

A   I do.

Q   And in fact, that $5 million was in fact paid as part of this settlement; is that correct?

A   Yes.

Q   All right.  Now, I'll just ask a couple of questions about this and maybe wrap this up quickly.  If

Page 451

you remember, I handed you at the beginning Exhibit 50, which is the complaint.

A   I remember.

Q   And I asked you about the adversary proceeding number, in particular that it was adversary proceeding 23-03036.  Do you remember me asking that?

A   I do.

Q   Now, look with me on the fourth whereas clause --

A   Which is --

Q   -- of the Settlement Agreement, Exhibit 60.

A   Which number --

Q   No, you're on Exhibit 60.

A   Oh, this one here.

Q   You're on Page 1 with me.

A   Okay.

Q   Fourth whereas clause.  This whereas clause purports to define a phrase or term called "Adversary Proceedings."  Do you see that?

A   I do.

Q   And there's a colon, followed by four different adversary proceeding numbers.  Do you see that?

A   I sure do.

Q   And one of them is adversary -- the first one is Adversary Proceeding Number 23-03036, the same one

Page 452

that's on the complaint that I showed you at the beginning of this deposition -- or the beginning of my questions.  Do you remember that?

A   I do.

Q   Okay.  Now, look forward with me.

A   Okay.  How far?

Q   On Page 3, numbered Paragraph 5.

A   Okay.

Q   It says, and I quote, "Effective on the Effective Date, and automatically, without need for further document or instrument, the Trustee, for himself, the Debtor, the Estate, GNET, and MFS and their respective subsidiary and affiliate companies, hereby releases and discharges Frinzi" -- that's you.

A   Yes.

Q   And now look down --

A   Okay.

Q   -- all the way to the third to last line, "all claims and causes of action for indemnification or that are asserted or assertable in the Adversary Proceedings."

Do you see that?

A   Yes.

Q   And we just agreed the adversary proceedings, that defined term, includes the complaint, Exhibit 50, that I showed you.  Do you recall that?

Page 453

A   Yes.

Q   Okay.  Is it fair to say then, sir, that $5 million was paid to settle and ultimately get you a release of the transactions alleged in the complaint against my client, which are detailed in Exhibit 50?

MR. WHITE:  Objection, legal conclusion.

A   Yes.

Q   (By Mr. Schmookler) And it was your understanding at the time of this agreement that that was part of it, you were getting released of those transactions; is that correct?

A   Yes.

Q   Now, turn with me to Paragraph 11, numbered Paragraph 11 --

A   Okay.

Q   -- which is on Page 4.  It says, and I quote, "Frinzi agrees he will reasonably cooperate by accepting third-party subpoenas for testimony, via deposition or at trial, in the Adversary Proceedings."  And then it goes on to talk about waiving of Fifth Amendment rights and things of that nature.  Do you see that?

A   Yes.

Q   To come to here today, did you get a subpoena served on you through the Hague Convention in Dubai?

A   No.

Page 454

Q   Do you ever recall anybody coming to serve you with a subpoena?

A   No.

Q   Did you agree, at the Trustee's request, to appear and testify?

A   Yes.

Q   And that was part and parcel of you cooperating with the Trustee, correct?

A   Right.

MR. SCHMOOKLER:  I have nothing further of this witness.

MR. RUKAVINA:  Let's have lunch.  Thank you.

THE VIDEOGRAPHER:  The time is 12:18 p.m. Central.  We are off the record.

(Recess.)

THE VIDEOGRAPHER:  The time is 1:00 p.m. Central.  We are on the record.

MR. RUKAVINA:  So it's me again.  Thanks to all Counsel for letting me go out of turn so Mr. Schmookler can get back home.

At the end of my questioning, this will end -- unless you have further re-cross, Scott, this will end the Federal portion of the deposition.  I'm going to focus mainly on Mr. Schmookler, but I have a couple of other questions too.

Page 455

R E - E X A M I N A T I O N

BY MR. RUKAVINA:

Q   Exhibit 12 -- you don't have to look at it. That's the Signal messages?

A   Yes.

Q   I would ask you or your Counsel, why are certain things in there redacted?  First of all, you guys did the redaction, not me, right?

A   Okay.

Q   Well, yes or no.  Do you know?

A   I don't know.  I mean --

Q   Do you know why certain things are redacted in there?

A   I personally don't.

Q   Okay.  Are you -- are you able to tell us just loosely as to why it's -- or would you rather have that discussion off line?

MR. ELKINS:  No, we can do it.  I believe those redactions were applied by Counsel.  I think it was Counsel prior to us.

MR. RUKAVINA:  Okay.  Do you --

MR. PULMAN:  Is there an original set without redactions?

MR. RUKAVINA:  Are you able to tell me whether there's an original set without redactions?

Page 456

MR. ELKINS:  I will look at it and see if I can.

MR. RUKAVINA:  Okay.

Q   (By Mr. Rukavina)  The other, the other kind of question was, I believe we established yesterday that you and I met about a year ago, once in my offices and once in Miami, correct?

A   Correct.

Q   Have you -- since that two years ago or so, have you met with either me or anyone on my team?

A   No.

Q   Since that time a couple of years ago, you and I have had a few minor communications related to the Frinzi Family Trust, which was unrepresented; is that accurate?

A   That's right.

Q   Wick Phillips didn't represent you in that matter, right?

A   Correct.

Q   Other than those communications and those couple of meetings two years ago, have we ever communicated, or anyone with my team?

A   No.

Q   Have you and I ever discussed what I would ask you today, at the deposition?

Page 457

A   No.

Q   Have you and I or anyone from my team ever discussed what your answers might or should be?

A   Not at all.

Q   Those meetings that we had, is it accurate to say that we were trying to figure out a way for AMRR to pay back the Trustee?

A   Yes.

Q   Did we ever discuss what I might in the future ask you at a deposition or at trial?

A   Absolutely not.

Q   Okay.  If you can please go back to Exhibit 38. This was the one that Mr. -- this is the one that Dale showed you.

A   Okay.

Q   Regarding the valuation of the OnePath business.

A   Got it.

Q   This is the company, Scalar.

A   Yes.

Q   Who retained Scalar?

A   I don't recall.

Q   Do you know whether AMRR or you retained them?

A   Yes.

Q   So who retained them?

Page 458

A    AMRR.  I don't recall if it was me or Mr. Peterkin or somebody of that nature.  But I recall a relationship with Scalar.

Q    Do you recall why they were asked to do this, quote-unquote, valuation?

A    Yeah, to sanity check the bid.

Q    Make sure the bid of 38 million was in the right ballpark?

A    Right.

Q    Why would this have been shared with Layer 7 if AMRR hired them?

A    I don't know.

Q    Do you know who paid them for their services?

A    AMRR.

Q    Do you have any ballpark memory as to how much?

A    Yeah, I feel like it was maybe $25,000.

MS. ZINSMEYER:  Davor, what exhibit is this?  I'm sorry.

MR. RUKAVINA:  This is 38.

MS. ZINSMEYER:  Thank you.

Q    (By Mr. Rukavina) Would you categor- -- characterize this as a deep dive, fully vetted, formal valuation of a business enterprise?

A    No.  I would characterize it as a review of what was presented by Layer 7, not an in-depth forensic

Page 459

evaluation.

Q    That was going to be my question.  Do you know that the materials that they relied on was in fact provided by Layer 7?

A    Correct.

Q    Do you know whether they went into the books and records of OnePath themselves and forensically did it from scratch?

A    They did not.  I remember that particularly because that was the difference between maybe like $150,000 and $25,000.

Q    I was going to suggest that $25,000 is very, very cheap for a full-on business valuation.

A    Yeah, the type that you're speaking of, like a forensic evaluation was -- I feel like it was maybe 100, 150, somewhere in that nature.

Q    And is it fair to then say that if they got information from Layer 7 that might have been wrong, then their conclusion might also be wrong?

A    That's fair.

Q    Garbage in, garbage out.

A    Correct.

Q    Okay.  If they valued the businesses that you were purchasing at 48.4 million, can you think of why MSouth would have allowed them to be sold for $10 million

Page 460

less?

A    No.

Q    Okay.  That's the end of that exhibit.  Exhibit 60, this was one of our settlement agreements.

A    Okay.

Q    It will be Exhibit 60.

MR. RUKAVINA:  Was it on the bottom or the top?

MR. ELKINS:  It was the last document.

A    The last one.  Down here.  Okay, I got it.

Q    (By Mr. Rukavina) Do you recall Mr. Schmookler was asking you about the fact that the Trustee has released you of the very claims that we're now suing Federal related to?

A    Yes.

Q    Okay.  Can you go to Section 7?

A    Sure.

Q    You see Section 7 says, "Notwithstanding anything contained herein to the contrary, nothing in this Agreement releases, waives," et cetera, et cetera.  And then read Romanette 4, please.

A    4 --

Q    Section -- yeah.

A    "Any first-party claim against any insurer of the Debtor.  Furthermore" --

Q    You can stop.  Was it not a material part of

Page 461

our settlement with you that whatever claims we may or may not have against Federal for first-party coverage would be preserved?

A    Yes.

Q    Okay.  You can put that exhibit down.  Now we're going to talk about the $4.4 million transfer.

A    Okay.

Q    You were given several documents by Mr. Schmookler.  And Mr. Schmookler asked you questions that were plural, "the loans."  Now we're going to talk about just the 4.4.

A    Okay.

Q    Did you cause the $4.4 million transfer that we looked at yesterday to be recorded as a loan on the Debtor's books and records?

A    Fifth Amendment.

MR. RUKAVINA:  Mr. Schmookler, you recall yesterday we agreed that he could just say "Fifth Amendment" instead of reading the whole thing?

MR. SCHMOOKLER:  I agree.

MR. RUKAVINA:  Thank you.

Q    (By Mr. Rukavina) Do you know who recorded the 4.4 million as a loan?

A    Fifth Amendment.

Page 462

MR. SCHMOOKLER: Objection, form.

Q   (By Mr. Rukavina) Just one second, please. I'm trying to find it here. Exhibit 59, sir. Mr. Schmookler had you look at this.

MR. SCHMOOKLER: Is that the native, Davor?

MR. RUKAVINA: It's the native, yes.

MR. SCHMOOKLER: Just orienting myself.

MR. RUKAVINA: I'm sorry.

MR. SCHMOOKLER: No, you're good. I just -- if you tell me what it is, I'll have it in my mind.

Q   (By Mr. Rukavina) Do you recall Mr. Schmookler asked you about Exhibit 59, the native that he printed out?

A   Yes.

Q   And it has a line item 4.4 million?

A   Yes.

Q   Okay. It says unrestricted cash as of January 1, 2022. Do you see that?

A   Yes.

Q   But then there's a Footnote B, it says the loan was conveyed to the preferred stockholder in March 2022. Do you see that?

A   Yes.

Q   Can we conclude therefore that this document was produced at least in March, if not after, 2022?

Page 463

A   We can conclude that.

Q   Wasn't it true, sir, that once the professionals CFGI, et cetera, got in, they were -- they saw that transfer and were thinking about how to book it, and then they went back in time and booked it in the only way that they knew how?

MR. SCHMOOKLER: Object to form, calls for speculation.

A   Yes.

Q   (By Mr. Rukavina) Did anyone discuss with you about how the 4.4 million should be booked?

A   No.

Q   Was the $4.4 million loan from the Debtor to MGR?

A   Yes.

Q   Are you telling me now that you're prepared to talk about the purpose of the 4.4 million?

A   No.

Q   Why was the $4.4 million transferred to MGR?

A   Fifth Amendment.

MR. SCHMOOKLER: Object to form, outside the scope.

Q   (By Mr. Rukavina) I'm sorry?

A   Fifth Amendment.

Q   Mr. Schmookler showed you several emails where

Page 464

they're requesting an explanation for the 4.4 million. I don't have this exhibit number.

MR. ELKINS: Let me see.

MR. RUKAVINA: Do you remember those --

MR. PULMAN: We've got a stack of them here.

MR. RUKAVINA: Paul will help me quick.

MR. ELKINS: 57.

Q   (By Mr. Rukavina) 57, please.

A   Okay. Got, got it.

Q   Are you there, sir?

A   Yeah, 57.

Q   So you saw on the bottom, CFGI, its first open list was an explanation of the 4.4 million. Do you see that?

A   I see that.

Q   Can you think of a reason why they would be asking for an explanation if anyone already knew what it was about?

MR. ELKINS: Hold on.

MR. SCHMOOKLER: Object to form, calls for speculation.

MR. ELKINS: Can you repeat that question?

MR. RUKAVINA: I apologize, yes.

MR. SIMON: This is 57?

MR. RUKAVINA: 57, yes.

Page 465

Q   (By Mr. Rukavina) Mr. Norowitz is asking various people at the company, looks like you're not included yet, for an explanation of the 4.4 million. You see that?

A   I see that.

Q   Do you know why he would be asking for that explanation had it already been recorded on the Debtor's books and records?

MR. SCHMOOKLER: Object to form, calls for speculation.

A   Yeah, Fifth Amendment.

Q   (By Mr. Rukavina) Okay. The email, next email, Ms. Elmore flips it to you. You see that?

A   Yes.

Q   "Jim, can you help with these CFGI requests?" You see that?

A   Yes.

Q   I never saw a response from you. Do you recall if you gave her an explanation for the 4.4 million?

A   I don't recall.

Q   And today when I'm asking you to explain the 4.4 million, you're resting on your Fifth Amendment right?

A   That's correct.

Q   Exhibit 56, please. Are you there, sir?

Page 466

A   Yes.

Q   Mr. Schmookler, I believe he asked you whether this was sent to the Secretary of State of Texas. Does that appear anywhere on here?

A   It does not.

Q   Do you know whether this was ever sent to the Secretary of State of Texas?

A   I have no idea.

Q   Do you know when this letter is dated?

A   I have no idea.

Q   Did you have anything to do with this letter?

A   None.

Q   Do you know whether at all times prior to the Chapter 7 bankruptcy Goodman Networks, Inc., was authorized to transact business in the State of Texas?

A   I don't know.

Q   Okay. That's something we can find out by checking the corporate records.

A   Okay.

MR. SCHMOOKLER: Object to form.

Q   (By Mr. Rukavina) The letter also says that as of December 31, 2021, the company no longer has employees. And Mr. Schmookler asked you about that, and you agreed with him.

A   Right.

Page 467

Q   Was Ms. Sondrup an employee?

A   I think that in the context of, as she's saying, she meant W-2, because we do not have a payroll system anymore.

Q   Did Mr. -- as of December 31, 2021, did Ms. Sondrup work for and get paid for her work for the company?

A   I don't know. To be honest, I didn't realize that she was still secretary or chief of staff at that time, so --

Q   Did you bring her over on AMRR?

A   I did.

Q   But that would have been after December 31, 2021?

A   Right.

Q   Okay. Ms. Elmore, was Ms. Elmore an employee of the company as of December 31, 2021?

A   I don't -- I think technically she was working for UFS, or another Goodman ecosystem company, in doing Goodman ecosystem --

Q   That was my question, whether they were technically W-2 employees or not as of December 31, 2021, there were people, whatever company they were housed with, that provided services to Goodman Networks, Inc. Is that accurate?

Page 468

A   That's right, yes.

Q   Would they have been in the legal department?

MR. SCHMOOKLER: Object to form.

Q   (By Mr. Rukavina) Strike that. Would they have been providing in-house legal services?

MR. SCHMOOKLER: Object to form.

A   I don't recall who was paying Madison Goodman. But Madison Goodman was in the same ecosystem of the Goodman entities. So -- and I believe at that time several people that had worked for Goodman went over with UFS when it was spun out, but were still conducting --

Q   (By Mr. Rukavina) Okay.

A   -- administrative and logistical tactics for Goodman Networks.

Q   Tactics, you meant something else other than tactics. Tasks?

A   Tasks --

Q   Okay.

A   -- is more accurate.

Q   Were they also providing after -- on and after December 31, 2021, accounting services?

MR. SCHMOOKLER: Object to form.

A   Yes.

Q   (By Mr. Rukavina) Okay. So when you answered Mr. Schmookler's question that as of December 31, 2021,

Page 469

the company no longer has employees, you were referring to formal W-2 employees?

A   Right. I meant in the technical sense of getting a W-2 and a paycheck.

Q   Okay.

A   There was a variety of contractors and other individuals working for other Goodman ecosystem entities that were providing services, but there wasn't what an HR staff would consider an employee.

Q   Mr. Schmookler, the record speaks for itself, but I remember him asking when he was looking at Exhibit 58, this is the summary, and it included the two loans.

A   Uh-huh.

Q   He asked whether the company carried those loans at all times. And again, he used loans in the plural to refer to the 44 million and the 4.4 million. I'm going to ask it separately. Did Goodman Networks, Inc., at all times, to your knowledge, carry the $4.4 million as a loan?

MR. SCHMOOKLER: Object to form.

A   Fifth.

Q   (By Mr. Rukavina) Fifth Amendment?

A   Yes.

Q   And I think I just have one or two more questions. This would be the complaint, the Plaintiff's

Page 470

Second Amended Complaint that Mr. Schmookler asked you to look at. And I don't know why I don't have an exhibit number. I apologize.

MR. WHITE: 50.

MR. RUKAVINA: 50. Thank you. I forgot I have the perfect person right next to me.

THE WITNESS: Okay.

MR. WHITE: Yeah.

MR. RUKAVINA: I move for contempt against myself.

Q (By Mr. Rukavina) And he wanted you to read Paragraph 33. Can you please go to 33?

A Sure.

Q He wanted you to read the first sentence. Now I'm going to have you read the second sentence which says, "Upon information and belief, this alleged loan was never reduced to a writing or a promissory note nor was this ever in fact a loan."

Is my allegation that I just read to you true or false?

MR. SCHMOOKLER: Object to form.

A Fifth Amendment, please.

Q (By Mr. Rukavina) And the next sentence says, "Rather, Frinzi had it recorded as such to hide his transactions and embezzlement." Is that allegation true

Page 471

or false?

MR. SCHMOOKLER: Object --

A Fifth Amendment.

MR. RUKAVINA: I apologize, you both spoke over each other. Did you object?

MR. SCHMOOKLER: I was just stating my objection.

MR. RUKAVINA: I know, but she can't hear you.

MR. SCHMOOKLER: Oh, object to form.

Q (By Mr. Rukavina) And then your answer was?

A Fifth Amendment.

MR. RUKAVINA: I'll pass the witness. Thank you.

R E - E X A M I N A T I O N
BY MR. SCHMOOKLER:

Q I have only one question. And I'm just going to sit right where I'm at.

A That's fine.

Q No one's ever accused me of being too quiet.

A I can see you.

Q Sir, earlier when I asked questions, we looked at your answers to interrogatories. Do you recall that?

A Yes.

Q And those answers were truthful answers at the time you answered them; is that correct?

Page 472

A Yeah, at the time of the allegations, those were true responses.

Q And so to the extent that those answers speak to the subjects that you were just questioned about, the contents of your answers in terms of how those transactions went down would be truthful; is that correct?

A At the time of the allegation.

MR. SCHMOOKLER: No further questions.

MR. RUKAVINA: Likewise, none.

So then this ends the Federal portion of the depositions. Thank you, everyone, again.

MR. SCHMOOKLER: I appreciate everyone's, just on the record, cooperation in letting me go home today.

THE VIDEOGRAPHER: The time is 1:17 p.m. Central. We are off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 1:21 p.m. Central. We are on the record.

E X A M I N A T I O N
BY MR. SIMON:

Q All right. Good afternoon, Mr. Frinzi. How are you?

A Well, thank you.

Q Mr. Frinzi, my name is Robert Simon. I

Page 473

represent two Goodman brothers, Jason Goodman and Joseph Goodman, but only those two individuals for purposes of this deposition. You understand that?

A I do.

Q All right. You're a lobbyist, right?

A Presently, no.

Q You were -- were you a lobbyist?

A Yes.

Q Okay. And I think you testified you had a lobbying firm called World Conquest, LLC?

A Well, that wasn't my lobby firm, but I had a firm called Frinzi & Associates, but I also did some government relations work with World Conquest.

Q Okay. All right. Please take a look at the document that the court reporter is going to mark as Exhibit Number 61.

(Exhibit 61 marked for identification.)

Q Okay. You see it?

A Yes.

Q 61 appears to be a retainer for -- retainer agreement for consulting services. Do you see that?

A I do.

Q All right. If you turn to the second page, you'll see your signature. Do you see that?

A Yes.

Page 474

Q All right. And what is the date of this agreement?

A **November 1st, 2019.**

Q And the firm you were contracting with was World Conquest, LLC?

A **Yes.**

Q And your client, according to the second paragraph, was Genesis Networks; is that correct?

A **That's right.**

Q All right. Now, this particular document is not signed, but did you enter into a lobbying or consulting agreement on behalf of Genesis Networks?

A **Yes.**

Q All right. And who is the person who owned Genesis Networks?

A **James Goodman.**

Q Okay. Did you enter into a similar type of lobbying or consulting agreement with Goodman Networks, Inc.?

A **I did.**

Q Okay. And did you send billings to Goodman Networks, Inc. for the work that you did?

A **Yes.**

Q All right. I'm going to hand you a document that the court reporter's going to mark as Exhibit

Page 475

Number 62.

(Exhibit 62 marked for identification.)

Q This appears to be an invoice from World Conquest, LLC, to Goodman -- Goodman Networks; is that correct?

A **That's right.**

Q And the amount is $5,000?

A **Yes.**

Q And the date looks like the 25th of February, 2020; is that correct?

A **Yes.**

Q And is this an invoice for billing the monthly retainer for consulting services?

A **Yes.**

Q And how long did World Conquest, LLC, continue its consulting engagement with Goodman Networks?

A **I don't recall.**

Q Period of months, period of years?

A **Months.**

Q Okay.

A **I mean off and on. I don't recall. I've done a lot with both John and James, and so I can't -- I guess I can't determine if it's a continuous period of time or -- it was off and on, and it would be maybe months at a time.**

Page 476

Q Okay. So it would be fair to say you had an ongoing relationship with Goodman Networks?

A **Absolutely.**

Q Okay. And doing consulting for them?

A **Yes.**

Q And government relations work?

A **Yes.**

Q All right. And is that also true for GNET ATC?

A **Yes.**

Q Were you sort of just generally familiar with the business of those companies back in the time period of 2020, 2021?

A **Yes.**

Q Okay. All right. If you look at the document that the court reporter is going to mark as Exhibit Number 63.

(Exhibit 63 marked for identification.)

Q This appears to be an email chain from April, in April 2020, between you and someone named Joe [sic] Farrace at Harbor Capital, and James Goodman is included on the email. Do you recognize this email chain?

A **I see that I'm on it. I don't recognize it.**

Q Do you have any reason to think it is not what it appears to be?

A **No, I believe it's a real email.**

Page 477

Q Okay. The subject line for the email, this email chain, is "Bond deal." Do you see that?

A **Yes, I do.**

Q All right. What is the bond deal that this email chain refers to?

A **I don't recall. This one's over five years ago. And so I would have -- anything I would get from it would be as a result of context in the email.**

Q Okay. If you look down at the bottom, the bottom of the first page of the email, does that sort of generally tell you that's what this bond deal is about?

A **Let me read it, please.**

Q Sure. Take your time.

A **(Reviewing document.) Okay.**

Q So can you tell -- who was the target market to buy the bonds?

A **I don't know. And I'm not sure if that's what this is conveying. I do now remember John Farrace from Hidden Harbor Capital, and this -- and again, this was five years ago. I just read it right now. It may have been either the Goodmans buying bonds back or the Goodmans refinancing bonds in the market. But I can't, I can't recall exactly.**

Q But these were bonds in Goodman Networks, Inc.?

A **Yes.**

Page 478

Q   And these were the bonds that were issued as a result of the bankruptcy of Goodman Networks, Inc., in 2017?

A   As I understand.

Q   Okay.  But back in 2017 -- back in April of 2020, you were working on some, some project to find a buyer for Goodman Networks bonds?

A   Or find financing to allow the Goodmans to refinance their bonds.

Q   Okay.  All right.  Would you look at a document that the court reporter is going to mark as Number 64.

(Exhibit 64 marked for identification.)

Q   This document appears to be an agreement dated March the 9th, 2021, between Goodman Networks, Inc., and World Conquest, LLC.  Do you see that?

A   Yes.

Q   Do you recognize the document?

A   Let me review it some.

Q   Sure.

A   (Reviewing document.)  Okay, I recognize it.

Q   All right.  And is that your signature on the second page?

A   Yes.

Q   So -- and someone named Scot Brunke signed for Goodman Networks; is that correct?

Page 479

A   Yes.

Q   Who is he?

A   He was a financial advisor or some financial officer at Goodman Networks.

Q   All right.  This agreement talks about a -- it's right in the first paragraph, talks about a strategic priority to divest the AT&T installation unit at Goodman Networks.  Do you see that?

A   Yes.

Q   And World Conquest was hired for this engagement by Goodman Networks?

A   The context of this document is, I believe, that either James or John wanted me to make a bid to buy the -- buy that business unit to spin it out from Goodman Networks.

Q   All right.  And what work was performed under this agreement?

A   The installation of home internet and DirecTV.

Q   So were you trying to find a buyer for the -- for that particular business unit?

A   I was trying to, yes, find a buyer.

Q   And what work did you do in order to find a buyer?

A   Reached competitors and private equity funds and asked if they would be interested in buying this.  I

Page 480

think at this phase it was when AT&T was essentially trying to strongarm Goodman into selling this business unit to Mastec.

Q   And did you familiarize, familiarize yourself with the business unit that you were trying to find a buyer for?

A   Yes.

Q   Okay.

A   Sure.

Q   So you were generally knowledgeable?

A   General knowledge, yes.

Q   Okay.  And was World Conquest paid for this work?

A   I don't recall, but probably.

Q   Okay.  No reason to think it wasn't?

A   Right.

Q   And now to your knowledge, why was the sale of the AT&T installation unit a strategic priority for Goodman Networks back in March of 2021?

A   Because AT&T was essentially strongarming Goodman to sell this business unit to Mastec for essentially pennies on the dollar.

Q   And you were aware of that?

A   Yes.

Q   All right.  And is that -- is the strategic

Page 481

priority that's articulated in this agreement the same strategic priority that was consummated as a business transaction in August of 2021?

A   I don't understand the question.

Q   Sure.  Did Goodman Networks end up selling the, this particular business unit to Mastec?

A   They did.

Q   Okay.  And did that transaction take place in August of 2021?

A   I believe so.

Q   Okay.  All right.  Please take a look at the document the court reporter will mark as Exhibit Number 65.

(Exhibit 65 marked for identification.)

Q   This document is an email dated August the 2nd, 2021, from you to James Goodman, correct?

A   Okay.

Q   All right.  And do you recognize the email?

A   I don't, but I see that it's real.  Let me read it.

Q   Sure.

A   (Reviewing document.)

MR. PULMAN:  This is 65?

MR. SIMON:  Yes.

A   Okay, I read it.

Page 482

Q    (By Mr. Simon) The subject line at the top says "Solutions," correct?

A    That's right.

Q    And what -- are the solutions the things that you're talking about down at the bottom, recapitalization, acquisitions and growth?

A    Yes.

Q    Okay.  If you look at the second line, right up at the top, it says, "Taking over from Jason, I would sell the techs to Mastec."  Okay.  And which Jason were you referring to?

A    Presumably Jason Goodman.

Q    Okay.  And you mean taking over from Jason Goodman as the CEO of the company?

A    I don't -- I suppose.  I don't recall if Jason was actually CEO, but Jason was perhaps managing the business, but in some shape or form taking over for Jason.

Q    Okay.  By this time, by August the 2nd of 2021, did you already know that you were going to succeed Jason Goodman as CEO?

A    Nothing was final at August 2nd.

Q    Okay.  Were you auditioning for that role?

A    I don't know if I was auditioning for the role, but I had been in discussions with James Goodman about

Page 483

it, and quite frankly, I wasn't sure if I -- I had a comfortable, easy life as a lobbyist, to be honest with you, and so I wasn't certain if I wanted to get into real industry, you know.  So --

(Zoom interruption.)

THE WITNESS:  Sorry.  Feedback?  My phone's not anywhere near me.

THE VIDEOGRAPHER:  We're fine now.

THE WITNESS:  Okay.

Q    (By Mr. Simon) Up at the top where it says, "I would sell the techs to Mastec," what did you mean by that?

A    That sell the -- because at the time there was still so much development in installations and there was a lack of techs with trucks.  So rather than sell the business as an enterprise, perhaps Goodman Networks could have sold the assets of the human resources, tools and trucks, rather than as an enterprise, which might actually have a higher value.

Q    So you thought -- you thought the assets might, the assets might have a higher value in pieces than sold as a unit?

A    Yes.  At the time, I believe that -- and I think it was even less than that, but I was to understand that Mastec was to buy that entire business for maybe 6

Page 484

to $8 million.  And the value per crew was estimated at maybe $15,000 per working crew.  And so I felt that potentially you could get more value selling the crews, trucks and tools to Mastec or Bechtol or other players in this field that were desperate to obtain crews.

Q    Sure.  And you knew enough about the business of Goodman Networks to form that opinion and give it, right?

A    Yes.

Q    Okay.  All right.  Look down at the bottom --

A    Okay.

Q    -- where it says -- well, just go ahead and read that bottom paragraph to yourself.  Begins with "I would entirely change the way Goodman is going."

A    Yes.

Q    All right.

A    (Reviewing document.)

Q    Do you see where it says at the bottom, "I also suspect that I am much cheaper than Jason.  Nothing against Jason, it's just that he's probably fatigued by this and he's already made his money."

A    That's right.

Q    Okay.  So you were auditioning for his job, weren't you?

A    I'm not going to say that.

Page 485

Q    Okay.

A    But you can conclude that.

Q    Okay.  You were offering to take over for him, right?

A    Okay.

Q    And you were advertising to -- or stating to James Goodman that you were less expensive than Jason.

A    I know that for sure.  And James had told me that.

Q    Okay.  And by this time, you were willing to take the job since you were offering yourself for less money than Jason was charging, right?

A    I was willing to.

Q    Okay.  Thank you.  Let's talk a little bit about some of the things on here that you say you'd like to do.

A    Okay.

Q    Go to Number 6, please -- I'm sorry, the document the court reporter's going to mark as Deposition Exhibit Number 66.

(Exhibit 66 marked for identification.)

Q    All right.  Deposition Exhibit Number 66 is an email from you to James Goodman dated August the 3rd, 2021.  Do you see that?

A    I do.

Page 486

Q All right. And do you recognize the email?

A I don't, but I believe it's true and correct.

Q Okay. Thank you. All right. And here you actually lay out the -- your strategy to -- the turnaround strategy to James Goodman, correct?

A Yes.

Q And do you copy either Jason Goodman or Joseph Goodman on this email?

A No.

Q All right. First on your list is to close the Mastec transaction; is that correct?

A Yes.

Q All right. And were Jason and Joseph Goodman working on that transaction, working on the Mastec sale back in August 2021?

A I don't have direct knowledge of that.

Q Okay. But that transaction did close in August 2021, correct?

A It did, yes.

Q Okay. And Goodman Networks sold those assets, those HSP, Home Service Provider assets to Mastec?

A That's right.

Q Okay. Second on the list is that you should be appointed as CEO to replace Jason Goodman, correct?

A It says, "Appoint me as CEO."

Page 487

Q Okay. So you were proposing at that time please appoint me as CEO of the company, right?

A Well, it says, "Appoint me as CEO."

Q Okay. But that's what you were communicating, right, I should be appointed as CEO?

A It says, "Appoint me as CEO."

Q Okay. Can you think of any reason why it would say, "Appoint me as CEO," if you were not asking to be appointed as CEO?

A I'm just reading from the document that was just showed to me from four years ago.

Q Okay. Can you think of any other reason why it would have said that?

A No.

Q All right. In fact, you were appointed as CEO of Goodman Networks a couple of months after this, correct?

A That's right.

Q All right. The third it says, your third -- and I understand these are not numbered, but just counting down -- counting down the list.

A I understand.

Q Yeah. The third it says, "Pay down bonds and some debt." Do you see that?

A I do.

Page 488

Q Did that ultimately happen?

A Yes. Actually, the bonds that James sold were -- eventually went to retiring debt. So yeah.

Q Okay. The fourth one you propose that Goodman Networks buy an over-the-counter market public shell corporation, correct?

A Yes.

Q And that happened, didn't it?

A It did.

Q And was the public shell corporation AMRR?

A Yes.

Q All right. Where did you get the idea to go buy a public shell corporation?

A In discussion with James. Before this shell company came up, we looked at potentially finding a SPAC to buy Goodman and have it as a, at least some asset within the SPAC. And then that seemed too expensive and too unrealistic, so then we pivoted to the shell corporation.

Q Okay. What's a SPAC?

A I don't -- it's special purpose acquisition company.

Q Okay. All right. So this is something that you and James Goodman discussed among yourselves and you came up with the idea of buying a public shell company?

Page 489

A We came up with the idea to buy a public shell company.

Q Okay. And then the next -- the next part of the scheme was -- I don't want to say scheme -- the next part of the restructuring plan was to then buy an operating company with EBITDA?

A Yes.

Q And to have the shell company acquire the company that had EBITDA?

A That's right.

Q All right. And who came up with that idea?

A Between us, we had those discussions and developed the idea.

Q Okay. And then further down here, you say the overall plan was to keep buying assets, correct?

A Yes.

Q So the -- so understand from that the idea was we would buy a company with operating assets, and then we would raise additional capital and buy another company with operating assets?

A That's right.

Q Okay. And you put that -- at least tried to put that plan into action, right?

A That's correct.

Q And you knew enough, you understood enough

Page 490

about Goodman Networks to execute on that plan, right?

A    Yeah.  Yes.

Q    Okay.  All right.  Would you please take a look at a document that the court reporter will mark as Exhibit 67.

(Exhibit 67 marked for identification.)

Q    This is an email from you to James Goodman that is dated August the 14th, 2021.  You see that?

A    I see that.

Q    And do you have any reason to believe it's not what it appears to be?

A    No.  I believe it's a true and correct email.

Q    Okay.  Thank you.  And then underneath it there is an email from someone called DealStream Search Genius.  Do you see that?

A    I do.

Q    Who is DealStream Search Genius?

A    I don't know.  I don't know who that is.  I recognize from this email that it must be some kind of search platform to find a public shell.

Q    Okay.  So the purpose of this email was to go find a public shell?

A    That's right.

Q    Okay.  Do you know what was in the redacted part of this email?

Page 491

A    I have no idea.

Q    Do you know why it was redacted?

A    I didn't redact it.

Q    Okay.  All right.  Let's look at the document that the court reporter will mark as Exhibit 68.

(Exhibit 68 marked for identification.)

Q    All right.  This document appears to be an email exchange between you and James Goodman dated -- there are a couple of them, but they all appear to be dated August the 26th, 2027 -- excuse me -- August 26, 2021.

A    I see that.

Q    Okay.  Same question, does this appear to be, does this appear to be a true and correct copy of --

A    It does.

Q    Okay.  And I see that you signed this as SVP Strategy Mergers and Acquisitions, with an email address of james.frinzi@genesisnet.com.  Do you see that?

A    I see that.

Q    Okay.  What was that about?

A    Can you be more specific?

Q    Yeah, sure.  Were you the Senior Vice President for Strategy, Mergers and Acquisitions for Genesis Networks?

A    I suppose in my consultancy function, that's

Page 492

the function I was doing, was to find the public, public shell.  So yes.

Q    Okay.  And you had that title, as far as you know?

A    Yeah, as far as I know, yeah.

Q    Okay.  And Genesis Networks is a company controlled by James Goodman?

A    That's right.

Q    All right.  Okay.  Now look at the bottom.

A    I see that.

Q    Yeah.  And you're speaking to James Goodman and you say, "I would like to be your chief of staff" --

A    Uh-huh.

Q    -- "and senior vice president of M&A at the holding company level.  Is that okay with you?"

A    That's right.  I said that.

Q    So you were asking for that job, correct?

A    Yeah.  Yes.  That -- I liked spending time with James and working with him, and he's very creative and it was something I like doing.

Q    All right.  You go on to say, "I really like being your right-hand man, I'm super dedicated, and you can always count on me," correct?

A    Yeah.

Q    And when you wrote that, you meant what you

Page 493

said, right?

A    At that time, yeah.  Again, I really liked spending time with James and John actually.  And they were fun to work with, and it was an enjoyable experience.

Q    Right.  And then James says up at the top, "Okay, but I need you finding money and companies," correct?

A    Yes.

Q    And you worked to do that, didn't you?

A    I did.

Q    And up at the top you affirm that you're going to support, fund and acquire like a tsunami, right?

A    That's right.

Q    And you attempted to do that?

A    That's right.

Q    On behalf of Goodman Networks?

A    Yes.

Q    When you talk about at the holding company level, down at the bottom, SVP of M&A at the holding company level, what were you talking about?  What was the holding company?

A    I don't know.

Q    Okay.  All right.  Would you look at the document the court reporter will mark as Exhibit Number

Page 494

69.

A   Sure.

(Exhibit 69 marked for identification.)

Q   All right.  The first part of this exhibit is an email, and I'll ask you a little bit about the email, then I want to ask you about what's attached to it.

A   Okay.

Q   So the email is an email from you to James Goodman dated September the 9th, 2021; is that right?

A   Yes.

Q   All right.  And what does it say on the subject line?

A   Goodman Solutions Restructure.

Q   Okay.  And do you have any reason to doubt that this document is what it appears to be?

A   It's a true and correct email.

Q   Okay.  Thank you.  And if you turn to the next page, you'll see a Goodman Solutions turnaround plan.  Do you see that?

A   Yes.

Q   And did you prepare the Goodman Solutions turnaround plan that is attached to the email that is Exhibit Number 69?

A   I have no reason to believe I didn't.

Q   Okay.

Page 495

A   Okay.

Q   All right.  And was everything in this proposed Goodman Solutions turnaround plan true and correct to the best of your knowledge at the time you created it?

A   Yes.

Q   Okay.  And you knew enough about the business of Goodman Solutions to draft this proposal, correct?

A   Yes.

Q   All right.  And was the principle around this turnaround plan basically the same as the plan you outlined in your August the 3rd email to James Goodman?

A   Generally, yes.

Q   All right.  Did you send this turnaround plan to Jason Goodman?

A   No.

Q   And did you send this turnaround plan to Joseph Goodman?

A   No.

Q   And why not?

A   Because I interfaced with and only with James Goodman.

Q   Okay.  So James -- so Jason Goodman and Joseph Goodman were just, they were just out of the picture as far as you were concerned with the turnaround plan?

MS. HINCKLEY:  Objection, form.

Page 496

A   Yes.  Actually, in working with James, he preferred that communications between you and James were between you and James.

Q   (By Mr. Simon) Okay.  And so -- but because we had a form objection, I'll ask the question a little bit differently.

And was there a reason why you did not include Jason Goodman or Joseph Goodman on the turnaround plan that you sent?

A   James prefers that if you work with James Goodman you're working with James Goodman one on one.  And if you are to share something, he'll advise you when you should share it.

Q   So as far as you know, Jason Goodman and Joseph -- as far as you know, do you have any information that would cause you to believe that Jason Goodman or Joseph Goodman knew what you were doing?

MS. HINCKLEY:  Objection, form, speculation.

A   Unless James shared it with him, with either Jody or Jason, I don't see how they would have known.

Q   (By Mr. Simon) Okay.  You didn't tell them.

A   That's right.

Q   And you're not aware that James Goodman told them.

A   I wouldn't know.

Page 497

Q   Okay.  All right.  Let's take a look at the document that the court reporter will mark as Exhibit Number 10 -- well, 70.  My Tab 10, your 70.

(Exhibit 70 marked for identification.)

Q   All right.  This is another email from you to James Goodman, and it is dated September the 9th, 2021.  You see that?

A   Yes.

Q   Do you have any reason to believe the email is not what it appears to be?

A   A true and correct email.

Q   Okay.  And you tell him, on the first line, "I found a shell on PitchBook."  Is that right?

A   Yes.

Q   Okay.  And it's a tower company?

A   I don't remember the tower company.  I think it was actually --

Q   Look at the second sentence of the email.

A   Okay.

MR. ELKINS:  I think we're on -- we may be on different exhibits, Robert.

THE WITNESS:  Yeah, the one I'm looking at is not a tower company.

MR. SIMON:  Are you looking at Number 70?

THE WITNESS:  Yeah.

LEXITAS

Page 498

MR. SIMON: I'm looking at the right one --

MR. ELKINS: Come on, Vanna.

MR. SKEELS: Oh, my bad.

(Discussion off the record.)

MR. BELANGER-COAST: Oh, we got a preview.

MR. SIMON: They're not that exciting. Okay.

THE WITNESS: And which exhibit is this now?

MR. SIMON: This is 70. Oh, wait.

MR. SKEELS: Why don't you mark the new one as 71.

MR. SIMON: Okay. This should be then 71. Okay.

MR. PULMAN: So we're marking 70 what was marked -- just identify 70 and 71 for us.

(Exhibit 71 marked for identification.)

MR. SIMON: All right. The one, the one that is 71 should be an email dated the 9th of September 2021, and it should say at the top "I found a shell on" -- and it's -- okay.

MR. PULMAN: Yeah, I got it.

MR. SIMON: Yeah. The Bates number is 2025_JEG_002775.

THE WITNESS: Okay. I don't have that.

THE REPORTER: Here you go.

THE WITNESS: Okay. I have it now. Okay.

Page 499

Now --

Q    (By Mr. Simon) All right. And this won't take long. Is this email, Exhibit 71, a true and correct copy?

A    Yes.

Q    All right. And it says, "I found a shell on PitchBook," right?

A    Uh-huh.

Q    And "It's a tower company," right?

A    Uh-huh.

Q    But that's not the company you ended up purchasing, correct?

A    That's right.

Q    All right. So the next one is 70. Right?

A    Yes.

Q    And the Bates number at the bottom is 2025_JEG_2776. Do you see that?

A    I do.

Q    All right. Okay. And this says -- and this is an email from you to James Goodman, correct?

A    That's right.

Q    And the date is the 10th of September 2021?

A    Uh-huh.

Q    And then you say this -- it says TX -- look up, under Subject line, it says "Shell," correct?

Page 500

A    Yes.

Q    And attachments says, "TXCB Profile"?

A    Yes.

Q    Do you know what that company was?

A    Yeah, it was actually an oil company that had -- it was a OTC oil small producer, OTC company.

Q    Okay. And you say, "This is trading for $3 per share"?

A    Yes.

Q    And then you say: We can get it up to 500,000 straight up?

A    Yes.

Q    All right. What did you mean by we can get it up to 500,000 straight up?

A    That's not what it says. It says, "We can get it for 500,000 straight up."

Q    Oh, you're correct. My mistake. What you're saying there is we can buy it for 500,000?

A    Correct.

Q    Got it. Okay. So this was -- was this another possible OTC shell acquisition?

A    Yes. I -- actually, I remember this one in particular because we did go a little bit far down the road with these guys, but it ended up just being too difficult.

Page 501

Q    Okay. So this was not a company that Goodman Networks purchased. It's not a company that was purchased as part of the turnaround plan?

A    In the succession, this was the first one that actually created communications between James and myself and the shell company.

Q    Okay. And on this email also, neither Jason Goodman nor Joseph Goodman is copied, correct?

A    That's correct.

Q    All right. Let's look at a document that the court reporter will mark as Exhibit Number 72.

(Exhibit 72 marked for identification.)

Q    And this is an email from you to James Goodman also -- well, this one's dated September the 17th, 2021, correct?

A    Yes.

Q    All right. And the subject line says, "Goodman Board Recommendations"?

A    Yes.

Q    And then down below, you say: Dear Mr. Goodman, Upon my extensive review of the state of affairs at Goodman, I have concluded that the following actions need to be taken. Correct?

A    Yes.

Q    All right. So according to this email you had

Page 502

by this time done an extensive review of the state of affairs at Goodman Networks, correct?

A   Yes.

Q   All right.  And based upon the extensive review, you made the recommendations that are shown here in bullet points on Exhibit Number 72, correct?

A   That's right.

Q   And neither Jason Goodman nor Joseph Goodman is copied on this email, right?

A   Incorrect.

Q   Oh, Jason Goodman is copied on this email.

A   Yes.

Q   All right.  And why was Jason Goodman copied on this one, do you recall?

A   James probably told me to.

Q   Okay.  And you say, "This is my recommendation to the board"?

A   Yes.

Q   Okay.  And does this email also basically in short form, bullet point form summarize your turnaround plan for Goodman Networks?

A   Yes.

Q   And is this basically the same plan you outlined in your -- the PowerPoint Goodman Networks Solutions Turnaround Plan that you attached to your email

Page 503

on September the 9th?

A   Yes.

Q   All right.  At the time you wrote this email, GNET ATC was a subsidiary of Goodman Networks, correct?

A   Yes.

Q   All right.  When you say in the first bullet point that Goodman Networks should spin out GNET ATC as a separate company, what did you mean by that?

A   I don't recall.

Q   Okay.  Did you know who you thought should own the shares of GNET ATC after the spinout?

A   No.

Q   Okay.  According to this proposal, in the third bullet point, GNET ATC would own the public company traded on over-the-counter market, correct?

A   That's what it says.

Q   Is there any place in this email where you tell either -- where you tell Jason Goodman or James Goodman that the public company would be purchased by an entity not owned or controlled by Goodman Networks?

A   No.

Q   Okay.  All right.  Would you please look at the document the court reporter is going to mark as Exhibit Number 73.

(Exhibit 73 marked for identification.)

Page 504

Q   This appears to be an email chain dated September 20th, 2021, that starts with an email from an attorney named William Rohrlich.  Do you see that?

A   I see that.

Q   And was he an attorney at Winstead?

A   Yes.

Q   And who did he represent?

A   I don't recall.

Q   Okay.  Do you see where Mr. Rohrlich says -- Mr. Rohrlich says there's a list of due diligence items for the spinoff of GNET ATC and combination of other businesses?

A   Yes.

Q   Okay.  And you say up at the top, "I will coordinate with James on the execution of this"?

A   Yes.

Q   Okay.  And is either Jason Goodman or Joseph Goodman copied on this email?

A   No.

Q   All right.  And is there a reason why not?

A   No.

Q   Okay.  Would you please look at the document the court reporter is going to mark as Exhibit Number 74.

(Exhibit 74 marked for identification.)

Q   All right.  This is another email dated

Page 505

September 20th, 2021, from you to Jason Goodman.  Do you recognize this document?

A   I believe it's true and correct.

Q   Okay.  And what is the subject of the email?

A   "Diligence Matters - GNET ATC."

Q   Okay.

A   Or, yeah, "GNET ATC Spin-Off Diligence."  Sorry.

Q   And if you look at the next two pages, you see a document that is entitled Diligence Matters Related to Spin-Off of GNET ATC, correct?

A   I see that.

Q   All right.  And up at the top, you say, "Jason, can you help me pull this together?"

A   It says that.  I said that, yes.

Q   Okay.  So what were you asking Jason Goodman to do?

A   Presumably to pull together the due diligence in the documents sent by Billy Rohrlich.

Q   Okay.  To answer these questions?

A   Yes.

Q   All right.  And did these questions come from Winstead?

A   Seemingly.

Q   All right.  And did Jason Goodman cooperate

Page 506

with you?

A  I don't recall.

Q  Okay.  Did you tell Jason Goodman anything else about the project other than what's in this email?

A  I don't recall.

Q  Okay.  Ask the same question for Joseph Goodman.  Did you tell Joseph Goodman anything else about the project you were working on other than what's in this email?

A  I don't recall.

Q  Okay.  Yeah, and also, Joseph Goodman is not copied on this email, is he?

A  That's correct.

Q  All right.  Would you please look at the document that the court reporter will mark as Exhibit Number 75.

(Exhibit 75 marked for identification.)

Q  This is another email chain, and the email at the top is from you to James Goodman dated on September the 20th, 2021, and timestamped at 3:58 p.m., correct?

A  Correct.

Q  All right.  Now, down below, there is an email from -- again, another email from Mr. Rohrlich, William Rohrlich, correct?

A  Correct.

Page 507

Q  And looking at the bottom, the message at the bottom, Mr. Rohrlich says, quote, "The financial statements of your company would not need to be audited by a firm registered with the PCAOB and would not need to meet PCAOB standards."  Do you see that?

A  I see that.

Q  All right.  When Mr. Rohrlich was referring to your firm, which firm did you understand him to mean?

A  I don't know.

Q  Okay.  Did he mean GNET ATC, or did he mean the public shell that you were trying to acquire?

MR. ELKINS:  As phrased, foundation.

A  I assume that, based on the context of this email, Billy Rohrlich was suggesting that GNET ATC reverse merged into a public shell would not have to have a PCAOB audit in order to be reverse merged into a public shell.  I believe that was the context.

Q  (By Mr. Simon) Okay.  And do you know what PCAOB stands for?

A  Something about -- it's an accounting standard that is required to be publicly traded.

Q  Okay.  And in response to the email from Mr. Rohrlich, Mr. Goodman responds in the middle of the page, "That's great news," right?

A  That's right.

Page 508

Q  And then you say up at the top, "Yes, indeed," right?

A  I said that.

Q  Okay.  And why was it great news?

A  Because it would have been a substantial barrier to go back and redo two years of financial statements with PCAOB standards.

Q  Okay.  So it was the fact that you didn't have to go through that process would speed up the transaction?

A  Well, and it would be less costly.  It probably would have cost half a million dollars to go re-audit financial statements for two years, and PCAOB standards.

Q  Okay.

A  So time and money.

Q  Fair enough.  And is either Jason Goodman or Joseph Goodman copied on this email?

A  Neither of them.

Q  Okay.  If you look at -- now please look at the document the court reporter is going to mark as Number 60 -- 76.  76.

(Exhibit 76 marked for identification.)

Q  This is an email chain dated September 20th and September 21st, 2021, between several lawyers at Winstead and you and James Goodman.  Do you recognize the email?

Page 509

A  I don't, but I believe it's true and correct.

Q  Okay.  If you look at the email that is timestamped -- the one in the middle that's timestamped 9:57 p.m. and 11 seconds.

A  I see that.

Q  All right.  Mr. Rohrlich says that Winstead has not had enough time to perform due diligence on the candidate public shells listed on the prior emails; is that correct?

A  Yes.

Q  And then he asks, "What is the time clock for this?"  Does that mean what is the time clock for the acquisition?

A  You'd probably have to ask Billy Rohrlich.

Q  Okay.  What did you understand him to mean?

A  I guess my impression from reading the email is he's asking what time frame are you looking for to have such a transaction.

Q  Okay.  And if you look at your response, up at the top, you say:  We need at least to get an OTC acquisition kicked off ASAP.  It's the only means to restructure our debt.  Ideally I'd like to close this year.

Correct?

A  That's right.  That's what it says.

Page 510

Q   All right.  Why did you believe that the acquisition of a public shell traded on the OTC was the only way to restructure the debt?

A   Because the ability to have liquid equity could be used as collateral and it could be used as -- liquid equity could be used in acquisitions.  So you could go to a smaller private company and pay part cash and part liquid shares as a means to create other acquisitions.  In the state that Goodman and the Goodman entities were in, it wasn't really in a situation to -- you couldn't really go to buy a smaller company with, you know, that state of affairs.  So having a public shell creates a lot more options in terms of borrowing, having flexibility to use equity, using equity as capital.  So that's why.

Q   Okay.  And is that a conclusion that you reached in consultation with James Goodman?

A   Yes, over the course of several months, this email is very consistent with the strategy that was listed in the PowerPoint that you showed me from perhaps August 2021.

Q   Okay.  And to your knowledge, did anyone else involved at Goodman Networks express a contrary belief?

A   No.

Q   And is either Jason Goodman or Joseph Goodman copied on this email?

Page 511

A   I don't see either of them copied.

Q   Okay.  But it was -- was it your intention to restructure the debt of Goodman Networks for the benefit of Goodman Networks and its creditors?

A   Yes.

Q   And for its shareholders?

A   Yes.

Q   It was not -- was it your intention not to pay the creditors of Goodman Networks?

A   Can you rephrase that?

Q   Sure.

A   It's kind of double negative.

Q   Sure.  When you were planning this restructuring, was it your intention not to pay the creditors of Goodman Networks?

A   The intention was to pay the creditors of Goodman Networks.

Q   Okay.  And you worked to do that?

A   Yes.

Q   Please look at the document the court reporter's going to mark as Deposition Exhibit 77.

(Exhibit 77 marked for identification.)

Q   This is an email chain that begins September 21st, 2021, and continues on to September 22nd, 2021.  Do you recognize this document?

Page 512

A   I don't, but I believe it's true and correct.

Q   Okay.  And if you turn to the second page, this chain begins with an email from Steven K. Lee at Layer 7 Capital to Jay Bock of Genesis Networks.  Do you see that?

A   Sure do.

Q   All right.  And Jay Bock -- and Genesis Networks was a company that was controlled by Mr. Goodman -- by James Goodman?

A   Yes, sir.

Q   And it was a company for which you were at that time the senior vice president for mergers and acquisitions?

A   Yes.

Q   Okay.  What was Layer 7 Capital?

A   I believe we covered this in other questions today.

Q   Yeah.

A   But it is a financial advisory, financial broker, investment banker firm.

Q   All right.  In this email, Mr. Lee tells Mr. Bock about a new acquisition opportunity called OnePath Integrated Services.  Is that the first time you heard of OnePath Integrated Services?

A   Perhaps.

Page 513

Q   Okay.  Do you recall hearing about it somewhere else?

A   I think that this flavor of OnePath may have been the first time, but I believe before this happened, before this email, James or Genesis bought another entity from OnePath.  So I loosely heard of OnePath.  This is the first time I've heard of this particular business unit.

Q   Okay.  Okay.  If you look at the top of the, of this email, right -- not the very top.  It's the one that's just above, two-thirds up the page, and it is an email from James Goodman to you, and it's dated -- it's timestamped 7:17 p.m.  Do you see that?

A   I do.

Q   Okay.  And Mr. Goodman says, "I want you to buy it."  Do you see that?

A   I see that.

Q   And by "I want you to buy it," what entity was he referring to?

A   The one referred to in this email, the OIS OnePath business opportunity.

Q   Okay.  So by September the 21st, 2017, at 7:17, James Goodman told you "I want you to go buy OnePath"?

A   He did.

Q   Okay.  And then at the top, it said -- you say:

Page 514

I reached out to Steve at 7 Layer Capital.

A   At Layer 7 Capital.

Q   I'm sorry, at Layer 7 Capital.

A   That's fine.

Q   And you did that, correct?

A   Yes, I did.

Q   And OnePath was eventually acquired, correct?

A   Correct.

Q   All right.  And one more time, neither Jason Goodman nor Joseph Goodman is copied on this email; is that correct?

A   That's correct.

Q   All right.  Now, in connection with the acquisition, or as part of the same turnaround plan, you also worked to acquire AMRR, correct?

A   That's right.

Q   And AMRR was in fact acquired, right?

A   Yes.

Q   And other than helping you with some due diligence questions from Winstead, was Jason Goodman involved in the acquisition of AMRR?

A   Zero.

Q   And was Joseph Goodman involved in any way in the acquisition of AMRR?

A   Zero.

Page 515

Q   Okay.  And the answer would be the same for OnePath, neither Jason Goodman nor Joseph Goodman was involved?

A   Correct.  Jason and Joseph Goodman had nothing to do with buying OnePath or AMRR.

Q   Okay.  Thank you.  All right.  Let's look at the document that the court reporter is going to mark as Exhibit Number 78.

(Exhibit 78 marked for identification.)

Q   All right.  This is an email chain dated September -- September 22nd, 2021, between attorneys at Winstead and you and James Goodman.  Do you recognize the email?

A   It's a true and correct email.

Q   Okay.  And the subject line says, "Winstead Engagement Letter"?

A   It does.

Q   All right.  Turn to the third page.  You should see the engagement letter from Winstead.  Do you see that?

A   I see that.

Q   All right.  And is this a true and correct copy of the engagement letter between Winstead and GNET ATC dated September 22nd, 2021?

A   Yes.

Page 516

Q   All right.  Now, Goodman Networks is not on this engagement letter.  Do you know why?

A   I don't recall.

Q   Okay.  And what was Winstead engaged to do?

A   Well, let me read the document.  (Reviewing document.)  Based on the document, at the very least legal services.  Presumably to pursue acquisitions.  But it's not explicit in this document.

Q   Okay.  Do you recall that this was -- well, was the purpose of this engagement letter to help acquire OnePath and AMRR?

A   Yes.

Q   Okay.

A   And Jason and Joseph were not copied on this.

Q   Thank you.  Let's take a look at Deposition Exhibit Number 69 -- a document the court reporter will mark as Deposition Exhibit Number 79.

(Exhibit 79 marked for identification.)

Q   All right.  This is an email chain that begins on September the 27th --

A   Okay.

Q   -- of 2017 and runs to September -- 2021, and runs to September the 29th of 2021, between several people at Goodman Solutions, Genesis Networks, and finally between you and Cathy Kincy.  Do you recognize

Page 517

the email?

A   I don't, but I believe it's a true and correct email.

Q   Okay.  And if you look up at the subject line, it says, "GNET-ATC Income Statement."  Do you see that?

A   I see that.

Q   All right.  And if you look at the email that's dated September the 28th, 2021, and timestamped 7:14, right in the middle of the page.

A   Yes.

Q   Okay.  And you see that is an email from Cathy Kincy to you and Steve -- is that pronounced Seago?

A   Seago.

Q   Seago.  And James Goodman, correct?

A   That's right.

Q   All right.  And this has some words in it.  It has -- if you look on the second line, it has the abbreviation MOM.  Do you understand that to mean month over month?

A   Yes.

Q   Okay.  And Ms. Kincy appears to say in this paragraph that the 2021 income statement she received from Goodman Networks are not accurate.  The 2021 income statements she received from Goodman Networks was not accurate.  Do you read it that way?

Page 518

A   Yes.

Q   And she says the original income statement understated costs of goods sold by $1.2 million?

A   I see.

Q   And was that 1.2 million per year or 1.2 million per month?

A   I don't know.

Q   Okay.  Then she goes on to say, if you look a little further down, same -- same -- the second paragraph of the email, last sentence, she says, "I just want to make sure everyone understands this is very thin margin (.6 percent) book of business and I'm uncertain $249,000 of margin will result in positive EBITDA once support team, services and operating expenses are factored in."  Do you see that?

A   I do.

Q   And did you understand her to say -- not really -- did you understand that to mean I'm not sure this company really makes money?

A   Yes.

Q   Okay.  And you reply up at the top, you say, "Thanks.  I entirely understand.  We clearly need to trim costs and restructure debt before we can grow."  Is that right?

A   Yes.

Page 519

Q   But you believed you could do that; is that right?

A   Yes.

Q   Okay.  And you proceeded on the basis that you, that Goodman Networks could trim costs, restructure debt and then grow?

A   In the context of this document, it would be GNET ATC.

Q   Okay.  Okay.  Very well.  So GNET ATC was actually the entity that had the contract with FedEx?

A   Yes.

Q   Okay.  So your, your belief at the time was, yeah, we could do this.  It may be tough, but we can trim costs, we can restructure debt, and we make this thing work?

A   With my knowledge at the time, that was definitely what I thought.

Q   Okay.  All right.  Let's take a look at a document that the court reporter will mark as Number 80.

(Exhibit 80 marked for identification.)

Q   Okay.  This begins with an email from you to James Goodman that is dated September the 29th, 2021, correct?

A   Yes.

Q   And the attachment -- well, the subject line

Page 520

says, "Presentation," correct?

A   Yes.

Q   And the attachment says, "GNET ATC Restructure Plan - JEG," correct?

A   Yes.

Q   All right.  And is it -- is the email and the attachment to it, are they true and correct copies?

A   True and correct.

Q   Very well.  Thank you.

A   And Jason and Jody are not copied on it.

Q   Thank you very much.  Okay.  And so the attachment says, "GNET ATC Restructure Plan," correct?

A   Yes.

Q   And did you prepare this document?

A   Yes.

Q   And does this document lay out your restructuring plan for Goodman Networks as it existed on September the 29th, 2021?

A   Yes.

Q   And was everything in this document true and correct to the best of your knowledge at the time?

A   Yes.

Q   Now, turn to the last page, which says, "Next Steps."

A   Okay.

Page 521

Q   And does that lay out the restructuring plan?

A   It does.

Q   And is that basically the same plan you had articulated to James Goodman since August the 3rd?

A   Yes.

Q   All right.  And you considered that plan to be reasonable at the time?

A   Yes.

Q   And as you noted, neither Jason Goodman nor Joseph Goodman is copied on either the plan or the email.

A   I noted that.

Q   Thank you.  And did you separately send that restructuring plan to either Jason Goodman or Joseph Goodman?

A   There's no chance.

Q   All right.  Let's look at the document the court reporter is going to mark as Exhibit 81.

(Exhibit 81 marked for identification.)

Q   I think we've seen this one before, so -- all right.  This appears to be an analysis dated September the 30th, 2021, that details disagreements between Unified Field Services and Goodman Networks about how much is owed to Goodman Networks.  Do you -- you saw this document yesterday, correct, or something like it?

A   Yeah, something like it.  This or something

Page 522

like it, yes.

Q   Yeah.  Before yesterday, had you seen this document?

A   I don't recall.

Q   Okay.  Do you know who prepared this document?

A   I don't.

Q   All right.  If I refer to Unified Field Services by the initials UFS for the rest of the examination, will you know what company I'm referring to?

A   Yes.

Q   You testified yesterday that you thought UFS purchased certain assets from the Debtor in what you characterized as a leveraged buyout.  Do you recall that testimony?

A   I recall.

Q   Okay.  Were you involved in that transaction in any way?

A   I was not.

Q   Do you know when that transaction occurred?

A   Not exactly.

Q   Do you know how that transaction occurred?

A   No, I do not.

Q   Have you seen any of the transactional documents between UFS and the Debtor?

A   No.

Page 523

Q   More specifically, did you ever see the Asset Purchase Agreement?

A   Never.

Q   Did you ever see the Transition Services Agreement?

A   Maybe.  I don't recall.

Q   Don't recall.  All right.  Do you know what the terms of those agreements were?

A   I don't.

Q   Is it correct to say you do not know what contractual obligations the Debtor may have had to UFS under those documents?

A   Correct.

Q   When did you first learn that UFS claimed an offset of $2,321,831.89 against its obligations to Goodman Networks?

A   I don't recall.  I didn't learn about it until it became an argument.

Q   After you became the CEO of Goodman Networks?

A   Yes.

Q   Okay.

A   I was not aware of the leveraged buyout format, and I didn't know that there was a difference until it became a problem.

Q   Okay.  So when you look at the exhibit, the

Page 524

Exhibit 81, you have no idea whether any of this information is correct or not correct?

A   No idea.

Q   All right, fair enough.  Let's take a look at the document that the court reporter is going to mark as Exhibit 82.

(Exhibit 82 marked for identification.)

Q   This is -- this appears to be the same analysis presented in different format, do you see that?

A   Yes.

Q   All right.  And if I asked you the same question, you'd give the same answer, you do not know whether these numbers are true and correct and you don't know where they came from?

A   That's right.

Q   Fair enough.  Did you rely upon this analysis in any way in making business decisions for Goodman Networks?

A   No.  For this matter, I stayed out of it.

Q   Okay.  It did not affect the way you managed the business?

A   No.

Q   All right.

A   It was an interfamily issue.  It wasn't in my scope.

Page 525

Q   All right.  Now, you testified yesterday that in June of 2022 you agreed to write off debt owed by UFS to the Debtor, correct?

A   Yes.

Q   All right.  Then if you look at, it was actually Exhibit Number 12, but I have it also as -- this will be Exhibit Number -- no, we can leave it out for now.

It was Deposition Exhibit Number 12 for yesterday.

A   Okay.

Q   Page 135.  These are the Signal messages.  Yeah, Page 135.

A   Okay, got it.

Q   All right.  And so your testimony yesterday was James Goodman asked you to write off the debt and you wrote it off; is that correct?

A   Yes.

Q   All right.  Do you understand the difference between writing off a debt and forgiving a debt?

A   No.

Q   Okay.  I'll make a representation to you.  I'll represent to you that writing off a debt means you take it off the balance sheet as an asset.

A   Okay.

Page 526

Q   But it doesn't mean that the obligor doesn't still owe the money.

A   Okay.

Q   And forgiving a debt means you're saying you don't have to pay me back.

A   Got it.

Q   You understand that distinction?

A   I do now.

Q   Okay.  Was the debt that UFS owed to Goodman Networks written off or was it forgiven?

MR. ELKINS:  Foundation.

A   Yeah, I don't know.  However financial people classified it.

Q   (By Mr. Simon) Okay.  Did the Debtor send UFS an IRS form -- the Debtor meaning Goodman Networks.  Did Goodman Networks send the Debtor an IRS Form 1099 for forgiveness of debt?

A   I have no idea.

Q   Okay.  I will represent to you the Trustee sued UFS and recovered judgment for the same obligation that you say you wrote off for the Debtor.  Were you aware of that?

A   No.

Q   Okay.  Would you please look at the document the court reporter will mark as Number 83.

Page 527

(Exhibit 83 marked for identification.)

Q   When I finish with this, we'll be just about halfway done, so it will be a good time to take a break.

A   Okay.

MR. PULMAN:  Halfway, all right.

MR. SIMON:  Maybe a little more.

Q   (By Mr. Simon) All right.  Do you see the --
Exhibit Number 83 is an email from, a rather lengthy email from William Rohrlich to you and James Goodman and then there's some other people also copied.  Do you see that?

A   I see that, yes.

Q   All right.  Now, do you have any reason to believe this is not what --

A   True and correct email.

Q   All right.  Now, if you go to the last -- all right.  Look up at the top.  I'm sorry.  Mr. -- it's the top of the email.  Mr. Rohrlich says Winstead has reviewed the revisions to the proposed LOI provided for, from Repository Services, correct?

A   Yes.

Q   Then he says:  Then it appears the sellers have some hesitancy to have the public shell join as a party to the LOI, so we have made some revisions in response. It seems like the strong preference tends to have the

Page 528

controlling shareholders simply sell the shares outright and allow Goodman to implement the reverse merger or other business combination on the back end without involvement from the controlling shareholders.

Did I read that correctly?

A   You did.

Q   In this context, was AMRR the public shell Mr. Rohrlich was talking about?

A   Based on the documents you gave me, yes.

Q   Okay.  And that company was acquired, right?

A   Yes.

Q   If you look at the next paragraph, just take a moment and read it to yourself.

A   Okay.  (Reviewing document.)  Okay.

Q   All right.  Here, Mr. Rohrlich says that the proposed structure would be for you and James Goodman to acquire the shares directly from the controlling shareholders sometime before effecting the merging to -- the merger or other transaction with GNET, right?

A   Yes.

Q   All right.  Then Mr. Rohrlich says, "We strongly suggest that you and James acquire these shares via a separate legal entity."  Do you see that?

A   I do.

Q   And that's actually what happened, correct?

Page 529

A   That's right.

Q   All right.  Next Mr. Rohrlich asked -- Rohrlich asked whether you and James had a separate, clean company that you could use to acquire the shares, and then if not, he offers to form one for you.  Is that correct?

A   Yes.

Q   And that's what ultimately happened, right, he went and formed a new company?

A   Yes.

Q   And was the new company Multiband Global --

A   Resources.

Q   Multiband Global Resources.

A   Yes.

Q   And that company was formed to go acquire the shares of AMRR for your turnaround of Goodman Networks?

A   Yes.

Q   All right.  And did Winstead actually form that entity for you?

A   I don't recall.

Q   Okay.  But that entity was formed?

A   Yes.

Q   And then Mr. Rohrlich, a little down -- a little further down Mr. Rohrlich says:  After the acquisition of AMRR, the new entity should engage in a share exchange or merger between the shell and GNET ATC.

Page 530

Correct?

A   Yes.

Q   And would that then give GNET ATC the economic benefit of the acquisition?

MS. HINCKLEY:  Objection, form.

A   Seemingly.

Q   (By Mr. Simon) Okay.  And so -- and the reason I say that is if you go acquire the asset in a new special purpose entity that you control, then the way you would get value to Goodman Networks, or for GNET ATC, would be for GNET ATC or Goodman Networks to then acquire shares in the new entity, right?

A   Okay.

Q   Make sense?

A   Yes.

Q   Okay.  And that actually is what you planned to do, right?

A   Yes.

Q   All right.  Was either Jason Goodman or Joseph Goodman copied on this email?

A   Neither were copied on this email.

Q   And were either Jason Goodman or Joseph Goodman involved in any way in this transaction?

A   No.

MR. SIMON:  Okay.  I think this is a good

Page 531

stopping -- or a good break point.  We're a little over halfway.

THE VIDEOGRAPHER:  The time is 2:32 p.m. Central.  We're off the record.

(Recess.)

THE VIDEOGRAPHER:  The time is 2:49 p.m. Central.  We are on the record.

Q   (By Mr. Simon) All right.  Welcome back, Mr. Frinzi.  Mr. Frinzi, please take a look at a document that the court reporter will mark as Exhibit Number 84.

(Exhibit 84 marked for identification.)

Q   All right.  This is an email from you to James Goodman and Bobby Forshey, and it is dated on October the 15th, 2021.  Do you see that?

A   Yes.

Q   Okay.  And do you recognize the email?

A   I don't, but it's true and correct.

Q   Okay.  Very good.  Thank you.  All right. There are a couple of things I want to talk about.  First you list the facts at the top.  And I want to confirm that those things were true at the time.  Goodman -- Goodman Investment Holdings owns Goodman Networks; is that true?

A   Yes.

Q   And Goodman Networks owned GNET ATC?

Page 532

A   Yes.

Q   And Goodman Networks had $17 million in bond debt and GNET ATC had approximately $57 million in trade debt.  Is that correct?

A   Yes.  Yes.

THE REPORTER:  What?  I'm sorry.

MR. SIMON:  Trade debt.

Q   (By Mr. Simon) Okay.  And then below you explained at least a portion of the turnaround transaction that you're working on; is that correct?

A   Yes.

Q   All right.  And then there's someone copied on this email who pops up for the first time in all these emails, and that's Bobby Forshey.  Do you see that?

A   Yes.

Q   All right.  Bobby Forshey is a bankruptcy lawyer, right?

A   That's right.

Q   Was there a reason why Bobby Forshey was copied on this email?

A   Because we were seeking his counsel.

Q   Okay.  Were you seeking his counsel about a possible bankruptcy?

A   No, I don't think at that time we were looking at possible bankruptcy, but I don't think this was in

Page 533

preparation of bankruptcy.  I don't recall.  Maybe more of like a turnaround advice.  I don't know.  But I don't -- at this stage, Goodman was certainly not looking at filing for bankruptcy.

Q   Okay.  All right.  And were either Jason Goodman or Joseph Goodman copied on this email?

A   Neither.

Q   All right.  Would you now please look at a document that the court reporter will mark as Exhibit Number 85.

(Exhibit 85 marked for identification.)

Q   All right.  This is another email chain that begins on October the 15th and goes to October the 18th, 2021.  Do you see that?

A   Uh-huh.  Yes.

Q   All right.  And down at the bottom, you tell Madison Goodman to send the bond indenture and related documents to Bobby Forshey; is that right?

A   Yes.

Q   All right.  And why did you give that instruction?

A   I don't recall.

Q   Okay.  In the middle of the page, it says, "Attached are the bond documents."  That is an email from Madison Goodman to you and to Bobby Forshey, right?

Page 534

A   Yes.

Q   And then at the top, you say, "Thank you, James, we also need a list of the bondholders." Is that correct?

A   Yes.

Q   And do you know why you were trying to transmit to Bobby Forshey the bond documents and the list of bondholders?

A   I don't recall.

Q   Okay. Let me ask you this. Did you plan to ask -- did Goodman Networks plan to ask Bobby Forshey to reach out to the bondholders and try to make a deal with them?

A   Based on the context of this document, that would make sense.

Q   Okay. But do you recall specifically one way or another?

A   I don't specifically recall, but actually as you say that, I do feel that's a realistic conclusion.

Q   Thank you. All right. Let's look at the document the court reporter is going to mark as Deposition Exhibit Number 86.

(Exhibit 86 marked for identification.)

Q   All right. This document is unanimous consent of the board of directors of Goodman Networks dated

Page 535

October the 20th, 2021. Do you see that?

A   Yes.

Q   Okay. Now, it appears that this document, it says -- the Bates number at the bottom says Seidel Frinzi and then it has a number 8769. Is this a document that you provided to the Trustee?

A   I don't recall.

Q   Okay. Have you seen this document before?

A   I don't recall.

Q   Okay. And do you know whether the information on here is correct?

A   I do not.

MR. ELKINS: Foundation.

MR. SIMON: What did you say?

MR. ELKINS: Foundation.

MR. SIMON: I just asked him if he knew.

Q   (By Mr. Simon) And the answer is you don't know?

A   Right.

Q   Okay. Thank you. Please take a look at a document that the court reporter is going to mark as tab -- as Exhibit 87. Thank you very much.

(Exhibit 87 marked for identification.)

Q   This document is an email chain. All emails appear to be dated on October the 27th, 2021. The

Page 536

timestamp at the top appears to be 12:21 p.m. and 38 seconds. Do you see that?

A   Yes.

Q   Do you recognize the email?

A   I don't recognize it, but I do recognize it's true and correct.

Q   Okay. And you sign it at the top, your email signature at the top says, "CEO - GNET ATC." Correct?

A   Yes.

Q   And by this time were you the CEO of GNET ATC?

A   Yes.

Q   And by this time were you also the CEO of Goodman Networks?

A   Yes.

Q   Okay. And this appears to be -- although there is no attachment to the email, the email appears to attach a -- even though the attachment somehow didn't make it to us, it talks about a demand letter being attached. Do you see that?

A   I do.

Q   Okay. And who was the creditor that was, that transmitted this demand letter to James Goodman and you?

A   WNC.

Q   And what was WNC?

A   A manufacturer of some kind of telecom

Page 537

equipment.

Q   And is that some telecom equipment that Goodman Networks used in its business?

A   I think it was more in the GNET ATC reseller MBE project. I don't think that this was a cost of goods sold or installation equipment.

Q   Okay. But this was -- this vendor sold some product to GNET ATC?

A   In the same way -- so this was also like an MBE pass-through deal. So GNET ATC didn't buy it and really hold it as inventory. It was just a pass-through that allowed WNC to sell WNC product to telecom companies and get MBE credit.

Q   Okay. So there was some very small markup for --

A   Yes.

Q   -- for GNET ATC?

A   Yes.

Q   All right. Now, you reply, "We are not in a position to pay you. We have retained a restructuring advisor to help us create a plan to move forward with a realistic plan to make payment." Do you see that?

A   Yes.

Q   All right. Was that a truthful statement?

A   Yes.

Page 538

Q   All right.  And you say that Goodman Networks had retained a structure -- a restructuring advisor.  Who was the restructuring advisor?

A   I don't recall if it was -- if at that point we had someone like Sierra or CFGI yet, but at least Bobby Forshey.

Q   Okay.  And is either Jason Goodman or Joseph Goodman copied on this email?

A   Neither.

Q   Okay.  All right.  Look at the document that the court reporter is going to mark as Deposition Exhibit Number 88.

(Exhibit 88 marked for identification.)

Q   Did -- back to 87 briefly, did you have any discussions with either Joseph Goodman or Jason Goodman regarding the subject of the email that is Deposition Exhibit Number 87?

A   No.

Q   All right.  Looking at Deposition Exhibit Number 88, this is -- appears to be an email from you to James Goodman and Billy Rohrlich that is dated October the 27th.  We have several emails, but they're all dated October 27th, 2021.  Do you see that?

A   Yes.

Q   And up at the top, it says, the subject line

Page 539

says, "AMRR Closing," correct?

A   That's right.

Q   All right.  And is this a true -- is this email a true and correct copy?

A   Yes, it is.

Q   All right.  If you look at the first email in the chain, which is actually on the next page, on the second page -- and this email comes -- it's to James from someone named Tom at Redstone Consulting Corporation.

A   Yeah.

Q   Do you see that?

A   I do.

Q   And he says:  Billy just told Ron, the seller's attorney, this won't be closing until January.  The escrow was executed by you and the seller and has a closing date of November 5th, 2021.  We understand that sometimes there is a day or two off from closing, but two months will not work.

A   Yeah.

Q   All right.  And do you recall seeing this email?

A   I don't recall it, but I believe it's real.

Q   Okay.  Do you know why there was a two-month delay in the closing of the escrow that this -- that Tom at Redstone Consulting is complaining about?

Page 540

A   I don't recall.

Q   Okay.  But you recall that there was a two-month delay in the closing between November -- November of 2021 and January 2022?

A   I don't recall.

Q   Okay.  Now, if you look up just a little bit to, it's the same exhibit, but look just under halfway, halfway down the page, you say -- and this is to Billy Rohrlich and James Goodman -- "Please read below.  We spent" -- "We spent a lot of money, time and resources on buying the company.  It's essential to the business."

Now, the company you're talking about was AMRR?

A   Yes.

Q   All right.  And it was essential to the business for the reasons you articulated before?

A   Yes.

Q   Okay.  All right.  Let's take a look at a document the court reporter will mark as Deposition Exhibit Number 89.

(Exhibit 89 marked for identification.)

Q   This appears to be an email dated October the 28th, 2021, from you to Josh, Joshua at Bonds Ellis.  Do you see that?

A   Yes.

Q   All right.  Okay.  And is this a true and

Page 541

correct copy?

A   Yes.

Q   All right.  Joshua at Bonds Ellis is Joshua Eppich at Bonds Ellis, correct?

A   Yes.

Q   E-P-P-I-C-H.

A   Yes.

Q   And Bonds Ellis is another bankruptcy firm, isn't it?

A   Yes.

Q   All right.  And so why was this email sent to Joshua at Bonds Ellis?

A   Further assistance in restructuring.

Q   Okay.  So either Goodman Networks or GNET ATC engaged another bankruptcy firm --

A   Yes.

Q   -- to help with restructuring?

A   Yes.

Q   Okay.  All right.  Then you say in the actual text of the email, "I'm getting my arms around FedEx.  My understanding is that GNET ATC is net" -- "net-net $6.4 million negative with FedEx."  Is that right?

A   Yes.

Q   Okay.  So what -- so what exactly were you saying by that?

Page 542

A  That it was 6.4 million behind in what it was owing.

Q  Okay. Does that -- did you mean that the relationship was upside down by $6.4 million or that it was just $6.4 million late in paying?

A  That, I don't recall.

Q  Okay. Now, the next line says: Here is the general math. 15.3 in AP from FedEx and 9.9 in FedEx cash on hand. Right?

A  Yes.

Q  So is that where you get the math that --

A  Yes.

Q  Okay, okay. Very well. And then "AP is recommending we pay $5.3 million tomorrow." Correct?

A  Yes.

Q  And AP is accounts payable?

A  Yes.

Q  And then the next line you say: Well, that would leave 10 million in accounts payable and 4.6 million in cash on hand, equaling a $6.4 million deficit.

A  Yes.

Q  Okay. Now, did the relationship with FedEx ever get -- did the economic relationship with FedEx ever get better from this point on, or did the debt simply get better from this point on, or did the debt simply

Page 543

continue to grow?

A  It just continued to grow.

Q  Okay. Is this sort of the starting point where after this everything is downhill?

A  Yes.

Q  Okay. Thank you. One more question on this. Down the last, the second to last line, it's really the sentence that begins, "In a parallel path we have $7 million in cash on hand that is attributed to the VAR business. Goodman Networks itself has 8.2, which is mostly the result of the asset sale that occurred this past August." Do you see that?

A  Yes.

Q  And 8.2 means $8.2 million, correct?

A  Yes.

Q  And the 8. -- and when you say "the asset sale that occurred this past August," was that the Mastec sale?

A  Yes.

Q  Okay. Thank you. All right. Let's go to a document that the court reporter will mark as Exhibit Number 90.

(Exhibit 90 marked for identification.)

Q  All right. This is an email chain, a short email chain that takes place on November the 5th, 2021.

Page 544

Do you see that?

A  Yes.

Q  Okay. And the -- what I really want to focus on is the email -- it's the second one in the chain from someone named Jason Cramer to someone named Colin at Hill Innovation [sic] Law.com. Do you see that?

A  Yes.

Q  Who is Jason Cramer?

A  A lawyer at Winstead.

Q  Okay. And do you know who Colin at Hill Innovation.com was?

A  I don't recall.

Q  Okay. And then two people copied, Ron Stauber and William Rohrlich, correct?

A  That's right.

Q  All right. This says, "Dear Mr. Hill, On behalf of our client GNET Partners, LLC, please see the attached notice pursuant to Section 3.2(b) of that certain Escrow Agreement dated as of October the 6th, 2021, by and among GNET Partners, LLC, Repository Services, LLC, and David Hill, II, on behalf of Innovative Law, LLC. Please release the escrowed funds using the wire instructions attached."

Did I read that correctly?

A  Yes.

Page 545

Q  All right. So what was -- what was Goodman -- or what was GNET asking for? Was it asking for a refund of the money it had put into escrow?

A  I don't recall.

Q  Okay. Was this the original five, the original $550,000 escrow for the purchase of AMRR?

A  I don't recall.

Q  Okay. All right. Let's go to the next document which the court reporter will mark as Exhibit Number 91.

(Exhibit 91 marked for identification.)

Q  All right. This is an email chain dated November 9 and 10, 2021. And you'll see it's timestamped 12:57:55 a.m. at the top. Do you see that?

A  Yes.

Q  All right. And it's between Stephanie Elmore at Goodman Networks and you and Samantha Sondrup, and also Joshua at Bonds Ellis. Do you see that?

A  Yes.

Q  All right. And this email appears to deal with signatory authority on G -- if you'll look in the middle.

A  Yes.

Q  Signatory authority on GNET ATC bank accounts; is that correct?

A  Yes.

Page 546

Q   All right.  And was the significance of this email that Jason Goodman was being taken off of the bank accounts and you were being put on?

A   That's what the document appears, yes.

Q   Okay.  And was that because you were now the CEO and Jason Goodman wasn't the CEO anymore?

A   That's right.

Q   Okay.  All right.  Would you please take a look at the document the court reporter will mark as Deposition Exhibit Number 92.

(Exhibit 92 marked for identification.)

Q   All right.  This is an email chain that begins November the 9th and continues November the 10th, 2021.  And at least at the top, it's an email from you to Jason Goodman and Josh -- Joshua at Bonds Ellis, and then also Jason Goodman and Bobby Forshey are copied.  Do you see that?

A   Yes.

Q   All right.  And then you say in the middle, I'm talking -- the email at the top, in the middle, you say "As a practical matter for me, my name is going to be on all the lawsuits, and I will" -- "I will have to bear the responsibility of settling with the creditors.  That's fine and I signed up for the turnaround plan."

A   Yeah.

Page 547

Q   "However, I have no authority settles me with risk, but little domain over my outcome."

Does that seem like a prophetic statement?

A   It really sure does.  Yeah, wow.

Q   Okay.  But you did undertake this responsibility.

A   Yeah.

Q   Okay.  And this was your turnaround plan, correct?

A   Yes.

Q   And at the time, you had a reasonable belief that the turnaround plan would be successful for Goodman Networks?

A   Yes.

Q   All right.  And the turnaround plan was ultimately executed, but for the back end problems with the --

A   Yes.

Q   -- with the valuation of OnePath.

A   That's right.

Q   Okay.  All right.  Let's look at the document that is Exhibit Number 93 -- the court reporter will mark as Exhibit Number 93.

(Exhibit 93 marked for identification.)

Q   All right.  This is an email chain, and it is

Page 548

dated -- I think everything is from November the 16th of 2021.  You see that?

A   Yes.

Q   All right.  Look at the email that is timestamped 8:36 a.m.  Well, first, is this email a true and correct copy of what it appears to be?

A   Yes.

Q   Thank you.  Look at the email that is -- it's the very first one, which means it's on the last page --

A   Okay.

Q   -- of the chain.  And this is an email from you to Stephanie Elmore, Cathy Kincy, Samantha Sondrup, and then copied to Jody --

A   Yes.

Q   -- Goodman and Josh, Josh at Bonds Ellis.  Do you see that?

A   Yes.

Q   All right.  And you say:  We are still holding on to FedEx payments.  We're developing a complex plan on how to spend money at ATC.  Definitely do not pay $10 million to FedEx.

Correct?

A   Yes.

Q   Okay.  So you at this -- in this email you're giving clear instructions to, at least Stephanie Elmore

Page 549

and Cathy Kincy, not to pay FedEx at this point, right?

A   Yes.

MR. ELKINS:  Document speaks for itself.

A   Yes.

THE REPORTER:  I'm sorry, I didn't hear you.

MR. ELKINS:  Document speaks for itself.

Q   (By Mr. Simon) Okay.  And do you recall giving this instruction?

A   Yes.

Q   Okay.  And why did you give that instruction:  Definitely do not pay $10 million to FedEx?

A   I was advised that -- about making favorite, favorite payments, because if we paid -- because it wasn't FedEx money, WNC money, ARRIS money.  It was GNET ATC money.  And so I was advised that if GNET ATC paid all of its money to FedEx and then ARRIS, WNC and CommScope got nothing, then that would be a problem.  So if you're going to make, start making payments, they'd have to be advised in a, some kind of equitable manner.

Q   Okay.  The same email, when you say, "We are developing a complex plan on how to spend our money at ATC," what was that complex plan?

A   It's the plan I just was speaking of.

Q   You mean a plan to pay these creditors pro rata rather than paying, paying anyone in full?

Page 550

A Right. So some kind of restructuring that allowed GNET ATC to stay in business, somehow satisfy creditors, but not favor creditors.

Q Okay. All right. Okay. On this email, the November the 16th email, you did copy Joseph Goodman --

A Yes.

Q -- correct? And why was he copied on this email?

A Frankly, I have no idea.

Q Okay. Did Joseph Goodman ever respond to this email to you?

A I doubt it.

Q Okay. You don't have a recollection that he did?

A No.

Q Got it. Okay. If you look at an email -- this is the email that's in the -- it's at the bottom of the first page, and it's timestamped 10:46 a.m. And then the actual text email is on the next page.

A Okay.

Q Okay? But you'll see the timestamp is 10:46 a.m. and goes to the next page, and it's an email from you to Cath- -- again, Cathy Kincy and Stephanie Elmore. Do you see that?

A Yes.

Page 551

Q All right. You say, "Josh, Bobby, James and I will probably talk today to resolve this. We have two bankruptcy attorneys involved, and there is an overall strategy and plan. I know for sure that paying $10 million to FedEx isn't in that plan." Do you see that?

A Yes.

Q Okay. And when your -- when you talk about the overall strategy and plan, do you mean that's the one you just told me about a little bit ago, that we'll figure out some way to pay these people pro rata?

A Yes.

Q Okay. And if you look at the middle of the first page, you have an email from Cathy Kincy to -- and the timestamp is 11:40 -- 11:40 and 2 seconds a.m. Do you see that?

A Yes.

Q And she tells you, "I would bank on losing the FedEx business line as their request for payment of the $10 million is broaching two weeks old and dates back to late September. Their payments to date total $25 million." Do you see that?

A Yes.

Q And does that suggest to you that there was -- that $25 million has built up in payments from FedEx?

Page 552

A It does suggest that.

Q Okay. And it says, "They continue to send promptings requesting payment and we will continue to ignore, per your directive." Right?

A That's right.

Q And you gave that directive?

A Yes.

Q And then up at the top, same email, and this is email at 5:54 p.m. and 11 seconds. You say: There is an overall bankruptcy plan, and if you'd like, call Bobby Forshey, who is representing James Goodman and Goodman Networks. Josh represents ATC. Both of which advised me to suspend payments.

Do you see that?

A Yes.

Q Is that a truthful statement?

A Yes.

Q Okay. All right. Let's look at a document the court reporter will mark as Exhibit 34 -- excuse me, 94.

(Exhibit 94 marked for identification.)

MR. PULMAN: Oh, just 94?

MR. SIMON: That's all. It's only my tab 34.

All right. Thank you.

Q (By Mr. Simon) All right. Please look at the document. This is an email chain that starts on November

Page 553

the 17th, 2021. Excuse me. It's dated November the 17th, 2021, and it's timestamped 5:50 p.m. at the top. Do you see that?

A Yes.

Q And the email is addressed to James Goodman, Cathy Kincy, Bobby Forshey, and Josh Eppich. Do you recognize this email?

A I don't recognize it, but I do recognize it's true and correct.

Q Okay. Thank you. If you look at the email in the middle of the first page, the one that's timestamped 10:37 a.m., James Goodman is speaking, correct?

A Yes.

Q And he says, "We need to pay FedEx or we will be doing the same thing that Goodman did with OEM money." Do you see that?

A Yes.

Q He says, "I cannot set that" -- I assume he meant precedent.

A Yes, I assume so.

Q Okay. And you respond at the top and you say you're not against paying them, but we would have to have an agreement as to what happens after the payment?

A Right.

Q And by agreement, you're talking about some

Page 554

type of a restructuring plan?

A   Yes.

Q   Okay.  And that was -- was that the result of the conversations that you had with Josh Eppich and Bobby Forshey?

A   Yes.

Q   Okay.  Would you look at the document, please, that the court reporter will mark as Exhibit Number 95.

(Exhibit 95 marked for identification.)

Q   In these business decisions that we've been talking about, you would -- well, was Goodman Networks being advised by Counsel?

A   Yes.

Q   And was it being advised by, in fact, by bankruptcy lawyers?

A   Yes.

Q   And was Goodman Networks following the advice that it received from bankruptcy counsel?

A   Yes.

Q   All right.  Do you see the document that the court reporter has marked as Exhibit Number 95?

A   I do.

Q   Okay.  And this is an email that is dated November 17, 2021.  And the timestamp on the bottom email is 1:01 p.m., correct?

Page 555

A   Yes.

Q   And here Cathy Kincy provides a short statement of the financial condition of the FedEx relationship; is that correct?

A   Yes.

Q   And is the information that she provides here correct?

A   Based on my knowledge of this email.

Q   Okay.  And up top you say, "Thank you for confirming this.  Extremely helpful."

A   That's right.

Q   All right.  And so what she appears to be saying is -- and this is in the last line of the, of that paragraph in the middle of the page -- that there seems to be a $5.2 million difference between the amount that's owed to FedEx and the amount that's in the bank account.

A   Yes.

Q   Okay.  Okay.  Let's look at the document that the court reporter will mark as Exhibit Number 96.

(Exhibit 96 marked for identification.)

Q   All right.  This is an email dated November the 17th, 2021, and timestamped 8:52 p.m., correct?

A   Yes.

Q   And this is an email from you to Bobby Forshey and James Goodman and Josh Ellis, correct?

Page 556

A   Yes.

Q   And is this email what it appears to be?

A   Yes.

Q   All right.  And at the top, you say, "I just spoke with James.  We're in agreement on what we discussed this morning, where I do have authority and an established process on finances."  Do you see that?

A   Yes.

Q   Do you know what the agreement was?

A   I don't recall.

Q   Okay.  And then you say, "We need you to draw up an agreement that outlines the process for spending money on Goodman and GNET ATC."  Correct?

A   Yes.

Q   And did Bobby Forshey ever draw up that document?

A   I don't recall.

Q   Okay.  Was there a -- do you recall relying upon some document --

A   Yes.

Q   -- drawn up by Mr. Forshey?

A   Yes.

Q   Okay.  You just don't recall what the document --

A   I don't recall, but I do recall that a document

Page 557

of such nature was produced.

Q   Okay.  And you attempted to adhere to the advice given by Mr. Forshey?

A   Yes.

Q   All right.  Then in the next paragraph it says, "Presently, AP" -- and AP here means accounts payable, correct?

A   Yes.

Q   -- "processes payables, Jody reviews and approves.  Going forward, James and I would be the signors on that account."  Correct?

A   Yes.

Q   So that would give you and James the authority over who gets paid?

A   Yes.

Q   Okay.  And then you say, "I'd like to have $250,000 authority, and anything above that requires James Goodman's approval."  Is that correct?

A   Yes.

Q   Was that done?

A   I believe so.

Q   All right.  Let's look at the document that the court reporter will mark as Deposition Exhibit Number 97.

(Exhibit 97 marked for identification.)

Q   This document appears to be an email from you

Page 558

to James Goodman and also Joshua Eppich at Bonds Ellis; is that correct?

A Yes.

Q And the subject matter is "Confidential - Payments"?

A Yes.

Q And you request the authority to spend money, correct?

A Yes.

Q And one of your requests is to spend $551,000 to buy a public company to serve as the anchor to buy OnePath and Sprout as part of the turnaround plan, correct?

A Yes.

Q And that public company would be AMRR?

A Yes.

Q All right. And AMRR did eventually go buy OnePath, correct?

A Yes.

Q And then you say $100,000, that's for the rest of your -- remainder of your salary, correct?

A Yes.

Q And did you receive that money?

A Yes.

Q Okay. And then a $500,000 upfront payment for

Page 559

six months to Multiband for Frontier work as sub to GNET ATC. Did that happen?

A Yes.

Q And it says, "This transaction will actually make money for GNET ATC."

A Yes.

Q Was that correct?

A I mean, a small amount. Maybe like $300,000 or something. But yeah.

Q Okay. And then the last thing you say is, "From an incoming point, I plan to pursue the sale of FedEx back to Genesis, which would remove the FedEx debt from GNET ATC, and add $2 million in cash to the balance sheet." You see that?

A Yes.

Q Did you attempt to do that?

A Yes.

Q Were you successful in doing that?

A No.

Q All right. And on this email, is either Jason Goodman or Jody Goodman copied?

A No.

Q All right. Please take a look at a document the court reporter will mark as Deposition Exhibit Number 98.

Page 560

(Exhibit 98 marked for identification.)

Q And this document should answer questions on dates.

A Got it.

Q All right. Do you see this document says: Current Report, Date of Report: November 23rd, 2021, Goodman Networks, Inc.?

A Yes.

Q All right. Turn to the last page.

A Okay.

Q And is that your signature as CEO of Goodman Networks, Inc.?

A It is.

Q Okay. And is this document a true and correct copy?

A Yes.

Q And is the information contained in this document true and correct?

A Yes.

Q Okay. All right. Turn to the second page.

A Okay.

Q All right. If you look under Resignation of Board of Directors, this says Jason Goodman was elected to Board of Directors on March the 22nd, 2021, and voluntarily resigned on October the 20th, 2021. Correct?

Page 561

A Yes.

Q And then under Resignation of Board of Directors, it says Joseph Goodman was elected to the exec- -- elected to Executive Chairman of the Board of Directors of Goodman Networks, Inc., on March the 22nd, 2021, and voluntarily resigned from the board on October the 22nd, 2021, correct?

A Yes.

Q All right. And so after that, James Goodman was the sole director; is that correct?

A Yes.

Q All right. Then a little further down it says: Resignation of Chief Executive. Officer Jason A. Goodman was appointed as Chief Executive Officer of Goodman Networks, Inc., on March the 22nd, 2021, and voluntarily resigned from the Chief Executive Officer position on October 20th, 2021. Right?

A Yes.

Q And then on October the 20th, 2021, James Frinzi was appointed to Chief Executive Officer.

A Yes.

Q All right. Is it -- is it now clear that you became the Chief Executive Officer on October the 20th, 2021?

A It's now clear. Thank you.

Page 562

Q   Sure.  Thank you.

All right.  This -- please look at the document the court reporter will mark as Deposition Exhibit Number 99.

(Exhibit 99 marked for identification.)

Q   All right.  This is the Written Consent of Sole Member of GNET ATC, LLC, dated as of December 1, 2021.  Do you see that?

A   Yes.

Q   And if you turn to the last page, that is your signature, correct?

A   Yes.

Q   Okay.  And this document is a true and correct copy?

A   Yes.

Q   All right.  And it appears to me that what this document does is it takes Jason Goodman off the bank accounts and puts you and James Goodman on the bank accounts; is that correct?

A   Yes.

Q   All right.  And please take a look at the Deposition Exhibit Number 100.

MR. BELANGER-COAST:  You get a prize now.

THE WITNESS:  Yes.

(Exhibit 100 marked for identification.)

Page 563

Q   (By Mr. Simon) Okay.  Mr. Frinzi, this is -- this document appears to be a supplement to business account signature card for East West Bank.  Is there any reason to think that's not what it is?

A   This is a true and correct document.

Q   Okay.  And your signature is on it in two places, right?

A   Yes.

Q   And this adds you as a signatory on the East West Bank account and takes Jason Goodman off the account, right?

A   Yes.

Q   Okay.  Thank you.  All right.  A document the court -- please take a look at a document the court reporter will mark as Deposition Exhibit 101.

(Exhibit 101 marked for identification.)

Q   All right.  This document appears to be an email from Cathy Kincy to Samantha Sondrup, Jody Goodman, Jason Goodman, Madison Goodman, someone named Zachary Wiebe and you, dated December the 8th, 2021.  And do you see the document?

A   Yes.

Q   Okay.  Is this document a true and correct copy of --

A   True and correct.

Page 564

Q   Thank you.  Is this the first -- when you saw this on December the 8th, 2021, was this the first time you heard of the discrepancy dispute between UFS and Goodman Networks, Inc., as to the amount owed by UFS and the relationship with Goodman Networks?

A   It may have been.

Q   Okay.  Do you recall whether you heard about it any time before December the 8th, 2021?

A   I don't recall.

Q   Okay.  And your testimony was you stayed out of this dispute, did not get involved in it; is that correct?

A   That's right.  Yes.

Q   All right.  Now, according to this email, and this is in the second line, UFS agreed that it owed Goodman Networks at least $3,665,065.80.  Do you see that?

A   Yes.

Q   And as of December the 8th, 2021, that dispute remained unresolved; is that right?

A   Yes.

Q   All right.  Go to the next one.  Please look at a document the court reporter will mark as Deposition Exhibit 102.

(Exhibit 102 marked for identification.)

Page 565

Q   This appears to be -- this email appears to be a follow-up to the prior email, and this time from Jody Goodman.  Do you see that?

A   Yes.

Q   And the date of the email is November -- excuse me -- December 8, 2021, at 11:25, correct?

A   Yes.

Q   All right.  And up at the top, Jody says, "My recommendation would be to get the $3,665,065.80 approved and booked with the intention of continuing negotiations on the remaining $2,321,831.89; is that correct?

A   That's what it says.

Q   Right.  Now, at the time, December the 8th, 2021, Jody Goodman was no longer an officer or a director of Goodman Networks, was he?

A   Correct.

Q   And although Jody Goodman can give recommendations like anyone else can, did he have the authority to do anything other than give a recommendation?

A   No.

Q   And did Goodman Networks make the decision to go ahead and book the $3,665,065 in revenue or not?

A   I don't recall.

Q   Okay.  All right.  Please look at the document

Page 566

that the court reporter will mark as Deposition Exhibit Number 103.

(Exhibit 103 marked for identification.)

Q   This document is an email dated December 9, 2021, from you to Madison Goodman, Samantha Sondrup, Stephanie Elmore and a couple of other people.  Do you recognize the email?

A   I don't recognize it, but I recognize it as true and correct.

Q   All right.  And the subject line is "Confidential - turnaround"?

A   Yes.

Q   All right.  Then you say, "We" -- in the second paragraph, you say, "We have been cleared to acquire OnePath."  Do you see that?

A   Yes.

Q   All right.  When you say, "We have been cleared to acquire OnePath," what did you mean by that?

A   I suppose me and James Goodman.

Q   Okay.  You mean you and James Goodman had made the decision to go ahead and acquire OnePath?

A   Yes.

Q   Got it.  And when you say OnePath had $8 million in EBITDA --

A   Yes.

Page 567

Q   Okay.  Where did you get that information?

A   From Layer 7.

Q   Okay.  And did that information prove to be inaccurate?

A   It proved to be inaccurate.

Q   All right.  A little further down you say:  Additionally, we are buying AMRR, a public company.  Right?

A   Yes.

Q   And you say:  Both will be owned by Multiband Global, which will be partially owned by Multiband -- Multiband -- try again -- Multiband Field Services.  Correct?

A   Yes.

Q   As of December 9th, 2021, who were the owners of Multiband Global?

A   I don't recall.  I don't even -- I'm not even sure if it was even established at that point.

Q   Okay.  Who ultimately acquired AMRR?

A   Multiband Global did.

Q   Okay.  And Multiband Field Services -- I recognize we have lots of Multibands, but --

A   Yes.

Q   -- Multiband Field Services was a -- was an already existing subsidiary of Goodman Networks; is that

Page 568

correct?

A   Yes.

Q   Okay.  Now, let me see if I understand how this was going to work.  As you describe it, Multiband Field Services, which was a subsidiary of the Debtor, was going to buy an interest in Multiband Global, which would own AMRR.

A   Yes.

Q   Okay.

A   As described in this email.

Q   Right, right.  And then AMRR would in turn own or be merged with OnePath.

A   Yes.

Q   Okay.  So the Debtor, Goodman Networks, was going to get value out of this transaction because it had a subsidiary which was going to own 50 percent of Multiband Global, which would own AMRR, which would own OnePath.

A   Right.

Q   Got it.  And did Multiband Field Services ever get its ownership interest in Multiband Global?

A   No.

Q   And why not?

A   I don't recall.

Q   Okay.  You also say in this email that you're

Page 569

bringing in outside money in addition to whatever Goodman Networks contributes, correct?

A   Yes.

Q   And where was that outside money going to come from?

A   I was working with investment bankers to source capital to additionally supplement this transaction.

Q   Okay.  So you were working hard trying to get outside capital.

A   Yes.

Q   And -- but despite your best efforts, outside capital was not available?

A   Right.

Q   Okay.  And are either Jason Goodman or Joseph Goodman copied on this email?

A   They're not.

Q   And did you provide the -- did you otherwise provide the information in this email to Jason Goodman or Joseph Goodman?

A   No.

Q   Thank you.  Please look at a document that the court reporter is going to mark as Number -- we don't need to.  This was Number 12.  This is the existing Number 12.  Yeah.  There's no need to do it again.

All right.  This document, which is the

Page 570

existing Number 12, these are your Signal communications with, with Joseph Goodman, correct?

A   James Goodman.

Q   I'm sorry, I'm sorry.  James Goodman.

A   Yes, sir.

Q   Okay.  My mistake.  I'm sorry.  I just misspoke.

All right.  Would you please turn to Page 81. It will say Frinzi 00081 at the bottom.

A   Okay.

Q   Okay.  Now, you previously testified the blue boxes are your -- are your messages, and the gray is responses from James Goodman; is that correct?

A   Yes.

Q   All right.  And you say up at the top, "My lawyer is working on" -- "working up the transaction to buy AMRR and OnePath."  Correct?

A   Yes.

Q   All right.  And then you tell him it will put you personally in a much better position in a fair way, right?

A   Yes.

Q   And you believe that, it would put him in a better position and it would be fair?

A   Yes.

Page 571

Q   Got it.  And then you say a little further down, "Goodman lends Multiband Field Services a million dollars."  By that you meant Goodman Solutions --

A   Yes.

Q   -- lends Multiband Field Services a million dollars?

A   Yes.

Q   And then "Multiband Field Services buys 51 percent of Multiband Global at a valuation of $2 million"?

A   Yes.

Q   And then "Global buys AMRR and OnePath, making it public and creating a 10 times post money valuation."

A   Yes.

Q   Okay.  So again -- and this is also December the 9th, 2021, correct?

A   Yes.

Q   Which was the same day as the email that we've just previously talked about --

A   Yes.

Q   -- that was Exhibit, Exhibit Number 103, correct?

A   Yes.

Q   All right.  So as of December the 9th, 2021, the concept was that Multiband Field Services will end up

Page 572

owning 51 percent of, of the new, new company; is that right?

A   Yes.

Q   Do you have any idea why that didn't happen?

A   I don't recall.

Q   Okay.  Did you have some discussion with James Goodman when it didn't happen?

A   I'm sure I did, but I don't recall.

Q   Don't recall.  Okay.

Do you understand that because that didn't happen, for whatever reason it didn't happen, the Debtor, meaning Goodman Solutions, didn't own any economic interest in the newly created turnaround company that you put together by acquiring AMRR and having it acquire OnePath?

A   I understand that.

Q   Okay.  And was any effort ever made to fix that?

A   No.  It was accomplished -- the transaction was instead accomplished by debt rather than equity investment.

Q   Okay.  And the debt was the loan from Goodman Solutions -- well, the Good- -- well, from GNET ATC to AMRR?

A   Yes.

Page 573

Q   Okay.  All right.  Next I'm going to hand you a document the court reporter will mark as Number 95 -- 105?

MR. ELKINS:  4.

MR. RUKAVINA:  104.

(Exhibit 104 marked for identification.)

(Discussion off the record.)

Q   (By Mr. Simon) Okay.  Please look at the document the court reporter will mark -- has marked as Exhibit 104.  And this is a, an email dated December the 13th, 2021, from you to Ana McCollum at Prosperity Bank, correct?

A   Yes.

Q   And if you look up at the top, if you look at the bottom she's questioning your authority on -- to -- on the bank accounts, correct?

A   Yes.

Q   All right.  Oh, is this email a true and correct copy?

A   Yes, it's true and correct.

Q   If you look up at the top -- and you're speaking to Ana McCollum, the banker, "I am the lead administrator.  I am the only officer at Goodman" -- "I'm the only officer at Goodman, GNET ATC. and Multiband."  Correct?

Page 574

A   Yes.

Q   And you say, "Jason and Jody have resigned.  So any further decision points on authority consider that Jason and Jody no longer work here, I am the only officer."

A   Yes.

Q   Okay.  And here Jason and Jody mean Jason Goodman and Joseph Goodman?

A   That's right.

Q   All right.  So to the extent that anyone had the authority to do anything, it was you, right?

A   It was me and James.

Q   You, subject to the authority of the, of the director?

A   Sure.  Yes.

Q   And nobody else had any executive authority?

A   Right.

Q   Got it.  All right.  Please look at the document the court reporter will mark as Exhibit -- 106?

MR. BELANGER-COAST:  105.

MR. SIMON:  105.

(Exhibit 105 marked for identification.)

Q   (By Mr. Simon) Oh, one more question.  Was there ever any point in time when you discussed with Jason and Jody what the -- Goodman, what the turnaround

Page 575

plan would be?

A   I rarely discussed items with Jason and Jody.

Q   Okay.

A   If ever.

Q   And one of the things you did not discuss was this turnaround plan?

A   I would be surprised.  I mean maybe.  I don't recall.

Q   You don't recall.  But you don't recall ever talking to them about it?

A   No, never.

Q   Got it.  All right.  Let's see, this is an email dated December the 29th, 2021.  Do you see that?

A   Yes.

Q   And it is from you to James Goodman.  And there is a CC to a number of people, including Bobby Forshey, Cathy Kincy, Eric Teachout and Zach Wiebe.  Do you see that?

A   Yes.

Q   And the subject line is Goodman Stock Value?

A   Yes.

Q   And is this email a true and correct copy?

A   Yes.

Q   All right.  In the middle, going down to the middle, there is a statement from James Goodman, "I'm

Page 576

assuming there's no value in Goodman Networks."  Do you see that?

A   Yes.

Q   Do you know why he said that?

A   Because there's no value in it.

Q   Okay.  Fair enough.  But there was value in -- there would be value in the restructured company you were -- you were building, there just wouldn't be any value in Goodman Networks.

A   Yes.

Q   Got it.  Now, up at the top, you say:  I don't want Goodman in bankruptcy.  I'm going to sue AT&T, and they won't take it seriously if we're in bankruptcy.  I can keep creditors at bay, but I think plan on suing for $150 million.

Do you see that?

A   Yes.

Q   What was that about?

A   Because it was our opinion that AT&T unfairly sabotaged Goodman Networks and forced the fire sale to Mastec.

Q   Okay.  And was a lawsuit ever filed against AT&T?

A   No.

Q   And why not?

Page 577

A   We couldn't afford it.

Q   Just couldn't afford the legal fees to go fight it?

A   I mean, the ROI on it was just so tough because they're AT&T, so whatever we as the Goodman ecosystem could spend, they could outdo us.  And so after further evaluation, it seemed unrealistic to even, to even try.

Q   Okay.

MR. RUKAVINA:  Robert, could you just ask him what ROI is?  We know what it is, but just ask him what ROI stands for.

Q   (By Mr. Simon) What does ROI stand for?

A   Return on investment.

Q   Thank you.  All right.  Please take a look at a document that the court reporter is going to mark as Exhibit 106.

(Exhibit 106 marked for identification.)

Q   All right.  This is a draft presentation created by Sierra Constellation Partners, correct?

A   Yes.

Q   And did you -- did Goodman Networks engage -- or did GNET ATC engage Sierra Constellation Partners for this purpose?

A   Yes.

Q   And did GNET ATC or Goodman Solutions provide

Page 578

the information used by Constellation Partners?

A   Yes.

Q   And is the information contained in this document true and correct to the best of your knowledge?

A   To the best of my knowledge.

Q   There's nothing in here that you know to be incorrect?

A   Correct.

Q   Got it.  And please now look at the last document.  This is the document the court reporter's going to mark as Exhibit Number 107.

(Counsel conferring off the record.)

(Exhibit 107 marked for identification.)

Q   All right.  This document appears to be a presentation created by -- financial presentation for GNET ATC created by CFGI.  Do you see that?

A   Yes.

Q   And the date is January 17, 2022?

A   Yes.

Q   And did G -- GNET ATC engage CFGI for this presentation?

A   Yes.

Q   And did G -- did GNET ATC provide the financial information used to create this presentation?

A   Yes.

Page 579

Q   And did GNET ATC make its books and records available to CFGI for the purpose of creating this presentation?

A   Yes.

Q   And is the information contained in this presentation true and correct to the best of your knowledge?

A   Yes.

Q   And are you aware of any information in this presentation that is not correct?

A   No.

MR. SIMON:  And that's it.  Hold on.

(Counsel conferring off the record.)

MR. SIMON:  Why don't we take a five-minute break.

MR. ELKINS:  Before we do that, can we -- Exhibit 100 is this East West Bank statement.  It has his Social Security number on it.

MR. SIMON:  Oh, it needs to be redacted?

MR. ELKINS:  Can we just redact it right now for the copy for the court reporter?

MR. SIMON:  Yeah, yeah.

MR. RUKAVINA:  Just get a -- just get a felt pen and put a black mark over it.

MR. SIMON:  Absolutely.

Page 580

MR. ELKINS:  Thank you.

MR. SIMON:  You bet.  We should take a five-minute break and then let David and I talk about whether there are any other questions.

MR. RUKAVINA:  Sure.

THE VIDEOGRAPHER:  The time is 3:52 p.m. Central.  We're off the record.

(Recess.)

THE VIDEOGRAPHER:  The time is 4:20 p.m. Central.  We are on the record.

MR. RUKAVINA:  During the break, the lawyers conferred.  We have agreed that Mr. Frinzi will come back at 9:30 a.m. on March the 28th.  Is that agreeable, Mr. Elkins?

MR. ELKINS:  Yes, sir.

MR. RUKAVINA:  I think we understand that the Federal lawsuit is concluded, but Federal will be invited.  We will send a Zoom link for anyone that wants to participate remotely.  And the Trustee will agree that that portion of the deposition may be remote, for whoever wants to.

Is that all agreeable?

MR. PULMAN:  Yes.

MR. SIMON:  Yes.

MR. BELANGER-COAST:  (Nodding head.)

Page 581

MR. RUKAVINA:  Then I will now -- thank you for letting me go out of turn.  I -- because I am not here on the 28th, I will now have a very short redirect.

THE WITNESS:  Okay.

MR. RUKAVINA:  We will conclude today, and then Mr. Pulman will start on the 28th.

R E - E X A M I N A T I O N

BY MR. RUKAVINA:

Q   Okay.  Mr. Frinzi, now that I'm done pontificating, now I'm going to ask you questions.

A   Okay.

Q   Talk about the UFS receivable, please, that you were being asked about --

A   Yes.

Q   -- by Mr. Simon.  When you were the CEO of the Debtor, did the Debtor take any action to try to collect or enforce that receivable?

A   No.

Q   Do you know why?

A   It was a Goodman family matter that if your name wasn't Goodman, you didn't really want to be involved in that.  And so it was -- it was not something to even bother spending energy on.

Q   Did you feel like you had the authority to unilaterally take any action on behalf of the Debtor to

Page 582

collect that receivable?

A    No.

Q    Did you ever discuss with James Goodman or any other person named Goodman a possible action to collect that receivable?

A    No.

Q    You just understood that you would be beating a dead horse?

A    I understood the brothers will sort it out as the brothers sort it out.

Q    While you were the CEO, did you ever form an impression that -- strike that.

Exhibit 106.  This was the Sierra deck.

A    Okay.

MR. RUKAVINA:  It's the last one, Paul.

THE VIDEOGRAPHER:  Yeah.

Q    (By Mr. Rukavina) Do you see the Bates number there?

A    Yes.

Q    That was produced by Jason Goodman in a Rule 2004 Examination.

A    Okay.

Q    Do you have any understanding of how Jason Goodman would have had possession of that document if you didn't discuss it or Sierra didn't discuss it with him?

Page 583

A    No.

Q    Okay.  Also, you were asked about Exhibits 106 and 107 by Mr. Simon.  You were asked whether everything in there, to the best of your knowledge, was accurate.  Do you recall those statements?

A    Yes.

Q    I saw you spend a second or two looking at those.

A    Yes.

Q    Separate from that second or two that you spent looking at them, do you have perfect recall of what they say?

A    No.

Q    Okay.  So how could you answer to Mr. Simon that everything in there was accurate when you just gave them a cursory look?

A    In my confidence in CFGI and my impression of CFGI and their workmanship.

Q    Other than your confidence in Sierra and CFGI, anything else as to why you would conclude that the information in those two exhibits is accurate without taking a deep look into them?

A    The only reason I would say that they're accurate is because my confidence in CFGI.

Q    What is the basis of your confidence?  In other

Page 584

words, why do you have confidence in them?

A    I think that they have a -- or at least my impression is that they have a track record in this restructuring industry as being respected, and I don't have any reason to feel that they're not credible.

Q    Do they have any skin in this game?

A    No.

Q    Let's move to the $44 million note.  I'm not sure it was discussed today.  But you know what note I'm talking about?

A    Yes, yes.

Q    Are you aware that James Goodman has stated that he did not sign that note?

A    I'm aware.

Q    And I asked you yesterday as to how you thought that maybe that note was executed by him, and your answer to me was that it might have been through Signal.

A    Yes.

Q    Okay.  It's a big deal in this bankruptcy case whether that note was signed by him or not.  Okay?  You understand that.

A    Yes.

Q    Can you -- sitting here today, can you think of any record, email, communication, anything that would support your testimony that he did sign it?

Page 585

A    No.

Q    Have you tried to find some paper trail or some ghost remnant of something to try to confirm that he signed it?

A    Through initial discovery, I believe I went through every available means.  And over -- I think we've been in multiple productions, so I don't know where else I would find something.

Q    Did you ever find a, what's it called, a native version of that note, like a Microsoft Word document?

A    No.

Q    So to the best of your understanding today testifying under oath, you have exhausted reasonable means that you could think of to find any documentary proof -- I won't use the word evidence -- proof that he signed that note?

A    Right.

Q    Why was that note made out to GNET when yesterday we saw that the $44 million came from the Goodman account at Prosperity?

A    I don't recall.

Q    Do you recall whether it was intentional that it be made payable to GNET?  In other words, do you recall whether someone sat down and actually thought about it, or do you recall that it just was what it was?

Page 586

MR. PULMAN:  Objection, leading.

A   I don't -- I don't recall either way.

Q   (By Mr. Rukavina) Okay.  And you don't recall who drafted that note?

A   Right.

Q   And you don't recall any facts or circumstances as to how, where and when it was signed, other than that perhaps it came through Signal?

A   Right.

Q   And you don't recall that there would be a human being witness to the negotiation or execution of that note, other than you and Mr. James Goodman?

A   Right.

Q   I'm going to go back to some of your questions and answers regarding Mr. Forshey and Mr. Eppich.  Did Bobby Forshey tell you not to pay the amounts due to FedEx?

A   Yeah.  I was advised to --

Q   Not "I was advised."  Who advised you?

A   Bobby Forshey.

Q   What did Bobby Forshey tell you?

A   To suspend payments until we could create a plan to make payments.  And I do -- and actually, one of the -- one of the exhibits did develop a recollection that -- so say that GNET ATC paid $10 million to FedEx,

Page 587

that's not to say that FedEx isn't going to sue right away to get the rest.  And so there needed -- if you were going to pay $50 or $10 million to FedEx, there would have to be some kind of agreement on how to deal with the rest of it.

Q   What you just told me, is that, to the best of your recollection, the gist of what Mr. Forshey told you?

A   Yes.

Q   Did -- to your knowledge, did Mr. Forshey have an understanding that the Debtor and/or GNET were continuing to engage business with FedEx as of the time that he advised you to not pay?

MR. PULMAN:  Objection.

MR. SIMON:  Objection, foundation.

MR. PULMAN:  Yeah, calls for speculation.

Q   (By Mr. Rukavina) I asked, I asked to your knowledge.

A   I don't know.

Q   Did you tell Mr. Forshey or discuss with him something to the effect that:  Well, okay, we have this past due amount, but you know we're still engaged in business with FedEx?

MR. PULMAN:  Objection, leading.

A   Yes.  I believe I actually -- I feel that had been a discussion.

Page 588

Q   (By Mr. Rukavina) Do you recall Mr. Forshey ever advising you that, well, going forward, you ought to keep FedEx current?

MR. PULMAN:  Objection, leading.

A   I don't recall that.  But I do recall, as you said, that he was aware that -- of the state of the business, what the business was doing, and he was advising that if you make payments, they need to be structured, and there needs to be a rationale behind it with a conclusion to what's -- beyond what you pay.

Q   (By Mr. Rukavina) Where I'm going with this, and my brethren will no doubt assert forth proper objections as follows.  Insolvency lawyers like me will sometimes advise a client not to pay for various strategic reasons.  But that's one thing from telling a client not to pay, knowing that the client was going out there and incurring -- and incurring new obligations.  Do you understand the difference between that?

A   I understand.

MR. PULMAN:  Objection -- excuse me.

MR. RUKAVINA:  Go ahead.

MR. PULMAN:  Objection, leading.  Objection, compound question.  Objection to the lawyer just testifying.

Q   (By Mr. Rukavina) That was a predicate to my

Page 589

question, which is, do you understand the difference?

A   I do now.

Q   Did you ever discuss that dichotomy or that scenario with Mr. Forshey, the fact that there might be a past due amount, but that there was ongoing accrual of amounts?

MR. PULMAN:  Objection, leading.

A   I don't recall that.

Q   (By Mr. Rukavina) Now let's turn to Mr. Eppich.  Did Mr. Eppich advise you or give you any words to the effect that you ought not to pay the past due FedEx amount?

A   Yes.

Q   Did he tell you why?

A   I think with him it was more about favoritism to a creditor.  And both the -- both Forshey and Eppich advised that you need to structure -- if you don't have the full amount, you need to restructure how it will be paid in any case.

Q   Do you have reason to believe, from discussions that you had with Mr. Eppich, that Mr. Eppich knew that there was an ongoing business with FedEx generating new receivables and new obligations?

MR. PULMAN:  Objection.

MR. SIMON:  Objection.

Page 590

MR. PULMAN: You go ahead, Mr. Simon.

MR. SIMON: Leading, foundation.

A Yes.

Q (By Mr. Rukavina) What is the basis of your understanding?

A We gave him -- we gave both Josh and Bobby information on the business, and they asked questions on what was available, what we were doing. And so I don't -- I don't recall not -- I mean, I believe we did walk through what was happening with the business so they could provide accurate advice.

MR. PULMAN: Objection to the nonresponsive -- objection to the nonresponsive portion of the answer.

Q (By Mr. Rukavina) Do you recall whether Mr. Eppich ever said anything to you to the effect of we'll figure out the past due balances, but you've got to keep your vendors and contract counter-parties current going forward?

MR. SIMON: Objection, leading.

A That, I don't recall.

Q (By Mr. Rukavina) One way or the other?

A One way or the other.

Q Okay. When Mr. Simon was asking you questions, in particular the December 2021 discussion regarding paying FedEx $10 million, you testified that you were

Page 591

advised that you shouldn't do that because it would be preferential. It would be what we call a preference. Do you recall that discussion?

A Yes.

Q And I was sitting there thinking that that's a paradox. And let me now give you the predicate to my question.

In other words, if making a payment to a creditor is a preference, then you don't pay any creditor, and that seems worse to me. Are you understanding my predicate?

MR. PULMAN: Objection, leading.

A Yes.

Q (By Mr. Rukavina) Was that ever discussed or considered by you?

A I don't know. I don't -- I don't know if we had that discussion in the way that you just laid that out.

Q Mr. Frinzi, are you aware that certain parties have alleged that someone stopped paying FedEx in order to amass the 17 million that went to Hudson, the 14 million that went to 18920, the 44 million that went to AMRR, intentionally? Are you aware that's an allegation?

A Yes.

Page 592

Q Do you have any personal knowledge that any such intentional decision was made?

A No.

Q Do you have any rational suspicion as to the foregoing?

A No.

Q If any such decision had been made, it would not have been by you?

A Right.

Q Do you have any personal knowledge that James E. Goodman instructed or made such a decision?

A I don't have knowledge of that.

Q Jason Goodman?

A I don't have knowledge of that.

Q Joseph Goodman?

A No knowledge of it.

Q Sierra Constellation Partners?

A No knowledge of that.

Q When you were the CEO of Goodman, did you ever form any impression that the Goodman brothers, James, Joseph and Jason, were running the company for their personal benefit at the expense of their creditors?

A Yes.

MR. PULMAN: Objection -- excuse me, objection, leading.

Page 593

Q (By Mr. Rukavina) When did you form that opinion?

A Just over time and socializing with them and seeing what they, I guess what they had.

Q "I'm just a poor Mexican"?

A Sort of, yeah.

MR. SIMON: Objection, sidebar.

Q (By Mr. Rukavina) That's a question.

A Yes.

Q Was the commentary about "I'm just a poor Mexican" something that formed your impression?

A Yeah. I felt that they had a lot of, a lot of benefits at the expense of the company for sure. Just you would see in socializing or being at their home or doing things with them and -- you know.

Q And would a lack of action to enforce the UFC -- UFS receivable have something to do with that?

MR. SIMON: Objection, leading.

A I would tend to agree with that as a possible conclusion.

Q (By Mr. Rukavina) Did there come a time when James E. Goodman instructed you to make some payment to his son?

A Yes.

Q In the nature of what? Severance?

Page 594

A Severance.

Q Did you feel like you had any discretion not to make that payment?

A I did not have discretion in that.

Q Did you ever look at whether there was any severance amount properly payable to the son -- what was the son's name?

A Jake.

Q Jake. There's so many of them.

A Yeah, I know.

Q Did you ever -- did you ever look at whether any such payment was properly payable to Jake?

A I didn't think that Jake worked for the company, to be honest with you, so --

Q Is that another example of your impression that the Goodmans were running the company for their benefit?

A Yes.

Q Did there come a time in December 2021 when Mr. Goodman or someone -- pardon me, strike that -- when someone instructed you to make a payment to Madison Goodman?

A Madison actually did work there.

Q Do you recall that a rather large payment was made to her? Do you have any memory of this?

A Yeah, yeah, I do. Yeah.

Page 595

Q What do you remember?

MR. SIMON: Objection. This goes beyond the scope of direct. It goes beyond the scope of cross.

MR. RUKAVINA: Right. Well, these are your questions, but we can fight about that later.

Q (By Mr. Rukavina) What do you remember about the Madison payment?

A Well, I know that Goodman paid Madison, and she was an attorney, and she actually --

Q Goodman, who's Goodman?

A Goodman Networks, one of the Goodman ecosystem entities paid Madison, and Madison legitimately worked there and legitimately performed legal services.

Q So that, to your understanding, was a legitimate payment?

A Yes.

Q Okay. We're switching now to the plan that you had discussed with Mr. Simon involving AMRR and OnePath, okay?

A Okay.

Q You mentioned to Mr. Simon that the plan was that Multiband Field Services, the Debtor subsidiary, would own 51 percent of the end product. Do you recall that?

A Yes.

Page 596

Q Would MFS have owned 51 percent of MVR, which would then solely own AMRR, which would then solely own OnePath?

A Yes.

Q Who would have owned the other 49 percent?

A I don't recall. I don't know. That -- it was theoretical -- not theoretical. It was in concept at that -- it was a working concept at that point.

Q Why would Multiband Field Services not own 100 percent?

A I don't recall why. I mean, I'm sure there was some rationale at the time, but I don't recall what it was.

Q When did you and James Goodman -- I'm going to use my word -- have a falling out. You can certainly replace my word with your word. When did that first happen?

A Probably when the bond payments, the final bond redemption became due, and then that is when the wheels truly fell off the whole ecosystem.

Q I was thinking about something involving feces in a ventilator, but I prefer your --

A Yeah, yeah.

Q -- I prefer your analogy.

A Okay.

Page 597

Q That's some four months after the acquisition of OnePath, right?

A Yeah.

Q So to go back to what Mr. Simon asked, why did the intent that MFS would own 51 percent of MGR in that space of time not get effectuated?

A I don't recall.

Q Okay. You mentioned to Mr. Simon that at one point it was decided that it would be debt financing from GNET, hence the $44 million note, right?

A Yes.

Q Okay. Now, think about my question. It's a logical -- I'm asking you a logical question. If the good faith intent of this plan was to recapitalize the Goodman ecosphere, as I think you've called it --

A Yes.

Q -- how would a promissory note, where at best GNET gets its principal back and some interest, effectuate this plan?

A So ultimately the, when the public entity was established, the public entity would use public shares to acquire and reverse merge Genesis Networks into the public entity, making it control.

Q But listen to my question, because my question is a little bit different. Let's assume what you just

Page 598

said is completely accurate.

A   Okay.

Q   GNET gets paid back 44 million and change, right?

A   Yes.

Q   How does then GNET benefit from the reverse merger, et cetera?

A   Oh, I see.

Q   In other words, I'm following this plan --

A   From --

Q   I'm following this plan, and it's making sense.

A   Okay.

Q   What doesn't make sense is why at some point it went from equity to debt.

A   I think that -- I don't recall exactly, but I feel like that having the equity -- there was some kind of transactional problem with it, and the debt made it more like arm's length, or something. I don't -- I don't know.

Q   Do you have any memory that that issue was discussed with anyone, a lawyer, an accountant, James Goodman?

A   I'm sure it was discussed exhaustively. We had lawyers construct the transaction, so --

Q   Other than being served, sitting here today, do

Page 599

you have a present memory of having a discussion with any human being about going from the equity concept to the debt concept?

A   Yes.

Q   Who?

A   I know I've had these discussions with at least James, and I'm confident we discussed these with our attorneys. I can't remember a specific time sitting down and having that discussion, but that's my recollection.

Q   And the attorneys actively involved with exploring these options would have been Bobby Forshey?

A   Yes.

Q   Josh Eppich?

A   Yes.

Q   Would Winstead have been involved?

A   Yes.

Q   Would Akerman have been involved?

A   I don't think Akerman, no. But I do think Winstead and perhaps one of the lawyers at Haynes & Boone.

Q   Again, think about my question, because it's -- I'm having a hard time phrasing it. Winstead represented the Debtor and James Goodman at the same time, right?

A   Yes.

Q   And Haynes & Boone represented the Debtor --

Page 600

didn't they represent someone else at the same time?

A   Probably one of the other Goodmans.

Q   Do you recall at the Debtor whether these law firms ever implemented any controls --

A   No.

Q   Let me finish my question.

A   Oh, I thought you were.

Q   -- implemented any controls so that everyone knew that in this transaction we're representing James or representing the Debtor or representing someone else?

A   Not to my recollection.

Q   How did Akerman get hired?

A   Through one of the -- I think Sierra recommended them. And Akerman, I don't believe was very involved in the transaction. It was primarily Winstead, with some help from Haynes & Boone.

Q   Okay.

A   And plus Forshey and Eppich.

Q   Because Akerman is not present, I will avoid the strong temptation to keep asking more questions.

A   Okay.

Q   Final round of questions. And this is one where I'm hoping -- you need to talk to Paul -- I'm hoping that you can give me some information while I'm respecting your Fifth Amendment absolute right against

Page 601

self-incrimination.

A   Okay.

Q   And this relates to the bank statements of Multiband Field Services related to the 4.4 million -- the $4 million transfer.

A   Okay.

Q   Do you remember those, or shall we pull the bank statement out? It might be better if --

MR. RUKAVINA: It was one of the first exhibits, Paul, showing the $4 million from East West to MGR. Thank you.

Q   (By Mr. Rukavina) So this is, yeah, 4.4 million from East West Bank.

A   Okay.

Q   This is -- we discussed this yesterday and you asserted your Fifth Amendment right.

A   Yes.

Q   I'm going to try to be careful. Immediately before the transfer of the 4.4 million, if you remember yesterday, we saw that Goodman transferred money into this account to fund that. Do you remember that? Or are you going to plead the --

A   Yeah, I don't --

Q   Let me strike that.

The $4.4 million that is the subject of this

Page 602

transfer, do you know whether Multiband owned that money or whether Goodman Networks, Inc., owned that money, it just happened to be in Multiband's account?

A  I think that Goodman Networks owned that money and it happened to be in this account, but --

Q  As of this date, did Multiband Field Services have any more operations --

A  No.

Q  -- as of January and December?

A  No.

Q  Did it have any revenue?

A  No.

MR. RUKAVINA:  Okay.  That concludes my redirect.  Thank you again for your time, sir.

THE WITNESS:  Sure.

MR. RUKAVINA:  And thank you everyone for your accommodation.  28th at 9:30.

MR. PULMAN:  Let me mark a couple --

MR. RUKAVINA:  Yeah, yeah.  So just for the record, so I am marking this whole transcript of yesterday and today and the 28th confidential in total, please.

THE VIDEOGRAPHER:  Are we staying on the video record?

MR. PULMAN:  Yeah.

Page 603

(Discussion off the record.)

(Exhibits 108-110 marked for identification.)

E X A M I N A T I O N

BY MR. PULMAN:

Q  Mr. Frinzi, I've marked Exhibit 108.  That's the notice and subpoena for you to be here today.

A  Okay.

Q  Do you recognize that document?

A  No.

MR. PULMAN:  Do your lawyers acknowledge that's why you're here?

MR. ELKINS:  We'll stipulate that that's the notice that he's appearing pursuant to.

Q  (By Mr. Pulman) Okay.  And you know that you're here under subpoena?

A  Yes.

Q  And that you're compelled to be here?

A  Yes.

Q  We issued a couple of notices as well.  I just want to show you those and mark them for the record.  109 is a deposition notice for you in what we call the Goodman Brothers case, Adversary 03039.

THE REPORTER:  Did you say 03039?

MR. PULMAN:  Yes, ma'am.

Q  (By Mr. Pulman) Do you understand that you're

Page 604

here pursuant to subpoena on that deposition notice as well?

MR. ELKINS:  We'll stipulate he's appearing pursuant to the subpoena.

Q  (By Mr. Pulman) Okay.  And then finally, in the Hudson bond case, we also issued a notice of subpoena, 110.

THE WITNESS:  Did you get that one?

MR. ELKINS:  Yeah.

Q  (By Mr. Pulman) And you acknowledge that you're here pursuant to subpoena in that case as well?

MR. ELKINS:  Same stipulation.

A  Yes.

Q  (By Mr. Pulman) Okay.  So we're going to meet again at 9:30 on --

MR. ELKINS:  Hold on, you didn't do --

MR. PULMAN:  Beg your pardon?

MR. ELKINS:  Did you get that one, 18920?

MR. PULMAN:  I didn't issue -- I issued one in 18920, but that's been settled in court.

MR. ELKINS:  Okay.

MR. RUKAVINA:  Well, Paul, you'll, you'll stipulate that I issued a subpoena to Mr. Frinzi --

MR. ELKINS:  Indeed, yeah.

MR. RUKAVINA:  -- in 18920 and Hudson?

Page 605

MR. ELKINS:  Yes.

MS. ZINSMEYER:  And Paul, can I get the same stipulations as to our cross-claims?

MR. ELKINS:  Yes.

MS. ZINSMEYER:  Or I'm sorry, as to our cross notices.

MR. ELKINS:  We will stipulate Mr. Frinzi has appeared by agreement subject to the coordination of multiple parties pursuant to the notices and subpoenas that we've received as the law firm on his behalf.

MR. RUKAVINA:  Thank you.

MR. SIMON:  And you have also received notice from us as well.

MR. ELKINS:  Indeed.

MR. SIMON:  And there may be a few questions that we will ask.

MR. PULMAN:  Thank you.

Q  (By Mr. Pulman) And you've agreed to reappear here in these offices on the 28th of March 2025 at 9:30?

A  Agreed.

Q  And you'll be here?

A  I'll be here.

Q  Do you understand how important it is that you're -- that you show up?

MR. ELKINS:  He understands how important.

Page 606

A   I understand. I'll be here.

MR. PULMAN: I just wanted him to say it.

MR. ELKINS: I understand.

MR. PULMAN: All right. Thank you very much. We'll see you in a week.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: All right. I'm going to submit the same video orders as yesterday. Thank you.

The time is 4:48 p.m. Central. We are off the record.

(Deposition recessed at 4:48 p.m.)

Page 607

CHANGES AND SIGNATURE OF WITNESS

WITNESS NAME:  JAMES FRINZI

DATE OF DEPOSITION:  MARCH 20, 2025

PAGE/LINE   CHANGE                    REASON FOR CHANGE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I, JAMES FRINZI, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
JAMES FRINZI

Page 608

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE:                          §   CASE NO. 22-31641-mvl-7
                                §
GOODMAN NETWORKS, INC.,         §   (Chapter 7)
                                §
     Debtor.                    §
_____

AND RELATED ADVERSARY PROCEEDINGS:
SCOTT M. SEIDEL, TRUSTEE;       §
GNET ATC, LLC; and MULTIBAND    §
FIELD SERVICES, INC.,           §
     Plaintiffs,                §
                                §
VS.                             §   Adv. No. 23-03036-mvl
                                §
MULTIBAND GLOBAL RESOURCES,     §
LLC and FEDERAL INSURANCE       §
COMPANY,                        §
     Defendants.                §
_____

SCOTT M. SEIDEL, TRUSTEE;       §
and GNET ATC, LLC,              §
     Plaintiffs,                §
                                §
VS.                             §   Adv. No. 23-03072-mvl
                                §
18920 NW 11TH, LLC; JAMES       §
GOODMAN; STEVEN ZAKHARYAYEV;    §
EVELINA PINKHASOVA; PEOPLE NQ   §
INC.; JJC & PEOPLE LLC; GDMN    §
FAMILY INVESTMENTS 2, LLC,      §
     Defendants.                §
_____

Page 609

SCOTT M. SEIDEL, TRUSTEE,       §
     Plaintiff,                 §
                                §
VS.                             §   Adv. No. 24-03037-mvl
                                §
MSOUTH EQUITY PARTNERS III,     §
L.P.; 1PATH MANAGED SERVICES,   §
LLC; ONEPATH ITDS HOLDINGS,     §
LLC; ONEPATH ITDS BUYER,        §
INC.; ONEPATH HOLDINGS, LLC;    §
ONEPATH HOLDING CORPORATION;    §
and ONEPATH SYSTEMS OF NC,      §
LLC,                            §
     Defendants.                §
_____

SCOTT M. SEIDEL, TRUSTEE,       §
     Plaintiff,                 §
                                §
VS.                             §   Adv. No. 24-03039-mvl
                                §
JAMES GOODMAN; JASON GOODMAN;   §
and JOSEPH GOODMAN,             §
     Defendants.                §
_____

SCOTT M. SEIDEL, TRUSTEE,       §
     Plaintiff,                 §
                                §
VS.                             §   Adv. No. 23-03090-mvl
                                §
HUDSON CLEAN ENERGY             §
ENTERPRISES, LLC; ALLIANCE      §
TEXAS HOLDINGS, LLC; NEIL Z.    §
AUERBACH; JUDITH AUERBACH;      §
AUERBACH PARTNERS, L.P.;        §
JAMES GOODMAN; GOODMAN          §
INVESTMENT HOLDINGS, LLC;       §
GENESIS NETWORKS, INC.;         §
GENESIS NETWORKS GLOBAL         §
SERVICES, LLC; AUERBACH         §
CHILDRENS DYNASTY TRUST U/A/D   §
OCTOBER 9, 2012; AUERBACH       §
FAMILY DYNASTY TRUST U/A/D      §
OCTOBER 9, 2012; AND            §
SHALOM AUERBACH                 §
     Defendants.                §

Page 610

- - - - - -

REPORTER'S CERTIFICATION

ORAL DEPOSITION OF JAMES FRINZI

MARCH 20, 2025

- - - - - -

I, MOLLY CARTER, Certified Shorthand Reporter in and for The State of Texas, hereby certify to the following:

That the witness, JAMES FRINZI, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(e)(1), that the signature of the deponent:

_XX_ was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial

Page 611

interest in the action.

Certified to by me on this 31st day of March 2025.

_Molly Carter_

MOLLY CARTER, CSR NO. 2613

Expires 04/30/2026

Lexitas – Dallas

Firm No. 459, Expires: 12/31/2026

325 North St. Paul, Suite 1900

Dallas, Texas 75206

(214) 373-4977